IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ANGELO FEARS, | : | |
| Petitioner, | : | CASE NO. 01 CV 183 |
| vs. | : | JUDGE RICE |
| MARGARET A. BAGLEY, WARDEN | : | MAGISTRATE JUDGE MERZ |
| Respondent. | : | |

**RESPONDENT BAGLEY'S POST
EVIDENTIARY HEARING MEMORANDUM**

Respondent Bagley respectfully submits the following post evidentiary hearing memorandum to aid the Court in its consideration of matters and issues raised in the hearing.

Respectfully submitted,

**JIM PETRO**
Attorney General

S/ Stephen E. Maher
**STEPHEN E. MAHER (0032279)**
Assistant Attorney General
Trial Counsel of Record
Capital Crimes Section
30 East Broad Street, 23rd Floor
Columbus, Ohio 43215-3428
(6l4) 728-7055; (614) 728-8600 (fax)

**COUNSEL FOR RESPONDENT**

*Overview*

Advancing alternative theories, Fears claims to be innocent of capital murder. His primary theory is that the .25 caliber pistol went off by itself, the expelled bullet coincidentally shooting into the head of a person to whom Fears just a second before said "I don't give a fuck about killing you." His alternative theory, in case the primary theory doesn't fly, is that he was so far intoxicated that he "was incapable of performing the act with which he/she has been charged". See Ohio Jury Instructions – Criminal, Section 411.07, Intoxication, Attachment A. The Court afforded him a chance to prove these alternative theories in an evidentiary hearing. The Warden respectfully submits that Fears succeeded in proving the exact opposite.

In support of his first innocence theory about the pistol going off by itself, Fears repackaged evidence already in the State Court record: testimony from William Schrand, the State's firearms examiner who testified at Fears' trial, and the "recall notice" that was published a single time in a single magazine 13 years before the stash house robbery and killing, the same document that he presented during post-conviction proceedings. In support of his alternative innocence theory of intoxication, Fears presented anecdotes from the State court record about various players who were drinking and doping at various times surrounding the stash house robbery and killing. By way of "new evidence", Fears inquired of counsel Rosenwald about whether during confidential attorney client meetings, Fears revealed to Rosenwald that he was hopelessly intoxicated during the stash house robbery and killing. Fears then went on to rail against this Court for its rulings that attorney-client privilege had been waived.

In case his innocence theories don't get him off death row, Fears back-up claim is that the jury sentenced him to death because his attorneys were buffoons. According to Fears, his attorneys were buffoons because the jury heard about his mother's mental instability from the prosecution instead of the defense. (Petitioner's Memorandum, pg. 17, fn 10) His attorneys main failing, according to Fears, was not convincing the jury that young black males are more prone to lethal violence than other population groups. The Court afforded him a chance in an evidentiary hearing to prove his attorneys were buffoons. The Warden respectfully submits that Fears succeeded in proving the exact opposite.

### *Stash House Robbery and Killing Is The Context In Which Fears Brings His Claims*

Fears claims of innocence of capital murder (accident and intoxication) are not to be considered in a vacuum. Rather, these claims are to be considered in context of the State court record. 28 U.S.C. 2254(e). The same goes for Fears claims that his attorneys bungled the mitigation case. However, Fears has not enlightened this Court about the context in which he brings his claims, which is the stash house robbery and killing, along with the mitigation case his attorneys did in fact present. So that this Court can properly evaluate Fears claims, the Warden will provide this missing context.

The first step in providing this missing context is to supply a playbill of sorts so that the Court can familiarize itself with the cast of characters who were eyewitnesses to the stash house robbery and killing.

3

### *Cast of Characters*

| **Name** | **Nickname** | **Role** |
| --- | --- | --- |
| **Bryant, Lakeesha** | n/a | Shared an apartment with Derrick Frazier. Frazier kept his stash of crack in a safe in Bryant's bedroom closet. Bryant's boyfriend is Darius Harris. Knew Grant from Fast Freddy's night club. Knew Fears through her cousin William Rutherford. Knew Fears' brother Antonio from Fast Freddy's night club. |
| **Fears, Angelo** | Lo. | Shooter. Girlfriend is Keeyano, who is friends with Gilliam's girlfriend Keyona Hayes. |
| **Franklin, Steve** | Bill. | Street level crack dealer. Buys from Derrick Frazier. Had known both Fears and Grant for seven years. Friends with the deceased victim, Antwuan Gilliam. |
| **Frazier, Derrick** | Debo. | Mid-level crack dealer who supplies crack to the street dealers. Shares an apartment Lakeesha Bryant and keeps his stash of crack in a safe in Bryant's bedroom closet. Frazier's girlfriend is April. Knew Fears and Grant from the neighborhood. |
| **Gilliam, Antwuan** | T'wan. | Street level crack dealer. Buys from Derrick Frazier. Deceased victim. Friends with Steve Franklin. |

| | | |
|---|---|---|
| **Grant, James** | n/a | Co-defendant with Fears. Doing 50 years for burglary, robbery, and involuntary manslaughter. |
| **Harris, Darius** | Joe. | A guy from the neighborhood. Boyfriend of Lakeesha Bryant. Knows Grant and Fears from the neighborhood. |
| **Hayes, Keyona** | Kee-Kee, Blue Hair. | Girlfriend of deceased victim Antwuan Gilliam. Knew Grant because he wanted to be her boyfriend. Knew Fears because he was the boyfriend of her friend, Keeyano. Saw Fears and Grant immediately before and after the murder. |

What follows is a narrative of the facts of the stash house robbery and killing. Specific citations to the State Court record are provided in the guilt phase testimony summary. See Attachment B. It is in this context that Fears makes his claim that his pistol went off by itself, or alternatively, that he was too intoxicated to shoot a pistol.

### *Fears Was Lucid and Agile Before And After The Murder*

Early Saturday evening, Darius Harris and James Grant were hanging around the basketball court. Around 10:00 PM, Angelo Fears came by. Fears told Harris to stay off the street that night because he and Grant were going to be robbing people.

Around 1:00 AM, Grant and Fears were driving around the neighborhood in Grant's van. Fears was in the passenger seat. Grant was driving. Grant stopped the van in the vicinity of 533 E. 13th Ave. Grant got out to talk with Keyona Hayes and her

5

boyfriend, T'waun Gilliam, the victim. Fears stayed in the van. Grant and Gilliam talked for ten minutes and then walked together down the street. About ten minutes later, Fears got out of the van and walked in the same direction that Grant and Gilliam had gone.

About ten minutes after that, Fears came running back toward the van and jumped in the passenger seat. Grant followed behind Fears. Grant got into the drivers seat. Grant and Fears drove off. Hayes did not learn until later that her boyfriend was dead.

These are the facts and Fears has not challenged them. In context of these facts, Fears claim that he was too intoxicated to shoot a gun is patently false.

### *Factors of Lucidity and Agility*

- Fears was lucid upon arrival.
- Fears was able to sit erect.
- Fears opened the van door, stepped out of the van, and closed the van door without difficulty.
- Fears walked down the street without difficulty.
- Fears possessed the mental acuity to get himself to the place where he would again meet up with Grant and the victim.
- Fears possessed the mental acuity to get himself from the murder scene back to Grant's van.
- Fears possessed the physical agility to run to the van without difficulty.
- Fears possessed the mental acuity to go to the passenger seat, because Fears knew Grant was following behind and that Grant would be driving the van.
- Fears opened the passenger side van door, stepped into the van, and closed the van door without difficulty.
- Fears was lucid upon leaving the scene.

The context in which Fears makes his claims of accident and intoxication continues with the events inside Lakeesha Bryant's apartment, which doubled as Derrick Frazier's stash house.

6

### *Fears Was Lucid and Agile During*
### *The Murder*

Lakeesha Bryant and Derrick Frazier shared a second floor apartment at 533 E. 13th Ave. Bryant's two children shared the front bedroom. Bryant stayed in the back bedroom. The bedrooms were connected by a hallway. Just inside the main apartment door, there was a combined living room and kitchen area.

Frazier used Bryant's apartment as a location to sell larger quantities of crack to street level dealers. Frazier kept his crack in a safe that was bolted to the floor in the closet of Bryant's bedroom. Frazier had stashed in the safe one pound, twelve ounces of crack. The crack was worth $21,000.00. Steve Franklin and Gilliam, the victim, were street level dealers who regularly bought their crack from Frazier.

That night, Frazier was at his girlfriend April's apartment when Gilliam called. Gilliam told Frazier that Franklin wanted to buy two ounces of crack from Frazier. Later, Gilliam and Franklin met up on the street. While Gilliam and Franklin were talking, Grant got out of his van and approached them. Frazier showed up. Frazier and Franklin walked off together to Bryant's apartment to do the dope deal. Grant stayed there on the street, talking with Gilliam and Gilliam's girlfriend, Hayes.

Around 1:00 AM, Bryant was asleep in her apartment. Frazier didn't have his apartment keys with him, so he knocked on the door. Bryant let Frazier and Franklin into the apartment. Bryant went back to bed. Franklin sat down at the kitchen table. Frazier went to the safe in Bryant's bedroom and got out the two ounces of crack that Franklin wanted to buy. Franklin was seated at the kitchen table and had $2,000.00 cash in his hand.

There was another knock at the door. Frazier got up and let Gilliam in, who was followed right behind by Grant. Grant told Frazier that he wanted to buy a hundred dollars worth of crack. While the door was still opened, Grant called in the hallway for Fears to come in. Fears came into the apartment. Grant locked the door. Grant pulled out a black Tec-9 and stuck it in Frazier's face. Fears pulled out a .25 caliber semi-automatic pistol. Fears said "Don't nobody move". Grant told Franklin to lay his money down on the kitchen table.

Fears made Franklin and Gilliam lay on the floor. Checking for weapons, Fears patted down Franklin and Gilliam. Grant then robbed Frazier, taking $280.00 in cash, plus the .380 caliber semi-automatic pistol that was in Frazier's back pocket. Grant told Fears to get Franklin's money from the kitchen table. Fears scooped up the money. Grant handed Frazier's gun to Fears. Fears now had his own .25 caliber semiautomatic pistol in one hand, and Frazier's .380 semiautomatic pistol in his other hand.

While Grant searched the rest of the apartment, Fears covered Gilliam, Franklin and Frazier. Grant opened the door to the children's room. Bryant screamed "Don't hurt my baby". Grant stood in the doorway of Bryant's bedroom and told her everything would be all right. Grant grabbed the bedroom phone and pulled the cord out of the wall.

While he was standing in the doorway to Bryant's bedroom, Grant twice shouted to Fears to "shoot that nigga'". Fears said "Which one?" Fears then said he was going to shoot Gilliam.

Gilliam was laying his stomach, with the right side of his head to the floor. Fears said to Gilliam "I ought to shoot you in your bootie", and prodded Gilliam's butt with his gun. Gilliam said "Please don't shoot me." Fears said to Gilliam "I don't give a fuck

8

about killing you". Standing over Gilliam, Fears cocked his own .25 caliber semi-automatic pistol and shot Gilliam in the left temple. Hearing the gunshot, Franklin got up, ran and jumped out of the window of the children's bedroom.

About half a minute after Fears shot Gilliam, Grant rounded up Frazier and demanded the rest of the loot. Frazier said to Grant "Please don't shoot me." Grant said "Just open the mother fucking safe". Frazier complied. From inside the safe, Grant grabbed a Kroger bag full of crack. Grant and Fears fled the apartment.

Once again, these are the facts and Fears doesn't challenge them. Or perhaps the Warden is mistaken and Fears contends that every bit of the testimony against him was a lie. It could be that Fears' challenge to the facts lies somewhere between these two extremes. Ideally, Fears will elucidate in his reply memorandum which specific facts of the State court record, if any, that he challenges. It any event, it certainly doesn't seem that the pistol went off by itself, or, alternatively, that Fears was too intoxicated to shoot a pistol.

### *More Factors of Lucidity and Agility*

- Fears was lucid upon his entry to Bryant's apartment.
- Fears had sufficient mental acuity to hear and follow Grant's call to enter Bryant's apartment.
- Fears had sufficient lucidity to know when the robbery was in progress, by pulling out his gun and saying "Don't nobody move".
- Fears had sufficient mental acuity to comprehend that the ability of Franklin and Gilliam to retaliate against Fears and Grant would be reduced if he made them lay on the floor.
- Fears had sufficient mental acuity to comprehend that he should search Franklin and Gilliam for weapons, lest they counter-attack him with guns or knives.
- Fears had sufficient physical dexterity and balance to bend over and pat down Franklin and Gilliam for weapons while they were laying on the floor.
- Fears had sufficient mental acuity to hear and follow Grant's instruction to scoop up Franklin's money off the kitchen table.

- Fears had sufficient hand-eye coordination to grab a wad of cash from the kitchen table.
- Fears had sufficient physical dexterity to hold Frazier's .380 caliber semi-automatic pistol in one hand, while holding his own .25 caliber semiautomatic pistol in his other hand.
- Fears had sufficient mental acuity to comprehend that he should keep his guns trained on Gilliam, Franklin and Frazier while Grant searched the rest of the apartment, lest they would counter-attack him during a moment of inattention.
- Fears had sufficient mental acuity to respond with the specific question of "Which one?" to Grant's non-specific demand to "Shoot that nigga'".
- Fears had sufficient motor skills and hand-eye coordination to prod Gilliam's butt with his gun after stating to Gilliam "I ought to shoot you in your bootie".
- Fears had sufficient mental acuity to comprehend that if he was to shoot Gilliam, Fears would need to chamber a round by cocking the slide back.
- Fears had sufficient motor skills and physical dexterity to grip the slide of a small gun, pull it backwards and then let it go so that a round would be chambered.
- Fears had sufficient mental acuity to comprehend that the gun in his hand would not fire unless he pulled the trigger after chambering a round.
- Fears had sufficient motor skills and physical dexterity to pull the trigger of the gun.
- Fears had sufficient motor skills and visual acuity to aim his gun such that the bullet would strike Gilliam in the temple.
- Fears had sufficient mental acuity to comprehend that even though he just shot Gilliam, the job was not yet completed because he and Grant had not yet got the dope out of Frazier's safe.
- Fears had sufficient mental acuity to comprehend that after Frazier opened the safe and Grant came out of the bedroom with a Kroger bag full of dope, the job was completed and it was time for he and Grant to leave.
- Fears had sufficient mental acuity to comprehend that he'd better high-tail it back to the van, because if he stuck around the cops might show up and arrest him for robbery and murder.

### *It Was All One Big Accident*

The pistol went off by accident. Or did it? If the pistol went off accidentally, that small moment in time would certainly be incongruous with the many more moments of purposeful, intentional and deliberative conduct by Fears in the armed robbery of Frazier's stash house.

Beyond that incongruity, a most unfortunate irony would be present. Fears would not dispute that, just seconds before the "accident", Grant called out to him to "shoot that nigga'". Fears would not dispute that, just seconds before the "accident", Fears said he would shoot the soon-to-be-dead victim, as opposed to Franklin who was laying right beside. Fears would not dispute that, just seconds before the "accident", he had a .25 caliber semi-automatic pistol in his hand and pointed at the head of the soon-to-be-dead victim. Fears would not dispute that, just seconds before the "accident", he chambered a round to make the pistol in his hand capable of firing a bullet. Fears would not dispute that, just seconds before the "accident", the soon-to-be-dead victim pleaded "Please don't kill me". Fears would not dispute that, just seconds before the "accident", he said to the soon-to-be-dead victim "I don't give a fuck about killing you". Fears would not dispute that, just a split second before the "accident", the pistol in his hand was coincidentally pointed directly at the left temple of the soon-to-be-dead victim.

Yet it is in this context that Fears would have this Court believe that, in a most unfortunate timing and ironic turn of events, his pistol chose that very split second to go off by itself, without any help from, and in fact contrary to the wishes of Fears himself.

Of course, Fears would secretly acknowledge that acceptance of this contention, because of its inherent implausibility, would be better served by adding some window dressing to dispel the immediate sense of disbelief one would have in hearing this contention for the first time. That window dressing comes in the form of a meticulously crafted red herring, designed to befuddle the mind and interfere with the step by step progression of logical and orderly thought. That red herring comes in the form of

allegations of cheating by the prosecutors and buffoonery on the part of trial counsel Rosenwald.

### *Don't Look At The Big Picture*

The primary prerequisite to the success of the habeas corpus defense of accidental discharge, and alternatively intoxication, is the necessity that this Court ignore the true context in which it is raised. The true context is the facts of the crime. That true context begins with Darius Harris in the basketball court, and ends with Fears running back to the van after the murder. In between these beginning and ending points is the more immediate context of Grant's demand to "Shoot that nigga'", and Fears declaration to the victim that "I don't give a fuck about killing you." Just seconds after this chilling statement, the pistol in Fears hand goes off "accidentally", and the bullet coincidentally shoots into the head of the person that just seconds before Fears said he didn't "give a fuck about killing". When viewed in terms of this true context of the big picture, Fears' claims of innocence are preposterous.

### *Focus Only On The Little Picture*

Instead, Fears would confine the context of his claim of accidental discharge to the inside of the pistol itself, i.e. the hammer and the non-inertial firing pin. Inside this tiny world, far from the streets of Over-the-Rhine, far from the kitchen of Lakeesha Bryant's apartment, Fears poses the question: Can the gun go off accidentally? Of course, the answer is yes. For Fears, this is the beginning and end of the story. Ask no more questions, case closed, writ granted.

### *Cheating And Buffoonery*

However, for Fears there is also a middle part to this story, the part that he peppers with allegations of cheating and buffoonery. This part of Fears' story begins with the unspoken assumption that the pistol, in fact, went off accidentally. Not just that it *could* go off accidentally, but it in fact *did* go off accidentally. After all, what difference would it make if the pistol *could* go off accidentally, if in fact Fears fired the pistol on purpose? Consequently, Fears claim about the pistol is founded on the absolutely necessary, albeit assumed, fact that the pistol went off of its own accord, by accident; i.e. a result that occurs unintentionally and without any design or purpose to bring it about. See OJI, Section 411.01(2), Attachment A, Tr. pg. 2384 ("Accident" defined for the jury).

### *How Would The Prosecutors Learn Whether*
### *The Pistol Went Off "Accidentally"?*

Next, Fears claim about the pistol is based on an assumption that the prosecutors knew that the pistol went off accidentally, but squelched the truth just for the sake of notching another conviction on their belts. At this point, a question arises. How would the prosecutors learn whether the pistol went off accidentally? Since the murder wasn't on videotape, and the prosecutors weren't at the scene of the murder when it happened, they could learn this information from only two sources: witness statements or scientific testing. Did the witnesses say the pistol went off accidentally? Did scientific testing show the pistol went off accidentally? The answers to these questions were given in a public courtroom, before the judge, the jury, and Fears himself, and are now memorialized in a public record called a trial transcript.

What did the prosecutors learn from witness interviews? Would the prosecutors believe accidental discharge where both Frazier and Franklin said Grant was yelling "Shoot that nigga'" just seconds before Fears shot Gilliam? Would the prosecutors believe accidental discharge where both Frazier and Franklin told them that Fears was poking Gilliam's butt with his gun and saying "I should shoot you in your bootie."? Would the prosecutors believe accidental discharge where Frazier reported that Fears said to Gilliam "I don't give a fuck about killing you", and a second or so later Gilliam is dead from a bullet to the temple fired from a pistol Fears had just cocked and was holding in his hand? If the prosecutors held the belief that the pistol went off by accident, it wasn't derived from witness statements. Of course, Fears wasn't talking, so the prosecutors certainly didn't hear any story of accidental discharge from him.

Could the prosecutors' belief of accidental discharge have been derived from recovery and test firing the very same .25 caliber pistol used to kill the victim? No, because the results of that testing showed that the very same pistol used to kill the victim had four functional safeties. The very same pistol used to kill the victim was test fired twice and found to be functional and operable. Tr. p. 1917-1918, p. 1941-1943. Could the prosecutor's belief of accidental discharge have been derived from their own evidence they presented to the jury that the very same pistol used to kill the victim had a non-inertial firing pin and could go off accidentally if a bullet was chambered and the hammer was struck with a sharp direct blow? No, because such a blow would leave marks on the hammer itself and no such marks were present. Tr. p. 1937-1939.

What this means is that the prosecutors would not have held the belief of accidental discharge based on witness statements or scientific testing. To the contrary,

witness statements and scientific testing showed exactly the opposite. Yet, Fears would have this Court believe his conviction for aggravated murder came about only because the cheating prosecutors kept the truth from the jury. And where does Fears say the truth about that night in Lakeesha Bryant's apartment was hiding? It was hiding, so says Fears, on a single page of a single magazine published more than a decade before Grant and Fears made plans to rob Frazier's stash house.

### *Is Rosenwald A Buffoon?*

According to Fears, Rosenwald is a buffoon for not getting an independent expert to come into Court to testify that the pistol went off accidentally. Not that the pistol *could* go off accidentally, since that was already a fact established by the State's own witness, firearms examiner William Schrand. Rather, Rosenwald is a buffoon, according to Fears, for not having an independent expert testify that the pistol *did* go off accidentally, just seconds after Fears said to the victim "I don't give a fuck about killing you", and coincidentally at the very split second when the pistol just happened to be pointing at the left temple of the victim.   Of course, rounding up such an expert would seem to be a daunting task for counsel of even the utmost competence, and evidently far outside the reach of a buffoon.

And what would that hypothetical independent expert say? That the pistol had four functional safeties and a non-inertial firing pin? That the pistol *could* go off accidentally if a round was chambered and the hammer was hit directly with a sharp solid blow?  Since these were already established and unquestioned trial facts, Fears' hypothetical trial expert would have to say something more to avoid redundancy with the State's expert witness, William Schrand.

On what basis would Fears' hypothetical independent expert witness testify that the pistol did in fact go off of its own accord, coincidentally just a second or so after Fears said to the victim "I don't give a fuck about killing you"? It couldn't be from examination of the weapon itself, since Fears post-conviction gun expert reached the same conclusions as did the State's expert about functionality of the pistol. Could Fears' hypothetical expert have reached the conclusion of accidental discharge from the recall notice published a single time in a single magazine more than a decade before the trial? No, because the magazine article simply confirms Schrand's trial testimony that the pistol has a non-inertial firing pin and could accidentally discharge if a round was chambered and the hammer was struck with a sharp, direct blow. Apart from confirming this established trial fact, the magazine advertisement does nothing more than show that the manufacturer was willing to replace the non-inertial firing pin with an inertial firing pin if the owner would mail in the coupon.

A Ford Mustang manufactured in 1975 did not come equipped with airbags. A Ford Mustang manufactured in 1995 did come equipped with airbags. Is the '75 Mustang "defective" because it didn't have airbags? Would it be more likely that the driver of the '75 Mustang, as opposed to the '95 Mustang, would get hurt in a head-on crash due to the lack of airbags? The answers are no and yes: The car is not "defective" simply because it doesn't have the latest safety features, and airbags do help prevent serious injuries.

In similar fashion, the .25 caliber Colt Pocket Automatic was not "defective" because it had an old style non-inertial firing pin. As Fears recognized from Schrand's testimony before this Court, pistols have been made this way for a hundred years. Fears

16

Post-Hearing Brief, page 5, Point Number 3. Would the .25 Caliber Colt Pocket Automatic be less prone to accidental discharge if it had an inertial firing pin? The answer is obviously yes. That proves, according to Fears, that his pistol "accidentally" went off in Lakeesha Bryant's kitchen, coincidentally just when he and Grant were doing an armed robbery of Frazier's stash house, coincidentally just seconds after the victim pleaded with Fears "Please don't kill me", and coincidentally just a second or so after Fears said to the victim "I don't give a fuck about killing you".

It was an established fact of the state trial record that "accidental discharge" due to a non-inertial firing pin comes about only under certain specific conditions: a round having been chambered and the hammer being struck with a sharp, direct blow. There was no evidence presented at the State court trial that these conditions were present in Lakeesha Bryant's kitchen at the same time Fears and Grant just so happened to be in the middle of an armed robbery. Neither was there any evidence presented during the hearing before this Court that those conditions were present in Lakeesha Bryant's kitchen, just a second or so after the soon-to-be-dead victim pleaded with Fears "Please don't kill me". Instead of presenting this type of evidence, Fears substituted implications of cheating by the prosecutors and buffoonery by trial counsel Rosenwald. These red herrings should not divert this Court's attention from the truth about what took place that night in Lakeesha Bryant's kitchen.

### *On The Mitigation Side – Fears Proves That Trial Counsel Were Effective*

The Warden respectfully submits that if any doubt were present about the effectiveness of counsel during the mitigation phase, Fears has dispelled that doubt through presentation to this Court of the testimony of his trial counsel Pandilidis and

17

Rosenwald, along with the mitigation investigator Martha Jacoby. See Mitigation Phase Transcript Summary, Attachment C. See also Indices to Evidentiary Hearing Testimony of Witnesses Pandilidis, Attachment D, Rosenwald, Attachment E, and Jacoby, Attachment F.

### *Dr. Gastil and Dorian Hall – Fears Skips Over The "Daubert Hearing" Part*

Although the Ohio Public Defender calls Dorian Hall a "mitigation expert", that appellation does not, in context of a *Daubert* hearing, carry any legal weight. What should carry significance, however, are Hall's admissions that there is no accreditation or licensing body, state or federal, for "mitigation experts". It should also carry significance, in a *Daubert* context, that Hall admitted that no one in her field has an objective way of determining whether a particular mitigation case was successful. See Index to Testimony of Dorian Hall, Attachment G. In fact, Fears does not even purport to qualify Hall in a *Daubert* context, and in fact relegated her entire testimony to a single footnote of his hearing brief. See Fears Post-Hearing Memorandum, p. 20, fn 12.

In respect to Dr. Gastil, Fears takes a different approach, yet he does so again in the setting of a single footnote. Fears explains how Dr. Gastil's testimony about the Southern Culture of Violence meets *Daubert* criteria as follows: **"The admissibility of Dr. Gastil's testimony pursuant to *Daubert* et al. is set out in the evidentiary hearing transcript at pgs. 3-181".** In response, the Warden respectfully will advance the exact opposite proposition, although will do so with more than a bare assertion. Instead, the Warden will support that assertion with an index to the testimony of Dr. Gastil. See Gastil testimony index, Attachment H.

*Racial Profiling Is Not Mitigation*

According to Dr. Gastil, young black males are more prone to lethal violence than other population groups. Angelo Fears was a young black male. Therefore, Angelo Fears was more prone to lethal violence than a person from some other population group. The name given to this reasoning process is "racial profiling", and constitutes misconduct if done by the police.

In this case, however, Fears does not call this misconduct. Instead, he calls it mitigation. Fears would have this Court believe his counsel were buffoons for not convincing the jury that their client was destined for lethal violence because he was a young black male. Of course, Fears would dress this up with some prattle about dueling in the *ante-bellum* South and top it off with the pseudo prestige of a Harvard degree. Prattle and prestige should not transform racial profiling into acceptable social science.

## Conclusion

The Warden respectfully submits that the testimony elicited at the evidentiary hearing, in context of the facts of the State court record, should demonstrate to the Court a number of specific reasons why the writ should be denied.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Respondent's Post Evidentiary Hearing Memorandum has been forwarded to Lawrence Greger, 1100 Liberty Tower, 120 W. Second Street, Dayton, Ohio 45402 **and** Stephen A. Ferrell, Ohio Public Defender, 8 East Long Street, 11th Floor, Columbus, Ohio 43215, by electronic filing this 10th day of October, 2003.

S/Stephen E. Maher
STEPHEN E. MAHER
Assistant Attorney General