## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

ANGELO FEARS,

                 : 

         Petitioner,                    Case No. 1:01-cv-183

                 :       District Judge Walter Herbert Rice

     -vs-                   Chief Magistrate Judge Michael R. Merz

MARGARET BAGLEY, Warden,

                 :

         Respondent.

## REPORT AND RECOMMENDATIONS

        Petitioner Angelo Fears filed a Petition for Writ of Habeas Corpus (Doc. No. 8), which was subsequently amended (Doc. No. 69), challenging his incarceration and death sentence for the aggravated murder of sixteen-year-old Antwuan Gilliam on March 30, 1997. Respondent has filed her Return of Writ (Doc, No. 11), and Fears has filed his Traverse (Doc. No. 61). The case is now ripe for decision on the merits.

        Fears presents ten grounds for relief in his Amended Petition, as follows:

### First Ground for Relief

Intentional prosecutorial misconduct in [P]etitioner's state court trial denied [P]etitioner his right to due process of law and his right to a fair trial protected by the Sixth Amendment. The resultant sentence of death violates [P]etitioner's Eighth Amendment right to be free from cruel and unusual punishment.

         A.     Continuous and pervasive misconduct by the prosecution in the guilt phase of capital proceedings which prejudices the Petitioner's right to a fair trial, violates due process and the Eighth Amendment of the United States Constitution.

1

B.  Egregious misconduct by the prosecutor in the penalty phase of Petitioner's capital proceedings requires reversal of the death sentence where the prosecutor frequently injected improper and prejudicial matter after defense objections had been sustained, argued non-statutory aggravating factors, argued 'facts' [sic] outside the evidence, employed inflammatory remarks and invective against the accused and his counsel.  A death sentence based on a jury verdict following such tactics and arguments violates due process and the Eighth Amendment of the United States Constitution.

C.  The Petitioner's case is not one where the misconduct of the Prosecuting Attorneys was slight or confined to a single instance, but one where such misconduct was pronounced and persistent with the probable cumulative effect upon the jury which cannot be disregarded as inconsequential.  The cumulative effect of prosecutorial misconduct herein, violates the Petitioner's right to a fair trial under the Fifth, Sixth and Fourteenth Amendments and the resultant sentence of death violates the Eight[h] Amendment.

**Second Ground for Relief**

Petitioner's death sentence resulted from an arbitrary and capricious process that deprived him of fundamental constitutional protections in violation of his rights as guaranteed by the Fifth, Sixth, Eighth, [and] Fourteenth Amendments to the United States Constitution.

A.  It is impermissible for a sentencer in a capital case to weigh the nature and circumstances of the offense as an aggravating circumstance, to weigh as aggravating an aggravating circumstance which the law requires to be merged with another such circumstance for sentencing purposes, and to weigh the mitigating factors separately (rather than collectively) against the aggravating circumstances, and, where the sentencing opinion of the trial court reveals that such errors occurred in the imposition of the death sentence, the death sentence imposed violates the offender's constitutional rights under the Eighth and Fourteenth Amendments to the U[nited] S[tates] Constitution.

B.  Where, as the result of one indivisible course of conduct, a defendant is charged with aggravated robbery, aggravated burglary and kidnapping with separate capital

2

specifications for each of those felonies, in a prosecution for aggravated murder as well as for the underlying felonies, the trial court must merge the kidnapping specification, the aggravated burglary specification, or both, with the other felony specification before the penalty phase.

C. Unless it can fairly be held beyond a reasonable doubt that penalty phase error in a capital trial had no effect upon the jury's sentencing verdict, appellate courts are rendered powerless by the right to trial by jury and due process from purporting to 'cure' [sic] the error and to affirm the death sentence; any such affirmance violates the right of the accused to trial by jury, and the death sentence must be vacated and set aside.

D. Where the state fails to establish that aggravation outweighs mitigation beyond a reasonable doubt, the death penal1y [sic] is absolutely precluded, and the imposition of the death sentence under such circumstances constitutes a violation of the offender's constitutional right to be free of cruel and unusual punishment and also his right to due process of law.

**Third Ground for Relief**

Petitioner was denied his right to the effective assistance of counsel during the trial phase of this capital case as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

A. Counsel failed to obtain their own firearms expert to rebut testimony from the State's expert as well as to help in presenting their defense.

B. Counsel failed to present available evidence that the gun introduced by the State at trial was subject to recall due to danger of accidental discharge.

C. Counsel failed to obtain expert assistance from a toxicologist that [sic] would have presented a defense that Petitioner was unable to form the requisite purpose to kill because he was too intoxicated at the time of the offense.

D. Counsel failed to object to numerous instances of prosecutorial misconduct.

3

**Fourth Ground for Relief**

Petitioner was denied his right to the effective assistance of counsel during the jury selection phase of this capital case as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

**Fifth Ground for Relief**

Petitioner was denied his right to the effective assistance of counsel at the penalty phase of this capital case as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

    A.    Failure to adequately prepare and present available mitigating evidence.

    B.    Failure to present witnesses who would have corroborated testimony of Petitioner's abusive childhood.

    C.    Failure to obtain the assistance of a cultural expert.

    D.    Failure to object to prosecutorial misconduct.

    E.    Failure to make objections to erroneous jury instructions.

    F.    Failure to move to merge specifications.

    G.    Cumulative effect of ineffective assistance of counsel.

**Sixth Ground for Relief**

Petitioner Fears was deprived of the effective assistance of counsel on his direct appeal as of right in violation of the Sixth Amendment and [D]ue [P]rocess clause of the Fourteenth Amendment.

**Seventh Ground for Relief**

The most basic notions of due process are violated when a capital defendant is convicted of specifications for which he had not been indicted.

**Eighth Ground for Relief**

The trial court committed constitutional error when it improperly instructed the jurors that they must unanimously recommend a life

4

sentence in violation of Petitioner's Fourteenth Amendment right to
be free from deprivation of life without due process of law.

**Ninth Ground for Relief**

A jury instruction on the defense of accident that was neither asserted
by the defense nor supported in the record and which has the effect
of shifting the burden of proof on the essential element of purpose to
Petitioner, violated his fundamental rights to due process and a fair
trial as guaranteed by the Fifth, Sixth and Fourteenth Amendments to
the United States Constitution.

**Tenth Ground for Relief**

The execution of a mentally retarded individual constitutes cruel and
unusual punishment in violation of [P]etitioner's rights under the
Eighth and Fourteenth Amendments.

(Amended Petition, Doc. No. 69.)

## FACTS AND PROCEDURAL HISTORY

The facts in Fears' case, as found by the Ohio Supreme Court, are as follows:

The afternoon prior to the shooting, . . . Angelo Fears warned his
friend, Darius Harris, to stay off the streets that night after 11:00 p.m.
because he and James Grant were planning to rob people.  At around
1:00 a.m., [Antwuan] Gilliam was on the street outside his apartment
talking to his girlfriend, Keyona Haynes.  Gilliam's friend, Steven
Franklin, approached him and asked where Derrick Frazier was
because he wanted to purchase two ounces of crack cocaine.
Although Gilliam also dealt drugs, Frazier had recently purchased
over twenty-eight ounces of crack cocaine worth $21,000.  Gilliam
went into an alley and yelled to Frazier, who was inside his
girlfriend's nearby apartment, to come outside.

Frazier came outside and then took Franklin to another apartment,
where he kept the crack cocaine while staying with his friend,
Lakesha Bryant.  Bryant opened the door, let the men in, and went
back to bed.  Her young child was asleep in another bedroom.
Frazier retrieved two ounces of crack cocaine from the safe and put
the drugs on the kitchen table.  In the meantime, James Grant and
[Fears] pulled up in a van and were seen talking to Gilliam outside
the apartment building.  Gilliam knocked on the door when Frazier
and Franklin were discussing the price of the drug transaction.
Frazier let Gilliam in, but as Gilliam was closing the door, James
Grant stepped inside the apartment.  At first, Grant asked to buy a

small amount of crack cocaine, but then pulled out a gun and aimed it at Franklin, who was holding $2,000 in his hands, and told him to "lay it down." At this point, [Fears] entered the apartment with a gun in his hand. Franklin dropped the money and [Grant] told [Fears] to pick it up. [Fears] took the money as well as Franklin's bracelets and rings.

Franklin and Gilliam dropped to the floor. According to Franklin, Grant then told [Fears] who by that time was armed with a gun in each hand, to "shoot one of them niggas." [Fears] pointed the gun at Gilliam, but Grant said, "no, shoot him" referring to one of the other men. [Fears] said, "No, I'm going to shoot him [Gilliam]." [Fears] pointed his gun at Gilliam's buttocks and said "I should shoot you right here in your bootie." Gilliam pleaded with [Fears] not to kill him, but [Fears] told Gilliam, "I don't give a fuck about killing you." [Fears] then fired a single shot into Gilliam's left temple, killing him.

In the meantime, Grant had gone into a back bedroom. When he returned, he shoved his gun in Frazier's face, asked where the rest of the drugs were, and said, "Nigger, I should kill you." Grant forced Frazier at gunpoint to the back bedroom. Frazier opened the safe and Grant took the bulk of the remaining crack cocaine. While Grant and Frazier were in the back, Franklin escaped by jumping out a window to the alley below. Both Grant and [Fears] then fled the apartment. Gilliam's girlfriend saw [Fears] running from the apartment building and saw [Fears] and Grant drive off in a van.

*State v. Fears*, 86 Ohio St.3d 329, 329-30, 715 N.E. 2d 136 (1999). Fears was subsequently arrested and indicted on four counts of aggravated murder, one count of aggravated burglary, three counts of aggravated robbery, and four counts of kidnapping, all of which included firearms specifications. *Id*. at 331. The aggravated murder counts each included capital specifications as well. *Id*. Fears was convicted on all counts and specifications. (Appendix, Vol. II at 183-236.)

Fears presented the testimony of several family members and a psychologist in the mitigation phase of his trial. The jury determined that the aggravating circumstances outweighed the mitigating factors, and recommended a sentence of death. (Appendix, Vol. II at 183-236.) After its statutorily required independent reweighing of the aggravating circumstances and mitigating factors, the trial court agreed and adopted the jury's recommendation of death. (Appendix, Vol. II at 255-60.)

On direct appeal to the Ohio Supreme Court, Fears advanced the following seventeen propositions of law:[1]

### First Proposition of Law

Egregious misconduct by the prosecutor in the penalty phase of capital proceedings requires reversal of the death sentence and where the prosecutor frequently injects improper and prejudicial matter after defense objections have been sustained, argues nonstatutory aggravating factors, argues "facts" outside the evidence, employs inflammatory remarks and invective against the accused and his counsel, a death sentence based on a jury verdict following such tactics and arguments violates due process and the Eighth Amendment of the United States Constitution, and their counterparts in the Ohio Constitution.

### Second Proposition of Law

It is impermissible for a sentencer in a capital case to weigh the nature and circumstances of the offense as an aggravating circumstance, to weigh as aggravating an aggravating circumstance which the law requires to be merged with another such circumstance for sentencing purposes, and to weigh the mitigating factors separately (rather than collectively) against the aggravating circumstances, and, where the sentencing opinion of the trial court reveals that such errors occurred in the imposition of the death sentence, the death sentence imposed violates the offender's constitutional rights under the Eighth and Fourteenth Amendments to the U[nited] S[tates] Constitution, and Art. I. Secs. 9 and 16 of the Ohio Constitution, and must be reversed.

### Third Proposition of Law

Where, as the result of one indivisible course of conduct, a defendant is charged with aggravated robbery, aggravated burglary, and kidnapping, with separate capital specifications for each of those felonies, in a prosecution for aggravated murder as well as for the underlying felonies, the trial court must merge the kidnapping specification, the aggravated burglary specification, or both, with the other felony specification prior to the penalty phase, must instruct the jury not to consider the merged specifications separately, and must not itself consider separately the merged aggravating factors in the trial court's sentencing calculations; a death sentence imposed

---

[1] For ease of reading, the propositions of law are reproduced here in lower case, with appropriate capitalization, rather than in upper case as they appear in Fears' appellate brief to the Ohio Supreme Court.

following proceedings where all three capital specifications are considered, and weighed, violates the Eighth Amendment requirement that death sentences be reliable, and be imposed only upon consideration of proper aggravating factors.

**Fourth Proposition of Law**

Where capital specifications are duplicative, they must be merged prior to sentencing proceedings, upon motion of the accused, or by the court on its own motion. The failure of the trial court, *sua sponte*, to merge such specifications constitutes a violation of the rights of the accused under the United States Constitution and the Ohio Constitution as well where the death sentence is imposed thereafter.

**Fifth Proposition of Law**

The power conferred by R.C. 2929.05 upon appellate courts to review aggravating and mitigating factors, and to determine the appropriateness of a given death sentence, is subordinate to the right of the accused to trial by jury under Art. I §§ 5 and 10 of the Ohio Constitution.

**Sixth Proposition of Law**

Unless it can fairly be held beyond a reasonable doubt that penalty phase error in a capital trial had no effect upon the jury's sentencing verdict, appellate courts are rendered powerless by the right to trial by jury set forth in the Ohio Constitution, Art. I. §§ 5 and 10, from purporting to "cure" the error and to affirm the death sentence; any such affirmance violates the right of the accused to trial by jury, and the death sentence must be vacated and set aside.

**Seventh Proposition of Law**

The affirmance of a death sentence by an appellate court which has reweighed the aggravating and mitigating factors absent duplicative and improper aggravating circumstances originally considered and weighed by the jury in recommending the death sentence, constitutes a violation of the right of the accused under the Eighth Amendment to have the death sentence imposed only after the proper procedures have been followed under the state scheme for imposing the death sentence, and also constitutes a violation of the right to due process of law in that such appellate reweighing abrogates the liberty interest created by state law to jury participation in the capital sentencing process.

**Eighth Proposition of Law**

8

Only the relevant evidence from the guilt/innocence phase of a capital prosecution may be reintroduced at the penalty phase, and it is a violation of the Eighth Amendment prohibition against cruel and unusual punishment and of the Fourteenth Amendment right to due process of law for the State to introduce, and the trial court to admit, all evidence at the penalty phase which was admitted at the guilt phase, and to instruct the jury to consider same, and for the trial court itself to consider such evidence in its own sentencing decision.

**Ninth Proposition of Law**

Where the State fails to establish beyond a reasonable doubt that aggravation outweighs mitigation beyond a reasonable doubt, the death penalty is absolutely precluded, and the imposition of the death sentence under such circumstances constitutes a violation of the offender's constitutional right to be free of cruel and unusual punishment and also his right to due process of law.

**Tenth Proposition of Law**

Under the Ohio capital statutes, for purposes of proportionality review, death sentences must be compared with all other cases within the jurisdiction in which the death sentence was imposed, as well as those capital cases in which it was not imposed.

**Eleventh Proposition of Law**

The Ohio death penalty statutes are unconstitutional, violating the Eighth Amendment proscription of cruel and unusual punishments, the Fourteenth Amendment guarantees to due process of law and to the equal protection of the laws, and also violating the concomitant provisions of the Ohio Constitution.

**Twelfth Proposition of Law**

It is impermissible under the Eighth and Fourteenth Amendments to the [U]nited [S]tates Constitution and Art. I. Secs. 9 and 16 of the Ohio Constitution for the jury to be informed that a death verdict is merely a recommendation, which instruction impermissibly attenuates the jury's sense of responsibility for its decision.

**Thirteenth Proposition of Law**

Where jury instructions at the penalty phase of capital proceedings misstate the law to the jury, fail to define mitigating factors, exclude relevant mitigation, and is [sic] otherwise erroneous and misleads [sic] the jury, the resulting death sentence violates the Eighth and

Fourteenth Amendments, and Art. I. Secs. 9 and 16 of the Ohio Constitution, and must be reversed.

**Fourteenth Proposition of Law**

The increased need for reliability required in capital cases by the Ohio and federal constitutions mandates the granting to the defense more than six peremptory challenges.

**Fifteenth Proposition of Law**

A defendant who has been sentenced to death has been deprived of the reliable proceedings secured by the Eighth Amendment, as well as his right to due process of law under the Fourteenth Amendment, and their Ohio counterparts, where all of the proceedings are not recorded as required by law.

**Sixteenth Proposition of Law**

It is a violation of the Sixth Amendment right of confrontation, as well as Ohio law, for the trial court to permit the testimony of a witness identifying the accused, when the witness did not see the defendant, but was merely told by others that the defendant was involved.

**Seventeenth Proposition of Law**

A motion to suppress identification must be granted where a purported eyewitness admits that she did not see the defendant at the scene of the crime at the time of the crime.

**Eighteenth Proposition of Law**

Where the state fails to prove beyond a reasonable doubt the essential elements of purpose to kill and prior calculation and design, convictions for aggravated murder must be reversed as contrary to the right of the accused to due process of law under the Ohio and federal constitutions.

**Nineteenth Proposition of Law**

Convictions for aggravated murder which are contrary to the manifest weight of the evidence must be reversed, as contrary to the right of the accused to due process of law under the Ohio and federal constitutions.

**Twentieth Proposition of Law**

10

The trial court erred to the prejudice of Appellant's right to due process under the Fourteenth Amendment, and his Eighth Amendment rights as well, in entering judgment of conviction on the aggravated robbery, aggravated burglary and kidnapping counts, and the capital specifications based thereon, as those offenses were allied offenses of similar import, and, while an offender may be charged with all such offenses, he may be convicted of only one.

**Twenty-first Proposition of Law**

Continuous misconduct by the prosecution in the guilt phase of capital proceedings which prejudices the defendant's right to a fair trial violates due process and requires reversal of the conviction.

**Twenty-second Proposition of Law**

Where a witness' credibility has been attacked by the defense, the state may not rehabilitate that witness with a prior consistent statement made after the motive to falsify came into existence.

**Twenty-third Proposition of Law**

Where the defense attacks the element of intent, but does not raise a specific defense, the state should not be allowed to interject a specific defense, and the court should not give an instruction on that specific defense.

**Twenty-fourth Proposition of Law**

A death sentence recommended by a jury from service on which one or more veniremen were excused because of their views concerning capital punishment cannot stand unless it affirmatively appears on the record that each such venireman excused for cause unequivocally indicates that his scruples against capital punishment will automatically prevent him from recommending the death penalty and/or that such views will render him unable to return a verdict of guilty no matter what the evidence, and that he is prevented by his scruples from following the instructions of the court and considering fairly the imposition of the death sentence.

**Twenty-fifth Proposition of Law**

Appellant's right to an impartial jury under the Sixth Amendment to the United States Constitution and Article I, Section 5 of the Ohio Constitution and to due process under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution were violated by the court's abuse of

discretion in refusing to grant Appellant's motion for individual sequestered voir dire.

**Twenty-sixth Proposition of Law**

Where the defendant in a capital murder trial is deprived of the effective assistance of counsel at both the guilt/innocence and penalty phases of his trial, his conviction and death sentence offend the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and their counterparts in the Ohio Constitution, and must be reversed, and a new trial granted.

**Twenty-seventh Proposition of Law**

A defendant's statements about the offense to a defense mitigation psychologist are subject to the Fifth Amendment privilege against self-incrimination, and it is a violation of that right, and the doctor-patient and attorney-client privilege, as well as the Sixth Amendment right to counsel, for the trial court to overrule defense objections and to require the testifying mitigation psychologist to testify as to what he was told by the defendant about the nature and circumstances of the offense.

**Twenty-eighth Proposition of Law**

Where, during a criminal trial there are multiple instances of error, and the cumulative effect of such errors deprives the accused of a fair trial and undermines the reliability of the conviction and the sentence of death imposed upon a jury verdict, the rights of the accused to due process and to be free from cruel and unusual punishment, under the Fourteenth and Eighth Amendments, respectively, of the United States Constitution, and their corollaries in the Ohio Constitution, have been violated, requiring reversal.

(Appendix, Vol. III at 59-182.) The Ohio Supreme Court considered Fears' claimed errors, conducted its independent sentencing and proportionality reviews, and ultimately affirmed Fears' convictions and death sentence. *State v. Sheppard*, 86 Ohio St.3d 329, 715 N.E. 2d 136 (1999). Fears' subsequent motion for reconsideration (Appendix, Vol. III at 305) was denied without elaboration (Appendix, Vol. III at 316).

On September 2, 1998, Fears filed a petition for post-conviction relief under Ohio Rev. Code § 2953.21. (Appendix, Vol. V at 5.) Fears amended his petition on October 10, 1998 (Appendix,

Vol. VII at 1), claiming the following errors:

### First Claim for Relief

The judgment and sentence against Angelo Fears are void or voidable because the recent amendments to the Ohio post-conviction process violate his constitutional rights to procedural due process which the Ohio and United States Constitutions afford him.

### Second Claim for Relief

The judgment and sentence against Angelo Fears are void or voidable because he did not receive the effective assistance of counsel during the guilt phase of his trial . . . [due to counsels' failure] to investigate and obtain a firearms expert for testimony with respect to whether the gun involved in the offense could have been discharged accidentally, and if it is possible to shoot someone without purpose even with a gun that does not have a hair trigger.

### Third Claim for Relief

The judgment and sentence against Angelo Fears are void or voidable because he did not receive the effective assistance of counsel during the guilt phase of his trial . . . [due to counsels'] failure to introduce evidence that . . . the gun[] was subject to a manufacturer's recall for a firing pin malfunction.

### Fourth Claim for Relief

The judgment and sentence against Angelo Fears are void or voidable due to the ineffective assistance of his counsel during the sentencing phase of his capital trial . . . [due to counsels' failure] to protect Mr. Fears' Eighth Amendment right to have the jury consider all relevant evidence of mitigation.

### Fifth Claim for Relief

The judgment and sentence against Angelo Fears are void or voidable because he did not receive the effective assistance of counsel during the guilt phase of his trial . . . [due to counsels' failure] to present expert testimony regarding Angelo Fears' toxicology, and the effect that substance abuse had on Mr. Fears on the night of the offense.

### Sixth Claim for Relief

The judgment and sentence against Angelo Fears are void or voidable because he did not receive the effective assistance of counsel during

all phases of his capital trial . . . [due to counsels'] failure to impeach witness Derrick Frazier's testimony with Mr. Frazier's testimony from co-defendant James Grant's trial.

**Seventh Claim for Relief**

The judgment and sentence against Angelo Fears are void or voidable because the recent amendments to the Ohio post-conviction process violate his constitutional rights to procedural due process which the Ohio and United States Constitutions afford him. [This claim for relief is identical to Fears' first claim for relief.]

**Eighth Claim for Relief**

The judgment and sentence against Angelo Fears are void or voidable because his trial counsel failed to conduct an adequate background search for competent expert assistance, and due to this omission, important mitigating evidence was not presented to the trier of fact during the sentencing phase.

**Ninth Claim for Relief**

The judgment and sentence against Angelo Fears are void or voidable because he received the ineffective assistance of counsel during this capital trial . . . [due to counsels' failure] to call for a mistrial after learning that two members of the jury had engaged in a conversation regarding the death penalty with third parties.

**Tenth Claim for Relief**

The judgment and sentence against Angelo Fears are void or voidable because he did not receive the effective assistance of counsel during the sentencing phase of his capital trial . . . [due to counsels' failure] to conduct a reasonable and adequate investigation into mitigating factors.

**Eleventh Claim for Relief**

The judgment against Angelo Fears is void or voidable because he did not receive the effective assistance of counsel during the sentencing phase of his capital proceedings . . . [due to counsels' failure] to communicate with members of . . . [Fears'] defense team, and as a result, important mitigating information was not adequately developed or presented to the trier of fact.

14

### Twelfth, Thirteenth, and Fourteenth Claims for Relief[2]

The judgment and sentence against Angelo Fears are void or voidable because he received the ineffective assistance of counsel during the sentencing phase of his capital proceedings . . . [due to counsels' failure] to conduct an adequate and reasonable investigation into . . . [Fears'] background, and as a result, crucial mitigating information was not presented to the jury.

### Fifteenth Claim for Relief

The judgment and sentence against Angelo Fears are void or voidable due to the ineffective assistance of his counsel during the trial and sentencing phases of his capital trial . . . [due to counsels' failure] to protect Mr. Fears' Eighth Amendment right to have the jury consider all relevant evidence of mitigation, as well as his Sixth Amendment right to the effective assistance of counsel during the trial phase.

### Sixteenth Claim for Relief

The judgment and sentence against Angelo Fears are void or voidable because the death penalty, as administered in the State of Ohio, violates his constitutional right to protection from cruel and unusual punishment as guaranteed by the Eighth Amendment and the [D]ue [P]rocess [C]lause and [E]qual [P]rotection [C]lause of the Ohio and United States Constitutions.

### Seventeenth Claim for Relief

The judgment and sentence against Angelo Fears are void or voidable because the death penalty, as administered in the State of Ohio, violates his constitutional right to protection from cruel and unusual punishment as guaranteed by the Eighth Amendment and the [D]ue [P]rocess [C]lause and [E]qual [P]rotection [C]lause of the Ohio and United States Constitutions.

(Appendix, Vol. VII at 1.)  The trial court denied each of Fears' claims in his petition for post-conviction relief (Appendix, Vol. VII at 237), and Fears later raised the following two assignments of error on appeal to the court of appeals:

### First Assignment of Error

---

[2]While Fears' twelfth, thirteenth, and fourteenth claims for relief appear to be identical, the argument advanced under each relates to a different source of potentially mitigating information.

The trial court erred in granting the state's motion to dismiss Appellant's post-conviction petition . . . in violation of Appellant's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**Second Assignment of Error**

The trial court erred in granting the state's motion to dismiss Appellant's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

(Appendix, Vol. VIII at 152.)  The state court of appeals affirmed the trial court's denial of Fears' petition for post-conviction relief on November 12, 1999.  (Appendix, Vol. VIII at 418.)  Fears took an appeal to the Ohio Supreme Court, raising two propositions of law substantively indistinguishable from those raised in the court of appeals (Appendix, Vol. IX at 6), which the court dismissed as not involving any substantial constitutional question (Appendix, Vol. IX at 109).

Concurrent with his post-conviction proceedings, Fears also litigated an application to reopen his direct appeal pursuant to Ohio R. App. Proc. 26(B), claiming his appellate counsel were ineffective in his direct appeal for not having raised the following propositions of law:

**First Proposition of Law**

Appellant's trial counsel failed to object to the defective nature of Appellant's indictment.

**Second Proposition of Law**

The trial court erred by instructing the jury to deliberate over charges that differed from those in Appellant's indictment.

**Third Proposition of Law**

Appellant's trial counsel erred by failing to present the testimony of a firearm expert during the trial phase.

**Fourth Proposition of Law**

Appellant's trial counsel erred by failing to impeach the testimony of Derrick Frazier, with inconsistent testimony from an earlier trial.

16

**Fifth Proposition of Law**

The trial court erred by refusing to issue an instruction for voluntary manslaughter.

**Sixth Proposition of Law**

Appellant's trial counsel failed to present the defense of voluntary intoxication.

**Seventh Proposition of Law**

The death penalty violates international law.

**Eighth Proposition of Law**

The instructions given to the jury were improper, unconstitutional, inadequate, and incomprehensible.

**Ninth Proposition of Law**

The jury's [sic] instructions as given precluded the jury from the consideration of mitigating evidence.

**Tenth Proposition of Law**

Appellant's trial counsel were ineffective in failing to even try to rehabilitate members of the jury venire who had expressed anti-death penalty views.

**Eleventh Proposition of Law**

The trial court erred in permitting the jury to consider gruesome and inflammatory photos.

**Twelfth Proposition of Law**

Appellant's trial counsel were ineffective in failing to correct sentencing errors.

**Thirteenth Proposition of Law**

The trial court erroneously instructed the jury that its recommendation of death or life had to be unanimous.

**Fourteenth Proposition of Law**

Appellant's trial counsel were ineffective for failing to object to the trial court's instruction that the jury's recommendation of death or life had to be unanimous.

**Fifteenth Proposition of Law**

Appellant's trial counsel were ineffective for failing to conduct an adequate investigation during the sentencing phase of Appellant's capital trial . . . [and instead presented] inaccurate psychological testimony of Dr. Jeffrey Smalldon, the defense expert psychologist.

(Appendix, Vol. IV at 2.)  The Ohio Supreme Court denied Fears' application without elaboration.

(Appendix, Vol. IV at 178.)  On March 26, 2001, Fears brought his case to the federal courts in his

petition for a writ of habeas corpus.  (Petition, Doc. No. 8.)

## ANALYSIS

Since Fears filed his petition for a writ of habeas corpus well after the effective date of the

Anti-Terrorism and Effective Death Penalty Act of 1996, 110 Stat. 1214 (hereinafter "AEDPA"),

the amendments to 28 U.S.C. § 2254 embodied in that Act are applicable to his petition.  (*See*

Petition, Doc. No. 8.)  The standard of review under 28 U.S.C. § 2254 as amended by the AEDPA

is as follows:

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A factual finding by a state court is presumed to be correct, and a petitioner must rebut the

presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e).

A state court's decision is contrary to the Supreme Court's clearly established precedent if (1) the state court applies a rule that contradicts the governing law as set forth in Supreme Court case law, or (2) the state court confronts a set of facts that are materially indistinguishable from those in a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal rule [from Supreme Court cases] but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407-08. For a federal court to find a state court's application of Supreme Court precedent unreasonable, the state court's decision must have been more than incorrect or erroneous; it must have been "objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 511 (2003), *quoting Williams*, 529 U.S. at 409.

In *Jamison v. Collins*, 100 F. Supp. 2d 647 (S.D. Ohio 2000), this Court noted that:

> Principles of comity necessary to a federal system narrow a federal court's review of a petition for a writ of habeas corpus brought by a state prisoner. *See Coleman v. Thompson*, 501 U.S. 722, 731-32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The Supreme Court explains that "[u]nder our federal system, the federal and the state 'courts [are] equally bound to guard and protect rights secured by the [C]onstitution.'" *Rose v. Lundy*, 455 U.S. 509, 518, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982) (quoting *Ex parte Royall*, 117 U.S. 241, 251, 6 S.Ct. 734, 29 L.Ed. 868 (1886)); *see Coleman*, 501 U.S. at 731, 111 S.Ct. 2546 (quoting same). Thus, to ensure the states an opportunity to protect these rights, the doctrine of procedural default requires that the state courts retain "the first opportunity to address and correct alleged violations of state prisoner's [sic] rights." *Coleman*, 501 U.S. at 731, 111 S.Ct. 2546. The doctrine of procedural default provides that, if a state court previously dismisses a state prisoner's federal claim on the grounds that the prisoner failed to comply with a state procedural rule, then a federal court ordinarily cannot consider the merits of that federal claim. *Id*. at 729-730, 111 S.Ct. 2546.
>
> This procedural default doctrine bars federal habeas review of a state court ruling only if the following requirements have been satisfied:

(1)    the petitioner actually violated an applicable state procedural rule;

(2)    the procedural violation provides an "adequate and independent state ground" for denying the petitioner's federal constitutional claim; and

(3)    the state court actually enforced the procedural violation; that is, the highest state court to rule on the claim clearly and unambiguously relied upon the procedural violation as the reason for rejecting the claim.

*See generally Coleman*, 501 U.S. at 750, 111 S.Ct. 2546. However, the petitioner can excuse the procedural default by demonstrating either:

(a)    that there was "cause" for the procedural default and actual prejudice by the alleged constitutional error; or

(b)    that the case falls within the category of cases considered [a] "fundamental miscarriage of justice."

See *id*. . . .; *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *Harris v. Reed*, 489 U.S. 255, 260-62, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Ylst v. Nunnemaker*, 501 U.S. 797, 802, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

For the cause and prejudice standard, the petitioner must provide a "substantial" reason that is "external" to the petitioner as the cause for the procedural default. *See Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994). In addition, the petitioner must show that the alleged trial errors "not merely . . . created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed. 2d 816 (1982).

To demonstrate a "fundamental miscarriage of justice," a petitioner must show that the alleged constitutional violation probably resulted in the conviction of one who is actually innocent. *Murray*, 477 U.S. at 496, 106 S.Ct. 2639. This exception applies only in "extraordinary cases." *Id*. The standard requires a petitioner to show that he is "actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). To establish a probability of innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a

reasonable doubt." *Id.*

*Jamison*, 100 F.Supp.2d at 669-70. These principles guide the Court in its discussion of Fears'

asserted grounds for relief.

**First Ground for Relief**

In his first ground for relief, Fears argues that egregious and pervasive prosecutorial

misconduct deprived him of a fair trial. Respondent counters that this claim is procedurally

defaulted to the extent that the Ohio Supreme Court determined no contemporaneous objection to

the claimed misconduct was lodged by the defense, and that the remainder of the claim is meritless.

(Return of Writ, Doc. No. 11 at 27-28.)

The Sixth Circuit has recently articulated the relevant standard for habeas claims of

prosecutorial misconduct as follows:

> On habeas review, claims of prosecutorial misconduct are reviewed
> deferentially. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). To
> be cognizable, the misconduct must have "'so infected the trial with
> unfairness as to make the resulting conviction a denial of due
> process.'" *Id.* (citation omitted). Even if the prosecutor's conduct
> was improper or even "universally condemned," *id.*, we can provide
> relief only if the statements were so flagrant as to render the entire
> trial fundamentally unfair. Once we find that a statement is improper,
> four factors are considered in determining whether the impropriety if
> flagrant: (1) the likelihood that the remarks would mislead the jury
> or prejudice the accused, (2) whether the remarks were isolated or
> extensive, (3) whether the remarks were deliberately or accidentally
> presented to the jury, and (4) whether other evidence against the
> defendant was substantial. *See Boyle v. Million*, 201 F.3d 711, 717
> (6th Cir. 2000). Under [the] AEDPA, this bar is heightened by the
> deference we give to the . . . [Ohio] Supreme Court's determination
> of . . . [Petitioner's] prosecutorial-misconduct claims. *See Macias v.
> Makowski*, 291 F.3d 447, 453-54 (6th Cir. 2002)("If this court were
> hearing the case on direct appeal, we might have concluded that the
> prosecutor's comments violated Macias's due process rights. But this
> case is before us on a petition for a writ of habeas corpus. So the
> relevant question is not whether the state court's decision was wrong,
> but whether it was an unreasonable application of clearly established

21

federal law.").

*Bowling v. Parker*, 344 F.3d 487, 512-13 (6th Cir. 2003). In addition, an examination of alleged prosecutorial misconduct is performed in the context of the trial as a whole. *United States v. Beverly*, 369 F.3d 516, 543 (6th Cir. 2004), *citing United States v. Young*, 470 U.S. 1, 12 (1985) and *United States v. Francis*, 170 F.3d 546, 552 (6th Cir. 1999).

**Guilt Phase**

Fears first claims he was prejudiced in voir dire when the prosecutor suggested to the venire that the purpose element of aggravated murder may be absent in some killings, then gave the examples of a killing in self defense, or one occurring by accident. (Trial Tr. at 362.) Just prior to those statements, the prosecutor seemed about to suggest what would be one of the "major issues" for the jury to decide, but she was interrupted by a defense objection before she could say what the issue was. *Id*. A sidebar followed after which the objection was sustained. *Id*. at 360-62. Fears argues those statements, particularly in light of the trial judge's instruction to the jury on accident,[3] diluted the state's burden on the element of purpose. This part of Fears' claim was raised on direct appeal, and the Ohio Supreme Court addressed its merits. *State v. Fears*, 86 Ohio St.3d 329, 335, 715 N.E. 2d 136, 145 (1999). Ultimately, the court concluded that because the prosecutor never finished her thought on the "major issue" and Fears' attorney's objection was sustained, Fears was not prejudiced by the prosecutor's remarks. *Id*.

It is difficult to see how the result in the Ohio Supreme Court might be contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). After all, the prosecutor did not get the opportunity to identify the "major issue" she had in mind, and the incomplete statement conveyed nothing to the prospective jurors that could be considered improper. Moreover, at the point at which the prosecutor

---

[3]The propriety of the jury instruction on accident will be addressed in Fears' ninth ground for relief, *infra*.

suggested an accidental killing was one in which the purpose element was absent, there was no mention that, in law, an accident is an unforeseen consequence of *lawful* activity. *See* Ohio Jury Instructions § 411.01(2). Finally, the comments occurred in voir dire, and it is highly unlikely that the prospective jurors interpreted the word "accident" as a legal term of art, with all that it implies respecting the relative burdens of proof of the parties, rather than as it is commonly used in the lay community. In any case Fears has offered no support for the contrary proposition. It is unlikely that the prosecutor's comments misled the eventually empaneled jury, and it is nearly inconceivable that Fears was prejudiced by the prosecutor's statements. Fears has not carried his burden under the AEDPA, and the Court recommends this portion of his first ground for relief be denied.

Fears also contends the prosecutor argued in closing that Fears had raised the defense of accident, but provides no record reference. (Amended Petition, Doc. No. 69 at 9.) In the Court's reading of the transcript, however, the prosecutors merely mentioned that the definition of purpose precludes accident (Trial Tr. at 2293), and that the evidence did not show any indication that the firing of the gun occurred accidentally (Trial Tr. at 2279, 2300, 2368). It has long been the rule in Ohio that "'[w]here the state has shown that the death was the result of design, purpose, or intent, . . . then the notion of accident is necessarily excluded.'" *Fornash v. Marshall*, 686 F.2d 1179, 1183 (6th Cir. 1982), *quoting State v. Poole*, 33 Ohio St.2d 18, 20, 294 N.E. 2d 888, 890 (1973), *quoting Jones v. State*, 51 Ohio St. 331, 342, 38 N.E. 79, 83 (1894). Thus, the prosecutor's comment that an act done purposely precludes that it was done accidentally is not only a logical statement, it is one that accurately states the law in Ohio. In fact, defense counsel stated the same concept in his closing argument when he said, "To do an act purposely is to do it intentionally and not accidentally." (Trial Tr. at 2314.) Finally, the prosecutor made no argument that Fears had failed to prove accident, or that accident was a defense upon which Fears bore the burden, and instead repeatedly told the jurors that it was the state's burden to prove the purpose element beyond a reasonable doubt. (Trial Tr. at

2346, 2349, 2350.)  Thus, even if it is assumed that the present sub-claim has been preserved for habeas review, the argument that the prosecutors' closing argument and rebuttal exacerbated the alleged misconduct in voir dire is unavailing.

Next, Fears claims prejudicial error from the prosecutor's statement in voir dire that Fears and Grant were going to rob people on the night of March 30, 1997, and that if they had to kill someone they would.  (Amended Petition, Doc. No. 69 at 10.)  Although a defense objection to the comment was sustained, Fears argued in the state court on direct appeal that the trial court's failure to give a curative instruction *sua sponte* amounted to unconstitutionally prejudicial error.  *State v. Fears*, 86 Ohio St.3d 329, 335, 715 N.E. 2d 136, 145 (1999).  The court concluded that no curative instruction was requested and that the remark did not amount to prejudicial error.  *Id*.  While a valid argument could be made that the court's ruling resulted in procedural default of this portion of Fears' claim, Respondent has not argued that to be the case (Return of Writ, Doc. No. 11 at 27-8), so an analysis of the merits is appropriate.

Fears argues that following the state court's sustaining of the defense objection to the improper comment, the prosecutor was permitted to merely rephrase the same remark, negating the court's ruling on the objection, and compounding the prejudice from the original comment.  The transcript reveals, however, that the prosecutor moved on to explain the concept of accomplice liability.  (Trial Tr. at 517-19.)  Thus, no error of a constitutional dimension transpired.  The Ohio Supreme Court's determination that no significant prejudice flowed from the objectionable comment was not contrary to or an unreasonable application of federal law as articulated by the United States Supreme Court.  28 U.S.C. § 2254(d)(1).

Next, Fears contends the prosecutor improperly commented on Fears' exercise of his right to remain silent when he asked a prospective juror if she thought it was possible for the case against Fears to be proven "without having them help us figure [it] out" (Trial Tr. at 959), or "by using other

kind[s] of evidence" (Trial Tr. at 960). (Amended Petition, Doc. No. 69 at 10-11.) In addition, Fears argues, the prosecutor improperly speculated in closing argument on what Fears would have said had he chosen not to remain silent, and suggested that Fears was going to argue (presumably in his own closing argument) that the gun was not loaded. (Trial Tr. at 2294.) (Amended Petition, Doc. No. 69 at 11.) This portion of Fears' first ground for relief was raised in his twenty-first proposition of law on direct appeal in the Ohio Supreme Court, which addressed the issue on its merits, and it is therefore properly preserved for habeas review.

Consistent with *Miranda v. Arizona*, 384 U.S. 436 (1966), prosecutors may not comment, directly or indirectly, on a criminal defendant's failure to testify. *United States v. Tarwater*, 308 F.3d 494, 511 (6th Cir. 2002), *citing Doyle v. Ohio*, 426 U.S. 610, 619-20 (1976); *Raper v. Mintzes*, 706 F.2d 161, 164 (6th Cir. 1983); *see also Griffin v. California*, 380 U.S. 609, 615 (1965). Where the comments are indirect, a court should consider (1) whether the comments were manifestly intended as a comment on the accused's failure to testify or whether the jury would naturally and necessarily take them as such a comment; (2) whether the remarks were isolated or extensive; (3) whether the evidence of guilt was otherwise overwhelming; and (4) what curative instructions were given and when. *Spalla v. Foltz*, 788 F.2d 400, 404 (6th Cir. 1986), *citing Hearn v. Mintzes*, 708 F. 2d 1072, 1077 (6th Cir. 1983).

In context, the prosecutor's remarks in voir dire do not necessarily indicate an intent to comment on Fears' predicted failure to testify. First, at the time the prosecutor made the complained-of comments in voir dire, Fears had not yet failed to testify since the trial was still in the jury-selection stage. Consequently, the remarks could not have been manifestly intended as a comment on Fears' failure to testify, nor is it likely that the prospective jurors naturally and necessarily took them as such since it remained to be seen whether Fears would testify. It would not be unreasonable to interpret the "without having them help us figure that out" and "other kind[s]

of evidence" comments as attempts by the prosecutor to determine whether the prospective juror being questioned was of a mind to hold Fears' predicted silence against him, an entirely fair and common question in voir dire. In addition, the remarks were isolated, appearing on only two consecutive pages of a transcript spanning more than 2,500 pages in the guilt phase alone. Even assuming the jurors remembered the prosecutors comments throughout the trial, and interpreted them in the way Fears' now urges this Court to, they are unlikely to have caused any prejudice to Fears' case since evidence of his guilt was overwhelming. While defense counsel successfully objected to the first comment, no objection was lodged against the second, and no curative instruction was requested for either. (Trial Tr. at 959-60.) An objection to the closing argument comment speculating on what Fears would have said had he testified was sustained, but again, no curative instruction was requested. (Trial Tr. at 2294.) Regardless, any prejudice from the prosecutor's comments was diluted by defense counsel's successful objections.

The Ohio Supreme Court found the comments in question[4] "suggest[ed] an impermissible reference to [Fears'] failure to take the witness stand," but that the remarks could "also be read as a reference to [Fears'] defense of lack of intent. *State v. Fears*, 86 Ohio St. 3d at 336. The court concluded that the remarks were not the sort that the jury would necessarily take as comments on Fears' failure to testify. *Id*. The prosecutor's remark implying Fears would say the gun was not loaded was found improper, however, since that was never the defense's contention. *Id*. Nevertheless, the court found no reversible error in light of the overwhelming evidence of Fears' guilt. *Id*.

The state court correctly identified the governing legal principle in acknowledging *Griffin*

---

[4]Fears' twenty-first proposition of law in the state court included only the "without having them help us figure it out" voir dire comment and the closing argument comments speculating on what Fears would have said had he testified, including the unloaded gun remark. (Appendix, Vol. III at 153.) Since Respondent does not claim the "using other kind[s] of evidence" comment has been procedurally defaulted, the Court considers it along with the other two.

*v. California*, 380 U.S. 609 (1965), *Fears*, 86 Ohio St. 3d at 336, and the court's application of that principle to the facts of Fears' case was not objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 511 (2003); *Williams v. Taylor*, 529 U.S. 362, 409 (2000). The court found that the prosecutor's comments in voir dire indirectly referring to Fears' predicted failure to testify were reasonably amenable to at least one interpretation that did not implicate his Fifth Amendment rights, and ultimately found the fairness of Fears' trial was not compromised by the prosecutor's alleged misconduct. Moreover, the court's application of the rule prohibiting a prosecutor's comment on a criminal defendant's failure to testify does not contradict Supreme Court case law, nor does it arrive at a result different from Supreme Court precedent on materially indistinguishable facts. *Williams*, 529 U.S. at 405-6. Consequently, Fears' claim that the prosecutor engaged in misconduct in her "without having them help us figure that out" and "other kind[s] of evidence" voir dire comments, along with the "gun wasn't loaded" remark in closing argument should be denied.

In his final argument that the prosecutor engaged in misconduct in the guilt phase of the trial, Fears contends the prosecutor improperly denigrated defense counsel by referring to him as a magician, and the theory of the defense as a "slight [sic] of hand technique" and a "trick." (Amended Petition, Doc. No. 69 at 12; Trial Tr. at 2339-40.) Defense counsel did not object to the prosecutor's characterization. Respondent does not advance a procedural default defense. (Return of Writ, Doc. No. 11 at 27-28, 36.)

The specific comments alleged to constitute prosecutorial misconduct are, in context, as follows:

> When I tell you this, I'm going to tell you right up front I don't mean any disrespect to Mr. Rosenwald [defense counsel]. I think he is a fine attorney. Obviously, he is an excellent attorney.
>
> But when you look at this case and when you look at some explanations for some things, it reminded me of the first time I ever saw a magician take a quarter out of his pocket and show it to an

audience.  And he put it up in his hand and it was gone.

And I don't do it as well as most magicians do, but when you first see that for the first time, you look.  That's pretty impressive.

And what does everyone that is not a magician, what do they ask if they don't know the trick?  How did you do that?  How did that happen?

And what does the magician say how it happened?  Does he tell you the truth?  He says, "It's magic."

Some people say it would be magic.  But is that the truth?  No.  The truth is it's a slight [sic] of hand technique, a trick.

. . . .

The magic thing sounds good, but that's not the truth.

(Trial Tr. at 2339-40.)  Respondent argues that the prosecutor's prefacing of his "magician" remarks with praise for defense counsel dissolves any negative inference from his comments, and that in any case, the overwhelming nature of the evidence of Fears' guilt militates against a finding of prejudice flowing from the prosecutor's statements.  (Return of Writ, Doc. No. 11 at 36.)

Not every aspersion cast by a prosecutor upon a defense attorney's presentation of a case requires reversal of the guilty verdict.  *See United States v. Young*, 470 U.S. 1, 11 (1985)(stating that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial").  An accusation by a prosecutor that defense counsel was attempting to create a red herring has been found to have been allowable comment on the strength, or lack of it, of the defendant's case.  *United States v. Bernard*, 299 F.3d 467, 487-88 (5th Cir. 2002).  Likewise, a prosecutor's argument that the defendant's case consisted of smoke screens, game-playing, distractions, and distortions was deemed a legitimate attempt to direct the jury's attention to the evidence and away from defense counsel's allegations

that his client was framed. *United States v. Rivera*, 971 F.2d 876, 882-83 (2d Cir. 1992). The question is whether the prosecutor's remarks were so prejudicial that they rendered the trial fundamentally unfair. In Fears' case, the answer to the question must be "no," given the narrow review in habeas corpus proceedings. Assuming the "magician" comments were improper, they were not flagrant, as they comprise about one page in a voluminous transcript, and were unlikely to mislead the jury into believing that Fears' defense was that the gun was fired by magic. Even if the jurors recognized the analogy the prosecutor was attempting to make, by comparing Fears' contention that he fired the gun unintentionally to a magician's trick, it is improbable that the prosecutor's statements so infected Fears' trial that his conviction constitutes a denial of due process. *See Houston v. Estelle*, 569 F.2d 372, 382, 384 (5th Cir. 1978)(recognizing that "a defect of constitutional proportions is not to be found in any but egregious cases," and noting that "the constitutional frontier stands very far indeed from the core of good prosecutorial practice"). Thus, the Magistrate Judge recommends that Fears' claim that the prosecutor's "magician" comments deprived him of due process and a fair trial be denied.

Fears contends the Ohio Supreme Court erred in undertaking a plain error analysis of his claims of guilt-phase prosecutorial misconduct. (Amended Petition, Doc. No. 69 at 12-13; Traverse, Doc. No. 61 at 23.) The state court's discussion of Fears' claims relating to the guilt phase of his trial did not even mention plain error. *State v. Fears*, 86 Ohio St.3d 329, 335-36, 715 N.E. 2d 136 (1999). Rather, the court recognized that objections were made by defense counsel, and proceeded to address Fears' guilt-phase prosecutorial misconduct claims on their merits. *Id.* Thus, Fears' contention that the wrong standard was applied is factually incorrect.

**Penalty Phase**

Fears also alleges prosecutorial misconduct occurred during the penalty phase of his trial. Respondent claims procedural default only to the extent that the Ohio Supreme Court relied on the

29

Ohio procedural rule requiring contemporaneous objections, and acknowledges that all of the other penalty-phase prosecutorial misconduct claims are preserved for habeas review. (Return of Writ, Doc. No. 11 at 37-39.) Preliminarily, the Court notes that the Sixth Circuit has described the relevant inquiry in claims of penalty-phase prosecutorial misconduct claims as follows:

> In the context of a death penalty sentencing hearing . . . the question of error or effect is more complex than in traditional trials. Rather than determining whether a constitutional error would have pushed a jury from a "not guilty" verdict to a "guilty" verdict, we must attempt to discover whether the constitutional error influenced the jury's decision between life and death.

*Bates v. Bell*, 402 F.3d 635, 641 (2005).

Fears' first argument is that the prosecutors exceeded the bounds of propriety when they argued as follows in the guilt phase:[5]

> [D]oes that abuse, is that justification or is that a mitigation factor sufficient to outweigh the brutal death of Antwuan Gilliam[?]
>
> . . . .
>
> I submit to you there is nothing mitigating in the manner in which Angelo Fears purposely killed Antwuan Gilliam. There's no mitigation in that.
>
> . . . .
>
> Well, I guess there's some mitigation there because, you know . . . he left [Lakesha] alone and that four-year-old baby there. He didn't touch that child. There's mitigation for you. There's mitigation for you.
>
> The murder. You have to look at the nature and circumstances of the murder.

---

[5]Fears incorrectly attributes all of the comments to Prosecutor Prem's closing argument, providing no trial transcript page references. Though certainly not required to cull the transcript for the quoted passages, the Court notes that having done so reveals that Prosecutor Russell actually made most of the remarks in her rebuttal argument. (Trial Tr. at 2952, 2964-65.) Fears correctly credits Prem with the rhetorical question involving childhood abuse as a mitigating factor in the excerpt cited. (Trial Tr. at 2927.) In addition, Fears repeatedly quotes the Ohio Supreme Court's decision on direct appeal *without citation of any kind*. (*See, e.g.*, Amended Petition, Doc. No. 69 at 11 n.10; 14; 15.) Since the filing of these papers, the Court has adopted a General Order requiring record references in papers filed in these cases.

. . . .

> What kind of terror did [Fears] put into Derrick Frazier's head?  He
> told us he peed in his pants.   How is that for aggravating
> circumstances?

(Trial Tr. at 2927, 2952, 2964-65.)  Fears acknowledges that except for the comments respecting

Derrick Frazier's terror, defense counsel did not object to the prosecutors' statements.[6]  (Amended

Petition, Doc. No. 69 at 13.)  The Ohio Supreme Court so found in its review of Fears' claim, and

determined that no plain error resulted from the prosecutor's arguments.  *State v. Fears*, 86 Ohio

St.3d 329, 332-33.  Unfortunately, although implicitly acknowledging that defense counsel had

objected to the Derrick Frazier comments – an objection that was overruled – the state court failed

to address the Derrick Frazier part of Fears' assignment of error on its merits, instead lumping it

together with the other claims in its plain error analysis.  Respondent argues that defense counsels'

objections, curative instructions from the court, the charge to the jury regarding sustained objections,

and the sophistication of the jury pool in Fears' case all serve to ameliorate any prejudice Fears may

have suffered from the prosecutors' comments.  (Return of Writ, Doc. No. 11 at 38-39.)

Those comments to which Fears did not object at trial are procedurally defaulted.  Ohio's

contemporaneous objection rule — that parties must preserve errors for appeal by calling them to

the attention of the trial court at a time when the error could have been avoided or corrected, set

forth in *State v. Williams,* 51 Ohio St. 2d 112, 364 N.E. 2d 1364 (1977)(paragraph one of the

syllabus), *vacated in part on other grounds*, *Williams v. Ohio*, 438 U.S. 911 (1978); *see also State

v. Mason*, 82 Ohio St. 3d 144, 162, 694 N.E.2d 932 (1998) — is an adequate and independent state

ground.  *Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir. 2003), *citing  Hinkle v. Randle*, 271 F. 3d

239, 244 (6th Cir. 2001); *Scott v. Mitchell*, 209 F. 3d 854, 865-68 (6th Cir. 2000), *citing Engle v.*

---

[6]Fears also argues his trial counsel were ineffective for not objecting to many of the penalty-phase
instances of alleged prosecutorial misconduct both here, and in his fourth ground for relief.  That argument will be
considered when the Court addresses Fears' fourth ground for relief below.

*Isaac,* 456 U.S. 107, 124-29 (1982). *See also Seymour v. Walker*, 224 F. 3d 542, 557 (6th Cir. 2000). The Ohio Supreme Court enforced the rule against Fears in its appellate review of his case, *Fears*, 86 Ohio St.3d at 332-33, and Fears has not demonstrated cause and prejudice for his procedural default of this claim. Thus, the only comments requiring this Court's attention are the ones relating to Derrick Frazier's terror during the murder.

The Ohio Supreme Court's application of plain error analysis to Fears' claim that the prosecutors engaged in misconduct when they argued Derrick Frazier's terror and urination in his pants were aggravating circumstances was contrary to state procedural law. In Ohio, when there is no contemporaneous objection, plain error review is appropriate, but when defense counsel has objected the claim is preserved for a merits determination on direct appeal. *See State v. Williams,* 51 Ohio St. 2d 112, 116-18, 364 N.E. 2d 1364 (1977) *vacated in part on other grounds*, *Williams v. Ohio*, 438 U.S. 911 (1978). In *Greer v. Mitchell*, 264 F.3d 663, 675 (6th Cir. 2001), the Sixth Circuit Court of Appeals concluded that "when the record reveals that the state court's reliance upon its own rule of procedural default is misplaced, we are reluctant to conclude categorically that federal habeas review of the purportedly defaulted claim is precluded." *Hill v. Mitchell*, 400 F.3d 308, 314 (2005). When such circumstances arise, the district court is permitted to conduct *de novo* review on the merits of the claim. *Id*. Since the Ohio Supreme Court misapplied its own procedural rule, this Court is not bound by the state court's procedural findings, and will consider the merits of Fears' claimed error *de novo*.

In Ohio, aggravating circumstances making a death sentence possible are set forth by statute. Ohio Rev. Code § 2929.04(A). Similarly, the mitigating factors are statutorily defined, although unlike the aggravating circumstances, the list of mitigating factors is not exhaustive, and includes a "catch-all" factor that allows presentation of "any other factors relevant to the sentencing determination." Ohio Rev. Code § 2929.04(B). Although not one of the enumerated mitigating

32

factors, the "nature and circumstances of the offense" can only be considered by the sentencing entity for their mitigatory value, and cannot be used on the aggravating side of the sentencing scales. Ohio Rev. Code § 2929.04(B); *see also State v. Skatzes*, 104 Ohio St.3d 195, 234, 819 N.E. 2d 215 (2004). Fears contends that the prosecutor's argument concerning Derrick Frazier's fear during the murder improperly transformed a circumstance of the offense into an aggravating circumstance. Fears assumes Derrick Frazier's urinating in his pants was a circumstance of the offense. Whether it is or is not[7] is irrelevant to the inquiry, since arguing a non-statutory aggravating circumstance to the jury is as improper as converting a circumstance of the offense into an aggravating circumstance. That part of Fears' argument claiming the prosecutor argued Derrick Frazier's urinating in his pants as an aggravating circumstance is difficult to dispute, given the prosecutor's "[h]ow is that for aggravating circumstances?" question immediately following her description of Frazier's urination. The Court agrees with Fears and the Ohio Supreme Court's determination that the prosecutor's comment was improper. *State v. Fears*, 86 Ohio St.3d 329, 333, 715 N.E. 2d 136 (1999).

As noted above, the next step in the analysis of Fears' claim is to determine whether the improper comment was flagrant by considering (1) the likelihood that the remark would mislead the jury or prejudice the accused, (2) whether the remark was isolated, (3) whether the remark was deliberately or accidentally presented to the jury, and (4) whether other evidence against the defendant was substantial. *See Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000).

In the course of closing arguments, the prosecutors noted that there were three aggravating circumstances to be considered in relation to the mitigation evidence produced by Fears, that the nature and circumstances of the offense is only considered for any mitigatory value they may have, and that the murder itself is not an aggravating circumstance. (Trial Tr. at 2921, 2952.) In addition,

---

[7]It is at least questionable whether a third-person witness' physical reaction to the events occurring around him could fall within "the nature and circumstances" of a murder.

the trial court instructed the jurors on the aggravating circumstances as follows:

> The aggravated circumstances in [sic] which you found the defendant guilty are:
>
> First one, that the defendant, Angelo Fears, committed an aggravated murder of Antwuan Gilliam while the said Angelo Fears was committing, attempting to commit or fleeing immediately after committing or attempting to commit the offense of kidnapping, and that the defendant, Angelo Fears, was the principal offender in the commission of the aggravated murder or if not the principal offender, committed the aggravated murder with prior calculation and design.
>
> The second aggravating circumstance that you found the defendant guilty of was that the defendant, Angelo Fears, committed the aggravated murder of Antwuan Gilliam while the said Angelo Fears was committing, attempting to commit, fleeing immediately after committing or attempting to commit the offense of aggravated robbery, and that the defendant, Angelo Fears, was a principal offender in the commission of the aggravated murder or if not the principal offender, committed the aggravated murder with prior calculation and design.
>
> The third aggravating circumstance you found the defendant guilty of was that the defendant, Angelo Fears, committed the aggravated murder of Antwuan Gilliam while the said Angelo Fears was committing, attempting to commit, fleeing immediately after committing or attempting to commit the offense of aggravated burglary, and that the defendant, Angelo Fears, was a principal offender in the commission of the aggravated murder or if not the principal offender committed the aggravated murder with prior calculation and design.

(Trial Tr. at 2977-78.)  Immediately after those instructions were given, the court stated that the mitigating factors "include but are not limited to the nature and circumstances of the offense." *Id*. at 2978.

There is some degree of likelihood that the jurors would have been misled by the prosecutor's use of Derrick Frazier's urinating in his pants as an aggravating circumstance, especially when the legitimate defense objection to the comment was inexplicably overruled by the trial court, but the remark was isolated, having been uttered only once in argument.  The prosecutor

unequivocally and deliberately identified Derrick Frazier's unfortunate response to the murder as an aggravating circumstance, but other evidence relating to the aggravating circumstances was particularly strong.  In light of the foregoing, the prosecutor's other comments correctly acknowledging that the nature and circumstances of the offense can only be used as mitigation evidence, the trial court's accurate instructions as to what the aggravating circumstances in Fears case were, and the instruction on the proper use of the nature and circumstances of the offense evidence, this Court does not find the complained-of comment to have been flagrant.  The nature and circumstances of the offense had no mitigatory value, and given the strength of the evidence relating to the aggravating circumstance, it is highly unlikely the prosecutor's improper statements had any significant effect on the jury's sentencing recommendation.  Thus, Fears claim to the contrary should be denied.

Fears claims the prosecutors also engaged in misconduct by arguing that he was unremorseful.  The state court rejected Fears' claim on its merits, reasoning that the prosecutors' statements were allowable to rebut Fears' expressions of remorse in his unsworn statement.  *State v. Fears*, 86 Ohio St.3d 329, 333, 715 N.E. 2d 136 (1999).  The state court's determination is neither contrary to nor an unreasonable application of federal law as determined by the United States Supreme Court.  Consequently, Fears' claim fails.

Next, Fears argues that the prosecutors denigrated his psychological expert presented in the mitigation phase by calling him defense counsel's "mouthpiece," by telling the jury the expert was paid with taxpayer money, and by insinuating the expert's bias by repeatedly arguing he was hiding his interview notes and a (nonexistent) report from the prosecution.  (Amended Petition, Doc. No. 69 at 15-16.)  Fears raised these issues in his first proposition of law on direct appeal to the Ohio Supreme Court, and they are therefore preserved for habeas review.

During the mitigation phase, Fears presented the testimony of, *inter alia*, Dr. Jeffrey

Smalldon, a psychologist. (Trial Tr. at 2736-2908.) During Dr. Smalldon's testimony, there were numerous sidebar discussions, some of which were quite lengthy, concerning whether the prosecution was entitled to his notes on his interviews with Fears and Fears' family members. Nearly all of those discussions were held at sidebar or outside the presence of the jury. In one exchange before the jury, however, it was made clear that Dr. Smalldon had not provided copies of his interview notes to the prosecution. (Trial Tr. at 2847-48.) At the same time, the trial judge ruled the notes were not admissible. *Id.* Later, Dr. Smalldon summarized for the jury the contents of his notes. *Id.* at 2849-56. In addition, the prosecutors sought to obtain recordings of the oral psychological tests administered to Fears, and to explore whether and why Dr. Smalldon had or had not prepared a written report of his findings. *Id.* at 2749-57, 2865-68, 2798-2824, 2841-43. Dr. Smalldon was thoroughly cross-examined on those same questions. *Id.* at 2846-53; 2856; 2881-83. The trial judge repeatedly overruled the prosecutors' attempts to obtain a copy of Dr. Smalldon's notes (Trial Tr. 2757, 2768, 2820, 2821, 2843, 2847-48, 2882, 2883-84), and also sustained defense objections to the prosecutors' insinuations that Dr. Smalldon improperly or unscrupulously avoided making a written report of his findings, *id.* at 2883-8.

Even though the trial court had consistently ruled that the prosecutors were not entitled to Dr. Smalldon's interview notes and had immediately shut down their questioning as to why Dr. Smalldon had not prepared a written report of his findings, the prosecutors blatantly revisited both issues in their closing argument. Prosecutor Prem argued that "[w]e didn't get a report from [Dr. Smalldon]. We didn't know until he testified what his diagnosis was going to be. We heard it as you heard it." (Trial Tr. at 2931.) Adding to the implication that Dr. Smalldon was disingenuous was Prem's comment that "this doctor was fairly coy about how he presented things. He was very smooth as a witty thought [whatever that means]. And he glossed over things. . . . He wouldn't really go into a lot of detail. Didn't want to tell you what [Fears] told him happened on the night

of the murder."  (Trial Tr. at 2932.)

      The state court had the following to say about Fears' claims:

> [T]he prosecutor's reference to Dr. Smalldon as defense counsel's "mouth piece" . . . insinuates that defense counsel has paid the expert simply to have him parrot their opinions.  It is obviously intended to denigrate defense counsel.  However, the trial court sustained an objection to this remark and instructed the jury to disregard it.  The jury is presumed to have followed the court's instructions.  Appellant further argues that it was improper for the prosecutor to state in closing argument that the defense expert was being paid with taxpayer money.  Again, although it may be proper to discuss an expert's fee to show bias or pecuniary interest, this comment injects an impermissible reference to taxpayer's contributions, by which the prosecutor obviously hoped to gain an unfair advantage.  However, even though improper, these remarks do not rise to the level of prejudice found in *State v. Keenan* (1993), 66 Ohio  St.3d 402, 406, 613 N.E. 2d 203, 207.
>
> . . . .
>
> Several misconduct allegations stem from a dispute at trial over whether the prosecutors were entitled to see Smalldon's interview notes.  The trial court ruled that the state could not receive these notes.  Nevertheless, the prosecutor made several comments about these notes in the presence of the jury.  The prosecutor asked Smalldon, over objection, whether he provided these notes to the state.   The prosecutor also alluded in cross-examination to Smalldon's failure to write a report.  The court sustained several defense objections.  Finally, in closing argument, the prosecutor argued to the jury that Smalldon's bias was shown by his refusal to give information to the state.  Prosecutor Russell stated:  "He [Smalldon] was reluctant to give up what was in his file.  He was reluctant to tell us what the defendant had told him.  He was unwilling to give us his notes and unwilling to write a report." Defense counsel objected, and the judge sustained the objection as to the notes and instructed the jury to disregard the comment.  Since the trial court had initially overruled the state's request for Smalldon's notes, the prosecutor should not have made these comments, which cast an improper light on Smalldon and accused him of wrongdoing and withholding of pertinent information.   However, even in combination with the above errors, we do not believe that [A]ppellant was denied a fair trial by any of these remarks.

*State v. Fears*, 86 Ohio St.3d 329, 333-35, 715 N.E. 2d 136 (1999).

The Court observes first that Fears' claim that the prosecutors referred to Dr. Smalldon as defense counsels' "mouthpiece" does not hold up to a careful reading of the transcript.  Rather, the prosecutors' comment was intended to imply that defense counsel were Fear's "mouthpiece,"[8] as is apparent from the following exchange between the prosecutor and Dr. Smalldon on cross examination:

> Q:    Okay.  So our Hamilton County Court is paying for you to come in and testify at the request of the defense?
>
> A:    Well, my understanding is that public funds are being used to compensate me for my professional time and expertise in this case.  I'm not sure how else to say that.
>
> Q:    Thank you.  At the request of the Defendant?
>
> A:    Right.  No, at the request of defense counsel.
>
> Q:    Well, as far as we know, they are his mouth piece in this case
> . . . .

(Trial Tr. at 2838.)  A defense objection was subsequently sustained and the jury was admonished to disregard the prosecutor's comment.  *Id*.  Thus, the factual basis upon which Fears' claim respecting the "mouthpiece" comment rests is faulty, and can consequently provide no ground for habeas relief.

As observed by the Ohio Supreme Court on direct appeal, the trial court found that the prosecutors' statements in closing argument respecting Dr. Smalldon's not having made a written report of his findings were improper.  *State v. Fears*, 86 Ohio St.3d 329, 334-35, 715 N.E. 2d 136 (1999).  Defense counsel did not object to several of the prosecutors' comments.  (Trial Tr. at 2931, 2932, 2955, 2957.)  Following the prosecutor's comment that Dr. Smalldon was reluctant to turn over his notes or prepare a written report, the one objection defense counsel did lodge was sustained,

---

[8]Fears does not claim that the prosecutors comment, when correctly understood as an insult to defense counsel, constitutes misconduct, so this Court has no occasion to address that question.

and the jury was admonished to disregard the prosecutors' remark.[9]  (Trial Tr. at 2956-57.)

Moreover, the jury was instructed that "[s]tatements or answers that were stricken by the Court or

which you were instructed to disregard are not evidence and must be treated as though you never

heard them."  (Trial Tr. at 2981-82.)  Assuming the jurors heeded the trial court's direction to

disregard the comment, and there is no evidence to suggest that they did not, the comment that Dr.

Smalldon was reluctant to turn over his notes is insufficient to demonstrate the degree of prejudice

necessary to warrant habeas relief.

        The jurors were not told that the prosecutors' other comments along the same lines (Trial Tr.

at 2931, 2932, 2955, 2957) were improper, however, or that they should be disregarded.  There is

some likelihood that the prosecutors' statements could have prejudiced the jurors against the

evidence presented through Dr. Smalldon, thereby prejudicing Fears.  At least four times, the

prosecutors mentioned that Dr. Smalldon had not prepared a report of his findings and insinuated

that that was an unfair tactic calculated to deprive the prosecution of their rightful opportunity to

learn what Dr. Smalldon would say on the witness stand before he testified.  The truth of the matter

is that there is nothing untoward about Dr. Smalldon's not preparing a written report.  The

prosecutors were provided with all of his raw testing data and could have presented their own expert

to interpret it and dispute Dr. Smalldon's findings rather than impugning his integrity with improper

remarks.  Moreover, the remarks were repeated several times during closing argument and were

unquestionably deliberately made.  The aggravating circumstance evidence, however, was

particularly strong.

        Under these circumstances, and in spite of the obvious impropriety of the prosecutors'

---

[9]Because defense counsel did not object to most of the prosecutors' comments in closing argument, the state court could have relied on a the state procedural rule that requires a contemporaneous objection in rejecting Fears' claims related to those comments.  Since the state court did not distinguish between the objected-to comment and the unobjected-to comments, however, we address Fears' claim as he presents it on its merits.

conduct, this Court cannot say that the Ohio Supreme Court's rejection of Fears' claim was contrary to or an unreasonable application of federal law as articulated by the United States Supreme Court. 28 U.S.C. § 2254 (d)(1). Therefore, Fears' claim to the contrary should be denied.

Fears next argues that the prosecutors improperly commented that Dr. Smalldon was compensated with taxpayer money, a comment the Ohio Supreme Court held was improper, but not prejudicial enough to warrant reversal of the death sentence. *State v. Fears*, 86 Ohio St.3d 329, 334, 715 N.E. 2d 136 (1999). The comment was isolated and unlikely to prejudice the jurors against the accused, since the source of funding for Dr. Smalldon's services had been explored in his testimony without objection from defense counsel (*see* Trial Tr. at 2838), and that line of questioning is not now argued to have been improper nor does Fears claim his counsel were ineffective for not having objected. Thus, the substance of the prosecutor's statement in closing argument was before the jury without objection at trial, and has not been challenged in these habeas proceedings. Assuming without holding that the comment was deliberately made, it remains true that the evidence against Fears respecting the aggravating circumstances was substantial. The Ohio Supreme Court's decision that Fears did not suffer prejudice from the prosecutor's remark sufficient to warrant reversal of the death sentence was, under these circumstances, not contrary to or an unreasonable application of federal law.

Fears further argues that the prosecutors improperly questioned Fears' mother about a criminal charge against her for which she had not yet been sentenced after her plea of guilty. Fears raised this claim on direct appeal, but the state court observed that no objection to the questioning had been lodged by defense counsel, found no plain error, and concluded in the alternative that the prosecutor was entitled to impeach Mrs. Fears with her prior convictions. *Fears*, 86 Ohio St.3d at 334. Respondent has argued this sub-claim is procedurally defaulted due to defense counsels' failure to object to the alleged impropriety. (Return of Writ, Doc. No. 11 at 27-28.)

Ohio's contemporaneous objection rule — that parties must preserve errors for appeal by calling them to the attention of the trial court at a time when the error could have been avoided or corrected, set forth in *State v. Glaros,* 170 Ohio St. 471, 166 N.E. 2d 379 (1960) paragraph one of the syllabus; *see also State v. Mason*, 82 Ohio St. 3d 144, 162, 694 N.E.2d 932 (1998) — is an adequate and independent state ground. *Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir. 2003), *citing Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Scott v. Mitchell*, 209 F.3d 854, 867 (6th Cir. 2000), *citing Engle v. Isaac,* 456 U.S. 107, 124-29 (1982). *See also Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000). The rule applied in Fears' case, and was relied upon by the state supreme court on direct appeal. *Fears*, 86 Ohio St.3d at 334. Although Fears does not explicitly contend in his first ground for relief that he can show cause and prejudice for the default, he does argue trial counsels' ineffectiveness for not objecting to numerous instances of prosecutorial misconduct in his fifth ground for relief. (Amended Petition, Doc. No. 69 at 51.) In addition, he argues in his sixth ground for relief that his appellate counsel were ineffective for their failure to raise trial counsels' ineffectiveness based, in part, on trial counsels' failure to object to numerous instances of prosecutorial misconduct. *Id*. at 56. Therefore, the merit, if any, to the present sub-claim will be addressed to the extent necessary to resolve Fears' ineffective assistance of counsel claims in the Court's discussion of his fifth and sixth grounds for relief.[10] As a free-standing claim, however, this sub-claim is procedurally defaulted.

Next, Fears contends the prosecutors engaged in misconduct when they asked mitigation witnesses whether Fears belonged to a gang, about a prior assault Fears had allegedly committed, and whether the witnesses believed Fears knew right from wrong. In his amended petition and his traverse, Fears does not identify which witnesses were asked the allegedly improper questions, nor

---

[10]Because those claims ultimately fail, Fears cannot demonstrate cause and prejudice for his default of the instant sub-claim.

does he cite to the trial transcript so that the Court could find the offending passages itself. (Amended Petition, Doc. No. 69 at 16; Transcript, Doc. No. 61 at 28-9.)  The Court declines to read through nearly four hundred pages of the mitigation transcript to locate the comments of which Fears complains, and recommends denial of this sub-claim.

Finally, Fears contends that even if no particular instance of prosecutorial misconduct amounts to a deprivation of his federal constitutional right to a fair trial, the cumulation of the errors constitutes a denial of due process, and he urges habeas relief on that ground.  In his final paragraph of his first ground for relief, Fears alleges that "[t]he prosecutors' impropriety pervaded the trial, especially the penalty phase, and when viewed under the strict harmless error standard applied to the penalty phase of a capital trial, the state cannot establish, beyond a reasonable doubt, that the defendant was afforded his due process right to a fair trial." (Amended Petition, Doc. No. 69 at 26.) That sentence, however, does not accurately describe the standard of review or the party possessing the burden of proof in federal habeas corpus.  Instead, in such proceedings the burden is on the petitioner to show that the state court applied a United States Supreme Court case in an objectively unreasonable manner. *Price v. Vincent*, 538 U.S. 634, 641 (2003), *citing Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)(*per curiam*).  Fears has failed to meet that burden respecting his claims of prosecutorial misconduct, both individually and cumulatively.  Consequently, his first ground for relief should be denied.

## Second Ground for Relief

In his second ground for relief, Fears claims that the sentencer, presumably the trial judge, improperly weighed the nature and circumstances of the offense as an aggravating circumstance, that it was error not to merge duplicative aggravating circumstances, that the aggravating circumstances did not outweigh the mitigating factors in his case, and that the Ohio Supreme Court's reweighing

of the aggravating circumstances and mitigating factors did not cure any of those errors. (Amended Petition, Doc. No. 69 at 26-32.) Respondent argues the claim is partially procedurally defaulted. (Return of Writ, Doc. No. 11 at 41, 45, 48-49, 50-51.) Specifically, Respondent contends the sub-claim involving the "use" of the aggravated murder itself as an aggravating circumstance was never presented to the state courts, nor was the sub-claim that the jury instructions incorrectly required a verdict on each of the four counts of aggravated murder. (Return of Writ, Doc. No. 11 at 41.)

To begin, Fears fails to demonstrate that the trial judge improperly considered the nature and circumstances of the offense as an aggravating circumstance. The trial transcript page to which he directs the Court's attention is merely the trial court's instruction on what aggravating circumstances were found by the jury to have existed in the guilt phase of the trial (Amended Petition, Doc. No. 69 at 28; Trial Tr. at 2977.) There is nothing improper in the court's reminding the jury of the aggravating circumstances in preparation for its weighing of those circumstances against the mitigating factors, especially when the instruction includes a direction to the jurors that the aggravating circumstances for each count are merged for sentencing purposes, as was the case here. (Trial Tr. at 2978.) Moreover, the trial court's sentencing opinion clearly aligns the nature and circumstances of the offense on the mitigation side of the scales, which Fears has previously acknowledged in his direct appeal to the Ohio Supreme Court. (*See* Appellant's Brief, Appendix, Vol. III at 88.) Thus, this Court is at a loss to locate facts in the record to support Fears contention, and recommends this part of his claim be denied.

Although it is not named in the heading of the present ground for relief, Fears also makes the argument that his jury was improperly instructed that it was required to consider the death sentence first, and, if they failed to agree on death as the appropriate punishment, only then could they move on to consider one of the various life sentences available. (Amended Petition, Doc. No. 69 at 28.) Fears makes the same claim in his eighth ground for relief, *infra*, and there, Respondent

argues the claim is procedurally defaulted. (Return of Writ, Doc. No. 11 at 41, 84.)

In his traverse, addressing Respondent's defense in the eighth ground for relief, Fears argues that the issue is not procedurally defaulted because he raised it as a claim underlying his ineffective assistance of appellate counsel claim in his application to reopen his direct appeal (Appendix, Vol. IV at 10) in the state court. (Traverse, Doc. No. 61 at 96.) Such applications, however, preserve only ineffective assistance of appellate counsel claims, and not the underlying claims contained therein. Thus, Fears' application to reopen does not save his claim from procedural default. Although he does not say so, Fears did raise the instant claim in his direct appeal as part of this thirteenth proposition of law. (Appendix, Vol. III at 37.) The state supreme court observed that no objection had been made to the instruction at issue, however, and found no plain error. *State v. Fears*, 86 Ohio St.3d 329, 340-41, 715 N.E. 2d 136 (1999). As noted in Fears' analyzing first ground for relief, Ohio's procedural rule requiring a contemporaneous objection to perceived errors at trial is an independent and adequate state procedural rule. As the state court relied on that rule in rejecting Fears' claimed error, the instant ground for relief has been procedurally defaulted. Fears has not demonstrated cause and prejudice for the default, so his claimed error should be denied.

Even if that were not the case, however, the claim would fail. Fears relies on *Davis v. Mitchell*, 318 F.3d 682, 590 (6th Cir. 2003), in support of his claim. There, the Sixth Circuit Court of Appeals held that the combination of (1) a jury instruction stating unanimity was required on any sentencing decision, (2) a jury instruction stating the jury must first reject the death sentence before considering the life sentence options available, and (3) an instructional void concerning the lack of unanimity required respecting mitigating factors was contrary to *Mills v. Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990). *Davis*, 318 F.3d at 688-91. Those cases establish that "in order for Eighth Amendment law on mitigating factors to be coherent and capable of judicial administration without serious confusion, a capital jury must understand that .

. . 'a finding with respect to a mitigating factor may be made by one or more members of the jury.'"

*Davis*, 318 F.3d at 688.  The instructions in *Davis*, which included an "acquittal first" instruction not given in Fears' case, were constitutionally infirm because they were

> [S]ilent as to the different unanimity requirements for aggravating and mitigating circumstances, making no mention of the individual juror's power to prevent the death penalty by giving effect to mitigating circumstances absent the agreement of the other jurors regarding the presence of those mitigating circumstances.  Nor do they make clear that the jury need not be unanimous in rejecting death in order to render a verdict for life imprisonment.  The inescapable likelihood in this case that the jury understood the instructions to require unanimity in both its ultimate and interim conclusions violates *Mills*.

*Id*. at 690.  In addition, the court found it "hard to conceive" how the unanimity instruction and the requirement that each juror sign one of the twelve bars on the verdict form could be interpreted in any way other than that a jury finding that one or more of the mitigating factors existed and outweighed the aggravating circumstances must be unanimous.  *Id*. at 691.

The import of *Davis*, however, has been questioned by our sister court in the Northern District.  In *Madrigal v. Bagley*, 276 F. Supp. 2d 744, 783-85 (N.D. Ohio 2003), the district court observed that *Davis* was in conflict with three earlier Sixth Circuit cases, specifically, *Roe v. Baker*, 316 F.3d 557 (6th Cir. 2002), *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000), and *Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998).  The court stated:

> [A]lthough *Davis* is in conflict with *Coe*, *Roe*, and *Scott*, these three cases remain controlling authority because "'[a] panel of this [the Sixth Circuit] Court cannot overrule the decision of another panel.  The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.'"  *Taylor v. Mitchell* [296] F.Supp.2d [784, 813], 2003 WL 1477010 (N.D. Ohio Mar. 3, 2003)(discussing the effect of *Davis* and quoting *United States v. Smith*, 73 F.3d 1414[, 1418] (6th Cir. 1996).

*Madrigal*, 276 F. Supp. 2d at 785.  Thus, Fears' claim challenging the penalty phase jury instructions

must be evaluated under the precedents of *Coe*, *Roe*, and *Scott*.

In *Coe*, the jury was instructed as follows:

> If you unanimously determine that at least one statutory aggravating circumstance or . . . circumstances have been proved by the State, beyond a reasonable doubt, and said circumstance or circumstances are not outweighed by any mitigation circumstances, the sentence shall be death. The Jury shall state in writing the statutory aggravating circumstance or . . . circumstances so found, and signify in writing that there were no mitigating circumstances sufficiently substantial to outweigh the [aggravating circumstances].

*Coe*, 161 F.3d at 336-37. The jury was then told that the form of its verdict should be as follows:

> (1)    We, the Jury, unanimously find the following listed statutory aggravating circumstance or circumstances;
>
> . . . .
>
> (2)    We, the Jury, unanimously find that there are no mitigating circumstances sufficiently substantial to outweigh the [aggravating circumstances] so listed above.
>
> (3)    Therefore, we, the Jury, unanimously find that the punishment shall be death.

*Id*. at 337. In addition, the jury was instructed on the alternative result:

> If you unanimously determine that no statutory aggravating circumstance has been proved by the State beyond a reasonable doubt; or if the Jury unanimously determine that [aggravating circumstances] have been proved by the State beyond a reasonable doubt; but that said [aggravating circumstances] are outweighed by one or more mitigating circumstances, the sentence shall be life imprisonment.

*Id*. The *Coe* court found the jury instructions did not violate *Mills v. Maryland*, 486 U.S. 367, 373-75 (1988), reasoning that the challenged instructions required unanimity as to the weighing process, but not to the existence of a mitigating factor. The court noted that "[t]he instructions say clearly and correctly that in order to obtain a unanimous verdict, each juror must conclude that the mitigators do not outweigh the aggravators." *Coe*, 161 F.3d at 338. In addition, the court

acknowledged that an instruction requiring unanimity in the finding of aggravating circumstances, in combination with one instructing the jury to consider any mitigating factors, was not improper. *Id.* The inclusion of the unanimity feature in the instruction on aggravating circumstances, and its exclusion from the instruction on mitigating factors sufficiently informed jurors that unanimity was not required with respect to the existence of mitigating factors. *Id.* at 338-39.

The court also squarely addressed Coe's argument that the court had a duty to inform the jurors what the effect of a deadlock in the sentencing hearing would be. The court rejected the contention that jurors must be informed of the consequences of the jury's failure to achieve unanimity.

In Scott's case, the jury instructions were as follows:

> If all 12 members of the jury find, by proof beyond a reasonable doubt, that the aggravating circumstances which Jay Scott was found guilty of committing outweigh the mitigating factors, then you must return such a finding to the Court. I instruct you as a matter of law that if you make such a finding, then you have no choice and must recommend to the Court that the sentence of death be imposed upon the defendant . . . .

> On the other hand, if after considering all of the relevant evidence raised at trial, the testimony, other evidence, the statement of Jay Scott, and the arguments of counsel, you find that the State of Ohio failed to prove that the aggravating circumstances which the defendant, Jay Scott, was found guilty of committing, outweigh the mitigating factors, then you will return your verdict reflecting your decision.

> In this event, you will then proceed to determine which of two possible life imprisonment sentences to recommend to the Court. . . . .

> [The verdict form] says, "Verdict: We, the jury in this case being duly empaneled and sworn, do find beyond a reasonable doubt that the aggravating circumstances which the defendant, Jay Scott, was found guilty of committing, are sufficient to outweigh the mitigating factors presented in this case."

> "We, the jury, recommend that the sentence of death be imposed

upon the defendant, Jay Scott." and, again, signed by the foreman or forelady and all 12 of you must sign.

The second form is: "We, the jury in this case being duly empaneled and sworn, do find that the aggravating circumstances which the defendant, Jay Scott, was found guilty of committing, are not sufficient to outweigh the mitigating factors presented in this case."

"We, the jury, recommend that the defendant, Jay Scott, be sentenced to life imprisonment with parole eligibility after sentencing," and then there's a blank with an asterisk which refers down and says, "insert years of imprisonment," and again, the signatures, and the first line is reserved for the foreman or forelady, and the remainder of the eleven of you must sign that verdict form. It must be unanimous. . . .

[W]hen all 12 of you – I repeat – all 12 of you agree upon a verdict, you will sign the verdict in ink, and advise the Court of this fact.

*Scott*, 209 F.3d at 874. Again, the court differentiated between an instruction requiring the jury to be unanimous in its finding of each mitigating factor, as in *Mills v. Maryland*, 486 U.S. 367 (1988) and *Kubat v. Thieret*, 867 F.2d 351 (7th Cir. 1989), and a unanimity instruction relating only to the overall weighing of mitigating factors and aggravating circumstances, as the court found was so in Scott's case. *Scott*, 209 F.3d at 875. As in *Coe*, the court found the *Scott* instructions did not violate *Mills*. *Id*. at 877. In *Scott*, the court again rejected the argument that the jury must be informed of the consequences of a deadlock, stating as follows:

[T]he district court was clearly incorrect in finding error in the trial court's failure to advise the jury in its unanimity instruction as to the consequences of deadlock. The Supreme Court has chastised such instructions as encouraging deadlock and undermining the strong governmental interest in unanimous verdicts. *See Jones v. United States*, 527 U.S. 373, 119 S.Ct. 2090, 2099-2100, 144 L.Ed.2d 370 (1999).

*Scott*, 209 F.3d at 877.

In *Roe v. Baker*, 316 F.3d 557, 562-63 (6th Cir. 2002), the complained-of instructions were as follows:

Now each of you must decide the case for yourself, but you should do so only after a discussion and consideration of this case with your fellow jurors.  Now do not hesitate to change an opinion if you later find that that opinion or that position is wrong.  However, you should not surrender honest convictions in order to be congenial or in order to reach a verdict solely based upon the opinion of the other jurors.

. . . .

[Y]our verdict must be a unanimous verdict.  All 12 of the jurors must agree unanimously on the appropriate verdict.  Once you have made such a finding, again you would notify my bailiff with respect to that.  All 12 jurors have to sign the verdict form.

The Sixth Circuit recognized that although the challenged instruction might well have been incorrect under state law, it was not a basis for habeas relief since the unanimity requirement referred to the sentencing recommendation rather than to the existence of mitigating factors.  *Id.* at 564, *citing Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).  Once again, the court rejected the argument that the jury must be informed of the consequences of a deadlock, relying on *Jones*, 527 U.S. at 381-84, and *Coe*, 161 F.3d at 339-40.  *Roe*, 316 F.3d at 564.

The instructions given in Fears' case are not contrary to clearly established federal law.  The Sixth Circuit has criticized suggestions that the jury must be instructed on the effects of a deadlock as "*encouraging* deadlock and undermining the strong governmental interest in unanimous verdicts."  *Scott*, 209 F.3d at 877, *citing Jones v. United States*, 527 U.S. 373 (1999)(emphasis added).  *See also Coe*, 161 F.3d at 339-40.  For the reasons stated, the instant sub-claim should be denied.

Fears also argues that it is "clear" the trial judge assigned too much weight to the aggravating circumstance, considered improper factors, and failed to consider and give due weight to mitigating factors in its independent sentencing evaluation.  (Amended Petition, Doc. No. 69 at 28.)  Fears presents nothing beyond his own contention to support his claim that the trial court gave inordinate weight to the aggravating evidence, or that the court did not give appropriate weight to the mitigating factors.  Without more, Fears' sub-claim fails.

49

Next, Fears contends the trial court erred in not merging certain of the aggravating circumstances for sentencing purposes. (Amended Petition, Doc. No. 69 at 28-30.) Respondent acknowledges that Fears raised and properly preserved the issue for habeas review by bringing it to the Ohio Supreme Court on direct appeal, but argues that the state court correctly rejected the claim, and in the alternative, that the claim is one involving only state law and is not, therefore, cognizable in habeas corpus. (Return of Writ, Doc. No. 11 at 45.) It is not at all clear, however, that merger of the aggravating circumstances did not occur in the penalty phase.

First, the Court observes that prior to the sentencing deliberations, the trial court instructed the jurors, in relevant part, as follows:

> You have heard the evidence and the arguments of counsel and you will now decide what you will recommend to the Court – whether you will recommend to the Court that the sentence of death be imposed upon the defendant, and if not, whether you will recommend that the defendant be sentenced to life imprisonment without parole, life imprisonment with parole eligibility after serving 25 full years, imprisonment – or life imprisonment without parole eligibility until after serving 30 full years of imprisonment.
>
> . . .
>
> Now, verdict forms with these four options will be furnished to you. You will consider all the evidence, arguments and other information which is relevant to the nature and circumstances of the aggravating circumstances of which you have found the defendant guilty.
>
> The aggravated [sic] circumstances in which you found the defendant guilty are:
>
> First one, that the defendant Angelo Fears, committed an aggravated murder of Antwuan Gilliam while the said Angelo Fears was committing, attempting to commit or fleeing immediately after committing or attempting to commit the offense of kidnapping, and that the defendant, Angelo Fears, was the principal offender in the commission of the aggravated murder or if not the principal offender, committed the aggravated murder with prior calculation and design.
>
> The second aggravating circumstance that you found the defendant guilty of was that the defendant, Angelo Fears, committed the

aggravated murder of Antwuan Gilliam while the said Angelo Fears was committing, attempting to commit, fleeing immediately after committing or attempting to commit the offense of aggravated robbery, and that the defendant, Angelo Fears, was a principal offender in the commission of the aggravated murder or if not the principal offender, committed the aggravated murder with prior calculation and design.

The third aggravating circumstance you found the defendant guilty of was that the defendant, Angelo Fears, committed the aggravated murder of Antwuan Gilliam while the said Angelo Fears was committing, attempting to commit, fleeing immediately after committing or attempting to commit the offense of aggravated burglary, and that the defendant, Angelo Fears, was a principal offender in the commission of the aggravated murder or if not the principal offender, committed the aggravated murder with prior calculation and design.

*Now, when a person is convicted of more than one count of aggravated murder, the penalty for each individual count must be assessed separately. The aggravating circumstances that are related to a particular count of aggravated murder will merge with each other when you consider assessing the penalty for that count.*

. . .

Four sentencing possibilities will be in verdict forms in each count which I'm about to read to you. . . .  And there are sixteen verdict forms in all.  You are required to reach one verdict in each of the four counts which means you are required to execute four verdict forms, one on each count.

. . .

The first [verdict form for Count 1] reads as follows:  "We, the jury unanimously find," that's all twelve of you, "by proof beyond a reasonable doubt that the aggravating circumstances [sic] the defendant was found guilty of committing in Count 1 outweighs the mitigating factors and, therefore, we do hereby recommend to the Court that the sentence of death be imposed on the defendant."

Same style[,] same caption, same case number, still on Count 1.  "We, the jury, unanimously find that the aggravating circumstances [sic] the defendant was found guilty of committing in Count 1 does not outweigh the mitigating factors and recommend that the defendant be sentenced to life imprisonment without parole eligibility."

51

Next one still on Count 1. Same caption, same case number. "We, the jury, unanimously find that the aggravating circumstances [sic] the defendant was found guilty of committing in Count 1 does not outweigh the mitigating factors and recommend that the defendant be sentenced to life imprisonment with parole eligibility after serving 30 full years of imprisonment."

And the next one, same caption, same case number, still on Count 1. "We, the jury, unanimously find that the aggravating circumstances [sic] the defendant was found guilty of committing in Count 1 does not outweigh the mitigating factors and recommend that the defendant be sentenced to life imprisonment with parole eligibility after serving 25 full years."

There are four forms for Count 1. You need to make a finding only on one form.

The other forms are exactly the same except you have four forms for Count 2, four for Count 3 and four for Count 4.

Now, you must return a sentence with respect to each of the four counts of aggravated murder. You should consider each of these counts and recommendations independently.

(Trial Tr. at 2976-78, 2983-85 (emphasis added).) Although the trial court clearly misread the verdict forms in using the plural "aggravating circumstances," it did instruct the jurors that the aggravating circumstances for each of the four capital offenses were merged for sentencing purposes. In addition, the four sentencing verdict forms themselves each referred only to a single aggravating circumstance. (Appendix, Vol. II at 263-66.) Moreover, in its sentencing opinion, the trial court stated that "[f]or the purposes of sentencing, the Court, . . . having found that all offenses charged in the indictment were committed as part of the same act, transaction or occurrence, hereby merges counts one, two, three and four together with those specifications charged in the same." (Appendix, Vol. II at 259-60.) Consequently, it appears that except for the unfortunate use of the plural "circumstances" in the jury instructions, the aggravating circumstances were merged for sentencing, and indeed that the trial court even merged the four counts of aggravated murder as well

52

as the aggravating circumstances in its independent sentencing evaluation.[11]

Nevertheless, when Fears raised the merger issue on direct appeal, the Ohio Supreme Court apparently either overlooked the facts set forth above, or took Fears' word that the capital specifications were not merged, when it held that "merger should have taken place." *State v. Fears*, 86 Ohio St.3d at 344. The court went on to merge the kidnapping specification with the aggravated robbery specification, then concluded that the remaining aggravating circumstances outweighed the mitigating factors, and that Fears had suffered no prejudice from the trial court's alleged failure to merge the capital specifications. *Id*. The court rejected Fears contention that any other combination of the aggravating circumstances should have been merged, even though the trial court plainly did so in the sentencing proceedings. *Id*.

Fears' claim here rests on a faulty factual premise. The trial court did merge the aggravating circumstances before the jury recommended death, and beyond that, the court merged the aggravating circumstances as well as the four capital counts in the indictment in its own sentencing evaluation. Consequently, it is recommended that Fears' claim to the contrary be denied.

Finally, Fears argues simply that the aggravating circumstance(s) in his case did not outweigh the mitigating factors. (Amended Petition, Doc. No. 69 at 30-31.) Presumably, his argument is that if the aggravating circumstances had been properly pared down by merging them for sentencing purposes, what remained would not have outweighed the mitigating factors presented in the penalty phase. Having determined that merger did in fact occur at trial, however, this claim fares no better than those before it, and it should be denied.

**Third Ground for Relief**

---

[11]It must be noted that Fears does not claim that the trial court erred in failing to merge the four capital counts in the indictment for sentencing purposes.

Fears next claims his trial counsel were ineffective in four instances:  (1) when they failed to obtain a defense firearms expert to rebut the state's expert witness' testimony; (2) when they failed to present evidence that the weapon used in the killing was the subject of a recall; (3) when they failed to obtain a toxicological expert to provide assistance respecting Fears' intoxication at the time of the offense; and (4) when they failed to object to numerous instances of prosecutorial misconduct.  Respondent contends the first and second of those instances have been procedurally defaulted by the Ohio Court of Appeals' holding in post-conviction that they were barred by the doctrine of *res judicata*.  (Amended Petition, Doc. No. 69 at 32-33.)  Respondent acknowledges that the third instance has been properly preserved for habeas corpus review, as has the fourth instance to the extent that Fears' defense counsel objected to the alleged prosecutorial misconduct.  (Return of Writ, Doc. No. 11 at 59, 61.)  Any claims of prosecutorial misconduct not objected to by defense counsel at trial are procedurally defaulted.  The Court considers each of Fears' contentions, along with Respondent's arguments as to procedural default and the merits of each in turn.

The governing standard for effective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687.

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689.

As to the second prong, the Supreme Court held:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to overcome confidence in the outcome.

466 U.S. at 694. *See also Darden v. Wainright*, 477 U.S. 168, 184 (1986); *Wong v. Money*, 142 F.3d 313, 319 (6th Cir. 1998); *Blackburn v. Foltz*, 828 F.2d 1177, 1180-81 (6th Cir. 1987). The merits of Fears' claim will be considered with these principles in mind.

In his first sub-claim, Fears argues that his trial counsel were ineffective for not conducting a thorough voir dire and cross-examination of the prosecution's firearms expert, and for not obtaining their own firearms expert to examine the weapon used in Gilliam's murder. (Amended Petition, Doc. No. 69 at 33-36.) Respondent counters that the sub-claim is procedurally defaulted since the appellate court found the sub-claim barred by the doctrine of *res judicata*. (Return of Writ, Doc. No. 11 at 54.)

Fears raised the instant sub-claim as his second claim for relief in his state post-conviction proceedings. (Appendix, Vol. V at 22-24.) The trial court found the claim barred on *res judicata* grounds (Appendix, Vol. VII at 238-9), and the appellate court affirmed that determination, *State v. Fears*, No. C-990050, 1999 WL 1032592 at *4-5 (Ohio App. 1st Dist. Nov. 12, 1999)(unreported).

Fears contends he preserved the sub-claim by raising it in his Ohio R. App. Proc. 26(B) application for reopening and in his state post-conviction petition. (Traverse, Doc. No. 61 at 56.) Neither argument succeeds.

Fears did indeed raise his appellate counsels' ineffectiveness in his application for reopening, with the instant sub-claim identified as one of the propositions of law his appellate counsel should have raised on direct appeal. (Appendix, Vol. IV at 9.) The Ohio Supreme Court's response to Fears' petition (which is so brief that it does not even require a block quote) reads as follows: "This cause came on for further consideration upon [A]ppellant's application for reopening under S. Ct. Prac. R. XI, Section 5. Upon consideration thereof, IT IS ORDERED by the Court that the application for reopening be, and hereby is, denied." (Appendix, Vol. IV at 178.) The entry is devoid of even a hint of the court's reason(s) for denying Fears' application. Where, however, there has been one reasoned state court judgment rejecting a federal claim, there is a rebuttable presumption that later unexplained orders upholding the judgment or rejecting the same claim rest on the same ground. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991). Regardless, while those facts may be of some value to a discussion as to whether Fears has preserved his ineffective assistance of appellate counsel claim for habeas review, they are irrelevant to a discussion on whether his ineffective assistance of trial counsel claim was preserved as a free-standing claim. In other words, ineffective assistance of *appellate* counsel claims can be preserved for habeas review via an application for reopening, but ineffective assistance of *trial* counsel claims cannot. Thus, Fears' instant sub-claim alleging his trial counsels' ineffectiveness is not saved from procedural default by his application for reopening.

Fears also argues his sub-claim was saved from procedural default by his raising it in his state post-conviction petition. That might be true except that the state court relied on an independent and adequate state procedural ground for denying him relief. As noted above, both the post-

conviction trial court and the appellate court determined Fears' sub-claim was barred from consideration by the doctrine of *res judicata*. (Appendix, Vol. VII at 238-9); *State v. Fears*, No. C-990050, 1999 WL 1032592 (Ohio App. 1st Dist. Nov. 12, 1999)(unreported). Ohio's doctrine of *res judicata* in criminal cases, enunciated in *State v. Perry,* 10 Ohio St. 2d 175, 226 N.E. 2d 104 (1967)(paragraph seven of the syllabus), is an independent and adequate state procedural ground. *Buell v. Mitchell*, 274 F. 3d 337, 349 (6th Cir. 2001); *Coleman v. Mitchell*, 268 F. 3d 417, 427 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir. 2000); *Rust v. Zent,* 17 F.3d 155, 160-61 (6th Cir. 1994); *Van Hook v. Anderson*, 127 F.Supp.2d 899, 916-17 (S.D. Ohio 2001). Also, the Ohio courts have consistently enforced the rule. *State v. Cole*, 2 Ohio St. 3d 112, 114, 443 N.E. 2d 169 (1982); *State v. Ishmail*, 67 Ohio St. 2d 16, 18, 423 N.E. 2d 1068 (1981). The rule was enforced against Fears as noted above, so the only question remaining is whether Fears actually violated the procedural rule. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

The state court of appeals found that the affidavit submitted by Fears to support his claim that his trial counsel were ineffective for not obtaining a firearms expert "failed to advance the claim[] beyond speculation and a desire for further discovery," and that the evidence submitted did not constitute legitimate evidence from outside the record, as is required to avoid the bar of *res judicata* in Ohio post-conviction proceedings. *State v. Fears*, No. C-990050, 1999 WL 1032592 at *5 (Ohio App. 1st Dist. Nov. 12, 1999)(unreported); *see State v. Pankey*, 68 Ohio St.2d 58, 59, 428 N.E. 2d 413 (1981); *State v. Jackson*, 64 Ohio St.2d 107, 413 N.E. 2d 819 (1980), syllabus. This is not a situation in which this Court can say with any confidence that the state court's reliance on its own procedural rule is misplaced, or that its determination that Fears had violated the rule is wrong. *See Hill v. Mitchell*, 400 F.3d 308, 314 (2005); *Greer v. Mitchell*, 264 F.3d 663, 675 (6th Cir. 2001). Thus, Fears has not preserved the instant sub-claim for habeas review.

Even so, were this Court to address the merits of Fears' claim, it would be unavailing. Cleon

Mauer's affidavit, submitted in connection with Fears' post-conviction petition in the state court, provides no evidence that an accidental discharge of the gun Fears was holding caused Antwuan Gilliam's death.  He stated the firearm was in "mechanical operating condition with the safety features functioning properly." (Appendix, Vol. VI at 179.)  He disagreed with William Schrand, the prosecution's firearms expert, who testified essentially that a discharge of the weapon caused by some means other than pulling the trigger *would* have prevented the slide from ejecting the casing. (Trial Tr. at 1940; Appendix, Vol. VI at 180.)  Mauer would have said such a circumstance *may* have prevented the slide from ejecting the casing, a slight difference to be sure, and not the sort of difference that results in reversal of an aggravated murder conviction.  In addition, Mauer's affidavit sets forth several omissions in Schrand's testimony.  (Appendix, Vol. VI at 180.)  The identification of an omission in an expert's testimony, however, with no evidence of what the omitted information was or how it would have affected the outcome of the trial, fails to demonstrate that an error of constitutional dimension was committed.  For example, Mauer notes that Schrand did not state the serial number of the weapon he examined, but that omission, without more, means nothing.  The same is true of the other omissions pointed out by Mauer in his affidavit.  Fears simply does not demonstrate how those omissions prejudiced him in any way.  In addition, Mauer's affidavit is entitled to less weight because when provided the opportunity for an evidentiary hearing in these proceedings, Fears never requested to present Mauer's testimony, and it remains uncross-examined. (Motion for Evidentiary Hearing, Doc. No. 60.)  To sum up, the statements in Mauer's affidavit and the evidence presented at the evidentiary hearing respecting the possibility of an accidental discharge of the murder weapon fall far short of overcoming the strong evidence that Fears intentionally fired the weapon, killing Gilliam.  Fears' statements at the time of the offense to the effect that he should shoot Gilliam in his "booty," and that he didn't "give a fuck" about killing him, along with his conversation with James Grant about which "nigger" to kill rather bluntly

convey his intention to kill Gilliam (Trial Tr. at 1568-69; 2010-15; 2129-31; 2134-40), and nothing in Mauer's affidavit or the evidence presented in the evidentiary hearing succeeds in suggesting the killing was caused by an accidental discharge of the weapon. Thus, even if preserved, denial would be recommended for Fears' claim that his trial counsel were ineffective for their failure to present at trial the substance of Mauer's affidavit and the additional evidence elicited from William Schrand in the evidentiary hearing.

Next, Fears contends that his trial counsels' failure to locate and present evidence that the murder weapon had been the subject of a manufacturer's recall constituted ineffective assistance. (Amended Petition, Doc. No. 69 at 36-38.) Respondent argues this sub-claim has been procedurally defaulted by the state courts' denial of the claim on *res judicata* grounds. (Return of Writ, Doc. No. 11 at 57.) Fears seems to contend that merely raising the issue in the state court is enough to preserve it regardless of the state's resolution of the claim on procedural grounds. (Traverse, Doc. No. 61 at 61.) Fears does not contest Respondent's assertion that the issue was resolved procedurally in the state courts, and the Court finds that Respondent's description of the status of Fears' sub-claim is accurate. In fact, the state court addressed the instant sub-claim and the one just preceding together, so both are in the same procedural posture for habeas purposes. Consequently, Fears has procedurally defaulted this sub-claim, and it should be denied.

Even if the sub-claim were not procedurally defaulted, however, it is meritless. That the murder weapon was subject to recall because there was a possibility of accidental discharge if it were dropped or carelessly handled, even in conjunction with the evidence submitted in connection with the preceding sub-claim, is not enough to overcome the evidence of Fears' intent produced at trial. Also, at trial there was no suggestion that the weapon was dropped or otherwise carelessly mishandled except that Fears may have been holding two weapons when he shot Gilliam. But holding two weapons at the same time, even if Fears were fumbling with them, is not the type of

"mishandling" that would cause the weapon to accidentally discharge. When discussing the recall, Schrand testified at the habeas evidentiary hearing that the type of blow necessary to cause an accidental discharge of the weapon would have to be such that it would hit directly on the hammer and break two pieces of metal associated with two safety features on the weapon. (Trial Tr. at 224-25.) In his words, it would take "a great deal of effort." *Id.* No evidence at trial, and none presented since, has tended to show that the weapon used to kill Gilliam was subjected to a blow sufficient to cause an accidental discharge. Thus, the instant sub-claim, had it been preserved, would have been meritless, and the Court would have recommended its denial.

Next, Fears contends that his trial counsels' failure to obtain a toxicological expert constituted ineffective assistance. (Amended Petition, Doc. No. 69 at 38-41.) He argues that the testimony of a toxicologist would have been valuable in both the guilt and penalty phases of his trial.[12] Respondent acknowledges that the instant sub-claim is properly preserved for habeas review. (Return of Writ, Doc. No. 11 at 59.)

Fears raised the instant sub-claim in his fifth post-conviction claim for relief. (Appendix, Vol. VII at 25-33.) The trial court rejected the claim, reasoning that counsels' failure to present additional evidence of alcohol and substance abuse was strategic and did not constitute ineffective assistance. (Appendix, Vol. VII at 240-41.) The state court of appeals agreed that counsels' decision not to present an intoxication defense during the guilt phase was trial strategy, and also noted that "Fears failed to demonstrate that his counsel's [sic] assistance was ineffective or that his defense was prejudiced by the failure to raise a defense of intoxication." *State v. Fears*, No. C-990050, 1999 WL 1032592 at *6 (Ohio Ct. App. 1st Dist. Nov. 12, 1999)(unreported). Thus, Respondent correctly concedes that this sub-claim is properly preserved and amenable to habeas

---

[12]Fears advances an ineffective assistance of trial counsel claim in his fifth ground for relief as well. That ground pertains to his counsels' performance during the penalty phase, and Fears' claim that additional evidence of substance and alcohol abuse would have been helpful in that phase of his trial is addressed there.

corpus review.

"'In Ohio, evidence of voluntary intoxication 'may be considered in determining whether an act was done intentionally or with deliberation and premeditation.'" *Hicks v. Collins*, 384 F.3d 204, 214 (6th Cir. 2004), *quoting Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000), *quoting Ohio v. Fox,* 68 Ohio St.2d 53, 55, 428 N.E. 2d 410, 412 (1981); *see also State v. Wolons,* 44 Ohio St.3d 64, 68, 541 N.E. 2d 443, 446 (1989). Only intoxication so severe that the defendant is "mentally unable to intend anything," however, is sufficient to negate the element of specific intent. *State v. Otte*, 74 Ohio St.3d 555, 564, 660 N.E. 2d 711, 720 (1996). At least one of Fears' trial counsel was under the mistaken belief that voluntary intoxication is not a defense to a specific intent offense and that it can only be used in mitigation. (Testimony of Peter Pandilidis, Evid. Hrg. Tr. at 428, 430.) Fears' other trial counsel testified that he relied on information given to him by Fears to rule out the voluntary intoxication defense. (Testimony of Peter Rosenwald, Evid. Hrg. Tr. at 505.)

Even assuming Fears' trial counsels' decision not to fully investigate and pursue a voluntary intoxication defense were the result of mistake rather than strategy, the evidence does not demonstrate that Fears was prejudiced by the alleged error. The evidence may support a conclusion that Fears had been consuming alcohol and drugs, perhaps even excessively, in the hours and days preceding the murder. But impairment does not equal incapacity. The evidence also demonstrates that Fears had the wherewithal to exit the van he and James Grant were traveling in prior to the murder, approach the apartment building, climb up the stairs to the apartment, assist in the robberies and confiscate the weapons of the occupants of the apartment, engage in a discussion of which "nigga" to kill, carry through with the decision once it was made, and flee the scene by running to the van. These are hardly the actions of someone who is "unable to intend anything." Taking all the evidence together, then, it is unlikely that the outcome of Fears' trial would have been different had his trial counsel exhaustively investigated and presented a voluntary intoxication defense in the

61

Case 1:01-cv-00183-SSB-MRM    Document 114    Filed 11/08/2005    Page 62 of 97

guilt phase of his trial. Therefore, even if Fears' attorneys made a serious error in their understanding of the law respecting the intoxication defense and its impact on the element of specific intent, no prejudice flowed from the error.

In his last sub-claim of the instant ground for relief, Fears argues that his trial counsel provided ineffective assistance when they failed to object to numerous instances of prosecutorial misconduct. (Amended Petition, Doc. No. 69 at 41.) Although Fears does not specify which alleged instances of prosecutorial misconduct should have been objected to by defense counsel, the Court presumes they are the same as what appear in Fears' first ground for relief as free-standing claims of prosecutorial misconduct, and considers now only those incidents to which defense counsel did not object.

Respondent contends the instant sub-claim is partially procedurally defaulted based on the Ohio Supreme Court's analysis of some instances of prosecutorial misconduct under the plain error rule. (Return of Writ, Doc. No. 11 at 61.) While the state court's plain error analysis may result in procedural default of the prosecutorial misconduct claims, Fears raised his counsels' ineffectiveness for not objecting to the prosecutor's alleged misconduct in his twenty-sixth proposition of law on direct appeal in the state court, and that claimed error was addressed on its merits by the Ohio Supreme Court. *Fears*, 86 Ohio St.3d at 346-48. Thus, Fears' ineffective assistance of trial counsel claim, based on counsels' failure to object to several instances of prosecutorial misconduct, is properly preserved for habeas review.

First, defense counsel did not object to the prosecutor's statements in closing argument relating to whether the killing could have been the result of an accident. (*See* Amended Petition, Doc. No. 69 at 9.) Since those comments were observed to have been logically and legally correct, and because Fears' counsel made substantially the same comment in his own closing argument, defense counsel were not ineffective for not objecting to the prosecutor's statements. *See* First

Ground for Relief, *supra*.

The next comment Fears claims his counsel should have objected to was the prosecutor's question in voir dire as to whether a prospective juror thought it was possible for the case against Fears to be proven by using evidence other than Fears' testimony. (*See* Trial Tr. at 960.) The query is inoffensive and entirely acceptable as a means of determining whether the prospective juror would require Fears' testimony to decide the case. Fears' trial counsel were not ineffective for failing to object to such an innocuous question.

Next, the Court considers defense counsels' failure to object to the prosecutor's reference to defense counsel as a "magician" engaging in a "slight [sic] of hand technique" or "trick." (*See* Trial Tr. at 2339-40.) Assuming the prosecutor's comments were improper and that defense counsel should have objected and even that the objection would have been sustained and a curative instruction given, Fears has not shown prejudice, as is noted in the Court's consideration of Fears' first ground for relief. For that reason, Fears has not made out his claim that his trial counsel were ineffective for their failure to object to the prosecutor's improper statements.

Having found no merit to Fears' claim that his trial counsel were ineffective as alleged in this ground for relief, the Magistrate Judge recommends its denial.

## Fourth Ground for Relief

In his fourth ground for relief, Fears argues his trial counsel were ineffective at the jury selection phase of his trial because they did not request a hearing to determine how only one African-American was present in his venire. (Amended Petition, Doc. No. 69 at 42-43.) Respondent acknowledges this ground for relief has been preserved for habeas review. (Return of Writ, Doc. No. 11 at 63.)

Early in the voir dire process, defense counsel expressed surprise that only one of the fifty

people in the initial jury pool was African-American.  (Trial Tr. at 157.)  In addition, since the

African-American woman was the forty-ninth person added to the jury pool, he doubted she would

be selected for service since the jury would most likely be chosen from those ahead of her in the

pool.  *Id*.  Counsel indicated an intention to "maybe mak[e] a motion on that tomorrow."  *Id*.  The

next day, counsel made the motion, and it was overruled.  *Id*. at 158-63.

> On direct appeal, the Ohio Supreme Court held as follows:

>> [Fears] also contends that trial counsel was [sic] ineffective in failing
>> to timely challenge the racial make-up of the venire.  Defense counsel
>> challenged the venire in open court, alleging that the array did not
>> constitute a fair cross-section of the community, since only one
>> individual out of fifty in the array was black.  The court denied the
>> motion as untimely, since voir dire had already begun, citing [Ohio]
>> Crim.R. 24(E), and noted that nothing indicated that the array was
>> chosen in any manner other than random selection from the voting
>> public.

*State v. Fears*, 86 Ohio St.3d 329, 346-47, 715 N.E. 2d 136 (1999).

Fears challenges his trial counsels' representation because they "assume[d] things were

probably done correctly" in assembling the jury pool.  (Amended Petition, Doc. No. 69 at 42; Trial

Tr. at 157.)  He claims his attorneys failed him when they moved for dismissal of the jury pool as

constituted instead of requesting a hearing on how the jury pool came to be so racially lopsided.

Even assuming Fears trial counsel should have requested a hearing, however, Fears has failed to

support his claim that anything untoward occurred in assembling the jury pool for his trial.  In other

words, saying trial counsel should have requested a hearing is meaningless without some evidence

that the hearing would have revealed discrimination in the selection of the jury pool.  Since Fears

does not reference any such evidence, indeed, he does not even make the claim that the racial make-

up of his jury pool was intentionally unbalanced.  He merely points out that it was suspicious.  True

enough, but suspicion is not enough to warrant issuance of a writ of habeas corpus.  Fears' fourth

ground for relief should be denied.

**Fifth Ground for Relief**

In his fifth ground for relief, Fears claims his trial counsel were ineffective in the penalty phase of his trial. (Amended Petition, Doc. No. 69 at 43-52.) In the first instance, Fears argues his counsel inadequately prepared for the mitigation phase of his trial, and for proof, points to the occasional contact between the mitigation specialist and the rest of the defense team, and defense counsel Peter Rosenwald's admission after the verdicts that he would not have used Dr. Smalldon as an expert in Fears' case if he had known what the doctor was going to say on cross-examination. Respondent makes no argument that this sub-claim is procedurally defaulted. (Return of Writ, Doc. No. 11 at 66.)

Fears claims that his counsel were ineffective because they failed to communicate with other members of the defense team, specifically the mitigation specialist, Martha Jacoby, and the psychological expert, Dr. Jeffrey Smalldon. (Amended Petition, Doc. No. 69 at 44-46.) Fears contends that if trial counsel had had more frequent and better communication with Jacoby, they would have presented the mitigation evidence more fully, and that better communication with Dr. Smalldon would have avoided the surprises in his testimony under cross-examination.

Fears details the number and length of meetings between Jacoby and trial counsel, and presented Jacoby's testimony at the evidentiary hearing in these proceedings in which she testified that she had more information to convey to the attorneys than was possible in the relatively short phone conversations and meetings she had with them. (Petitioner's Post-Evidentiary Hearing Memorandum, Doc. No. 94 at 14-15; Evid. Hrg. Tr. at 352.) Jacoby testified that she first met with Fears' lawyers on August 8, 1997. (Evid. Hrg. Tr. at 344.) That meeting lasted about one hour (Evid. Hrg. Tr. at 370), after which Jacoby met with Fears in jail for approximately two hours (Evid. Hrg. Tr. at 372). Although she traveled to Cincinnati again on two occasions, she did not meet with

Fears' attorneys during those trips.[13]  (Evid. Hrg. Tr. at 347-48.)  On October 1, 1997, she met again with Fears' counsel for approximately one hour.  *Id*. at 378.  Written correspondence was exchanged between Jacoby and the defense attorneys as well (Evid. Hrg. Tr. at 355, 360), and there were phone conversations, at least one involving the entire defense team (Evid. Hrg. Tr. at 389, 358-59).

Jacoby testified that she had compiled a list of approximately thirty-one potential mitigation witnesses prior to the one meeting of the defense team, but that not every potential witness was discussed at the meeting.  (Evid. Hrg. Tr. at 355.)  Later, four days before the start of the mitigation phase, in fact, Jacoby provided trial counsel with some of the strengths and weakness of some of the thirty-one potential witnesses.  *Id*. at 360.  Jacoby also testified that significant mitigation evidence was either not presented at all, or was superficially presented.  (Evid. Hrg. Tr. at 363-65.)  Fears' mother's psychiatric history of depression, panic disorder, outpatient treatment, and suicidal thoughts; Fears' own substance abuse; the poverty in which he was raised; the failure of child protective services and the educational system respecting the Fears family; and the generational cycles of abuse, neglect, and substance abuse were all issues Jacoby felt were inadequately presented during Fears' mitigation hearing.  *Id*.

Peter Pandilidis, one of Fears' trial attorneys, described his working relationship with Jacoby as "distant," noting that she was in Cleveland and he was in Cincinnati.  (Evid. Hrg. Tr. at 446.)  He recalled that most of their communications took place by telephone, but that there had been one or more face-to-face meetings between himself and Jacoby as well.  *Id*. at 433-34.  Peter Rosenwald, Fears' other trial counsel, testified that he felt the mitigation phase of Fears' trial went well.  (Evid. Hrg. Tr. at 526.)  Although Rosenwald could not say specifically why he called the witnesses he did and did not call the witnesses he did not in the mitigation phase, he stated that it must have been his

---

[13]Jacoby lived in Cleveland, Ohio, but Fears' trial took place in Cincinnati, Ohio, roughly 250 miles southwest of Cleveland.

belief at the time that it would not have been in Fears' best interest to call thirty-one witnesses to present what likely would have been repetitive testimony. *Id*. at 542-43. He could not say with any degree of precision how many times he might have met with Jacoby prior to the mitigation hearing. *Id*. at 545. He described his relationship with Jacoby as "businesslike." *Id*. at 550.

Fears also presented the testimony of Dorian Hall at his evidentiary hearing. Hall is a mitigation specialist, and was called to give expert testimony on the standards applicable to mitigation specialist and the presentation of mitigation evidence at trial. (Evid. Hrg. Tr. at 235-338.) The Court reserved ruling on Respondent's objection to Hall's testimony on *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), grounds. (Evid. Hrg. Tr. at 256.) Since the performance of the mitigation specialist in Fears' case was not challenged and in any case would not at present constitute a claim of constitutional error – there is no federal constitutional right to effective assistance of a mitigation specialist – and because Hall, as a mitigation specialist, is not qualified to offer expert testimony on the performance of attorneys, her testimony is excluded from this Court's consideration of Fears' ineffective assistance of counsel claim.

The evidence presented in the mitigation phase relating to Fears' mother's psychological problems came from three witnesses. First, Angelo Dean, who had worked with the Fears family in his capacity as a social worker, testified that when Fears was fourteen or fifteen years old, Mrs. Fears appeared to be "overwhelmed" by her responsibilities, but doing the best she could. (Trial Tr. at 2622.) Mrs. Fears' sister, Gail Benton, testified that Mrs. Fears had been struggling with depression for numerous years and had been on medication and in and out of the hospital as a result. *Id*. at 2717-18. In addition, Dr. Jeffrey Smalldon, the defense's expert, testified that Mrs. Fears had a long history of depression that included treatment with antidepressants and hospitalization. *Id*. at 2772. Later in his testimony, Dr. Smalldon stated that Mrs. Fears' depression had begun in the early 1970's and described it as "serious." *Id*. at 2786.

Fears' substance abuse was testified to by every one of the eight mitigation witnesses called. Fears' mother acknowledged in her testimony that she knew her son drank a significant amount of alcohol.  (Trial Tr. at 2562.)  His sister Latanya testified that Fears is an alcoholic, *id*. at 2581, and attorney Brian Anten testified that Fears "had a drinking problem" and that he had represented Fears on a charge of driving under the influence of alcohol in the past, *id*. at 2605.  Social worker Angelo Dean acknowledged that Fears did not appear to be abusing substances when Dean was involved with the family in Fears' teen years, but he also noted that the detection of such problems was not developed at that time, and that Fears had admitted to drinking alcohol and smoking marijuana.  *Id*. at 2639-40.  James Fears, Jr., Fears' brother, testified that Fears was a heavy drinker, *id*. at 2659, and Fears' stepmother, Willa Mae Fears, stated that she knew Fears was a drinker "like his father," *id* at 2690.  Gail Benton, Fears' aunt, testified that she used to "get on" Fears for his drinking, and that every time she would visit the family, Fears would be drunk or going to get a bottle of alcohol or have one already in his hand.  *Id*. at 2722.

Perhaps most thoroughly, Fears' alcohol abuse was described by Dr. Smalldon, who testified that Fears began drinking at a very young age, and that by the time he was twelve years old, Fears was a regular drinker, using alcohol every day unless he was in an institutional setting.  *Id*. at 2784. Dr. Smalldon suspected Fears had been drinking heavily even before the age of twelve, and that one of the reports he reviewed in his evaluation of Fears indicated Fears minimized his drinking.  *Id*. at 2886-87.  Further, Fears had acknowledged to Dr. Smalldon that he was an alcoholic, that he drank daily, and that it was his greatest source of pleasure.  *Id*.  In addition, Fears described marijuana use and experimentation with powder and crack cocaine.  *Id*. at 2785.  Dr. Smalldon  characterized Fears' alcohol consumption as "very heavy," *id*. at 2786, and noted that one of the clinical tests administered to Fears indicated excessive use of alcohol, *id*. at 2825.  After interviewing and administering psychological tests to Fears, Dr. Smalldon diagnosed him as alcohol dependent.  *Id*.

at 2827.  Dr. Smalldon also testified that Fears had indicated to him that he had consumed "a lot" of alcohol the day of Antwuan Gilliam's murder.  *Id.* at 2849.  Finally, Dr. Smalldon stated that alcohol, consumed in the quantities Fears regularly consumed, can play a significant role in compromising the consumer's judgment.  *Id.* at 2831.

Similarly, nearly all of the mitigation witnesses described the neighborhood in which Fears grew up as crime ridden, drug infested, and impoverished.  (Trial Tr. at 2604-5, 2625, 2642, 2658, 2664, 2687.)  Dr. Smalldon, in particular, testified Fears' mother's family was very poor, and that the area in which Fears lived had an extremely high delinquency rate.  *Id.* at 2772, 2777.  Dr. Smalldon also stated that Fears saw drive-by shootings and many of his friends were killed as he grew up.  *Id.* at 2777.  After Fears' father left the family, they lived in a very high crime and low socioeconomic area where they frequently were without enough food, and where sometimes a can of corn would suffice for a meal.  *Id.* at 2777, 2876-77.

Testimony on the failure of the children's protective services agencies and the educational system to provide services to Fears and his family was scant.  Fears' brother James testified that no agencies tried to help him or Fears with counseling "or anything like that," that no one told Fears' teachers at school that he was slow, and that no one helped Fears in school.  (Trial Tr. at 2662-63.)  Fears' stepmother stated, "[i]f [Fears] was in school and the teachers could see that he was having problems, someone should have came to his aid then."  *Id.* at 2696.  Dr. Smalldon testified that he understood Fears had as a youngster received some special educational services for children with learning problems, although he was unable to verify that with Fears' school records.  *Id.* at 2780, 2900.

As to the last category of evidence Fears claims was under-presented at his mitigation hearing, to wit, the generational cycle of substance abuse, neglect, and abuse in the Fears family, several mitigation witnesses testified on that topic.  Venustien Fears, Fears' mother, testified that

her life with her mother and stepfather was "hell" and that she was physically and sexually abused by her stepfather. (Trial Tr. at 2537.) She also testified to Fears' father's chronic alcoholism and abuse of Fears and the other children in the family. *Id.* at 2541. Fears' sister Latanya testified that life for her and Fears was "hell" because of James Fears, Sr.'s, extreme alcoholism, and his abuse of the children's mother and the children themselves. *Id.* at 2566-69. Moreover, James Fears, Sr., and all of his relatives are alcoholics. *Id.* at 2581. James Fears, Jr., Fears' brother, testified that James Fears, Sr., and Fears' paternal grandparents were all alcoholics. *Id.* at 2658. Willa Mae Fears said the same in her testimony. *Id.* at 2684. Gail Benton, Fears' aunt, testified that she never saw James Fears, Sr., sober. *Id.* at 2720. Dr. Smalldon stated that Fears' mother had left home at an early age, that James, Sr., was an alcoholic and an abuser of his wife and children. *Id.* at 2772-73. He also testified that James, Sr.'s, parents were both alcoholics and died of cirrhosis of the liver. *Id.* at 2886.

This is not a case, then, and Fears does not claim that it is, factually akin to *Strickland v. Washington*, 466 U.S. 668, 690 (1984), where the reasonableness of counsels' investigation was at issue. Rather, Fears argues here that his attorneys' *presentation* of the information obtained in the investigation was unreasonable. That argument places a heavy burden on Fears to demonstrate that the decision of his attorneys not to present certain evidence in more detail was unreasonable under prevailing professional norms, especially in light of the "strong presumption" that counsels' representation fell "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. As is noted above, Fears' counsel did present some evidence of Mrs. Fears' psychiatric history, Fears' substance abuse, the Fears family's poverty, the involvement (or lack of involvement) of the children's protective services and educational systems in Fears' formative years, and the generational cycle of substance abuse, neglect, and abuse in the Fears family. Granted, some issues were presented in more detail than others. It is entirely conceivable, however, that the attorneys

70

believed some of the information to be more useful or persuasive as mitigation evidence.  In other words, Fears' counsel reasonably could have decided as a strategic matter that presentation of all of the evidence available after investigation was ill advised.  Indeed, Peter Rosenwald testified in the evidentiary hearing that he did not think it would have been in Fears' best interest to call thirty-one people to the witness stand in the mitigation phase, especially since it was likely the evidence offered by some of them would have been repetitive.  (Evid. Hrg. Tr. at 542-43.)  Fears has not overcome the presumption that his attorneys' decision to call a smaller number of witnesses, and to avoid presenting repetitive testimony, was unreasonable.  His request for a writ of habeas corpus on that ground, therefore, should be denied.

Fears also argues his attorneys were ineffective for not knowing ahead of time the information that came out during the State's cross-examination of Dr. Smalldon.  (Amended Petition, Doc. No. 69 at 46; Traverse, Doc. No. 61 at 79.)  In his petition, Fears claims only that one of his defense counsel would not have used Dr. Smalldon if he had known about the information that came out on cross-examination.  (Amended Petition, Doc. 69 at 46.)  Fears does not specify precisely what information was so damaging to him that he would have foregone Dr. Smalldon's testimony.  In his traverse, he hints that the damaging information had something to do with Dr. Smalldon's "background."  (Traverse, Doc. No. 61 at 79.)  In his post-evidentiary hearing brief, Fears suggests that Dr. Smalldon never received the list of potential mitigation witnesses, and quotes Rosenwald as identifying Dr. Smalldon's "changes in position on the death penalty" and "prior testimony" as having diminished the doctor's credibility at trial.  (Post-Evidentiary Hearing Memorandum, Doc. No. 94 at 19.)  Counsel provide no references to the trial record where Dr. Smalldon might have uttered the complained-of comments.  As best the Court can tell, the comments Rosenwald was referring to are presumably that Dr. Smalldon had testified for the defense in the mitigation phase of a trial in which the defendant had murdered a teacher while in prison (Trial Tr.

71

at 2834); he had also testified in two cases involving one Tucker and one Rutledge about the difference between a "hard science" and a "behavioral science," *id*. at 2860-61, 2895; he acknowledged that he had not always been totally against the death penalty and that he at one time could foresee some circumstances in which he believed it could be an appropriate punishment, *id*. at 2863;[14] and that he had testified in a Tennessee case involving one Middlebrooks, *id*. at 2866. None of those statements by Dr. Smalldon could have prejudiced Fears. That the doctor had testified in other death penalty cases as a defense witness is neither here nor there insofar as prejudice to Fears is concerned. In addition, Dr. Smalldon's testimony on the difference between a hard science and behavioral science was innocuous. Dr. Smalldon's acknowledgment that his opinion respecting the death penalty has evolved over time, too, is neither inherently nor apparently prejudicial, and Fears does not explain how he was damaged by that testimony. That one of Fears' trial counsel expressed discontent with Dr. Smalldon's testimony immediately after his client was sentenced to death, and his belief that there "were some problems" with Dr. Smalldon's trial testimony, a belief that persisted at least until the evidentiary hearing in these proceedings, is not proof of prejudice. It is worth noting that Peter Pandilidis, who also represented Fears at trial, has never expressed regret at presenting Dr. Smalldon in the mitigation phase of Fears' trial, nor has he indicated surprise or disappointment at Dr. Smalldon's testimony. Moreover, that some of Dr. Smalldon's answers during cross-examination may have been unexpected by one of Fears' attorneys falls short of demonstrating the degree of prejudice required to constitute constitutional error, or any prejudice at all, for that matter. Thus, Fears' claim that his trial attorneys were ineffective in obtaining and presenting mitigation evidence should be denied.

---

[14]It was brought out in Dr. Smalldon's direct testimony that he is personally opposed to the death penalty, but that he does not allow his personal opinion on that matter to impact his professional judgment in death penalty cases. (Trial Tr. at 2745.) Fears does not contend he was unpleasantly surprised by anything Dr. Smalldon testified to on direct examination, nor did Rosenwald so indicate during his testimony in the evidentiary hearing in these proceedings.

Fears also contends his attorneys were ineffective for not presenting witnesses who would have more fully explained the cumulative effect of the Fears' family's substance abuse, neglect, and abuse on Fears' coping skills. (Amended Petition, Doc. No. 69 at 46-48.) Respondent concedes this sub-claim is preserved for habeas review. (Return of Writ, Doc. No. 11 at 68.)

Fears claims his father, girlfriend, aunt, uncle, co-defendant, and his co-defendant's brother should have been called as witnesses at his mitigation hearing. He argues that those witnesses would have revealed the full scope of his dysfunctional upbringing by presenting the "entire body of facts" relating to his abuse by his parents, his father's alcoholism, and his own substance abuse. (Amended Petition, Doc. No. 69 at 46-47.) Fears directs the Court's attention to several affidavits submitted in conjunction with his state post-conviction petition in support of his argument. Specifically, he cites his post-conviction Exhibits 25, 27, 29, 31, and 33, respectively the affidavits of James Fears, Sr., Fears' father (Appendix, Vol. VI at 150-54); Keisha Grant, Fears' girlfriend at the time of the murder (Appendix, Vol. VI at 159-61); John Lee, a mitigation specialist for the Office of the Ohio Public Defender (Appendix, Vol. VI at 169-70); Gloria Criswell, Fears' paternal aunt (Appendix, Vol. VI at 173-74); and Alvin Grant, brother of Fears' co-defendant (Appendix, Vol. VI at 201-2). Except for John Lee's identification of himself as a mitigation specialist and his statement that he interviewed Fears' cousin, Lee's affidavit consists entirely of hearsay as to what the cousin told Lee. For that reason, and because Fears does not now claim that his trial counsel should have called Lee to testify in the mitigation phase of his trial, this Court will not consider the substance of Lee's affidavit in its consideration of the instant sub-claim. In addition, although Fears argues that an unnamed paternal uncle should have been called by defense counsel at trial, none of the exhibits cited is that of an uncle of Fears. In examining the post-conviction exhibits, the Court did not find any affidavit by Fears' uncle, but it did find one sworn to by Fears' co-defendant James Grant (Appendix, Vol. VI at 201). Although Fears does not reference James Grant's affidavit by

its exhibit number, he does include James Grant's name when arguing that certain witnesses should have been called to testify in mitigation, so the Court will consider the affidavit in its resolution of the instant sub-claim.

The affidavits of Keisha Grant, Alvin Grant, Gloria Criswell, and James Grant do not contain any information substantially different from what was presented through other several witnesses in the mitigation phase of Fears' trial. Those parts of the affidavits that are relevant to the present sub-claim contain statements relating to James Fears, Sr.'s, heavy drinking, his abuse of his wife and children, and Angelo Fears' chronic and early introduction to alcohol abuse. Those facts were well established in the mitigation phase, and were only very weakly addressed in cross-examinations of the mitigation witnesses. (*See* Trial Tr. at 2633, 2639.) Testimony from the named individuals, then, would have been repetitive. Fears' attorneys were under no constitutional or ethical duty to present every witness who could possibly testify about the admittedly horrendous circumstances of Fears' upbringing, and their decision not to call the witnesses Fears argues should have been called does not constitute ineffective assistance of counsel.

James Fears, Sr.'s, affidavit differs from the others in that it includes information about Fears' upbringing that was not conveyed to the jurors during Fears' mitigation hearing. The elder Fears acknowledged that he and Fears' mother frequently fought and that many times one or both of them would resort to the use of weapons such as guns, knives, frying pans, razors, and the like. (Appendix, Vol. VI at 151, 153.) Both of Fears' parents were treated at hospitals at some time during their tumultuous marriage, and his father was jailed on at least one occasion for domestic violence, *id.* at 151, and was routinely removed from the family home to spend the night in jail for the same reason, *id.* at 153. Fears, Sr., indicated that he sometimes threatened Mrs. Fears and the Fears children with his German Shepherd. *Id.* Although he stated the dog never bit them, he acknowledges that they were frightened. *Id.* Both Fears and his brother had at some time threatened

their father with guns in an effort to get him to stop beating their mother. *Id*. Firearms were plentiful in the Fears home. *Id*. at 153. In addition, Fears was sexually precocious as a child. *Id*. at 152. For instance, his father describes two incidents in which Fears and his friends were attempting to have sexual intercourse with a young girl when Fears himself was as young as eight or nine years old. *Id*. Although other witnesses testified that the elder Fears had once encouraged his male children to place their penises in the mouth of their uncle when he was passed out on the Fears sofa, Fears' father confirmed that he had done so repeatedly. *Id*. at 152-53. Fears, Sr., also stated that he forced his sons to fight with their older, larger cousins in an attempt to toughen them. *Id*. at 153. Such conduct was encouraged from the time Fears was six to when he was ten years old. *Id*. Fears' father became aware of his son's drinking when the boy was a young teenager. *Id*. at 152. When Fears was eighteen or nineteen years old, his father used to go to a city park with him and the two would drink alcohol until dawn. *Id*.

In addition, the elder Fears' affidavit corroborates testimony of some of the mitigation witnesses as to his treatment of his wife and children. He acknowledged that he shot his children with a BB gun once. (Appendix, Vol. VI at 153.) He confirmed that he frequently beat his children and his wife. *Id*. at 151. He admitted to taking the younger Fears to the homes of women with whom he had extra-marital affairs, *id*. at 152, and as noted above, he stated he encouraged his children to place their penises in their uncle's mouth when the uncle would lose consciousness on at the Fears home. *Id*. at 152. This Court cannot say that corroborating evidence provided by Fears' father would be merely cumulative, as was true of the other post-conviction affidavits submitted in support of this sub-claim. The evidence of Fears' abuse as a child, delivered from the mouth of his own father and abuser, carries with it a weight difficult to discount. Yes, some of the facts in James Fears, Sr.'s, affidavit were presented to the jury through the testimony of Fears' mother, brother, and other relatives, but Fears, Sr.'s, testimony would not only have added to the evidence of abuse, it

75

would have established that the other members of the Fears family were not exaggerating the circumstances of Fears' youth.

Thus, on the face of it, the information in Fears' father's affidavit could, maybe even would have been beneficial to Fears in his mitigation hearing.

Fears, Sr., however, told a different story, or at a minimum, an incomplete story at the time of Fears' trial. During the evidentiary hearing in these proceedings, Fears produced the interview notes compiled by the mitigation specialist who worked on his case, Martha Jacoby; the notes were transmitted to Fears' defense counsel on October 24, 1997, four days prior to the beginning of the mitigation phase of Fears' trial. Her notes indicate Fears, Sr., told her that his son was not raised to commit murder, and that the elder Fears did not let his son "get away with things." (Petitioner's Evid. Hrg. Exhibit 15 at 4.) Aside from acknowledging his own alcoholism and the frequency of his fights with Fears' mother, sometimes including weaponry, there is little in common between the content of Fears, Sr.'s, affidavit and the mitigation specialist's notes from her interview with him. In fact, the notes indicate Fears, Sr., placed blame on Fears' mother and the crowd Fears fell in with for his son's predicament, and he portrays himself as a father who kept in touch with his children and took them fishing after separating from their mother. Thus, there was little reason for Fears' attorneys to believe that Fears' father possessed or would testify to the information contained in his post-conviction affidavit. Other family members revealed to the mitigation specialist some of the abuse the Fears children suffered at the hands of their father, and those witnesses were called to testify in the mitigation phase. Quite possibly, Fears' attorneys simply decided it was better strategy not to call Fears' father to the witness stand, only to have him describe himself as a father who took his children fishing and did not "let them get away with things," which suggests he was a proper disciplinarian rather than a violent abuser. Neither of Fears' trial counsel were asked why they did not call James Fears, Sr., to testify at his son's sentencing hearing when they testified at the

evidentiary hearing in these proceedings.

In habeas corpus, the burden is on a petitioner to show that the state court applied a Supreme Court case in an objectively unreasonable manner. *Price v. Vincent*, 538 U.S. 634, 641 (2003), *citing Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)(*per curiam*). Thus, it is Fears' burden to demonstrate the ineffectiveness of his trial counsel, which includes presenting evidence to show that the decision not to present the testimony of James Fears, Sr., was neither strategic nor tactical. This Fears has failed to do. Accordingly, the instant sub-claim should be denied.

Next, Fears argues that his trial counsel were ineffective for failing to obtain a cultural expert. Fears contends a cultural expert could have explained how the "Southern Culture of Violence" propelled Fears into his criminal activities and influenced the particular circumstances of Fears' upbringing in a violent, high-crime neighborhood. (Amended Petition, Doc. No. 69 at 49.) Respondent concedes this sub-claim has been preserved for habeas corpus review. (Return of Writ, Doc. No. 11 at 70.)

The state court of appeals resolved Fears' claim that his trial counsel were ineffective for not presenting a cultural expert's testimony in the mitigation phase of his trial succinctly:

> In his eighth claim for relief, Fears asserted that trial counsel was [sic] ineffective for failing to provide evidence concerning Fears's cultural background during mitigation. This was nothing more than an alternative mitigation theory. Thus, Fears failed to provide substantive grounds for his claim of ineffective assistance in this respect.

*State v. Fears*, No. C-990050, 1999 WL 1032592 at *7 (Ohio App. 1st Dist. Nov. 12, 1999) (unreported) (footnotes omitted). Since that is a ruling on the merits of the claim, habeas relief cannot be granted by the federal courts unless the state's adjudication of the claim was contrary to or an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1) and (2). The Magistrate Judge finds neither to

be the case.

In the guilt phase of his trial, Fears' theory of the defense was that the weapon just went off and that Fears had not intended to kill Antwuan Gilliam. (Trial Tr. at 2016-18.) In the mitigation phase, Fears presented evidence of his severe abuse as a child at the hands of his father, the family's history of alcoholism, Fears' own alcoholism, and the effects of those circumstances on his mental health, as is discussed elsewhere in this ground for relief. At bottom, Fears' contends in the present sub-claim that his trial counsel should have presented an alternative theory of mitigation, that being that the "Southern culture of violence" theory should have been presented via the testimony of Dr. Raymond Gastil. Assuming without holding that the substance of Dr. Gastil's theory would be deemed reliable after undergoing a *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), analysis, and that it would be relevant to Fears' case, trial counsels' ineffectiveness has not been demonstrated. "The decision of what mitigating evidence to present during the penalty phase of a capital case is generally a matter of trial strategy." *Hill v. Mitchell*, 400 F.3d 308, 331 (6th Cir. 2005). Trial counsels' failure to offer alternative theories in mitigation does not necessarily show that counsel were ineffective, especially where, as here, the alternative theory in mitigation is contrary to the theory of the defense in the guilt phase of the trial. *See Campbell v. Coyle*, 260 F.3d 531, 550 (6th Cir. 2001)(noting that proof of evidence not presented in mitigation that might support an alternative theory of mitigation does not demonstrate trial counsels' ineffectiveness when counsel competently presented the case in mitigation, given the facts available at the time). Fears' theory of the defense in the guilt phase, that he did not intend to shoot Gilliam, is at odds with the theory he now argues should have been presented in mitigation, which, in admittedly abbreviated fashion, is that the black urban subculture's increased violence is attributable in part to the migration of the Southern culture of violence into Northern urban centers. (Testimony of Dr. Raymond Gastil, Evid. Hrg. Tr. at 3-179.) To be sure, nothing prohibits counsel from presenting opposing theories of

78

defense in the guilt and mitigation phases of a capital trial, but a jury is naturally less likely to be swayed by theories in mitigation that contradict a theory presented in the guilt phase. Consequently, it is not at all clear that there is a "reasonable probability" that but for Fears' counsels' failure to present Dr. Gastil's testimony in mitigation, "the sentencer – including [the state] appellate court, to the extent it independently reweighs the evidence – would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Harries v. Bell*, 417 F.3d 631, 637 (6th Cir. 2005), *quoting Strickland*, 466 U.Sd. at 695. The likelihood that a reasonable juror, the sentencing judge, or a reviewing state court would have been persuaded to a life sentence rather than death is further diminished by the distaste for any argument that asks for a benefit or more severe punishment based on conclusions about groups of people. *See State v. Murphy*, No. 00AP-233, 2000 WL 1877526 at *6 (Ohio App. 10th Dist. Dec. 26, 2000)(unreported). Such arguments are, as Ohio's Tenth District Court of Appeals said, "an anathema to individualized sentencing." *Id*. For these reasons, the Magistrate Judge recommends that the instant sub-claim be denied.

Evidence of substance abuse and intoxication at the time of the offense is admissible for mitigation purposes, Ohio Rev. Code § 2929.04(B)(3) and (7), and Fears presented some evidence on that subject in the mitigation phase of his trial. He argues, however, that there is a reasonable probability that presentation of additional substance abuse and intoxication evidence at trial would have resulted in a sentence other than death. He claims that his trial counsels' failure to present such evidence constitutes ineffective assistance. A comparison of the evidence actually presented, and that Fears now claims should have been presented is thus in order.

In the mitigation phase of Fears' trial, his counsel presented testimony from several lay witnesses respecting alcoholism in the Fears family. (Trial Tr. at 2541, 2544, 2566-67, 2581, 2658, 2684, 2720, 2722, 2729.) Fears' psychological expert also testified that Fears' father was described as a "severe alcoholic" who, among other things, would bribe the six- or seven-year-old Fears with

alcohol so that the child would remain silent about the older Fears' carousing with other women. (Trial Tr. at 2772-74.) Seven lay witnesses also testified that Fears himself abused alcohol. (Trial Tr. at 2562, 2581, 2605, 2639-40, 2659, 2690, 2722.) Fears' psychological expert testified repeatedly about Fears' own alcoholism (Trial Tr. at 2774-2782-2784-86, 2825, 2831, 2886-88), diagnosed Fears with alcohol dependence (Trial Tr. at 2827), and stated that alcohol can play a significant role in compromising the individual's judgment when consumed in the quantities Fears regularly consumed (Trial Tr. at 2830). In addition, Fears' expert also testified that Fears had been drinking heavily in the hours prior to the murder. (Trial Tr. at 2830, 2849, 2854, 2874.) Finally, Fears himself stated in his unsworn statement that he was drunk and on drugs at the time of the murder. (Trial Tr. at 2909.)

Fears argues now that his defense counsel should have obtained and presented the testimony of a chemical dependency expert, Dr. Robert L. Smith. In the affidavit he provided for Fears' state post-conviction proceedings, Dr. Smith detailed the Fears family's history of alcohol and substance abuse. (Appendix, Vol. VI at 207.) Dr. Smith also described Fears' introduction to alcohol at a very young age, and his increasing use of alcohol and other substances as he progressed through his teen years. *Id*. at 207-8. Dr. Smith diagnosed Fears with alcohol dependence, and cannabis and cocaine abuse. *Id*. at 214. He explained the etiology of Fears' substance abuse as a combination of genetics, noting the high incidence of alcoholism in Fears' extended and nuclear family; of having experienced numerous traumatic events in his childhood, mostly involving Fears' father's violent conduct toward Fears, his siblings, and his mother, and the elder Fears' training his children to steal and to engage in sex at early ages; and of the role models Fears had to emulate, most of whom were alcoholics. *Id*. at 209. Dr. Smith stated it was "inevitable that Mr. Fears would eventually turn to alcohol and other drugs as a means of escaping his emotional turmoil." *Id*. Dr. Smith opined that Fears' alcohol and substance abuse prior to the murder, his limited intellectual functioning, and his

abuse and neglect as a child all contributed to Fears' actions the night of Gilliam's murder. *Id*. at 214-15.

At the evidentiary hearing in these proceedings, Fears presented both of his trial counsels' testimonies. When questioned about the possibility of developing Fears' substance abuse and intoxication on the night of the murder as mitigating evidence, Peter Pandilidis testified that such evidence can be used in mitigation, but that he did not recall consulting with a toxicological expert in Fears' case. (Evid. Hrg. Tr. at 428.) Although he acknowledged that he could see "no down side" to requesting appointment of a toxicological expert, *id*. at 429, he also testified that there is the risk that numerous pretrial motions for experts would try the patience of the trial judge, *id*. at 418. Pandilidis also testified that he could not remember whether he developed the intoxication evidence in the mitigation phase of Fears' trial, though it could be an effective strategy. (Evid. Hrg. Tr. at 454.) Peter Rosenwald testified that his notes indicated Fears had told him he had been using "substances" on the day of the murder, but did not reflect that Fears ever stated he was drunk or high on drugs that night. *Id*. at 491. The defense did not consult a toxicologist to find out how a particular amount of alcohol, consumed at a particular hour, would later result in a certain blood alcohol level. *Id*. at 496. Rosenwald relied upon information given to him by Fears in considering whether to present evidence of intoxication. *Id*. at 505. He did not recall whether he questioned the prosecution's witnesses to ascertain whether Fears smelled of alcohol during the commission of the murder, or if Fears staggered to or from the apartment where the murder was committed. *Id*. at 509.

There is a strong presumption that counsels' performance was constitutionally effective. *McFarland v. Yukins*, 356 F.3d 688, 710 (6th Cir. 2004), *quoting Scott v. Mitchell*, 209 F.3d 854, 880 (6th Cir. 2000)(*citing Strickland*, *supra*.) Although Fears raises the possibility that counsels' presentation of less than all of the evidence available respecting Fears' family's history of substance abuse, his own alcoholism and drug use, and his level of intoxication at the time of the murder might

have been attributable to inadvertence or mistake, he has not succeeded in eliminating the probability that the decision was strategic or tactical. Most of the evidence Fears claims would have resulted in a life sentence was presented to the jury by mitigation witnesses. Dr. Smith's diagnosis of alcohol dependence duplicated Dr. Smalldon's, which was presented in the mitigation phase. Granted, Dr. Smith also made note of Fears' cannabis and cocaine abuse, but those "diagnostic impressions" would have added little to the substantial evidence of Fears' chronic alcoholism and his family's history of alcoholism, which the jury heard in the mitigation phase. In addition, much of what Fears now says should have been included by defense counsel is cumulative of what was presented to the jury. Finally, Dr. Smith's state post-conviction affidavit relies exclusively on Fears' own estimates of how much alcohol he consumed and marijuana he smoked in the hours leading up to the murder, and even Fears admitted that he did not recall the exact amount of alcohol and marijuana he ingested. (Appendix, Vol. VI at 214.) Such evidence is hearsay, uncorroborated, and entitled to little weight. Thus, Fears has not overcome the strong presumption that his trial counsel effectively represented him respecting their presentation of evidence of Fears' substance abuse in the mitigation phase of his trial. Fears' claim to the contrary should be denied.

Next, Fears argues that his trial counsel were ineffective when they failed to object to numerous acts of prosecutorial misconduct during the penalty phase of the trial, specifically those instances of misconduct articulated in his first ground for relief, above. (Amended Petition, Doc. No. 69 at 51.) In Fears' first ground for relief, this Court concluded that many of the alleged incidents of prosecutorial misconduct Fears complained of had been procedurally defaulted. There, the Court found the prosecutors' comments that were accompanied by a contemporaneous objection by defense counsel were either not improper, or improper but not flagrant, and to that extent, denial of the ground for relief was recommended. Here, the Court must determine whether any of the remaining, unpreserved instances of alleged prosecutorial misconduct were so egregious and

prejudicial to Fears' defense that his attorneys' failure to object to the prosecutors' statements constituted ineffective assistance as Fears claims.

Recall that during closing arguments in the penalty phase of Fears' trial, the prosecutors made the following comments:

> [D]oes that abuse, is that justification or is that a mitigation factor sufficient to outweigh the brutal death of Antwuan Gilliam[?]
>
> . . . .
>
> I submit to you there is nothing mitigating in the manner in which Angelo Fears purposely killed Antwuan Gilliam.   There's no mitigation in that.
>
> . . . .
>
> Well, I guess there's some mitigation there because, you know . . . he left [Lakesha] alone and that four-year-old baby there.  He didn't touch that child.  There's mitigation for you.  There's mitigation for you.
>
> The murder.  You have to look at the nature and circumstances of the murder.

(Trial Tr. at 2927, 2952, 2964-65.)   Fears argues that his attorneys' failure to object to those statements left him without the effective counsel contemplated by the Sixth Amendment to the United States Constitution.

Some of the comments were entirely proper.  For instance, it is difficult to fathom how the prosecutor's arguing that there was nothing mitigating in the manner in which Fears killed Antwuan Gilliam should have prompted Fears' attorneys to object.  There is simply nothing objectionable about the statement.  Similarly, that Fears' spared Lakesha Bryant and her child can reasonably be considered mitigating.   The prosecutor's comment to that effect was neither improper nor

prejudicial.[15]  The same is true of the prosecutor's declaration to the jurors that they must look at the nature and circumstances of the murder in the weighing process.  That comment came during the prosecutor's argument respecting mitigation and could reasonably be understood to mean precisely what Ohio law requires – that the nature and circumstances of the offense must be considered for any mitigatory value they might possess.  Certainly nothing in the prosecutor's statement suggests that the nature and circumstances of the offense be viewed as an aggravating circumstance.  As for the prosecutor's incorrect suggestion that mitigation must outweigh the aggravating circumstances to preclude a death verdict, the comment was isolated, likely attributable to unfortunate phrasing, since the prosecutor at other times stated, correctly, that the aggravating circumstances must outweigh the mitigating factors, rather than the other way around.  (Trial Tr. at 2920, 2924, 2936, 2971.)  In addition, the jury was instructed that the aggravating circumstances must outweigh the mitigating factors before a death verdict could be returned.  (Trial Tr. at 2973, 2979-80, 2983.)  The jury verdict forms also conformed to the law.  (Trial Tr. at 2984-85.)  One careless misstatement by the prosecutor inverting the weighing formula does not negate the numerous correct explanations by the prosecutor and trial judge of the proper weighing scheme for determining the appropriate sentence for Fears.  Fears' sub-claim to the contrary should be denied.

The next alleged incidents of prosecutorial misconduct to which Fears' trial counsel did not object concerned the prosecutors' repeated complaints that they had not received a copy of Fears' mitigation phase expert witness Dr. Jeffrey Smalldon's interview notes and report on the psychological evaluation he conducted.  While objections to some of the prosecutors statements respecting Dr. Smalldon's notes and nonexistent report were sustained, defense counsel did not object to every mention of them.  (Trial Tr. at 2931, 2932, 2955, 2957.)  Nevertheless, the

---

[15]Of course, inflection could also make the comment snide, but the United States Constitution does not protect a defendant from snideness and in any case, a transcript cannot convey it.  A reviewing court is left with the meaning of the words as they appear on paper and cannot assume inflection.

aggravating circumstance evidence against Fears was particularly strong, and objections to comments substantively the same as those at issue had been sustained and cautionary instructions given.  (Trial Tr. at 2956-57.)  These factors reduced the likelihood of prejudice from the unobjected-to comments.  *See Darden v. Wainwright*, 477 U.S. 168, 182 (1986).  Consequently, although Fears' counsel should have objected to the prosecutor's comments, Fears has not demonstrated prejudice from their failure to do so, and his ineffective assistance of counsel claim based on the prosecutor's reference to Dr. Smalldon's notes and nonexistent report should fail.

Fears next contends that his counsels' failure to object to the prosecutor's comment that Dr. Smalldon was compensated with taxpayers' money constituted ineffective assistance.  The substance of the prosecutor's statement, however, had been put before the jury during Dr. Smalldon's testimony without objection from defense counsel.  (Trial Tr. at 2838.)  In his free-standing claim of prosecutorial misconduct, Fears claimed only that the prosecutor's comment in closing argument was improper, and did not challenge defense counsels' failure to object to exploration of Dr. Smalldon's compensation during his testimony.  (*See* First Ground for Relief, *supra*.)  Since the substance of the prosecutor's improper comment was before the jury, unobjected to, and unchallenged here, no prejudice resulted from the prosecutor's remark.  Therefore, Fears' trial counsel were not ineffective for failing to object to the remark.

Fears argues his counsel were also ineffective when they did not object to the prosecutor's use of her Mrs. Fears' prior convictions to impeach her during her testimony in the mitigation phase of his trial.  As noted, *supra*, the underlying prosecutorial misconduct claim was not preserved for habeas review, so this Court examines the viability of that claim only insofar as it might support the claim of ineffective assistance of trial counsel.

At the time of her testimony, Mrs. Fears had pled guilty and was awaiting sentencing.  Under the Rules of Evidence in Ohio, a witness' credibility may be impeached by a prior conviction "if the

crime was punishable by . . . imprisonment in excess of one year."  Ohio R. Evid. 609(A)(1).  Fears does not argue that the prosecutor's inquiry into Mrs. Fears' burglary conviction was inadmissible under that rule, and the Court is at a loss as to what other ground there could be upon which to object to the questioning.

Fears also argues that his counsel should have objected to the prosecutor's use of a psychologist's determination that she exaggerated her answers on a psychological test administered to her in preparation for a competency hearing related to the burglary charge.  When asked if she knew whether the doctors administering and interpreting the test results indicated she was exaggerating her responses, Mrs. Fears answered "no."  Thus, no *evidence* within the definition provided to the jury (*see* Trial Tr. at 2981) was presented respecting the conclusions of the doctors who evaluated Mrs. Fears, and in fact Mrs. Fears answered the prosecutor's question in the negative.  Fears consequently suffered no prejudice from the question, and his trial counsel were not ineffective in remaining silent rather than objecting.

In the mitigation phase of her son's trial, Mrs. Fears also admitted on cross-examination to being convicted of a charge of falsification, presumably as a result of her welfare fraud.  (Trial Tr. at 2547-49.)  The Ohio Rules of Evidence permit the use of convictions for impeachment purposes in certain circumstances.  Any prior conviction for a crime involving dishonesty or false statements is admissible to impeach a witness' credibility unless admission of the evidence would cause undue delay or if it were needlessly cumulative.   Ohio R. Evid. 609(A)(3), 403(B).   An additional restriction on the admissibility of Mrs. Fears' prior conviction, however, is imposed by Ohio R. Evid. 609(B), which states that prior convictions admitted under Rule 609 must be no older than ten years, as calculated under the Rule.  When Mrs. Fears was asked the year of her conviction, she stated that she did not remember.  (Trial Tr. at 2549.)  The prosecutor never established at trial that the conviction was within ten years prior to Mrs. Fears' testimony, and defense counsel did not

object to admission of the evidence on that ground. But no evidence of when that conviction occurred been presented in these habeas proceedings, either. If the conviction was within the ten years prior to Mrs. Fears' testimony, the prosecutor's questioning of Mrs. Fears on that matter was entirely appropriate, and Fears' trial counsel had no cause to object. Fears has offered no evidence suggesting the conviction was stale, and has consequently failed to demonstrate that there was anything improper in the prosecutor's questioning Mrs. Fears about the falsification conviction. That being so, Fears has simultaneously failed to show that his trial attorneys were ineffective in not objecting to the evidence, or to the prosecutor's eliciting it, when it was offered. Fears' claim to the contrary should be denied.

Next, Fears claims his counsel were ineffective for not objecting to the prosecutor's questioning of various mitigation witnesses as to their knowledge of Fears' prior criminal history or membership in a gang. As noted in the Court's consideration of Fears' first ground for relief, however, he has not identified the witnesses by name nor has he directed the Court to the appropriate pages in the trial transcript. Additionally, Fears does not indicate whether his counsel objected to the allegedly improper questioning. Again, the Court declines to sift through the record to find support for Fears' claim, and recommends denial of the instant sub-claim.

Next, Fears contends his trial counsel were ineffective for failing to object to an instruction that the sentencing verdict must be unanimous. (Amended Petition, Doc. No. 69 at 51.) Whether or not the ineffective assistance claim is procedurally defaulted as Respondent contends (Return of Writ, Doc. No. 11 at 73), the underlying claim is meritless under *Jones v. United States*, 527 U.S. 373 (1999), *Roe v. Baker*, 316 F.3d 557 (6th Cir. 2002), *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000), and *Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998). (*See also*, Second Ground for Relief, *supra*; Eighth Ground for Relief, *infra*.) Accordingly, Fears' trial counsel cannot be found to have been ineffective for failing to raise an objection that would have been overruled.

Fears also claims his trial counsel were ineffective in failing to move for the merger of the aggravating circumstances. (Amended Petition, Doc. No. 69 at 51.) As is discussed in Fears' second ground for relief, *supra*, the jurors were instructed on merger, and the trial court's opinion reflects not just that the aggravating circumstances for each of the four counts of aggravated murder were merged, but that the four counts themselves were merged for sentencing purposes. Fears' sub-claim that his counsel were ineffective for not requesting merger, when merger took place even without counsels' motion, must fail, and the Magistrate Judge recommends denial.

Finally, Fears contends that the cumulative effect of his trial counsels' ineffectiveness deprived him of a fair trial. (Amended Petition, Doc. No. 69 at 52.) Having found no conduct or omissions by his counsel that constitutes ineffective assistance under prevailing Supreme Court precedents, Fears' cumulative error claim suffers the same fate as the prior sub-claims of ineffectiveness. Fears' fifth ground for relief should be denied.

**Sixth Ground for Relief**

In his sixth ground for relief, Fears claims his appellate counsel provided ineffective representation on direct appeal in the Ohio Supreme Court. (Amended Petition, Doc. No. 69 at 52-56.) Respondent makes no argument that Fears has procedurally defaulted the claim. (Return of Writ, Doc. No. 11 at 79.)

In Ohio, an application for reopening is the only vehicle available to raise claims of ineffective assistance of appellate counsel. *See State v. Murnahan*, 63 Ohio St.3d 60, 65-66, 584 N.E. 2d 1204 (1992); Ohio R. App. Proc. 26(B). In filing the application, the appellant states that his appellate counsel failed to raise arguably meritorious claims on direct appeal, and that that failure constituted ineffective assistance. Essential to the success of an application for reopening in Ohio, however, is that the proposed propositions of law must be of the sort that are cognizable on direct

appeal.  Here, for instance, Fears claims his appellate counsel were ineffective for not raising as

error on direct appeal his trial counsels' failure to obtain a firearms expert to testify at his trial.  To

succeed on such a claim, Fears would have necessarily had to produce in the state court, and indeed

did produce in post-conviction, the affidavit of his proposed firearms expert showing what crucial

evidence could have been presented had his trial counsel presented a firearms expert.  Ohio law,

however, does not allow consideration of evidence outside the record on direct appeal, so even if

Fears' appellate counsel had presented the claim on direct appeal, there is no doubt that it would

have been summarily rejected by the Ohio appellate court.  *State v. Ishmail*, 54 Ohio St.2d 402, 377

N.E. 2d 500 (1978)(paragraph one of the syllabus)(holding that "[a] reviewing court cannot add

matter to the record before it, which was not a part of the trial court's proceedings, and then decide

the appeal on the basis of the new matter").  Thus, Fears' sub-claim alleging his appellate counsels'

ineffectiveness for not calling a firearms expert, had it been raised on direct appeal as he contends

it should have been, would have been a losing proposition of law, and his appellate counsel cannot

be deemed ineffective for failing to raise it as error.

Several of Fears' other sub-claims asserting the ineffectiveness of his appellate counsel

suffer the same fate for the same reason.  Each of the following sub-claims would necessarily have

required resort to evidence outside the record on direct appeal, and would have been summarily

rejected by the Ohio Supreme Court for that reason:

1. Petitioner's trial counsel erred by failing to impeach the testimony of Derrick Frazier, with inconsistent testimony from an earlier trail [sic].

2. Petitioner's trial counsel failed to present the defense of voluntary intoxication.

3. Petitioner's trial counsel were ineffective for failing to conduct an adequate investigation during the sentencing phase of Appellant's capital trail [sic].  As a result, trial counsel presented inaccurate psychological testimony of Dr.

Jeffrey Smalldon, the defense expert psychologist.

(Amended Petition, Doc. No. 69 at 55-56.)  Those sub-claims should be denied for the reason stated.

Fears also claims his appellate counsel were ineffective for the following reasons:

1.    Appellate counsel . . . failed to raise fundamental errors, including but not limited to the fact that Petitioner was convicted and sentenced to death based on specifications that he was never charged with [sic].

2.    Appellate counsel also failed to raise the issue of trial counsel's ineffectiveness for their failure to object to the defective nature of the indictment and/or the court's instruction to the jury to deliberate over charges that differed from those alleged in the indictment.

3.    Appellate counsel also failed to properly raise the issue of the trial court's erroneous instruction to the jury that its recommendation of death or life had to be unanimous.

4.    The instructions given to the jury were improper, unconstitutional, inadequate, and incomprehensible.

5.    The jury's instructions as given precluded the jury from the consideration of mitigating evidence.

6.    Petitioner's trial counsel were ineffective in failing to correct sentencing errors.

7.    Petitioner's trial counsels' failure to object to continuos [sic] and blatant prosecutor[ial] misconduct.

(Amended Petition, Doc. No. 69 at 54-56.)  Of those remaining sub-claims, three are so skeletal that

it is impossible for the Court to discern with any precision what the error is alleged to have been.

For instance, Fears claims the jury instructions were "improper, unconstitutional, inadequate, and

incomprehensible."  There is no citation to the record, and no reference to any related ground for

relief to enlighten the Court about the nature of Fears' complaint.  The same is true of Fears' claim

that the jury instructions precluded the jury from considering the mitigating evidence, and his claim

that trial counsel somehow failed to correct sentencing errors (as if that were even possible for trial

counsel).  With no way to know where in the record to look for the errors Fears complains of, this Court is at a loss to address the sub-claims numbered 4, 5, and 6, above.  Consequently, it is recommended that they be denied.

The two sub-claims alleging error in the indictment or jury instructions relating to the indictment can be addressed together.  (Amended Petition, Doc. No. 69 at 54.)  In the indictment (Appendix, Vol. I at 12-37) Fears and his co-defendant, James Grant, were identically charged.  In each of the twelve counts in the indictment, Fears and Grant were charged with an offense and each was charged with identical specifications.  For example, Count One of the indictment charged Grant and Fears with the aggravated murder of Antwuan Gilliam, and each was charged with three identical capital specifications and two identical firearms specifications.  Grant's specifications were numbered one through five, and Fears' were numbered six through ten.  The remaining eleven counts in the indictment were similarly set forth.  The problem Fears complains of, if indeed it can be called that, arose when the trial judge instructed the jurors on the specifications to the counts.  Rather than identify the specifications as they are numbered in the indictment, specifically, seven through ten, the judge referred to them as "the first specification," or "Specification Two to Count One."  (Trial Tr. at 2391, 2393.)  Fears thus contends he was convicted of specifications with which he was never charged, to wit, the specifications that related to James Grant, not himself.

"An individual accused of a felony is entitled to an indictment setting forth the 'nature and cause of the accusation' pursuant to Section 10, Article I of the Ohio Constitution and the Sixth Amendment to the United States Constitution."  *State v. Sellards*, 17 Ohio St.3d 169, 170, 478 N.E. 2d 781, 783 (1985).

> The purpose of an indictment is twofold.  By compelling the government to aver all material facts constituting the essential elements of an offense, an accused is afforded with adequate notice and an opportunity to defend. . . .  An indictment, by identifying and defining the offense, also enables an accused to protect himself from

any future prosecutions for the same offense.

*Id.* There is nothing defective about the indictment since it accomplished both of the goals stated.

Instead, Fears sub-claim represents an excellent example of attorneys attempting to take advantage of understandable human error, specifically, the trial judge's misidentification of the enumeration of the specifications attached to each count of the indictment. Since the jury instructions naturally came at the end of the guilt phase, nothing the trial court said could have influenced in the slightest Fears understanding of the charges and specifications he faced or his defense to them, including the judge's misnumbering of the specifications. Any casual observer would recognize the mistake as careless, but harmless. There having been no prejudice to Fears from the trial judge's mistake, the Magistrate Judge recommends the two sub-claims concerning the alleged errors in the indictment and the jury instructions relating to the indictment be denied.

Fears next argues that his appellate counsel were ineffective for not raising as error on direct appeal the instruction to the jury whether they determined the appropriate sentence for Fears was death or life, either verdict must be unanimous. (Amended Petition, Doc. No. 69 at 54, 55.) The instruction, however, is a true statement of the law in Ohio, as noted in Fears' second ground for relief, *supra*. *State v. Jenkins*, 15 Ohio St. 3d 164, 213-14, 473 N.E. 2d 264 (1984); Ohio Rev. Code § 2929.03(D)(2); Ohio R. Crim. Proc. 31(A). Thus, had Fears' appellate counsel raised the claim as error on direct appeal, it would have been rejected. Counsel cannot be deemed ineffective for failing to raise a claim doomed to fail. For that reason, the instant sub-claim should be denied.

Finally, Fears claims his appellate counsel were ineffective for failing to raise as error on direct appeal trial counsel's failure to object to pervasive prosecutorial misconduct, presumably the same misconduct Fears identified in his first ground for relief, although such is not stated. (Amended Petition, Doc. No. 69 at 56.) In Fears' third and fifth grounds for relief, however, this Court recommended that Fears' claims of trial counsel ineffectiveness based on their failure to

object to alleged instances of prosecutorial misconduct were meritless.  In each sub-claim in those grounds for relief the Court determined that the complained-of comment or conduct by the prosecutor was either not improper, or that Fears had not demonstrated prejudice from the comment and that trial counsel was consequently not ineffective for not having objected.  Thus, this Court has already examined Fears' prosecutorial misconduct and ineffective assistance of trial counsel claims through the lens of *Strickland* and found them to be lacking.  *See* First, Fourth, and Fifth Grounds for Relief, *supra*.  Fears' only hope of success with his ineffective assistance of appellate counsel claim here, then, is to demonstrate that one or more of his underlying claims would have been successful under *state* law, had appellate counsel raised them as error on direct appeal.  Fears does not attempt to so argue, preferring instead to point out the alleged deficiencies without discussing the likelihood of appellate counsels' success on any of them, or the theory under which appellate counsel might have proceeded, had the alleged errors been raised on direct appeal.  Accordingly, the instant sub-claim should be denied.

Having found no merit to Fears' ineffective assistance of appellate counsel claim, it is recommended that it be denied.


**Seventh Ground for Relief**

In his seventh ground for relief, Fears argues that he was denied due process when he was convicted of specifications on which he had not been indicted.  (Amended Petition, Doc. No. 69 at 56.)  This ground for relief springs from the same factual situation described in the preceding ground for relief:  the trial court's misenumeration of the specifications in his instructions to the jury and on the jury verdict forms.  Respondent advances a procedural default defense.  (Return of Writ, Doc. No. 11 at 82.)

The Court agrees with Respondent that the claim is procedurally defaulted.  Fears did not

raise the indictment/jury instruction issue on direct appeal, nor was the issue raised in Fears' state petition for post-conviction relief.  In the course of Fears' appeal from denial of his post-conviction petition, however, the First District Court of Appeals noticed the discrepancy, brought it to the parties' attention, and provided them with an opportunity to supplement their argument, which presumably they did.  *State v. Fears*, No. C-009950, 1999 WL 1032592 at *1 (Ohio App. 1st Dist. Nov. 12, 1999)(unreported).  The court of appeals expressed concern about the discrepancy, but concluded that the error was one that could have been raised on direct appeal, barring it from consideration in post-conviction on *res judicata* grounds.  *Id*. at *2.  At the same time, the court hinted that another procedure might be available through which Fears could pursue the issue.  *Id*. Taking the hint, Fears did raise the indictment issue in his application to reopen his direct appeal (Appendix, Vol. IV at 10), but only as a claim underlying his ineffective assistance of appellate counsel claim, as is reflected in the preceding ground for relief.  An application to reopen, however, only preserves the ineffective assistance of appellate counsel claim for habeas review, and does not do the same for the underlying claims contained therein.  Consequently, Fears' claim here that the discrepancy in the enumeration of the specifications deprived him of due process has been procedurally defaulted as a free-standing claim.  Accordingly, the Magistrate Judge recommends the claim be denied.


**Eighth Ground for Relief**

In his eighth ground for relief, Fears contends that the jury instruction that any life imprisonment verdict must be unanimous deprived him of a fair trial.  (Amended Petition, Doc. No. 69 at 58.)  This claim duplicates a sub-claim advanced in Fears' second ground for relief, and was fully considered above.  For the same reasons stated there, Fears' eighth ground for relief should be denied.

**Ninth Ground for Relief**

In his ninth ground for relief, Fears contends that the trial court erred in giving an unrequested instruction on accident in the guilt phase of his trial. (Amended Petition, Doc. No. 69 at 60.) Respondent acknowledges that the claim is preserved for habeas corpus review. (Return of Writ, Doc. No. 11 at 86.)

In resolving Fears' claim when it was raised on direct appeal, the Ohio Supreme Court reasoned as follows:

> In his twenty-third proposition of law, [A]ppellant argues that the trial court erred in instructing the jury, at the state's request and over defense counsel's objection, on the defense of accident. The trial judge instructed the jury as follows: "[A]n accidental result is one that occurs unintentionally and without any design or purpose to bring it about. An accident is a mere physical happening or event out of the usual order of things and not reasonably anticipated or foreseen as a natural or probable result of a lawful action."
>
> Appellant contends that this instruction confused the jury and made it appear that the defense was asserting something more than a lack of purpose. We disagree. The concept of accident is tantamount to a denial that the act was intentional. Throughout the trial, defense counsel challenged the state's evidence of intent. The instruction on accident, in effect, underscores the position taken by defense counsel that appellant did not intentionally cause the death of the victim. The trial court made it clear that "purpose to cause the death" is an essential element of aggravated murder and that the state had to prove all the elements of the offense beyond a reasonable doubt, including that [A]ppellant had the specific intent to cause the death of Antwuan Gilliam. It is fundamental that jury instructions must be considered as a whole. See _State v. Price_ (1979), 60 Ohio St.2d 136, [141,] 14 O.O.3d 379, 398 N.E. 2d 772. When the jury instructions in this case are read as a whole, we find no error with this charge. Therefore, we reject [A]ppellant's twenty-third proposition of law.

_State v. Fears_, 86 Ohio St.3d 329, 340, 715 N.E. 2d 136 (1999).

Fears acknowledges that the instruction given did not place the burden of proof as to the defense of accident on himself, but argues that the prejudice he suffered flowed from the "false

impression" the instruction created with the jury that their decision between accident and finding purposefulness was an either/or situation. (Amended Petition, Doc. No. 69 at 63.) The argument is sheer conjecture on Fears' part and falls far short of demonstrating that the state court's resolution of the issue was contrary to or an unreasonable application of clearly established federal law as articulated by the United States Supreme Court. 28 U.S.C. § 2254 (d)(1). In fact, the only federal law cited by Fears in his argument relates to the impropriety of imposing a burden of proof of an essential element of an offense on a defendant, which Fears concedes is not what happened in his case. (Amended Petition, Doc. No. 69 at 63.) Accordingly, Fears ninth ground for relief should be denied.

## Tenth Ground for Relief

In his tenth ground for relief, Fears argues that under *Atkins v. Virginia*, 536 U.S. 304 (2002), he is ineligible for capital punishment since he is mentally retarded. This ground for relief, however, was withdrawn by Fears on March 22, 2005, and consequently will not be addressed. (Doc. No. 109.)

## CONCLUSION

For the foregoing reasons, and having found no ground upon which to grant relief, the Magistrate Judge recommends that Angelo Fears' petition for habeas corpus relief be DENIED.

November 8, 2005.

s/ **Michael R. Merz**
Chief United States Magistrate Judge

J:\Death Penalty\Fears v. Bagley\Fears R&R.wpd

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir., 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).