**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| ANGELO FEARS | : | CASE NO:    1:01-CV-183 |
| Petitioner | : | Chief Judge Walter H. Rice |
| | | Magistrate Judge Michael R. Merz |
| - vs - | : | |
| MARGARET BAGLEY, Warden | : | |
| Respondent | : | |

_____

PETITIONER'S OBJECTIONS TO MAGISTRATE'S REPORT AND
RECOMMENDATION DENYING ALL RELIEF ON HIS PETITION FOR HABEAS
CORPUS
_____

Now comes the Petitioner, by and through counsel and files his objections to the

Magistrate's Report and Recommendation, filed on November 8, 2005 pursuant to

Federal Rules of Civil Procedure, Rule 72(b) and for the reasons more fully set forth in

each Objection and the Memorandum in Support of same.

## **INTRODUCTION**

### **I. STANDARD OF REVIEW**

Article III of the United States Constitution and 28 U.S.C. §636(b)(1) require de

novo review of Petitioner's objections to the Magistrate Judge's Report and

Recommendations ("R & R") upon Petitioner's habeas corpus petition.

Since the Petitioner filed his habeas corpus petition after the effective date of the

Anti-Terrorism and Effective Death Penalty Act of 1996, 110 Stat. 1214, the standard of

review under 28 U.S.C. §2254, as amended, is applicable.

The standard states:

(d)      An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1)      resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court' s decision is contrary to the Supreme Court's clearly established precedent if (1) the state court applies a rule that contradicts the governing law as set forth in Supreme Court case law, or (2) the state court confronts a set of facts that are materially indistinguishable from those in a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. *Williams v. Taylor,* 529 U.S. 362, 405 (2000). A state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing rule [from Supreme Court cases] but unreasonably applies it to the facts of the particular state prisoner's case". *Id.* at 407-408. For a federal court to find a state court's application of Supreme Court precedent unreasonable, the state court's decision must not have been incorrect or erroneous; it must have been "objectively unreasonable". *Wiggins v. Smith,* 539 U.S. 510, 511 (2003), *quoting Williams,* 529 U.S. at 409.

## II. PETITIONER'S OBJECTIONS REGARDING PRESUMPTION OF CORRECTNESS.

A factual finding by a state court is presumed to be correct, and a petitioner must rebut the presumption of correctness by clear and convincing evidence. 28 U.S. C. §2254(e). The Magistrate in his Report and Recommendation, at page 5 recites facts that were "found by the Ohio Supreme Court" when in fact there was no "finding" by the Ohio Supreme Court but simply a summary of the background against which it set its decision. The Ohio Supreme Court does not state the facts as "findings" nor does it use the word "found" in stating its summary. Thus to state that the summary that precedes the Ohio Supreme Court's decision are facts "found" by a state court that are presumed correct, does not accurately reflect what the introductory paragraphs to the Ohio Supreme Court decision actually are and that summary is due no presumption of correctness.

Although the Magistrate Judge states that the state court facts are presumed correct and a petitioner must rebut the presumption of correctness by clear and convincing evidence, Petitioner calls to the court's attention the fact that the Magistrate Judge cites the following passage from the "state court" with reference to Petitioner's claim regarding the denigration of his psychological expert by the State prosecutor:

> [T]he prosecutor's reference to Dr. Smalldon as defense counsel's "mouthpiece"…insinuates that defense counsel has paid the expert simply to have him parrot their opinions… (R & R at 37)

and yet on the next page, the Magistrate Judge states,

> "[T]he Court observes first that Fears' claim that the prosecution referred to Dr. Smalldon as defense counsels' "mouthpiece" does not hold up to a careful reading of the transcript... (R & R at 38)

as an example of why the summary of the facts are not "findings" that are subject to a presumption of correctness and why careful analysis must follow to determine exactly what facts were "found" by the state courts.

## III. PETITIONER'S OBJECTIONS REGARDING PROCEDURAL DEFAULT RECOMMENDATIONS

The Magistrate Judge recommended that portions of Petitioner's claims for habeas relief were procedurally defaulted. Petitioner objects to the R & R wherein the Magistrate Judge recommends that any portion of Petitioner's claims were not preserved for federal review. Petitioner asserts that this Court is not procedurally barred from reviewing the merits of the federal constitutional claims raised in the Petition.

In determining whether to address these allegedly defaulted claims and/or portions thereof, this Court must consider the circumstances of this case. *Francis v. Henderson,* 425 U.S. 536, 539 (1976). Where an individual is facing the death penalty, it is appropriate for a court to liberally define which issues are federally cognizable issues for review.[1] Concerns for comity and for finality do not outweigh the absolute need to protect against the deprivation of an individual's constitutional rights, especially where that deprivation invalidates a capital sentence. *Mercer v. Armontrout,* 864 F.2d 1429, 1432 (8th Cir. 1988).

In this case, as in all capital cases, the federal interest in preserving constitutional protections and avoiding executions where the reliability of the state proceedings remain

---

[1] See, e.g., *Patterson v. Alabama,* 294 U.S. 600 (1935) ("It is well-settled that death [as a punishment] is different"). *Gardner v. Florida,* 430 U.S. 862 (1977). See also, *California v. Ramos,* 463 U.S. 992 (1983); *Rummel v. Estelle,* 445 U.S. 263 (1980); *Coleman v. Saffle,* 869 F.2d 1377, 1381 (10th Cir. 1989) ("We must remember that when a man's life is at stake and he has not had federal review of the alleged constitutional defects in his conviction and sentence, we should be reluctant to hold that [the activity leading to waiver] is grave enough to warrant***dismissal***"). See also, Daniel J. Meltzer, *State Court Forfeitures of Federal Rights,* 99 Harv. L. Rev. 1128 (1986).

questionable is of the utmost importance and outweighs any inconvenience the State might experience.

The United States Court of Appeals for the Sixth Circuit has held that when a respondent asserts a procedural default defense, the reviewing court must undertake a complex analysis to verify that the respondent has truly established a procedural default. *Bagby v. Sowders,* 853 F.2d 1340 (6th Cir. 1988); *Maupin*, 785 F.2d 135, 138. A respondent must prove that all five components of procedural default have occurred, in order to prevail on that defense. In the unlikely event that the respondent can cross all of these hurdles, the Court still may excuse the procedural default by finding cause and prejudice or to prevent a miscarriage of justice.

To establish a procedural default herein, the Respondent must establish that (1) there exists a state procedural rule applicable to Angelo Fear's claim; and (2) that Angelo Fears failed to comply with the rule and, the Respondent must establish that (3) the state courts have actually enforced the State procedural sanction. *Maupin v. Smith,* 785 F.2d 135 (6th Cir. 1986).[2] Next, the Respondent must establish that the state procedural forfeiture, is an adequate and independent ground justifying foreclosure of federal review of a federal constitutional claim. *Id.* In order for a state procedural forfeiture to constitute

---

[2] Petitioner calls the court's attention to the Magistrate's own analysis in applying procedural default to Petitioner's claims or portions thereof, as to whether in fact procedural default was actually enforced by the state court, that is the highest court to rule on the claim clearly and unambiguously relied on the procedural violation as the reason for rejecting the claim. *Coleman v. Thompson,* 501 U.S. 722, 750 (1991). The Magistrate variously stated in his Report and Recommendation: "1) While a valid argument could be made that the court's ruling resulted in procedural default of this portion of Fears' claim, Respondent has not argued that to be the case…" (R&R at 24) 2) "Since the Supreme Court misapplied its own procedural rule…" (R&R at 32); 3)"Because defense counsel did not object to most of the prosecutors' comments in closing argument, the state court could have relied on the state procedural rule that requires a contemporaneous objection in rejecting Fears' claims related to those comments" (R & R 39); "Fears claimed this on direct appeal but the state court observed that no objection to the questioning had been lodged by defense counsel, found no plain error, **and concluded in the alternative that the prosecutor was entitled to impeach Mrs. Fears with her prior conviction**" (Emphasis added) (R & R 40) all as examples as the State's failure to clearly and unambiguously rely on the procedural violation for rejecting the various claims.

an "adequate" ground, (4) the state procedural rule that was allegedly violated must be consistently and regularly applied *e.g. Dugger v. Adams,* 489 U.S. 401, 410-411 n.6 (1989). Additionally, in order for a state procedural forfeiture to constitute an "independent" ground, (5) the state court decision must not appear to rest primarily upon federal law or to be interwoven with federal law. E.g. *Coleman v. Thompson,* 501 U.S. 722, 115 L.Ed. 2d 640, 659 (1991).[3]

To conduct the proper analysis this Court cannot simply accept Respondent's assertion of procedural default but must affirmatively find Respondent has met all prongs of the affirmative defense.

A state procedural rule is inadequate and will not foreclose federal habeas review if it is not strictly or regularly followed by the courts of the state. *James v. Kentucky,* 466 U.S. 341, 348-349 (1984); *Barr v. City of Columbia,* 378 U.S. 146, 149 (1969); *Rogers v. Howes,* 144 F.3d 990, 995 .n.5 (6th Cir. 1998) (Even if a state has an absolute right to enforce its own procedural rules, the Supreme Court in *Ford v. Georgia,* 498 U.S. 411 (1991) held that the federal courts will not defer to this state interest where the procedural rule was not regularly enforced at the time of the petitioner's conviction).

The Supreme Court summarized its jurisprudence with respect to the regularly followed requirement in *Hathorn v. Lovorn,* 457 U.S. 255 (1983):

> We have recognized that the failure to comply with a state procedural bar may constitute an independent and adequate state ground barring our review of a federal question. Our decisions, however, stress that a state procedural ground is not "adequate" unless the procedural rule is 'strictly

---

[3] Even if Respondent successfully satisfies these five requirements and establishes a procedural default (which Petitioner asserts she has not) the Court may then excuse the default if Angelo Fears has demonstrated cause for violating the State procedural rule and prejudice resulting from the alleged constitutional error. *Bagby v. Sowers,* 853 F.2d 1340, 1347-48 (6th Cir. 1988); *Maupin,* 785 F.2d 135, 138 (6th cir. 1986). Finally, in extraordinary cases, a federal court may address the merits of a procedurally defaulted claim to avoid a miscarriage of justice. *Wainwright v. Sykes,* 433 U.S. 72 (1977); Accord, *Bagby,* 853 F.2d at 1348.

> or regularly followed'…State courts may not avoid deciding federal issues by invoking procedural rules that they do not **apply even-handedly** to all similar claims (Emphasis added).

*Id.* at 262-63 (quoting *Barr,* 378 U.S. at 149). Only state procedures that are "firmly established and regularly followed….can prevent implementation of federal constitutional rights." *James* 466 U.S. at 348-349; accord, *Morales v. Calderon,* 85 F.3d 1387, 1390 (9th Cir. 1996). The courts of the State of Ohio may not curb a person's federal constitutional rights by invoking procedural rules that are not applied evenly to all similar claims.

Ohio's intermediate appellate courts and the Ohio Supreme Court have been paradigms of inconsistency when it comes to regularly following their own procedureal doctrines. For example, in death penalty cases, the Ohio Supreme Court has reviewed issues on the merits, where those issues were not raised at trial or on direct appeal, in excess of sixty-four occasions.[4]

Whether measured by the universe of criminal law decisions applying the waiver doctrine, or simply the treatment of claims in death penalty cases, or the present case, the Ohio courts have not strictly or regularly followed the doctrine of waiver, and as such, the Respondent cannot invoke that doctrine to bar this Court's consideration of any of Petitioner's federal constitutional claims. See, e.g. *Hathorn,* 457 U.S. at 262-63; accord, *Rogers,* 144 F.3d 990, 995 n. 5 (6th Cir. 1998). Because the courts of the State of Ohio

---

[4] See, e.g. *State v Dennis,* 79 Ohio St.3d 421 (1997) (deciding claim based on prosecutor's improper closing arguments at penalty phase where no trial objection); *State v. Wickline,* 50 Ohio St.3d 114 (1990) (deciding claim based on prosecutorial misconduct at both stages of trial where no trial objection); *State v. Greer,* 39 Ohio St.3d 236 (1988) (deciding claim based on prosecutor's comments at trial where no trial objection); *State v. Hamblin,* 37 Ohio St.3d 153 (1988) (deciding ineffective assistance of counsel not raised in court of appeals).(See n.5 for additional examples).

have not consistently and fairly applied the waiver doctrine, Petitioner is entitled to a

merits ruling on all grounds for relief contained in his petition.

Respondent must establish that the Ohio courts actually enforced the state

procedural sanction for refusing to address those issues on their merits. *Bagby,* 853 F. 2d

1340; *Maupin,* 785 F.2d 135. If this Court determines that the state court relied on these

alleged procedural defaults and, as a result, refused to consider the merits of these issues,

this Court could refuse to review these issues as well. If, however, upon review of the

decisions of the state courts, this Court finds that those Ohio courts did address the merits

of these issues, in whatever form, no procedural bar exists to prevent this court from

considering the merits of these issues. See, e.g. *Cooper v. Wainwright,* 807 F.2d 881 (11th

Cir. 1986) ("When a state court decides a constitutional question, even though it does not

have to, it necessarily holds that the policies underpinning its procedural rule are

unworthy of vindication under the particular circumstances of the case before it"); *Raper

v. Mintzes,* 706 F.2d 161 (6th Cir. 1983); *Hockenbury v. Sowders,* 620 F.2d 111 (6th Cir.

1980). Pursuant to these cases, any procedural default which may otherwise have been

considered to have occurred in state court proceedings would be "forgiven" by the state

court's consideration of the merits of petitioner's claims in the state court. See, *County

Court of Ulster County v. Allen,* 442 U.S. 140 (1979); *Caldwell,* 472 U.S. 320.

For the Respondent to satisfy this element of the procedural default analysis, this

Court must conclude that the Ohio courts not only failed to review the merits of Mr.

Fears' claims, but also expressly relied on the alleged procedural default in doing so. In

order to conclude that the state court "relied" on an alleged procedural default, the last

state court rendering judgment in the case **<u>must clearly and expressly state</u>** that its

judgment rests on a state procedural bar. (Emphasis added) *Hill v. McMackin,* 893 F.810 (6th Cir. 1989) (citing *Michigan v. Long,* 463 U.S. 1032 (1983), see also, *Caldwell v. Mississippi,* 472 U.S. 320 (1985). Thus, no presumption that a court substantially relied upon procedural grounds is appropriate, without clear and express language stating such reliance. Without such language, no procedural default exists. Cf., *Bagby,* 853 F.2d 1340; *Maupin,* 785 F.2d 135.

At least in capital cases, the Supreme Court of Ohio does not consistently and uniformly apply its procedural default rules. [5]

## III. PETITIONER'S OBJECTIONS REGARDING PROCEDURAL DEFAULT AS TO INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS.

Petitioner was not required to raise any issue on direct appeal that either directly or indirectly involved the issue of effective assistance of counsel, whether the substantive issue of ineffectiveness of counsel or any other substantive issue that was not properly

---

[5] See, e.g., *State v. Buell,* 22 Ohio St.3d 124, 489 N.E. 2d 795 (1986) (the court sua sponte addressed a jury instruction concerning *Caldwell v. Mississippi,* 472 U.S. 320 (1985), which had never been raised by counsel).; *State v. Rogers,* 32 Ohio St. 3d 70, 512 N.E. 2d 581 (1981) (the court reconsidered and decided an issue concerning *Wainwright v. Greenfield,* 476 U.S. 284 (1986) to which the Court had earlier applied the doctrine of *res judicata*); *State v. Post,* 32 Ohio St. 3d 380, 513 N.E. 2d 754 (1987) (the court considered an issue concerning *Booth v. Maryland,* 482 U.S. 496 (1987) which was raised for the first time by supplemental brief. The court also decided an issue raised for the first time as to whether Ohio Rule of Criminal Procedure 11(C) requires a trial de novo to determine the existence of aggravating circumstances when a no contest plea is involved); *State v. Williams,* 23 Ohio St. 3d 16, 490 N.E. 2d 906 (1986) (the court considered issues which were not raised below, including a jury instruction precluding sympathy, the failure to instruct that the life in prison sentence does not require unanimous vote, the failure to secure a special verdict on intent to kill, and on the prosecutorial review of all mitigating factors); *State v. Barnes,* 25 Ohio St. 3d 203, 495 N.E. 2d 922 (1986) (the court addressed an issue, not previously raised, concerning duplicative aggravated circumstances); *State v. Holloway,* 38 Ohio St.3d 239, 527 N.E. 2d 831 (1988) (the court addressed challenges, not raised before to both trial counsel's ineffectiveness and to the constitutionality of Ohio's capital punishment statute); *State v. DePew,* 38 Ohio St.3d 275, 528 N.E. 2d 542 (1988) (the court sue sponte examined the propriety of a prosecutorial remark concerning a capital defendant's right not to make a sworn statement); *State v. Hamblin,* 37 Ohio St.3d at 155 ("Because this is a capital case, we will review all five arguments***despite waiver determination in appellate court"); *State v. Williams,* 38 Ohio St.3d at 347 ("Because of the gravity of the sentence that has been imposed on appellant we have reviewed the record with care for any errors that may not have been brought to our attention. In addition, we have considered any pertinent arguments which were not briefed or argued by the parties."); *State v. Coleman,* 45 Ohio St.3d at 301 ("However, [despite waiver] since this is a capital case we have reviewed the [waived issues on their merits]").

preserved for appellate review due to the deficient performance of trial counsel. The Magistrate Judge recommended procedural default as to issues which were integrally intertwined with ineffective assistance of counsel issues and which could not have been raised until post-conviction.

The Ohio Supreme Court has determined that trial ineffectiveness claims should not be raised on direct appeal. In *State v. Cooperrider,* 4 Ohio St.3d 226, 448 N.E. 2d 452 (1983), the Court recognized that trial ineffectiveness claims often require an evidentiary hearing for full development. *Cooperrider* involved the failure of trial counsel to object to a jury instruction error. The Court held this was an issue for post-conviction. "[A]ppellant is free to petition for a post-conviction evidentiary hearing to develop a record upon which this issue may be more effectively addressed." *Id.* at 228-229, See also, *State v. Keith,* 79 Ohio St.3d 514, 536-537, 684 N.E. 2d 47, 67-68 (1997) (Ineffectiveness claims for failure to present mitigation not appropriately considered on direct appeal). This is so because the Ohio Supreme Court restricts direct appeal review to the trial court record. *State v. Ishmael,* 54 Ohio St.2d 402, 377 N.E. 2d 500 (1978).

In *Kimmelman v. Morrison,* 477 U.S. 365 (1986), the United States Supreme Court held that "restricting the litigation of some Sixth Amendment claims to trial and direct review would seriously interfere with an accused's right to effective representation." The Sixth Circuit has concluded that the better procedure is for the defendant not to raise the issue of trial ineffectiveness on direct appeal, but to instead raise the issue on collateral review. *United States v. Hill,* 142 F.3d 305 (6th Cir. 1998); See also, *United States v. Kincaid,* 145 F.3d 771 (6th Cir. 1998) (Ineffective assistance of

counsel claims would not be reviewed on direct appeal because the record was silent as to counsel's trial strategy).

In Ohio, *res judicata* bars state courts from considering constitutional claims in post-conviction collateral attacks when those claims have already or could have been fully litigated on direct appeal. *Monzo v. Edwards,* 281 F.3d 568, 576 (6th Cir. 2002). Absent cause and prejudice, when a habeas petitioner fails to obtain consideration of a claim by the state courts due to a state procedural rule that prevents the state courts from reaching the merits of the petitioner's claim, the claim is procedurally defaulted and may not be considered by the federal court on habeas review. *Wainwright v. Sykes,* 433 U.S. 72, 84 (1977); *Lancaster v. Adams,* 324 F.3d 423, 436 (6th Cir.); *cert. denied,* 540 U.S. 1004 (2003); *Seymour v. Walker,* 224 F.3d 542, 549-50 (6th Cir. 2000). Demonstrating cause requires showing that an "objective factor external to the defense impeded counsel's efforts to comply" with the state procedural rule. *Murray v. Carrier,* 477 U.S. 478, 488 (1986). Demonstrating prejudice requires showing that the trial was infected with constitutional error. See, *United States v. Frady,* 456 U.S. 152, 169 (1982).

It has long been recognized that under exceptional circumstances and to prevent a miscarriage of justice, federal courts can exercise their power to grant habeas review. *Sykes,* 433 U.S. at 95; *Engle,* 456 U.s. at 135. When ineffective assistance of counsel so upsets the adversarial process that the verdict is suspect, the grounds contained in the habeas petition must be reviewed regardless of any procedural defaults that may have occurred.[6]

---

[6] See, e.g. *Kimmelman,* 477 U.S. 365 (1986); *Strickland v. Washington,* 466 U.S. at 695 (ineffective assistance establishes manifest miscarriage of justice) (Stephens, J. concurring). This court would be justified in exercising its equitable discretion to grant habeas review on any and all of Mr. Fears' claims that this Court determines to be otherwise defaulted. *Murray v. Carrier,* 477 U.S. 497.

**OBJECTION TO DENIAL OF RELIEF ON PETITIONER'S FIRST GROUND FOR RELIEF: Intentional prosecutorial misconduct in petitioner's state court trial denied petitioner his right to due process of law and his right to a fair trial protected by the Sixth Amendment. The resultant sentence of death violates petitioner's Eighth Amendment right to be free from cruel and unusual punishment.**

Petitioner raised the following subclaims to his First Ground for Relief:

**A)      Continuous and pervasive misconduct by the prosecution in the guilt phase of capital proceedings which prejudices the Petitioner's right to a fair trial, violates due process and the Eighth Amendment of the United States Constitution;**

**B)      Egregious misconduct by the prosecutor in the penalty phase of Petitioner's capital proceedings requires reversal of the death sentence where the prosecutor frequently injected improper and prejudicial matter after defense objections had been sustained, argued non-statutory aggravating factors, argued 'facts' outside the evidence, employed inflammatory remarks and invective against the accused and his counsel. A death sentence based on a jury verdict following such tactics and arguments violates due process and the Eighth Amendment of the United States Constitution;**

**C)      The Petitioner's case is not one where the misconduct of the Prosecuting Attorneys was slight or confined to a single instance, but one where such misconduct was pronounced and persistent with the probable cumulative effect upon the jury which cannot be disregarded as inconsequential. The cumulative effect of prosecutorial misconduct herein, violates the Petitioner's right to a fair trial under the Fifth, Sixth and Fourteenth Amendments and the resultant sentence of death violates the Eighth Amendment.**

"Again and again and again, the Ohio Supreme Court has held that in the penalty phase of a capital trial, the 'aggravating circumstances' against which the mitigating evidence is to be weighed are limited to the [statutory specifications] that have been alleged in the indictment and proved beyond a reasonable doubt." *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 356, 662 N.E.2d 311, 322.  The Ohio Supreme Court provided syllabus law expressly on point to eliminate any confusion:  "It is improper for

prosecutors in the penalty phase of a capital trial to make any comment before a jury that the nature and circumstances of the offense are 'aggravating circumstances.' " *Id*. at paragraph two of the syllabus.

More than seventeen years ago, the Ohio Supreme Court announced "mounting alarm" over the increasing incidence of prosecutorial misconduct. *State v. DePew* (1988), 38 Ohio St.3d 275, 288, 528 N.E.2d 542, 556. Commenting on the misconduct of the assistant prosecutors in *DePew*, the Court said: "We have previously voiced our disapproval of the various forms of misconduct by counsel in such cases. * * * Apparently, our efforts in this regard have been something less than successful, and the avenues for prevention and correction by trial courts, appellate courts and this court are relatively few. Time and again we see counsel misconduct which in many cases would appear to be grounds for reversal and the vacating of convictions and/or sentences". *Id.* The Ohio Supreme Court affirmed the sentence of death; this Court recommended habeas relief and was affirmed by the District Court and the Sixth Circuit.

State Prosecutors after *DePew,* did not understand the seriousness of the Ohio Supreme Court's admonitions that they should refrain from misconduct. Though the following is not a comprehensive listing of all the capital cases in which the Ohio Supreme Court addressed some form of prosecutorial misconduct, the following capital cases, all decided after the Ohio Supreme Court's decision in *DePew*, involve prosecutorial misconduct that has been criticized by the Ohio Supreme Court. See, e.g., *State v. Keenan* (1993), 66 Ohio St.3d 402, 405-409, 613 N.E.2d 203, 206-209 (reversed and remanded for new trial); *State v. Raglin* (1998), 83 Ohio St.3d 253, 699 N.E.2d 482; *State v. Getsy* (1998), 84 Ohio St.3d 180, 702 N.E.2d 866; *State v. Davie* (1997), 80 Ohio

St.3d 311, 686 N.E.2d 245; *State v. Henness* (1997), 79 Ohio St.3d 53, 679 N.E.2d 686; *State v. Davis* (1996), 76 Ohio St.3d 107, 666 N.E.2d 1099; *State v. Brooks* (1996), 75 Ohio St.3d 148, 661 N.E.2d 1030*; State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 662 N.E.2d 311*; State v. Hill* (1996), 75 Ohio St.3d 195, 661 N.E.2d 1068; *State v. Lundgren* (1995), 73 Ohio St.3d 474, 653 N.E.2d 304; *State v. Williams* (1995), 73 Ohio St.3d 153, 652 N.E.2d 721; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 613 N.E.2d 212*; State v. Evans* (1992), 63 Ohio St.3d 231, 586 N.E.2d 1042; *State v. Murphy* (1992), 65 Ohio St.3d 554, 605 N.E.2d 884*; State v. Combs* (1991), 62 Ohio St.3d 278, 581 N.E.2d 1071; *State v. Durr* (1991), 58  Ohio St.3d 86, 568 N.E.2d 674; *State v. Wiles* (1991), 59 Ohio St.3d 71, 571 N.E.2d 97; *State v. Tyler* (1990), 50 Ohio St.3d 24, 553 N.E.2d 576; *State v. Lott* (1990), 51 Ohio St.3d 160, 555 N.E.2d 293; *State v. Landrum* (1990), 53 Ohio St.3d 107, 559 N.E.2d 710; *State v. Hutton* (1990), 53 Ohio St.3d 36, 559 N.E.2d 432; *State v. Johnson* (1989), 46 Ohio St.3d 96, 545 N.E.2d 636; *State v. Greer* (1988), 39 Ohio St.3d 236, 530 N.E.2d 382; *State v. Bedford* (1988), 39 Ohio St.3d 122, 529 N.E.2d 913.

Even after this extensive list of critical jurisprudence, Petitioner's Prosecutors continued the misconduct; it was intentional and was initiated before trial, during the voir dire, continued through the guilt and penalty phases and culminated in closing, intentionally and with prior calculation and design, to have the weighing scales unfairly skewed in favor of death.

Petitioner's Prosecutors, in response to a pretrial motion filed by Petitioner's counsel, stated to the court:

> The state intends to use these instructions [*State v. Gumm* and *State v. Wogenstahl*] in its closing argument, and of course, this Court is also bound to follow this law, not the wishes of the defendant.

(Appendix Vol. I at p. 298).  Thus not only were Petitioner's Prosecutors presumed to know the law, they confirm they know the limitations of closing argument by specifically citing to *Wogenstahl* and quoting as follows:

> (1) In the penalty phase of a capital trial, the 'aggravating circumstances' against which the mitigating evidence is to be weighed are limited to the specifications of aggravating circumstances set forth in R.C. 2929.04(A)(1) through (8) that have been alleged in the indictment and proved beyond a reasonable doubt.
> (2) It is improper for prosecutors in the penalty phase of a capital trial to make **any** comment before a jury that the nature and circumstances of the offense are 'aggravating circumstances'

(Emphasis added). Id.

The Prosecutors, although professing to know the limitations of closing argument, began to indoctrinate and confuse the jury in voir dire by improperly characterizing non-statutory factors as aggravating circumstances to be weighed against mitigation, in an effort to skew the weighing process in favor of death, in direct violation of the law.

Prosecutor Russell, notorious for her misconduct[7], began the confusion when she stated to the jury:

> In the second phase, you are taking everything that you heard from the first trial; and you weigh that against any mitigation defense provides, or anything they give you, an explanation, anything, excuses, or history on behalf of the defendant, what ever they chose to provide to you; that's when you get to hear all of that, **and you weigh the mitigation they give you against the facts of the crime.**

---

[7] *See, State v. Cotton*, 113 Ohio App.3d 125 (1996), less than three years before Fears the First District Court of Appeals stated, "Prosecutorial misconduct was rampant and egregious…[T]his is a basic misconduct, a blatant effort to obfuscate the evidence with innuendo***A study by the Prosecutor of the Code of Professional Responsibility, especially DR 7-103(B), DR-7 (106)(C)(7) and EC 7-25 would seem to be in order." *Id.* at 137.

(Emphasis added) (Tr. Trans. 187). Defense counsel objected, the court failed to rule and

the Prosecutor, calling it "very technical" (Tr. Trans. 188) continued:

> You are weighing mitigation which defense provides you against the
> aggravating circumstances. **I call the facts**.

(Emphasis added) (*Id.*).

In voir dire[8] Prosecutor Prem questioned Prospective Juror Siemers:

Q:     Have you ever been afraid before?

A:     Yes

Q:     Afraid for your life?

A:     No response***

Q:     Have you ever done something in your life because you were

       afraid, have changed a plan or done something because of your

       fear [knowing that the State planned to argue that the terror put

into Derrick Frazier's head, caused him to do "something because of [the] fear" to-wit

peeing his pants]. (Tr. Trans. 832-833).

Prosecutor Prem continued in the questioning of prospective juror Staubitz:

Q:     Have you ever been frightened before?

A:     Yes

Q:     In your—Have you ever been scared to death before?

A:     I don't think quite that far, no.

Q:     You ever have your heartbeat so hard in your chest you could feel

       it?

---

[8] One can hardly call it voir dire when the transcript is studied. Time and again it took both the form and
the substance of opening statement by the Prosecution, all without objection by trial counsel. See, e.g. Tr.
Trans. 881-884; 911-912; 914; 1138-1142;

A:       Yes, oh, yes.

(Tr. Trans. 938-939).

Thus the stage was set for the prosecutorial misconduct that occurred in closing argument. The State intentionally blurred the lines between aggravating circumstances and mitigating factors calling it "very technical", indoctrinated the jury with the sense of terror that they would intentionally revisit in closing and then intentionally argued non-statutory aggravating circumstances to the prejudice of the Petitioner:

> "What kind of terror did he [appellant] put into Derrick Frazier's head?  He told us he peed in his pants.  How is that for aggravating circumstances?" (Tr. Trans. 2965).

"It is clear that the prosecutor in this case erred in referring to the terror appellant inflicted on Derrick Frazier as an 'aggravating circumstance.'  As we have previously stated, it is improper for a prosecutor to "suggest that * * * the suffering and mental anguish the victims endured was an aggravating circumstance." *State v. Fears,* 86 Ohio St.3d 329, 333 (1999) citing with approval, *State v. Combs* (1991), 62 Ohio St.3d 278, 283, 581 N.E.2d 1071, 1077. In *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 662 N.E.2d 311, at paragraph two of the syllabus, the Ohio Supreme Court held that "[i]t is improper for prosecutors in the penalty phase of a capital trial to make any comment before a jury that the nature and circumstances of the offense are 'aggravating circumstances.' " [9] The "aggravating circumstances" are limited to those factors set forth in R.C. 2929.04(A)(1) through (8) that are specified in the indictment and proved beyond a reasonable doubt.  *Id*. at 351,662 N.E.2d at 318. )

---

[9] It is disingenuous to believe that the Hamilton County Prosecutors in light of *State v. Combs, State v. Gumm* and *State v. Wogastahl* were accidentally arguing that the nature and circumstances of the offense are "aggravating circumstances". A pattern of intentional misconduct exist herein which deprived Petitioner of a fair trial.

> "…arguing a non-statutory aggravating circumstance to the jury is
> as improper as converting a circumstance of the offense into an aggravating
> circumstance."

(R & R at 33).

Apparently the Prosecutors in Fears did not take seriously the First District Court of Appeal's admonition to read the Disciplinary Rules as a result of *State v. Cotton*, or having read them, continued to violate their dictates, all without sanction by any court.

Not surprisingly, the Magistrate Judge "agrees with Fears and the Ohio Supreme Court's determination that the prosecutor's comment was improper" (R & R p. 33). The Magistrate Judge further found "[T]here is some degree of likelihood that the jurors would have been misled by the prosecutor's use of Derrick Frazier's urinating in his pants as an aggravating circumstance…" (R & R p. 34). There is no question that the jury was in fact misled because the Prosecutor indoctrinated them early on in the case to blur the line and find the "facts of the crime" as aggravating circumstances. (Tr. Trans. 187).  The objection by defense counsel to the misconduct was "inexplicitly overruled". (R & R p. 34; Tr. Trans. 2965). Even with the jurisprudence preceding the misconduct in Petitioner's case covering seventeen years and particularly in light of *Combs, Gumm* and *Wogenstahl,* being directly on point to the misconduct, the Magistrate Judge did "not find the complained-of comment to have been flagrant".[10] (R & R at p.35).

The misconduct is the very essence of flagrant when examined in light of the almost two decades of Ohio Supreme Court warnings on this very point, the trial transcript where both the intentional confusion of the jury on what is and is

---

[10]"Conspicuously offensive; so obviously inconsistent with what is right or proper as to appear to be a flouting of law or morality" *Merriam Webster's Deluxe Dictionary* (10th Collegiate Ed.).

not an aggravating circumstance and the indoctrination as to the improper "fear"
factor occurred early on and repeatedly, by the Prosecutors, with the
acknowledgement at the pre-trial stage, that they were going to use "*Wogenstahl*"
and *"Gumm"* in their closing argument. (Appendix Vol. I, p. 298).

Petitioner, in conjunction with Chief Justice Moyer, joined by Justice
Pfeifer of the Ohio Supreme Court would disagree with the Magistrate:

> It is only fair to presume, considering the clarity of the law on the
> issue, the objection by defense counsel and the repeated nature of
> the misconduct, that the prosecution's comments were not mere
> misstatements or inadvertent assertions made in the heat of the
> moment [i.e. they were flagrant]

*State v. Fears,* (1999), 86 Ohio St. 3d 329, 356.

However the Prosecutorial misconduct was not limited to these flagrant
examples, the experienced Prosecutors struck at the heart of the Fifth
Amendment.

Again indoctrination began in the voir dire portion of the trial, when the
Prosecutors asked a prospective juror whether it was possible for the case against
Petitioner to be proven "without having them help us figure [it] out". (Tr. Trans.
p. 959). In addition and immediately after the above example of misconduct, the
prospective juror was asked whether the case could be proven "by using other
kind[s] of evidence [i.e. testimony from "them"]". (Tr. Trans. p. 960). Finally, and
most egregiously, the Prosecutors in closing argument stated, "It's clear he is
going to tell you that he never was going to kill him. Gun wasn't loaded". (Tr.
Trans. 2294). Even though the comment was objected to and the court sustained
the objection, the court **_invited_** the State to rephrase (Id.); the curative instruction

did not come until the State had completed it closing argument. (Tr. Trans. 2304).

The State tried to explain away the misconduct, after a motion for a mistrial had

been made by the defense, by stating "[H]e didn't say accident. He never did—

make a comment of what he did or didn't say in this courtroom, but in the context

of what he was saying there" (Tr. Trans. 2305), clearly indicating her intent to

comment on Petitioner's failure to "make a comment of what he did not didn't say

in this courtroom" (Id.).

The Ohio Supreme Court found the comments in question "suggest[ed] an

impermissible reference to [Fears'] failure to take the witness stand", but that the

remarks could "also be read as a reference to [Fears'] defense of lack of intent."

*State v. Fears,* (1999) 86 Ohio St. 3d at 336.

Lack of intent is not an affirmative defense, generally, in the State of Ohio

upon which the Defendant bears the burden unless accompanied by a defense

which "represents a substantive or independent matter which the defendant claims

exempts him from liability even if it is conceded that the facts claimed by the

prosecution are true. Among these defenses, in Ohio are self-defense, duress,

insanity and intoxication." *State v. Poole,* (1973) 33 Ohio St. 2d 18 at 19. Thus

the simple fact that Defendant sought to introduce evidence that contradicted the

State's case on an essential element, does not thereby permit the State to comment

on the Petitioner's silence in violation of the Fifth Amendment to the United

States Constitution and it was error for the Ohio Supreme Court to so find.

Petitioner asserts additional prosecutorial misconduct occurred by the prosecutor's

reference to Dr. Smalldon as defense counsel's "mouth piece." The state court stated:

> [T]he prosecutor's references to Dr. Smalldon as defense counsel's "mouth piece"…insinuates that defense counsel has paid the expert to simply have him parrot their opinions.

*State v. Fears,* 86 Ohio St.3d 329, 333-334 (1999).

However, the Magistrate Judge indicated that the Ohio Supreme Court's statement quoted above, "does not hold up to a careful reading of the transcript" (R & R p.38) and "the factual basis upon which Fears' claim respecting the "mouthpiece" comment rests is faulty, and can consequently provide no ground for habeas relief". (*Id.*).

Thus although stating at the outset of his Report and Recommendation that facts found by the state courts are presumed correct, the Magistrate Judge reinterprets facts ("when correctly understood" R & R p. 38) to deny Petitioner relief. The "mouthpiece" fact, found by the Ohio Supreme Court, is presumed correct and can and does provide Petitioner a basis for habeas relief.

Petitioner further argues that it was improper for the prosecutor to state in cross-examination and in closing argument that the defense expert was being paid with taxpayer money. (Tr. Trans. 2838; 2839; 2954)   These comments injected an impermissible reference to pecuniary interests/abuse of taxpayer monies ("it's clear that he testifies all over the State of Ohio and elsewhere in this type of work at six thousand dollars a pop. That's your [jury's] money paying for him" Tr. Trans. 2954), by which the prosecutor obviously hoped to gain an unfair advantage; there is no other reasonable explanation for the use of these words. Who paid for the expert is irrelevant: the Ohio Supreme Court agreed. *State v. Fears,* 86 Ohio St. 3d 329, 334 (1999).

But the misconduct continued. Petitioner asserts a cluster of prosecutorial misconduct arose from a dispute at trial over whether the prosecutors were entitled to see

Dr. Smalldon's (Petitioner's expert psychological witness) notes. The trial court ruled that the state could not receive these notes.[11] The prosecutor blatantly ignored the court's ruling and made several comments about these notes in the presence of the jury.[12] The prosecutor asked Dr. Smalldon, over objection, whether he provided these notes to the state. The prosecutor also alluded in cross-examination to Dr. Smalldon's failure to write a report and the references were flagrant, pervasive and continual.[13] Finally, in closing argument, the prosecutor argued to the jury that Smalldon's bias was shown by his refusal to give information to the state. Prosecutor Russell stated: "He [Smalldon] was reluctant to give up what was in his file. He was reluctant to tell us what the defendant had told him. He was **unwilling** to give us his notes and **unwilling** to write a report." (Tr. Trans. 2956). "Unwilling" is factually wrong and her use of that term was flagrant and offensive and constitutes another example of prosecutorial misconduct.

> Do you think that one of the things he [Dr. Smalldon] may teach them to do is 'I don't have to prepare a report and that way the State can't cross-examine a report and can't know ahead of time what I'm going to say, what my diagnoses are and they can't consult with their other experts to rebut it because the State is not going to know what it is that you're going to say'.

(Tr. Trans. 2955).

---

[11] See, e.g., "I'm going to overrule your objection [notes are not to be produced]" (Tr. Trans. 2757);"Like I just ruled you're not entitled to his notes. We went over that before you are entitled to results of the reports" (Tr. 2766); "I think Dr. Smalldon and the defense has substantially complied with this Court's order. And it's clear to me that interview notes that he has made, himself, are work product and not subject to discovery" (Tr. Trans. 2821); "The interview notes are not going to be admissible" (Tr. Trans. 2847-2848)

[12] Q: Did you have experience in the Angelo Fears' case that when an objection was sustained, that the prosecutors returned to the very act that was found objectionable and sustained by the Court?
A: Specifically in the mitigation phase, yes I recall that specifically. Q: Repeatedly, was that your experience? A: yes. (Evid. Hrg. Tr. 568).

[13] "Doctor, let's make it clear. You did not provide any interview notes to the State, did you?" (Tr. Trans 2848; "You have not provided those interview notes to the State either, have you?" (Tr. Trans. 2848); "She has cross-examined him for an half hour. All it has been in trying to get notes, notes, notes" (Tr. Trans. 2853).

The Ohio Supreme Court observed on direct appeal that the trial court found improper, the prosecutor's statements in closing argument respecting Dr. Smalldon's not having made a written report of his findings. *State v. Fears,* 86 Ohio St.3d 329, 334-335 (1999). The misconduct surrounding the report was not limited to closing argument.[14]

> The jurors were not told that the prosecutor's other comments along the same lines (Trial Tr. At 2931, 2932, 2955, 2957) were improper, however, or that they should be disregarded. There is some likelihood that the prosecutors' statements could have prejudiced the jurors against the evidence presented through Dr. Smalldon, thereby prejudicing Fears. At least four times, the prosecutors mentioned that Dr. Smalldon had not prepared a report of his findings and insinuated that that was an unfair tactic calculated to deprive the prosecution of their rightful opportunity to learn what Dr. Smalldon would say on the witness stand before he testified. The truth of the matter is that there is nothing untoward about Dr. Smalldon's not preparing a written report. The prosecutors were provided with all of his raw testing data and could have presented their own expert to interpret it and dispute Dr. Smalldon's findings rather than impugning his integrity with improper remarks. Moreover, the remarks were repeated several times during closing argument and were unquestionably deliberately made [i.e. flagrant]

(R & R p. 39).

> Even though the trial court had consistently ruled that the prosecutors were not entitled to Dr. Smalldon's interview notes and had immediately shut down their questioning as to why Dr. Smalldon had not prepared a written report of his findings, the prosecutors blatantly revisited both issues in their closing argument.

(R & R p. 36).

This is the second example from the Report and Recommendation where the Magistrate Judge found the "likelihood" that Petitioner was prejudiced by the actions of the State Prosecutors and yet no relief granted.

---

[14] "Where is the report that you made, sir, summarizing all of your findings, psychological, neuropsychological, clinical assessment" (Tr. Trans. 2856); "But we haven't had a chance to review it, have we, the State"(Tr. Trans. 2881); "I don't have a report from you. So you need to make a report to the jury so that they know where those inconsistencies are" (Tr. Trans. 2883); "If you had made a report, sir, I would be able to cross-examine you a little more simply on this in this regard, wouldn't I" (Tr. Trans. 2884); "We didn't get a report from him" (Tr. Trans. 2931)

There was "unquestionably deliberate" prosecutorial misconduct surrounding "mouthpiece" Smalldon, his notes and his report, "blatantly revisited" in the State's closing argument after repeated admonishment by the trial court, deliberate misconduct in arguing that the nature and circumstances of the crime was an aggravating circumstance ignoring seventeen years of warnings from the Ohio Supreme Court and three of its cases directly on point to the "nature and circumstance" misconduct. The Ohio Supreme Court did "not believe that [A]ppellant was denied a fair trial by any of these remarks." *State v. Fears,* 86 Ohio St.3d 329, 333-335 (1999). That finding was an unreasonable application of Federal law.  What the Supreme Court of Ohio said was that Appellant was not prejudiced by "any" of these remarks, what they did not say is that the Appellant was not prejudiced by all of these statements, in a cumulative sense.

Clearly the blatant misconduct by the Prosecutors as it relates to Dr. Smalldon had a direct effect on the jury as evidenced by an on-the-record question and answer session, none of which violated Ohio Rule of Evidence Rule 606(B), since the question and answer session was not "testimony" and the jurors who commented were not "called" to testify about the validity of their verdict or indictment.

The question and answer session went thusly:

Q (Juror):          Can you tell us what the problems were?

A (Rosenwald):          **She's (Prosecutor Russell) trying to cheat**.(Emphasis added).

Q (Juror):          **I knew that**. I could tell by the look on your face.

Q (Juror):          I want you to tell me what was off the record about the

                    little doctor. Why he couldn't go into that.

24

| | |
|---|---|
| A:(The Court): | We can tell you if we can remember. |
| A:(Russell) | We can remember. |
| Q (Juror): | Why he didn't take his board test in '96. |
| A(The Court): | One of the things I'm sure you picked up on Dr. Smalldon is he does not write a written report. |
| A:(Rosenwald): | Which he doesn't have to. |
| A:(Russell): | But he could if he wanted to. |
| A:(Rosenwald): | Yes, but we asked him not to. |
| A:(Juror) | We wouldn't have had to deliberate so long if he did. |
| Q:(Juror) | If—Why would you not? |
| A:(Rosenwald) | Because the rules say I have to give them a copy. |
| A:(Russell): | Because I could prepare. |
| A:(Rosenwald): | Did you see the book she had? Did you see the one fellow in the blue suit? His name is Mike Bachman. He used to work in their office; now he use (sic) works for the Ohio Attorney General's death unit. He handles all the death appeal and habeas corpus. He brought back all the stuff on Dr. Smalldon to play with him. |
| A: (Juror): | It could have been a piece of paper. |
| A:(Juror): | **She was having a field day.** |
| A(Juror): | **For all we know, it could have been a box of paper**… |

(Emphasis added) (Tr. Trans. 3022-3024).

Knowing that the court had ruled (after a sidebar that encompassed eight pages of trial transcript all of which occurred in the presence of the jury plus two additional sidebar conferences (the first two and a portion of the third were all in the presence of the jury Tr. Trans. 2749-2757; 2765; 2798-2822) that Dr. Smalldon need not have prepared a report, nor provided his notes to the Prosecutor and having been succinctly and firmly informed of same by the court[15], the Prosecutors ignored the court and engaged in the deliberate misconduct; several times either at sidebar in the presence of the jury or directly before the jury in open court (e.g. 2847-2848). Even though the court ordered that the witness need not produce his notes to the State, the State was permitted to ask over the objection of the Defense:

Q:      Doctor, let's make it clear. You did not provide any interview notes to the State, did you?

A:      No.***

Q:      You have not provided those interview notes to the State either, have you?

A:      I haven't provided—I'm not sure how else to say it. I haven't provided you with any of my interview notes. I think I have been told I don't need to do that".

(Tr. Trans. 2848).

Defense counsel asked that the jury be admonished about the court's ruling that the notes need not be produced as Prosecutor Russell continued in the area the court had

---

[15] "I'm going to overrule your objection. I'll allow the testimony to proceed…note your objection for the record" (Tr. Trans. p. 2757); "Like I just ruled, you're not entitled to his notes. We went over that before. You are entitled to results of the reports".(Tr. Trans. p. 2766); "**<u>Listen, don't argue with me</u>**" (Emphasis added) (Tr. Trans. p.2767); "I think Dr. Smalldon and the defense has substantially complied with this Court's order. And it's clear to me that interview notes that he has made, himself, are work product and not subject to discovery" (Tr. Trans. 2821); [We think we're entitled at this juncture to the doctor's notes] "That motion will be denied. We won't have to revisit it". (Tr. Trans. 2843); "Well, interview notes are not going to be admissible. All right". (Tr. Trans. 2848)

ruled off limits; defense's objection was noted for the record and the doctor ordered back to the stand. (Tr. Trans. 2853). No action was taken by the trial court, in the presence of the jury, correcting the misperception that a report had to be prepared or that the court had ruled the notes need not be produced. The objection and request for admonition about the court's ruling is a manifestation of the effect the prosecutorial misconduct was having on the jury.

Even after multiple sidebars, multiple rulings, multiple instructions as to what was produceable and what was not, the Prosecutors continued the misconduct:

Q (Russell);    Where is the report that you made, sir, summarizing all of your findings, psychological, neuropsychological, clinical assessment?

A: (Smalldon): I wasn't requested to produce a report.

Q: (Russell):    Are you aware, sir, there was an entry put on in this case last Friday ordering either all of your materials or in the alternative a report?

A:(Smalldon): I have read that entry and multiple times indicated my interest in complying with it and asking clarification and have done what I was told I should do.

The defense objection was sustained. The request that the testimony be stricken was granted. (Tr. Trans. 2856-2857).

> Do you think that one of the things he may teach them to do is "I don't have to prepare a report and that way the State can't cross-examine a report and can't know ahead of time what I'm going to say, why my diagnosis are and they can't consult with their other experts to rebut it because the State is not going to know what it is that you're saying.

(Tr. Trans. 2955).

He was **unwilling** to give us his notes and **unwilling** to write a report.

(Emphasis added) (Tr. Trans. 2956): blatantly and flagrantly false.

27

The objection to the Prosecutor's question about board certification was sustained, but there was no curative instruction. (Tr. Trans. 2866), the question and answer session demonstrated the prejudice.

In attempting to get the Defendant's criminal record before the jury, since the Defendant had not testified, the Prosecutor asked about "charges" not convictions when she posed the question to Dr. Smalldon, "Did you review his records? He was charged with a robbery in '90—(Tr. Trans. 2869)?" The objection was sustained. This was an intentional act of misconduct by the Prosecutor as demonstrated by the following:

Mrs. Russell:   It says charged with robbery, convicted of assault.

The Court:   Are you going to run this or am I? Look, I don't care what the record says. **You know** it was an assault. **No use trying to get it in here** it was a robbery reduced on a plea bargain to assault. Stick with the facts of the evidence. All right? (Emphasis added)(Tr. Trans. 2870-2871) ***

The Court:   ---**The point is don't infer something that shouldn't be admitted**. The fact that is was a robbery and reduced to theft is not admissible, should not be considered by them. I think there was a robbery dismissed; he was convicted of assault. The other dismissal stuff; the conviction is fine.

(Tr. Trans. 2872). This misconduct is especially egregious as the Defendant was facing an aggravated robbery in the present case and it cannot be doubted that a prior robbery conviction—which never occurred as well known by the Prosecutor—was particularly prejudicial.

It simply did not stop:

Mrs. Russell:   You haven't—I don't have a report from you. So you need to make

the **report to the jury so that they know where those**

**inconsistencies are.** [Mandating a report where none is required

and assuming a fact not in evidence that there were

"inconsistencies"]

Mr. Pandilidis: Your Honor, objection. That's not a question; it's a statement.

Mrs. Russell:   Do you understand my problem, my predicament?

The Court:      Wait a minute. The objection is well taken. You don't have to

answer that.

Mrs. Russell:   If you had made a report, sir, I would be able to cross-examine you

a little more simply on this in this regard, wouldn't I?

Mr. Rosenwald: Objection.

The Court:      Objection sustained.

If the above was not enough, the Prosecutors intentionally and falsely argued to

the jury actions that they well knew Petitioner did not commit:

He shot **them** [only one person was shot] with no remorse.  He shot **them**
in front of those other two people **and he pistol whipped Derrick Frazier**
[James Grant committed this act Tr. Trans. 2008-2009].

Prosecutorial misconduct has been recognized by jurists throughout history as a

challenge to the very foundation of the criminal justice system.  See, e.g*., State v. Keenan*

(1993), 66 Ohio St.3d 402, 613 N.E.2d 203 (convictions and death penalty reversed);

*State v. Thompson* (1987), 33 Ohio St.3d 1, 514 N.E.2d 407 (death sentence reversed);

*State v. Smith* (1984), 14 Ohio St.3d 13, 14 OBR 317, 470 N.E.2d 883 (conviction

reversed and cause remanded for new trial); *State v. Liberatore* (1982), 69 Ohio St.2d

583, 23 O.O.3d 489, 433 N.E.2d 561 (conviction reversed and cause remanded for new

trial); *United States v. Kojayan* (C.A.9, 1993), 8 F.3d 1315, 1323; *Walker v. Engle*

(C.A.6, 1983), 703 F.2d 959; *Darden v. Wainwright* (1986), 477 U.S. 168, 205-206, 106

S.Ct. 2464, 2484, 91 L.Ed.2d 144, 172-173 (Blackmun, J., dissenting, joined by Brennan,

Marshall, and Stevens, JJ.); *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 648-649, 94

S.Ct. 1868, 1874, 40 L.Ed.2d 431, 439-440 (Douglas, J., dissenting); *United States v.

Antonelli Fireworks Co.* (C.A.2, 1946), 155 F.2d 631, 661 (Frank, J., dissenting).

     The United States Supreme Court has explicitly recognized that prosecutors serve

a special role in our justice system requiring them to adhere to the highest standards and

to avoid improper arguments, insinuations, and assertions calculated to mislead the

jury.  The role of the prosecutor is to ensure "not that it shall win a case, but that justice

shall be done.  As such, he is in a peculiar and very definite sense the servant of the law,

the twofold aim of which is that guilt shall not escape or innocence suffer.  He may

prosecute with earnestness and vigor - indeed, he should do so.  But, while he may strike

hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from

improper methods calculated to produce a wrongful conviction as it is to use every

legitimate means to bring about a just one." *Berger v. United States* (1935), 295 U.S. 78,

88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321. The Magistrate has found "unquestionably

deliberate" prosecutorial misconduct surrounding "mouthpiece" Smalldon, his notes and

his report, "blatantly revisited" in the State's closing argument after repeated

admonishment by the trial court, and deliberate misconduct in arguing that the nature and

circumstances of the crime was an aggravating circumstance ignoring seventeen years of

warnings from the Ohio Supreme Court and three of its cases directly on point to the "nature and circumstance" misconduct.

The Ohio Supreme Court announced "mounting alarm" over the increasing incidence of prosecutorial misconduct. *State v. DePew* (1988), 38 Ohio St.3d 275, 288, 528 N.E.2d 542, 556. Commenting on the misconduct of the assistant prosecutors in this case, the Court said: "We have previously voiced our disapproval of the various forms of misconduct by counsel in such cases. * * * Apparently, our efforts in this regard have been something less than successful, and the avenues for prevention and correction by trial courts, appellate courts and this court are relatively few. Time and again we see counsel misconduct which in many cases would appear to be grounds for reversal and the vacating of convictions and/or sentences". *Id.* This case is such an instance.

As Justice Jerome Frank stated in his oft-cited dissent in *United States v. Antonelli Fireworks Co. Inc.* 155 F.2d at 661 (Second Cir. 1946):

> …the repeated use of vigorous language denouncing prosecutors for improper conduct, without more, constitutes an "attitude of helpless piety***. It means actual condonation of counsel's alleged offense, coupled with verbal disapprobation. If we continue to do nothing practical to prevent such conduct, we should cease to disapprove it. For otherwise***the deprecatory words we use in our opinions on such occasions are purely ceremonial.***the practice***breeds a deplorably cynical attitude towards the judiciary".

Chief Justice Moyer observed in his articulate and impassioned dissent in Petitioner's direct appeal, "As demonstrated by the pattern of misconduct we have been reviewing, Judge Frank's observation that prosecutors are willing to suffer such a verbal chastisement in order to ensure victory, despite the cost to our justice system, has been proven true." *State v. Fears,* (1999) 86 Ohio St.3d 329, 353.

Chief Justice Moyer continued:

31

> Refusing to address the fundamental unfairness of a trial **riddled with prosecutorial misconduct** because a majority of this court deems the evidence of guilt to be overwhelming creates the perception that we protect the right to a fair trial only when we believe that the defendant is guilty. However our constitutional duty is to ensure that all defendants, regardless of guilt or innocence, receive a fair trial and to ensure that a person accused is presumed innocent until the state, within the bounds of due process satisfies its burden of proving beyond a reasonable doubt all of the elements of the charged offense, and the appropriateness of the imposed sentence.

(Emphasis added) *Id.*

The Chief Justice, joined by Justice Pfiefer, cogently cite and analyze the prosecutorial misconduct that "pervaded the trial, especially the penalty phase"[16] in their more than twelve page dissent. Petitioner agrees with Justices Moyer and Pfeifer, the Ohio Supreme Court unreasonably applied *Berger v. United States,* 295 U.S. 78 (1935). Petitioner's case was exactly like that of *Berger* with respect to the prosecutorial misconduct, in that the conduct was not slight or confined to a single instance, but one where such misconduct was pronounced and persistent and the trial was "riddled with prosecutorial misconduct", with the probable cumulative effect upon the jury which cannot be disregarded as inconsequential.

The State, who was the beneficiary of the misconduct, failed to prove beyond a reasonable doubt that the jury's sentencing recommendation was not based even in part upon the error they created in violation of Sixth Circuit law. *Kordenbrock v. Scroggy,* 919 F.2d 1091 (6th Cir. 1990).

The Petitioner was denied a fair trial in violation of his Sixth and Fourteenth

---

[16] *Id.* at 362.

Amendment rights protected by the United States Constitution, especially in the sentencing phase of his capital trial. As Justices Moyer and Pfeifer stated, "[T]he conduct of the attorneys for the state in this case has bent the rules beyond the breaking point". 86 Ohio St.3d 329 at 356. As the United States Supreme Court has stated, "in death cases doubts…should be resolved in favor of the accused." *Andres v. United States,* 333 U.S. 740, 752 (1948). "…[A] prosecutor's comments violate the 8th Amendment when they are so prejudicial as to "constrain the manner in which the jury was able to give effect to mitigating evidence." *DePew v. Anderson,* 311 F/3d 742, 748 (6th Cir. 2002) quoting with approval *Buchanon v. Angelone,* 522 U.S. 269 at 277 (1998).

This court is not unfamiliar with prosecutorial misconduct, having recommended relief for Rhett DePew in his habeas case, which was adopted by the District Court and affirmed by the Sixth Circuit. Petitioner urges this court, upon re-review, to adopt Justice Steven's authoritative concurrence in *Brecht v. Abrahamson,* 507 U.S. 619 at 641 (1993), "if one cannot say with fair assurance…that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected". As the Sixth Circuit stated in affirming the District Court and this Magistrate in *DePew v. Anderson,* 311 F.3d 742, 751 (6th Cir. 2002). "[B]ecause we have grave doubt that the statements by the Prosecutor did not have an effect on the sentencing of the defendant, we find that the constitutional errors in this case are not harmless, and accordingly, we grant defendant a new penalty phase…"

In *United States v. Carroll,* 26 F.3d 1380 (6th Cir. 1994) the Sixth Circuit summarized their recent jurisprudence on the issue of prosecutorial misconduct. When addressing claims of prosecutorial misconduct, the Sixth Circuit first determines whether

the challenged statements were indeed improper. (See, *United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999). If the court finds impropriety, the court next looks "to see if they were flagrant and warrant reversal" *Id.* Flagrancy is determined by an examination of four factors "whether the statements tended to mislead the jury or prejudice the defendant' 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused". *Francis* at 549-550.

There is no question the statements were improper. There is no question the statements were flagrant. There is no question reversal is warranted.

Petitioner objects to the Magistrate's Report and Recommendation that denies habeas relief on Petitioner's First Ground for Relief and its subclaims alleging prosecutorial misconduct both individually and cumulatively. The Ohio Supreme Court applied United States Supreme Court precedent in an objectively unreasonable manner. In *DePew* only Justice Wright and Justice Herbert Brown dissented from the majority on the issue of whether prosecutorial misconduct occurred in that case. In Petitioner's case Justice Pfeifer joined the Chief Justice in dissenting in a twelve-page dissent that thoroughly and persuasively establishes Petitioner's entitlement to relief. Petitioner cannot articulate grounds for reversal better than two Justices of the Ohio Supreme Court and adopts their arguments and evidence in support of reversal and incorporates same herein.

As Judge Rice stated in adopting this Court's Report and Recommendation in *DePew*:

> Respondent would have this court believe that this is not a case in which

> The prosecutorial misconduct tipped the scales in favor of death. To the contrary, this Court concludes that the misconduct which occurred during the penalty phase of Petitioner's trial removed the scales of justice from the courtroom entirely.

*DePew v. Anderson,* 104 F.Supp.2d 879, 886 (S.D. Ohio 2000).

.

## OBJECTION TO DENIAL OF RELIEF ON PETITIONER'S SECOND GROUND FOR RELIEF:PETITIONER'S DEATH SENTENCE RESULTED FROM AN ARBITRARY AND CAPRICIOUS PROCESS THAT DEPRIVED HIM OF FUNDAMENTAL CONSTITUTIONAL PROTECTIONS IN VIOLATION OF HIS RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

Petitioner raised the following sub-claims to his Second Ground for Relief:

**A. It is impermissible for a sentencer in a capital case to weigh the nature and circumstances of the offense as an aggravating circumstance, to weigh as aggravating an aggravating circumstance which the law requires to be merged with another such circumstance for sentencing purposes, and to weigh the mitigating factors separately (rather than collectively) against the aggravating circumstances, and, where the sentencing opinion of the trial court reveals that such errors occurred in the imposition of the death sentence, the death sentence imposed violates the offender's constitutional rights under the Eighth and Fourteenth Amendments to the U.S. Constitution.[17]**

**B. Where, as the result of one indivisible course of conduct, a defendant is charged with aggravated robbery, aggravated burglary and kidnapping, with separate capital specifications for each of those felonies, in a prosecution for aggravated murder as well as for the underlying felonies, the trial court must merge the kidnapping specification, the aggravated burglary specification, or both, with the other felony specification before the penalty phase.[18]**

**C. Unless it can fairly be held beyond a reasonable doubt that penalty phase error in a capital trial had no effect upon the jury's sentencing verdict, appellate courts are rendered powerless by the right to trial by jury and due process from purporting to 'cure' the error and to affirm the death sentence; any such affirmance**

---

[17] Petitioner exhausted his Second Claim for Relief and sub-claim A in the Ohio Supreme Court as his Second Assignment of Error

[18] Petitioner exhausted sub-claim B in the Ohio Supreme Court as his Third Assignment of Error.

**violates the right of the accused to trial by jury, and the death sentence must be vacated and set aside.** [19]

**D. Where the state fails to establish that aggravation outweighs mitigation beyond a reasonable doubt, the death penalty is absolutely precluded, and the imposition of the death sentence under such circumstances constitutes a violation of the offender's constitutional right to be free of cruel and unusual punishment and also his right to due process of law.** [20]

Consideration by a capital sentencer of improper aggravating circumstances in a "weighing state" (one in which the sentencer must weigh aggravating circumstances against mitigating factors), is an Eighth Amendment violation. *Espinosa v. Florida*, (1992), 112 S.Ct. 2926, 2927; *Stringer v. Black* , 503 U.S. 222, 112 S.Ct. 1130 (1992). Further, if a weighing state divides sentencing authority between a jury and judge, then both must weigh the sentencing factors properly. *Espinosa v. Florida*, supra.

Due process requires a defendant's death sentence to be set aside if the reason for the invalidity of the eligibility factor is that it "authorizes a jury to draw adverse inferences from conduct that is constitutionally protected", or that it "attaches the aggravating label to factors that are constitutionally impermissible or totally irrelevant to the sentencing process…or to conduct that actually should militate in favor of a lesser penalty." *Zant v. Stephens,* 462 U.S. 862, 885 (1983).

If the presence of the invalid sentencing factor allowed the sentencer to consider evidence that would not otherwise have been before it, due process would mandate reversal without regard to the rule applied by the United States Supreme Court in *Brown v. Sanders,* 126 S.Ct.884, 163 L.Ed.2d 723 (2006).

---

[19] Petitioner exhausted sub-claim C in the Ohio Supreme Court as his Sixth Assignment of Error.
[20] Petitioner exhausted sub-claim D in the Ohio Supreme Court in his Ninth Assignment of Error.

"When the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from the death side of the scale". *Stringer v. Black*, 503 U.S. 222, 232 112 S.Ct. 1130. (1992) affirmed by the reversal in *Brown v. Sanders,* 126 S.Ct. 884, 163 L.Ed.2d 723 (2006).

Constitutional sentencing errors are apparent from the trial court's written opinion, wherein the trial court improperly weighed the evidence and considered invalid sentencing factors. The Ohio Supreme Court acknowledged the existence of the trial court sentencing errors.[21] The Magistrate Judge however, in rendering his Report and Recommendation, stated:

> Nevertheless when Fears raised the merger issue on direct appeal, the Ohio Supreme Court apparently either overlooked the facts set forth above, or took Fears' word that the capital specifications were not merged, when it held that "merger should have taken place".

(R & R p. 53; citing with approval *State v. Fears,* 86 Ohio St.3d at 344.)

The Magistrate Judge concluded in addressing Petitioner's Second Ground For Relief:

> Presumably, his argument is that if the aggravating circumstances had been properly pared down by merging them for sentencing purposes, what remained would not have outweighed the mitigating factors presented in the penalty phase.

(R & R p. 53)

It was error for the jury not to have been instructed that the offenses of kidnapping and aggravated robbery were not committed with separate animus and

---

[21] "…we find that the offenses of kidnapping and aggravated robbery were committed with no separate animus, as there is no showing of a prolonged restraint, significant asportation, or secret confinement of the victims. Therefore, we agree with appellant that the kidnapping specification merges with the aggravated robbery specification. Although merger should have taken place, under *Jenkins*, resentencing is not automatically required. *Fears* at 344.

therefore merged and should not be considered as two separate aggravating circumstances when weighing the aggravating circumstances against the mitigating factors. The failure unfairly tipped the scale in favor of death. The Ohio Supreme Court determined that merger did not occur, that is a finding of fact that is presumed correct. The Magistrate Judge's determinations to the contrary are in error.

> …the jury in this case was also improperly presented with duplicative statutory aggravating circumstances, because the trial court did not merge the kidnapping and the aggravated robbery circumstances until after the jury had made its recommendation. Thus, the state was improperly favored in the weighing process, contrary to the statutory mandates and despite the fact that the state bears the burden of proof. R.C. 2929.03(D)(1).

*State v. Fears,* (1999) 86 Ohio St.3d 329, 356.

Aggravating circumstances in a capital case are required in order to narrow the class of aggravated murders to those eligible for death. *Zant v. Stephens* (1983), 462 U.S. 862, 103 S.Ct. 2733; *Barclay v. Florida* (1983), 463 U.S. 939, 103 S.Ct. 3418. Proving two or more specifications out of the same course of conduct does not additionally proscribe any more severe conduct but merely loads the scales in the weighing process so that no amount of mitigation could outweigh the specifications. Especially as in this case, where prosecutorial misconduct constrains the consideration of mitigation in violation of the 8th Amendment.

A defendant may not receive multiple "shotgun" sentences or be subjected to multiple punishment for the same conduct. *Brown v. Ohio* (1977), 432 U.S. 161, 9 S.Ct. 2221; *Blockburger v. United States* (1932) 284 U.S. 299, 52 S.Ct. 180. The sentencing process was thus unreliable and arbitrary in violation of the Eighth and Fourteenth Amendments as an artificially high number of aggravating circumstances were permitted to be weighed against the mitigation presented.

The Ohio Supreme Court determined that in fact, no merger occurred. The failure to merge the aggravating circumstances as found by the Ohio Supreme Court, violated Appellant Angelo Fears' rights to due process, to a fair trial, and his right to be free from cruel and unusual punishment all covered by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

The state must establish the aggravating circumstances an offender was convicted of committing beyond a reasonable doubt, outweigh the mitigating factors advanced by him, R.C. 2929.02-.04. Where a state sentences an offender to die in violation of its own procedures for capital sentencing, the Eighth and Fourteenth Amendments are violated, and the death sentence must be set aside, *Gregg v. Georgia*, supra.

In reviewing the penalty phase of the proceedings, the Court will find substantial mitigation which is of such weight that it cannot be said that any reasonable juror, or jurist for that matter, can conclude that death is the appropriate sentence here especially when unconstrained by the prosecutorial misconduct.

But for trial counsel's ineffectiveness, additional and compelling mitigation could also have been offered (See infra). Even so, Petitioner presented substantial mitigation, including several factors that Ohio law has recognized as having mitigating value.

The totality of the mitigating factors established by the evidence at the penalty phase clearly demonstrates that the aggravating circumstance(s) of which Petitioner was convicted, do not outweigh the sum total of mitigation which was established by Petitioner, and consequently, his death sentence offends the Eighth Amendment and must be reversed.

**OBEJCTION TO DENIAL OF RELIEF ON PETITIONER'S THIRD GROUND FOR RELIEF**: **Petitioner was denied his right to the effective assistance of counsel**

**during the trial phase of this capital case as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. [22]**

Counsel's performance during the trial phase of Petitioner's trial was deficient and prejudicial, and the subclaims included in Petitioner's Third Ground for Relief, include:

    **A.**     **Counsel failed to obtain their own firearms expert to rebut testimony from the State's expert as well as to help in presenting their defense.**

    **B.**     **Counsel failed to present available evidence that the gun introduced by the State at trial was subject to recall due to danger of accidental discharge.**

    **C.**     **Counsel failed to obtain expert assistance from a toxicologist that would have presented a defense that Petitioner was unable to form the requisite purpose to kill because he was too intoxicated at the time of the offense.**

    **D.**     **Counsel failed to object to numerous instances of prosecutorial misconduct.**

To establish procedural default herein, the Respondent must establish that (1) there exists a state procedural rule applicable to Angelo Fear's claim; and (2) that Angelo Fears failed to comply with the rule, *Maupin v. Thompson,* 785 F.2d 135 (6th Cir. 1986) and, that (3) the state courts have actually enforced the State procedural sanction. *Id.*[23] Next,

---

[22] Petitioner exhausted his Third Claim for Relief in the Ohio Supreme Court as his Twenty-Sixth Assignment of Error.

[23] Petitioner calls the court's attention to the Magistrate's own analysis in applying procedural default to Petitioner's claims or portions thereof, that in fact procedural default was actually enforced by the state court, that is the highest court to rule on the claim clearly and unambiguously relied on the procedural violation as the reason for rejecting the claim. *Coleman v. Thompson,* 501 U.S. 722, 750 (1991). The Magistrate variously stated in his Report and Recommendation: "1) While a valid argument could be made that the court's ruling resulted in procedural default of this portion of Fears' claim, Respondent has not argued that to be the case…" (R&R at 24) 2) "Since the Supreme Court misapplied its own procedural rule…" (R&R at 32); 3)"Because defense counsel did not object to most of the prosecutors; comments in closing argument, the state court could have relief on the state procedural rule that requires a contemporaneous objection in rejecting Fears' claims related to those comments" (R & R 39); "Fears claimed this on direct appeal but the state court observed that no objection to the questioning had been lodged by defense counsel, found no plain error, **and concluded in the alternative that the prosecutor was entitled to impeach Mrs. Fears with her prior conviction**" (Emphasis added) (R & R 40) all as

the Respondent must establish that the state procedural forfeiture, is an adequate and independent ground justifying foreclosure of federal review of a federal constitutional claim. *Id.* In order for a state procedural forfeiture to constitute an "adequate" ground, (4) the state procedural rule that was allegedly violated must be consistently and regularly applied *e.g. Dugger v. Adams,* 489 U.S. 401, 410-411 n.6 (1989). Additionally, in order for a state procedural forfeiture to constitute an "independent" ground, (5) the state court decision must not appear to rest primarily upon federal law or to be interwoven with federal law. E.g. *Coleman v. Thompson,* 501 U.S. 722, 115 L.Ed. 2d 640, 659 (1991).[24]

The error of the Magistrate's decision is that sub-claim A and B of Petitioner's third claim "…appear to rest primarily upon federal law or to be interwoven with federal law". E.g. *Coleman v. Thompson,* 501 U.S. 722, 115 L.Ed. 2d 640, 659 (1991)[25] and thus not procedurally defaulted.

The First District Court of Appeals did not simply affirm the trial court's determination:

> The trial court concluded that Fear's claims were barred by res judicata. Further, as to the second claim, the court determined that Fears had failed to prove prejudice. As to the third claim, it concluded that there was no evidence that Fears mishandled or dropped the gun.

---

examples as the State's failure to clearly and unambiguously rely on the procedural violation as rejecting the claim.

[24] Even if Respondent successfully satisfies these five requirements and establishes a procedural default (which Petitioner asserts he has not) the Court may then excuse the default if Angelo Fears has demonstrated cause for violating the State procedural rule and prejudice resulting from the alleged constitutional error. *Bagby v. Sowers,* 853 F.2d 1340, 1347-48 (6th Cir. 1988); *Maupin,* 785 F.2d 135, 138 (6th cir. 1986). Finally, in extraordinary cases, a federal court may address the merits of a procedurally defaulted claim to avoid a miscarriage of justice. *Wainwright v. Sykes,* 433 U.S. 72 (1977); Accord, *Bagby,* 853 F.2d at 1348.

[25] Even if Respondent successfully satisfies these five requirements and establishes a procedural default (which Petitioner asserts he has not) the Court may then excuse the default if Angelo Fears has demonstrated cause for violating the State procedural rule and prejudice resulting from the alleged constitutional error. *Bagby v. Sowers,* 853 F.2d 1340, 1347-48 (6th Cir. 1988); *Maupin,* 785 F.2d 135, 138 (6th cir. 1986). Finally, in extraordinary cases, a federal court may address the merits of a procedurally defaulted claim to avoid a miscarriage of justice. *Wainwright v. Sykes,* 433 U.S. 72 (1977); Accord, *Bagby,* 853 F.2d at 1348.

*State v. Fears,* No. C-990050, 1999 WL 1032592 at * (Ohio App. 1st Dist. November 12, 1999) unreported. "When a state court decides a constitutional question, even though it does not have to, it necessarily holds that the policies underpinning its procedural rule are unworthy of vindication under the particular circumstances of the case before it"); *Raper v. Mintzes,* 706 F.2d 161 (6th Cir. 1983); *Hockenbury v. Sowders,* 620 F.2d 111 (6th Cir. 1980)Thus the Magistrate's decision that "…the appellate court determined Fears' sub-claim was barred from consideration by the doctrine of *res judicata"* (R & R p. 55) ignores the remaining bases examined by the First District Court of Appeals in addressing the Petitioner's claims. The Court of Appeal's statement is not a clear and express statement that its judgment rests on the procedural bar—if so, why mention anything after "Fear's claims were barred by res judicata" in rendering its decision?

Indeed the Magistrate reviewed the merits of the sub-claims and in his discussion, revealed why counsel were ineffective and why habeas relief should be granted to Petitioner.

The Magistrate Judge concluded:

> To sum up, the statements in Mauer's affidavit and the evidence presented at the evidentiary hearing respecting the possibility of an accidental discharge of the murder weapon fall far short of overcoming the strong evidence that Fears intentionally fired the weapon, killing Gilliam.

(R & R p. 58). What does Mauer state?

**Schrand does not testify nor submit a report which states the methods used in determining the working condition of the safety features of the gun. (Post-conviction exhibit 36)**

**Schrand does not state how much pressure was used and whether the gun was tested with a cartridge in the chamber and the hammer in the uncocked position, under the condition of an object hitting the back of the hammer to see if the pistol would fire a bullet (Post-Conviction exhibit 36)**

**Schrand asserts <u>in error</u> that an object hitting the back of the hammer causing the gun to fire, would prevent the slide from clearing the casing automatically. (So the shell casing found at the scene would have to be a result of a trigger fire, not a misfire.)  Mr. Mauer affies that it *may* prevent the slide from clearing the casing automatically. (And therefore, could have left an empty shell casing at the scene as a result of a <u>misfire</u>.**  (Emphasis added)**(Post-conviction exhibit 36, 37).**

The un-called expert's testimony would not have been presented in a vacuum, it would have been coupled with the State's witness, Steven Franklin:

> "…he (Angelo) just cocked the other gun.  He had both the guns in his hand.  He just cocked the other gun.  As soon as he cocked it, it went off."

(Tr. 2016).

It would have been coupled with counsel's notes:

> 1.  "Defendant tried to cock gun and it went off";
> 2.  "Gun just went off—cocked back just to see if bullet in it…";
> 3.  "Told Viola some of what happened re: gun just went off…"

(Evidentiary Hearing Ex. 31).

When questioned by the prosecutor about what happened after Petitioner "cocked the gun," Franklin responded, "Just the gun went off." (Tr. 2018).

Thus the uncalled expert would have impeached the testimony of the State's expert ("Schrand does not state how much pressure was used and whether the gun was tested with a cartridge in the chamber and the hammer in the uncocked position"; "Schrand asserts in error that an object hitting the back of the hammer causing the gun to fire, would prevent the slide from clearing the casing automatically") and would have added positive testimony to the defense of accidental discharge ("Mr. Mauer affies that it *may* prevent the slide from clearing the casing automatically. (And therefore, could have

43

left an empty shell casing at the scene as a result of a misfire).  (Post-conviction exhibit 36, 37).

The Magistrate Judge takes issue with the word "may" in Mauer's affidavit finding it to be a "slight difference to be sure" (R & R 58), from what the State's expert in fact testified to; but the fact that there is a difference is a reason why Petitioner criticizes defense counsel for not calling the fire arms expert. The Magistrate also states, "[T]he same is true of the other omissions pointed out by Mauer in his affidavit. Fears simply does not demonstrate how those omissions prejudiced him in any way". For all of the reasons stated above, Petitioner objects to the Magistrate's conclusions that he was not prejudiced.

Q:    Did Mr. Fears tell you at any point pretrial about how the gun discharged on the night in question?
A:    Yes.
Q:    Did you, based upon that or any other conversations with him, start to develop a defense of accidental discharge?
A:    Yes.

(Evidentiary Hearing p. 486).

How then could defense counsel have effectively started to develop the defense of accidental discharge, when the court considers: 1) counsel failed to hire a fire arms expert, 2) they did not "go to any reference book, web site, to determine whether that gun had any history of accidental discharge" (Evidentiary Hearing p. 487); 3) they did not have the weapon independently tested (Evidentiary Hearing p. 488); 4) defense counsel "…didn't go to the laboratory, and have him work the gun for me" (Evidentiary Hearing p. 490) and the only manner available to defense counsel to refute the State's firearm expert was "cross-examination" (Id.), which was limited to defense counsel's knowledge of firearms. (Id.). Had defense counsel asked the State's witness at trial, "Was this gun

subject to a manufacturer's recall due to the possibility or susceptibility of accidental discharge", the expert's answer would have been "yes". (Evidentiary Hearing p. 226). Lacking all of the above, how then did defense counsel develop the defense of accidental discharge which, based on the information they had, was suggested?

Couple the testimony of witness Franklin, with the criticisms the un-called defense firearms expert had with the State's firearm expert, with the fact that the gun at issue was subject to recall for thirteen years prior to Petitioner's trial for "susceptibility of accidental discharge" with Petitioner's argument that voluntary intoxication should have been developed and presented (infra), one starts to conclude that a miscarriage of justice has occurred in this case. Individually the areas are all capable of raising reasonable doubt, combined their effect is undeniably prejudicial.

Petitioner cites this court to the case of *Draughton v. Dretke,* 427 F.3d 286 (5th Cir. (2005) for the analysis of *Strickland* as applied to an uncalled firearm/criminalist expert.

In *Draughton,* counsel failed to utilize a criminalist to support their client's theory that he shot over the head of the pursuing crowd in his effort to flee the scene of an aggravated robbery. The evidence showed that Draughton, after attempting to rob a local Long John Silver's restaurant after restraining four individuals at gun point, ran out the back door of the restaurant and jumped into a waiting pickup truck, from which he fired four to six shots at the pursuing crowd. One bullet struck and killed one of the pursuers. Draughton was convicted of capital murder and sentenced to death. He unsuccessfully appealed his conviction through the Texas state courts, including state habeas corpus. It was only when the case was heard in federal court, was relief granted to Draughton on his

claim that his counsel were ineffective for failing to present expert testimony from a criminalist on the fact that the bullet struck a hard surface and ricocheted before it struck the decedent. Although Texas law would have upheld the conviction on the ground that firing four to six shots, in fleeing from the aggravated robbery, still made Draughton death-eligible regardless of the ricochet evidence, the District Court granted habeas relief.

The Fifth Circuit, not known for its liberal rulings, affirmed the grant of habeas relief ordered by the District Judge on the basis that trial counsel were ineffective in failing to call the expert thereby violating the first prong of *Strickland* and after further analysis, found prejudice to Draughton that satisfied the second prong.

In *Draughton* the Defendant was the sole source of evidence available to contradict the accuracy of the eye-witness's testimony absent the un-called expert. In Petitioner's case there was evidence in the record, other than the uncalled expert, to support his theory of accidental discharge, to-wit the testimony of Steven Franklin.

Petitioner has demonstrated how counsel were ineffective (relying solely on their knowledge of firearms, not consulting any firearms expert, not consulting any test or reference books, failing to inquire about the difference between an inertial and non-inertial firing pins which would have shown the weapon in question had a firing pin that was more susceptible to accidental discharge (it was "less safe") failing to examine the gun themselves, failing to consult with the State's fire-arm expert or have the weapon demonstrated in their presence, etc. ). As the district court found in *Draughton,* similar failures violated the first prong of the *Strickland* test. There is no strategic reason not to call a firearms expert in Petitioner's case "…they do not confront the reality that the failure to investigate the forensics of the fatal bullet [herein accidental discharge]

deprived Draughton of a substantial argument, and set up an unchallenged factual predicate for the State's main argument that Draughton intended to kill". *Draughton v. Dretke,* 427 F.3d 286, 296 (5th Cir. 2005).

Like the Prosecutors in *Draughton,* Petitioner's Prosecutors sought to portray him as a violent and cruel individual, engaged in a series of felonious acts that lead to the death of sixteen-year old Antuan Gilliam. Both Prosecutors sought to show the frequent use of weapons in commission of the various acts. It was critical that defense counsel in Petitioner's case develop the only defense they sought to develop by something other than their own criminal trial experience, especially on the issue of whether this firearm, which had been subject to recall by the manufacturer for more than thirteen years prior to Petitioner's case because of its susceptibility to accidental discharge, and because the weapon in question had a non-inertial firing pin[26] which was less safe than one with an inertial firing pin accidentally discharged on the night in question. As the court did in *Draughton,* this court should recommend habeas relief on this sub-claim.

A claim that all parties to this litigation agree is preserved for habeas relief, was defense counsels' ineffectiveness in failing to prepare and present the defense of voluntary intoxication. (R & R 60-61).

> At least one of Fears' trial counsel was under the mistaken belief that voluntary intoxication is not a defense to a specific intent offense and that it can only be used in mitigation.[27]

(R & R p. 61; Evidentiary Hearing at  428, 430).

---

[26] The difference between an inertial firing pin and non-inertial firing pin is that "an inertial firing pin is one that is considered safer in that you do not have sufficient energy from the hammer, **just a slight motion of the hammer will not cause a discharge of the hammer**". (Tr. Trans. 1936).

[27] It is difficult to give the deference courts require of trial counsel when addressing ineffective assistance of counsel issues, to counsel who professes ignorance on an elementary defense learned in the second year of law school and Petitioner urges the court not to defer to these counsel when analyzing the ineffective assistance of counsel claims argued herein.

Fears' other trial counsel testified that he relied on information given to him by Fears to rule out the voluntary intoxication defense

(Id.; Evidentiary Hearing at 505).

The Magistrate Judge is factually incorrect in his statement defense counsel ruled out the voluntary intoxication defense on information given to him by Fears.

> Q:     Did you attempt to develop any other theories of defense besides accidental discharge?
> A:     I don't believe that we did, no.
> Q:     I will ask you Mr. Rosenwald, whether or not Mr. Fears ever told you that he was intoxicated or drunk or high on the night in question?
> A:     The notes that I have, which I looked at this morning again before I came up here, do not reflect that specific language.

(Evidentiary Hearing p. 491).

The Magistrate Judge cited to page 505 of the evidentiary hearing transcript to support his conclusion that the intoxication defense was excluded by information from Petitioner:

> Q:     What did you do to try and determine whether or not you had intoxication as a factor in this case?
> A:     Relied on the information given to me **in** Fears.

(Id.). There is a distinction between the word "by" Fears (as the Magistrate concludes) versus "in" Fears. What then was provided, "in" Fears?

A. "You met Lakesha's boyfriend Darius, who told us that day, earlier in the day, of this murder; that Angelo and James Grant had been together drinking, getting high…" (Tr. Trans. 2270)

B. Exhibit 31 of the evidentiary hearing that contained:

  1. Defendant and Grant "rode to store to get beer on Auburn";

  2. "then rode around to clubs and drinking";

  3. "did some MJ [marijuana joints]";

4. "riding, drinking, laughing";

5. "Fast Freddy's on Walnut—defendant not allowed in as had gun in pocket—James out—went and got more beer"

6. "James out of van = 3 min.—Defendant just sitting and drinking and watching ppl."

C. The contributions of Dr. Smalldon, after interviewing and testing the Petitioner wherein Dr. Smalldon concluded "Mr. Fears was doing what he apparently did every day, which is consume **<u>huge</u>** amounts of alcohol (Emphasis added) (Tr. Trans. 2830).

Thus coupling the above subclaims—accidental discharge with voluntary intoxication casts grave doubt on the fairness of the Petitioner's trial.

Finally, the Magistrate Judge ruled on the last sub-claim of Petitioner's Third Ground for Relief: trial counsel rendered ineffective assistance of counsel, in their failure to object to prosecutorial misconduct. The Magistrate Judge stated "…Fears does not specify which alleged instances of prosecutorial misconduct should have been objected to by defense counsel…" (R & R p. 62) and while this is a partially true statement Petitioner will correct same by these objections and again offers his apologies to the court for its failures and the inconvenience caused to the court.

"Fears' ineffective assistance of trial counsel claim, based on counsels' failure to object to several instances of prosecutorial misconduct, is properly preserved for habeas review". (R & R p.62). This court should recall that prosecutorial misconduct "riddled" this trial and constitutes an independent ground for relief, previously argued.

Specific instances of prosecutorial misconduct that were not objected to, include:

1.    Cross-examination of Venustien Fears with **<u>arrests</u>** for domestic violence of James Fears, all of which were dismissed  (Tr. Trans. 2552);

2.    Cross examination of Latanya Clark with her conviction for endangering children (Tr. Trans. 2585)(no evidence it was a felony and complied with Ohio Rules of Evidence, Rule 609);

3.    Cross examination of Latanya Clark on whether Angelo Fears was in a **<u>gang</u>** (Tr. Trans. 2591)

4.    Cross-examination of Brian Anten on Petitioner's "other **<u>contacts</u>** with the criminal justice system" (Tr. Trans. 2607);

5.    Cross-examination of Angelo Dean on Petitioner being adjudged a juvenile delinquent in 1986 [more than ten years before trial] (Tr. Trans. 2628 Evidence Rule 609 (A), (B) and (D));

6.    Cross-examination of Angelo Dean on Petitioner's alleged juvenile probation violation (Tr. Trans. 2628; Evidence Rule 609 (A)(B) and (D)); Cross examination of Angelo Dean with Petitioner's probation violation in 1986 (Tr. Trans 2629; Evidence Rule 609 (A)(B) and (D));

7.    Cross-examination of Angelo Dean on the definition of breaking and entering (Tr. Trans. 2628) [The witness should never have been permitted to define a legal term, let alone breaking and entering which fit perfectly with the State's allegations, and the prosecutor should not have been permitted to ask the question];

8.   "Breaking and entering into somebody's **homes**; property that someone has entered without permission of that owner" [exactly what the jury had already concluded he did in this case.]

9.   Cross examination of Angelo Dean with Petitioner's juvenile delinquency of tampering with a coin machine (Tr. Trans. 2628);

10.  Cross-examination of Angelo Dean with a document he did not author, and for which no foundation was laid for the document's introduction into evidence and which was never admitted as an exhibit at trial (Tr. Trans. 2630; 2634)[28];

11.  Cross-examination of Angelo Dean with Petitioner's juvenile record pertaining to Petitioner breaking into the school for the performing arts (Tr. Trans. 2632);

12.  Cross-examination of Angelo Dean with Petitioner's juvenile record pertaining to Petitioner stealing a BB gun (Tr. Trans. 2632; Evidence Rule 609 (A), (B) and (D));

13.  Cross-examination of Angelo Dean with Petitioner's juvenile record pertaining to Petitioner stealing "numerous bikes" (Tr. Trans. 2632);

14.  Cross-examination of Angelo Dean with Petitioner showing no remorse with reference to one of his juvenile adjudications (Tr. Trans. 2632);

15.  Cross-examination of Angelo Dean with Petitioner's juvenile adjudications that resulted in a commitment to DYS (Tr. Trans. 2637);

---

[28] It is understandable why defense counsel did not object to the improper use of this document, since at least one defense counsel had never seen the document to which the State was referring. (Tr. Trans. 2647).

16.    Cross-examination of Mae Fears with Petitioner's grades while he was committed to DYS (Tr. Trans. 2697) from a document she did not author, professed no knowledge of, could not have been used to refresh her recollection on or for any other impeachment purpose and which was not admitted at trial as an exhibit;

17.    The false statement of Prosecutor Russell to the jury, in her portion of closing argument in the penalty phase, that **she asked each** of the witnesses "Before you came in here did you talk to the mitigation specialist, a person that works for them [defense counsel]" (Tr. Trans. 2926) so that she could argue that the mitigation specialist told them "….what they had to come in and say to help Angelo in this situation" (Tr. Trans  2927)[29];

18.    Finally, "He's 24 years old. That's old enough to vote and to die for your country and old enough to pay taxes which he doesn't know about because his family is welfare supported and they've never paid taxes. It's not in his experience". (Tr. Trans. 2970).

Counsel apologizes to the court for the failure to specify the instances of prosecutorial misconduct which should have been objected to by defense counsel but now having pointed out extensive instances, prays the Court re-evaluate its recommendation on Petitioner's sub-claim and grant him relief. The use of the Hillcrest document for

---

[29] Venustien Fears—cross Tr. Trans. 2547-2563—never asked the question; Latanya Clark—cross  Tr. Trans. 2583-2596—never asked the question; Brian Anten—cross Tr. Trans 2607-2614—never asked the question; Angelo Dean—cross Tr. Trans. 2625-2654—never asked the question; James Fears—cross Tr. Trans. 2666-2682, asked on Tr. Trans. 2668 whether he spoke to "her", "the investigator for your brother"; Mae Fears—cross Tr. Trans. 2694-2707—never asked the question; Gail Benton—cross Tr. Trans. 2725-2734—never asked the question.

which no foundation was laid, was patently unfair—counsel did not even know that the document existed—and it was improperly used throughout the cross examination of multiple witnesses.

**OBJECTION TO DENIAL OF RELIEF ON PETITIONER'S FOURTH GROUND FOR RELIEF: Petitioner was denied his right to the effective assistance of counsel during the jury selection phase of this capital case as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. [30]**

Immediately prior to beginning voir dire examination, counsel noted that out of the fifty people in the venire, only one was black and that she was number 49 of 50. (Tr. 157). What counsel did not know, was what to do about the apparent disparity. Counsel indicated to the court "I would like to put on the record, if—**if that's what I am supposed to do about this**, out of the 50 people that are brought up, Judge, there is only one black individual, that was a female". (Emphasis added) (Tr. 157).

Counsel challenged the composition of the jury pool because blacks constituted close to fifty percent of the population in the City of Cincinnati and that the black population of the county was between twenty and thirty percent. (Tr. 160). However, counsel stated that he "assume[d] that probably things were done correctly," (Tr. 159), and did not make a motion for an evidentiary hearing on the matter.

The Prosecutor informed trial counsel exactly what needed to be done to properly support his motion: "he has no legal authority on which to base his claim, unless he provides some authority or **unless he shows some misconduct in the way the jury is selected, he is not entitled to any change of the jury.**" (Emphasis added) (Tr. 160).

The federal constitution requires that in order to achieve an impartial jury, the panels from which grand and petit jurors are chosen must be drawn from a "fair cross

---

[30] Petitioner exhausted his Fourth Ground for Relief in the Ohio Supreme Court as his Twenty-Sixth Assignment of error. *Fears* at 346.

section" of the community. *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975); *Smith v. Texas*, 311 U.S.128 (1940).

Counsel were ineffective in the present case for failing to ask for a hearing to determine how only one African-American was called for potential jury duty; counsel did not know what to do to confront the problem and as a result Petitioner was denied the effective assistance of counsel. Counsel merely stated that they assumed the process was "correct" and yet complained on the record: "I don't know that you get a fair trial if you don't have a representative panel from the community; that's our position. We don't have that kind of fair representative panel and that is why we are asking to have the panel discharged". (Tr. 161). Counsel had a duty because of what he saw as potential jurors with an African-American client, to pursue this issue to insure a fair trial: one cannot assume that the process was done correctly.

The Sixth Amendment to the U.S. Constitution guarantees to the criminal defendant the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). This right is violated when counsel's performance falls below an objective standard of reasonableness and the client is prejudiced by counsel's breach of duty. *Strickland*, 466 U.S. at 690, 696. Here, Petitioner was prejudiced when counsel failed to pursue the issue of the selection of the panel of potential jurors; the performance prong was violated. The trial court overruled defense counsel's objection to the venire as being untimely, pursuant to Ohio Rules of Criminal Procedure, Rule 24(E). Although the Ohio Supreme Court cited the trial court's statement that "nothing indicated that the array was chosen in any manner other than random selection from the voting public" (*Fears* at 347) there was no hearing held to establish that fact and no evidence in the record that

supported the trial court's comment, as the objection by trial counsel occurred in open court after the voir dire had begun and was therefore untimely pursuant to Crim. R.24(E). Clearly a potential jury array that contained forty-nine whites and one black should raise concern in an effective counsel representing a black client and indeed it did. The performance prong of *Strickland* required counsel to timely challenge the manner in which the array was selected. Counsel's failure to understand what the remedy was for the situation about which he ccomplained, is demonstrated by counsels' failure to timely raise the issue pursuant to Crim. R. 24(E) [now Crim. R. 24(F)].

Due to the ineffectiveness of counsel for failure to ask for a hearing, Petitioner's rights guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the U.S. Constitution were violated, and as a result, he has suffered prejudice. Petitioner urges the court to utilize the lack of knowledge demonstrated by trial counsel as yet another reason not to afford Petitioner's trial counsel the presumption of effectiveness in considering the habeas petition as a whole.

**OBJECTION TO DENIAL OF RELIEF ON PETITIONER'S FIFTH GROUND FOR RELIEF**: **Petitioner was denied his right to the effective assistance of counsel at the penalty phase of this capital case as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.** [31]

Counsel's performance during the penalty phase of Petitioner's trial was deficient for many reasons including:

A.    Counsel failed to adequately prepare for the presentation and defense of the evidence gathered for the penalty phase.

B.    Counsel failed to present available mitigating evidence that would have presented a complete picture of Petitioner's character and background for the jury.

---

[31] Petitioner exhausted his Fifth Ground for Relief in the Ohio Supreme Court as his Twenty-Sixth Assignment of Error. *Fears* at 347.

C.     Counsel failed to obtain expert cultural assistance to investigate and present mitigating evidence.

D.     Counsel failed to object to numerous instances of prosecutorial misconduct.

E.     Counsel failed to object to erroneous jury instructions.

F.     Counsel failed to move for the merger of duplicative death penalty specifications.

Defense counsel fell below the minimum standard of reasonable legal representation in that they failed to communicate with members of Petitioner's defense team, and as a result, important mitigating information was not adequately developed or presented to the trier of fact. Counsel's performance was deficient and Petitioner was prejudiced in violation of his federal constitutional rights. This constitutional claim was raised as the Eleventh Ground for Relief in Petitioner's state post-conviction Petition.

Martha Jacoby was the mitigation specialist employed by Petitioner's trial counsel. Ms. Jacoby's function was crucial to developing and presenting an adequate sentencing phase on Petitioner's behalf. (Post-Conviction Exhibit 48). As such, it was imperative for defense counsel to develop a close working relationship with Ms. Jacoby, because she was defense counsel's link to their witnesses on mitigation and to mitigating information. (Post-Conviction Exhibit. 48).

As Dorian Hall, a mitigation expert, explained in post-conviction: "given the amount and variety of work involved in capital defense, the best approach to handling a capital defense is a team approach. . . . In order for the team approach to be successful, effective communication among team members is essential." (Post-Conviction Exhibit 48); ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty

Cases 1989 at Guideline 2.1 (Number of Attorney's per Case); Guideline 8.1 (Supporting Services).

As Ms. Jacoby stated however, defense counsel's communications with her can be described as minimal, at best. "I had only one meeting with defense counsel prior to trial. I did not have a strategy meeting with defense counsel prior to the mitigation phase. Attorney Pandolidis [sic] made arrangements to meet with the mitigation witnesses prior to the mitigation phase. He initially failed to notify me of these meetings, despite the fact that I was the person who had interviewed these mitigation witnesses." (Post-Conviction Exhibit 30).

Moreover, Ms. Jacoby's communication with defense counsel consisted of only "one brief meeting prior to the presentation of mitigation. The meeting lasted less than an hour." (Post-Conviction Exhibit 30). Defense counsel's failure to communicate with their mitigation specialist had an adverse effect on the presentation of mitigating evidence during the sentencing phase. "During the mitigation phase of the trial, the jury was given a sample of the turmoil that Petitioner experienced; however, those family problems were not detailed to the point where it may have impacted the jury." (Post-Conviction Exhibit 30).

The Magistrate Judge in his Report and Recommendation, cited to the mitigation specialist's testimony at the evidentiary hearing that significant mitigation evidence was either not presented at all, or was superficially presented. (R & R p. 66; Evid. Hrg. Tr. 363-65). Examples of the deficient mitigation presentation included Fears' mother's psychiatric history of depression, panic disorder, outpatient treatment, and suicidal thoughts, Fears' own substance abuse; the poverty in which Fears was raised; the failure

of child protective services and the educational system respecting the Fears family; and the generational cycles of abuse, neglect and substance abuse. (R & R at p. 66).

The Magistrate Judge stated that Peter Rosenwald, Fears' other trial counsel, testified that he felt the mitigation phase of Fears' trial "went well"; a closer reading of Attorney Rosenwald's testimony belies that conclusion:

> I thought the lawyers presented it well in getting the information out. I thought the family did what they could to talk about Angelo's history. I thought Ms. Jacoby did a fairly good job in getting information from us. She was in Cleveland, so there were problems sometimes in meeting, but in communicating she did a fairly good job. I was more concerned with Dr. Smalldon. (Evid. Hrg. Tr. 526).

No where in the quoted portion did Attorney Rosenwald give the unqualified "went well" that is attributed to him by the Magistrate Judge. All of his comments were couched in qualifications, e.g. "…the family did what they could", "Ms. Jacoby did a fairly good job". (Id). Counsel believed early on that they would get into the mitigation phase because of conservative Hamilton County juries. (Evid. Hrg. Tr. 525).

Attorney Rosenwald had little basis to determine how mitigation went, as Attorney Pandilidis took the lead in the preparation of the mitigation phase of Petitioner's case: "That was his responsibility, if you will". (Evid. Hrg. Tr. 342; 553). The attorneys prepared their witnesses alone (Evid. Hrg. Tr. 552), and Attorney Rosenwald heard the questions and answers from the mitigation witnesses for the first time just like the jury. (Evid. Hrg. Tr. 553). The Magistrate Judge concluded that "[I]t is entirely conceivable, however, that the attorneys believed some of the information to be more useful or persuasive as mitigation evidence. In other words, Fears' counsel reasonably could have decided as a strategic matter that presentation of all of the evidence available after investigation was ill advised" (R & R p.71) but that conclusion presupposes that the

attorneys knew about the universe of mitigation that had been developed by mitigation specialist Jacoby so that a strategic choice could reasonably be made. The Magistrate Judge's assumptions are not factually based, no reasonable strategic decisions were made in this case because:

1) There was only one "team" meeting, it occurred just before trial, lasted roughly an hour and attorney Pandilidis, who took the lead in mitigation, arrived late to the meeting (Evid. Hrg. Tr. 351-352);

2) Mitigation specialist Jacoby testified "there was a lot to talk about here in terms of collecting a whole information package about someone's life and the interviews and the records, so that's really an impossible task when you're breaking it down into some allotted period of time within an hour". (Evid. Hrg. Tr. 352);

3) Mitigation specialist Jacoby further testified "I don't think there was any sense on the part of the whole team in terms of what the mitigation was here" (Evid. Hrg. Tr. 353);

4) On October 3, 1997 mitigation specialist Jacoby sent a list of names of potential mitigation witnesses to attorney Rosenwald, the list did not contain a write-up of what the witnesses might have testified to (Evid. Hrg. Tr. 354);

5) Even though Attorney Pandilidis was responsible for the mitigation phase of Petitioner' trial, he and the mitigation specialist "did not see witnesses together, did not work together" (Evid. Hrg. Tr. 358);

6) On October 24th, just four days before mitigation began, the mitigation specialist was asked to fax to Attorney Pandilidis a list of what certain

witnesses would testify to—a list that was arrived at "after a decision had been made as to who would testify" (Evid. Hrg. Tr. 360);

7) The mitigation specialist had not sent a more detailed report prior to the October 24, fax, had not discussed in detail the testimony that each of these witnesses might give to the attorneys and did not offer any information on the strengths and weaknesses of the various witnesses (Evid. Hrg. Tr. 360);

8) Not only did the mitigation specialist complain about the preparation and presentation of mitigation (See, Evid. Hrg. Tr. 364-365), but the psychologist likewise expressed his frustration (Evid. Hrg. Tr. 366; Evid. Hrg. Ex. 20). The mitigation specialist was not fully utilized in Petitioner' case. (Evid. Hrg. Tr. 366).

9) The mitigation specialist believed that the mitigation case was strong because "there **were a lot of people** and a lot of things to talk about in terms of Angelo and there are some cases you can go into where you don't have very many people who are—who can be—who can get across what we wanted to get across in this case". (Evid. Hrg. Tr. 367).

10) Before October 1, 1997, Martha Jacoby had interviewed by telephone or face-to-face, twenty-eight or more mitigation witnesses (Evid. Hrg. Tr. 384);

11) The mitigation theories that were discussed included Petitioner's environment, his family, education, substance abuse history, poverty issues, physical and emotional abuse issues, neglect issues, generational patterns, mental illness, and mental health issues (Evid. Hrg. Tr. 388);

12) On October 23, 1997 (five days before mitigation started) defense counsel Pandilidis, the attorney who was responsible for mitigation, held a conference call and asked the mitigation specialist who would be the strongest witnesses to present in mitigation, the mitigation specialist complied with the request, however "I didn't say those were the only people". (Evid. Hrg. Tr. 391).

13) The best way to teach attorneys on what needs to be presented in mitigation is to take them out to the homes, to the schools, to the neighborhoods, conduct interviews with them, so that they get some sense of or hopefully the whole sense of what needs to be asked and what the true picture is; that was not done in this case. (Evid. Hgr. Tr. 403);

14) The list of mitigation witnesses that was faxed to Attorney Rosenwald (who did not have primary responsibility for mitigation) on October 3, 1997 did not get to Attorney Pandilidis until October 23, 1997, a day after the guilt phase had concluded and five days before mitigation was to begin (Evid. Hrg. Tr. 441-442);

15) A total of four hours of witness interviews was performed by Attorney Pandilidis, the attorney on the team charged with primary responsibility for mitigation, one day before the witnesses were presented to the jury (Evid. Hrg. Tr. 438);

16) Even though Attorney Pandilidis testified that the determination of which witness would testify at mitigation was "probably made that jointly together" there is no evidence to suggest Attorney Rosenwald had ever spoken to a potential lay mitigation witness (Evid. Hrg. Tr. 448);

17) It was the belief of Attorney Pandilidis that the jury in Petitioner's case "is looking as to what makes the individual tick, you know, how was he raised, you know, what advantages, what disadvantages did he have, and those are the things that you would explore". (Evid. Hgr. Tr. 455); exactly the kind of information that the thirty-one witnesses developed by the mitigation specialist possessed. It is unreasonable for counsel to default to the mitigation specialist to determine who would be the stronger witnesses to be presented in mitigation;

18) An example of not preparing mitigation is the fact that the defense put witness James Fears on the stand, not knowing that he had an outstanding warrant for his arrest (Evid. Hgr. Tr. 456). Yet another example was counsel "not knowing anything about that case [welfare fraud]" before they put Petitioner's mother on the stand where the Prosecutor cross-examined her about the competency evaluation that was performed on her for purposes of that case. (Id.) (Tr Trans. 2548-2549);

19) Counsel Rosenwald was unaware of critical facts that arose in mitigation and being unaware, could not have made strategic decisions on what to present. (e.g. Evid. Hrg. Tr. 557; 560-563);

20) Counsel Rosenwald admitted "It's unlikely I knew what each one was going to say, but how many of them I had a general idea of, I don't know" (Evig. Hrg. Tr. 541) with reference to the witness list containing the names of thirty-one mitigation witnesses.

Petitioner objects to the denial of habeas relief on Petitioner's sub-claim that

counsel failed to adequately prepare for the presentation and defense of the evidence gathered for the penalty phase.

Coupled with the sub-claim argued above, counsel for Petitioner failed to adequately prepare for the examination and cross-examination of their own expert at trial. Attorney Rosenwald had never met Dr. Smalldon prior to Petitioner's case. (Tr. Trans. 3029; Evid. Hrg. Tr. 550). "There were some problems, I [Attorney Rosenwald] thought, in his presenting his testimony". (Evid. Hrg. Tr. 530). In a frank question and answer session with the jury, Attorney Peter Rosenwald stated he would not have used Dr. Smalldon if he had known information that only came out during the state's cross-examination. (Tr. 3030). Such lack of preparation impacted upon the defense presentation and prejudiced the Petitioner.

Why was Dr. Smalldon problematic? The defense team was lulled into a false sense of security and unreasonably permitted Dr. Smalldon to dictate his direct examination by simply asking a list of questions provided by Dr. Smalldon as his testimony in Petitioner's mitigation case. Security from the death penalty is not what Dr. Smalldon provided Petitioner.

(Evid. Hrg. Tr. 529-530).

> Wasn't much preparation to do on Dr. Smalldon because you knew exactly what questions to ask and you knew because he had provided that script, he was going to answer them favorably to you…[Y]ou would certainly hope so. (Evid. Hrg. Tr. 530).

What the defense did not anticipate was that because of Dr. Smalldon's "track record" (Tr. Trans. 3030) the State was able to gather substantial impeachment

materials[32], so devastating that Attorney Rosenwald would not have used Dr. Smalldon had he had an awareness of that material and so devastating that the jury felt the Prosecutors were "having a field day". (Tr. Trans. 3022-3024). How can defense counsel be presumed competent when they were blindsided by a "track record" on their own expert that the State had ready access to?  One reasonable explanation is because defense counsel failed to properly prepare.

One of the unknown features of Dr. Smalldon's testimony was that in "every transcript" the State had for impeachment purposes, "his [Dr. Smalldon's] diagnosis was unspecified mixed borderline personality…with antisocial traits"[33]. (Tr. Trans. 3024). Attorney Pandilidis did not understand why "the Prosecutor's office…went after him". (Evid. Hgr. Tr. 447).

Because counsel failed to prepare Dr. Smalldon, counsel discovered "that the state had a significant amount of transcripts to use to cross-examine him with regard to the changes in position on the death penalty, with prior testimony that diminished his credibility." (Evid. Hrg. Tr. 526-527).

Counsel failed to cite to the court the specific instances where Dr. Smalldon's problematic testimony appeared in the record, again counsel apologizes to the court.

In addition to those areas discussed by the Magistrate, the following examples of Dr. Smalldon's testimony demonstrate why Petitioner's trial counsel were ineffective in obtaining and presenting mitigation evidence, particularly Dr. Smalldon:

---

[32] The State was able to develop the impeachment by  Mike Bachman the "fellow in the blue suit" who "used to work in their office, now he use [sic] works for the Ohio Attorney General's death unit. He handles all the death appeal and habeas corpus. He brought back all the stuff on Dr. Smalldon to play with him". (Tr. Trans. 3023-3024).

[33] In fairness, the actual diagnosis on Axis II in Petitioner's case was "personality disorder not otherwise specified with antisocial and narcissistic features". (Tr. Trans. 2828).

1) As demonstrated by the jury in the question-and-answer followup (Tr. 3029), Dr. Smalldon's background in English (Tr.2737) was a factor taken into consideration by the jury in assessing his credibility; his background in hospital administration was no more help (Tr.2738);

2) Following his evaluation, "[I]t is often the case after hearing from him and his findings are they opt not to request his testimony at a hearing like this" (Tr. 2746) [obviously having never met Dr. Smalldon and having done no preparation because Dr. Smalldon supplied the scripted questions, defense counsel did not "hear from him and his findings" and strategically opt "not to request his testimony at a hearing like this"];

3) He withholds information that the State is entitled to receive until he is ordered to produce it. (Tr. 2756);

4) Dr. Smalldon's use of the word "conspiratorial" to describe the relationship between Petitioner and his father (Tr. 2774)—parallels the relationship between Grant and Petitioner that caused Petitioner to become death-eligible;

5) Dr. Smalldon's testimony that Petitioner grew up without a core set of values (Tr. 2782) lessening the Petitioner's ability to be rehabilitated;

6) Dr. Smalldon's testimony that Petitioner "learned from an early age that the people who had the things that [he] thought [he] wanted were the people selling drugs" (Tr. 2783) explaining why Petitioner became involved in the offense for which he had just been convicted;

7) Dr. Smalldon's testimony that Petitioner became a "manipulator" and "con" (Tr. 2787);

8) Dr. Smalldon's testimony that Petitioner suffered from "low level depression" and a "personality disorder not otherwise specified with antisocial and narcissistic features" (Tr. 2828) added nothing to the case that was not otherwise known. As Prosecutor Russell indicated in the question-and-answer followup, "[E]very transcript I had of him, his diagnosis was unspecified mixed borderline personality—with antisocial traits. That's all his—well dah, I know he has antisocial trades [sic]. You don't shoot somebody dead in the head with witnesses if you don't have antisocial traits". (Tr. 3024-3025);

9) Dr. Smalldon's explanation, "[T]he antisocial features refer to his pattern over time of law breaking behavior, of inadequate consideration for the perspectives of other people, of repeatedly over the years being at loggerheads with authority, figures, institutions of authority" (Tr. 2829) simply reinforced the actions that formed the basis for the finding of guilt beyond a reasonable doubt on the aggravating circumstances and eliminated any doubt that the jury had correctly decided the guilt phase of the trial;

10) Finally, Dr. Smalldon's testimony that a prison setting for Petitioner would be one of "despair and monotony" (Tr. 2832) provided yet another reason for the jury to recommend death—put Petitioner out of his misery.

Not knowing Dr. Smalldon, never having met him prior to the trial and defaulting their obligations as trial counsel by simply asking the questions suggested by Dr. Smalldon's script, demonstrate counsel's ineffectiveness.

Petitioner objects to the Magistrate's recommendation that Petitioner be denied habeas relief on this sub-claim. Counsel selected Dr. Smalldon as an expert far too late in

the proceedings[34], Counsel failed to prepare Dr. Smalldon, failed to know his background and "track record" and to understand his impact on the jury's recommendation. Like Dr. Smalldon stated, usually counsel after "hearing from him and his findings…they opt not to request his testimony at a hearing like this " (Tr. 2746) exactly what should have been done in Petitioner's case since their lack of preparation caused them to be overwhelmed by the Doctor's "track record".

Petitioner likewise objects to the rejection by the Magistrate Judge of Petitioner's claim that his counsel were ineffective for their failure to call additional witnesses in mitigation. The Magistrate Judge concluded that the claimed evidence that was not presented does "not contain **<u>any information</u>** substantially different from what was presented through several witnesses in the mitigation phase of Fears' trial" (Emphasis added) (R & R at p. 74).

Keisha Grant would have testified that she had two children "whom Angelo did not father, however, he treated all of my children as his own. He took them to the zoo, movies and the park and at night he read to them as best he could. Angelo was not a good reader***Angelo provided for all five of my children. He bought them shoes, clothing and food"( Apx. Vol. IV p. 159). This mitigation was not cumulative.

In contrast to the other uncalled and undeveloped mitigation evidence, the Magistrate Judge found that "James Fears, Sr.'s affidavit differs from the others in that it includes information about Fears' upbringing that was not conveyed to the jurors during Fears' mitigation hearing". Further the Magistrate Judge found,

---

[34] Dr. Smalldon was not named as an expert until after trial had begun (Tr. Trans. 2757) thus eliminating the ability to consult with him to determine what threads could be woven between the guilt and penalty phases.

> This Court cannot say that corroborating evidence provided by Fears'
> father would be merely cumulative, as was true of the other post-
> conviction affidavits submitted in support of this sub-claim. The evidence
> of Fears' abuse as a child, delivered from the mouth of his own father and
> abuser, carries with it a weight difficult to discount Yes, some of the facts
> in James Fears, Sr.'s affidavit were presented to the jury through the
> testimony of Fears' mother, brother and other relatives, but Fears, Sr.'s
> testimony would not only have added to the evidence of abuse, it would
> have established that the other members of the Fears family were not
> exaggerating the circumstances of Fears' youth.

(R & R at p. 75-76). The Magistrate Judge goes as far as saying that "…Fears' father's affidavit could, maybe even would have been beneficial to Fears in his mitigation hearing". (R & R at p. 76). The Magistrate Judge then discounted its use by comparing it to the notes of the mitigation specialist admitted at the evidentiary hearing and finally concluded, "[T]hus, there was little reason for Fears' attorneys to believe that Fears' father possessed or would testify to the information contained in his post-conviction affidavit." (Id.). A closer look at the relevant evidence demonstrates why the Magistrate's conclusion on this point is in error.

Within days of the start of the mitigation phase of Petitioner's capital case, mitigation specialist Martha Jacoby faxed seven pages to Attorney Pandilidis—trial counsel who took the lead in mitigation. On page 4-5 of Petitioner's exhibit 15 admitted at the Evidentiary Hearing, is the section relevant to Petitioner's father. The notes, contrary to the conclusion of the Magistrate Judge, demonstrate:

1. Father feels Angelo hung with wrong crowd, **but didn't know them;**

2. Father left the family seventeen years before the event;

3. Father not aware of out of home placements;

4. Father had seen a psychiatrist for his anger;

5. Father and mother fight with knives and guns;

6. If the Father took them fishing it was when Angelo was six years old or younger, since Angelo was twenty-four at the time of the incident and the father had been out of the home for seventeen years;

7. Father was corrected by his current wife when he minimized his bad faults; The confession in the notes to violence, alcoholism ("gallons or fifths and now only pints") and beatings to the point of blooding one of his children were all useful and consistent with the father's later affidavit given in post conviction.

Finding that the affidavit would have been helpful, but finding that Petitioner's counsel about whom Petitioner complains, had little reason to believe that Fears' father "possessed" or "would testify to the information" is exactly why counsel were ineffective. The Magistrate Judge stated, "[N]either of Fears' trial counsel were asked why they did not call James Fears, Sr. to testify at his son's sentencing hearing when they testified at the evidentiary hearing in these proceedings" (R & R p. 77).

In response Petitioner informs the court that Attorney Rosenwald would not have been able to answer why Petitioner's father was not called because other than faxing the list of witnesses to Attorney Pandilidis, Rosenwald prepared only Dr. Smalldon for mitigation and heard for the first time, when the other witnesses actually testified, what it was they were offering in mitigation, "since Mr. Pandilidis took the majority of that lead" (Evid. Hearing Tr. 553). It is clear that Attorney Pandilidis could not have answered the question why Petitioner's father was not called to testify in mitigation, since he only spent a total of four hours to interview witnesses, culled from a list of thirty-one witnesses. There is no evidence that Attorney Pandilidis interviewed Petitioner's father, tested his credibility in the presence of his current wife, and strategically decided not to call him to testify. In fact on the morning the mitigation phase started, counsel were unsure who their mitigation witnesses were going to be as professed by them to the trial

court, including "James Fears" [unclear whether that meant Petitioner's brother, who was called, or his father who was not called. Counsel apparently did not even know there was a Junior and Senior James Fears and thus could not have strategically made any decision in that regard] (Tr. Trans. 2757).

In addition, Petitioner's counsel calls to the attention of the Magistrate Judge Post-conviction exhibit 47 (Apx. Vol. VI p. 336) the affidavit of Charles Fears. If the Magistrate Judge found Petitioner's father's affidavit helpful, surely the affidavit of Petitioner's paternal uncle is likewise helpful and insightful since it:

1)    Contains information of a historical/generational nature establishing two generations of alcohol abuse;

2)    Makes the mitigation that would have been supplied by Dr. Gastil complimentary to, and not an alternative to[35] the theory of mitigation actually presented as Charles Fears portrays his "mother" (Petitioner's grandmother) as an "aggressive woman from the South" who would "use anything to whip our butts". (Apx. Vol. VI p. 336);

3)    Corroborates the violence in the marriage and the home because "it was not unusual for the couple to use weapons when arguing" (Apx. Vol. VI p. 337);

4)    Corroborates not only the use of weapons on the immediate family, but also indicates the use of weapons on the witness ("[T]here were times James would shoot at me" (Id.) and also the use of the German Shepard as a weapon ("…as well as sic the dog on me". Id.);

---

[35] (R & R p. 78; "At bottom, Fears contends in the present sub-claim that his trial counsel should have presented an alternative theory of mitigation, that being that the "Southern culture of violence" theory should have been presented via the testimony of Dr. Raymond Gastil").

5)      Brings a different perspective to mitigation by corroborating Petitioner's abuse at the hands of his father, credibly accepted the beatings of his mother as not "excessive discipline" but then described the abuse of Petitioner as "brutal" (Id.);

6)      Corroborates the frequent use of weapons in the home including the use of a BB gun as a tool of discipline against Petitioner and his siblings; (Id.)

7)      Brings a different perspective to mitigation with his testimony "Angelo and his brother started selling drugs out of necessity because they had no financial support from their father. I believe Angelo his brother James, Jr. were actually supporting their entire family including Venustein from their drug sale proceeds" (Id.);

8)      Brings a different perspective to mitigation with his testimony that "Angelo and his siblings never had a chance" (Id.);

9)      Finally, showing that indeed someone like Angelo can be rehabilitated since the affiant, who grew up in a similar family as Petitioner, "no longer drink[s], is active in his church, owns his own construction business". (Apx. Vol. VI p. 337-338).

One of the reasons that counsel might not have known about Petitioner's father and Petitioner's uncle, is because defense counsel intentionally and not strategically "told family members to stay away from the trial…because of concerns regarding how the Fears family might act publicly" (Apx. Vol. VI p. 337).

The Magistrate Judge likewise found that the "alternative" theory of mitigation that would have been presented by Dr. Raymond Gastil was "contrary to the theory of the defense in the guilt phase of the trial"; Petitioner disagrees and objects.

The "Southern culture" of violence that would have been supplied by Dr. Gastil, would have been historically accurate, and could then have been actually applied to the Fears' lineage, starting with Petitioner's grandmother, to Petitioner's father and then to Petitioner. The accidental discharge of the gun ties strongly to the use of weapons in the culture in which Petitioner's father lived and in which Petitioner was reared.[36] The fact that Petitioner's paternal grandmother was described as an "aggressive woman from the South" would not have contradicted the theory of the defense at trial, a theory that was only half-heartedly and ineffectively presented in the first instance. One must not forget that in addition to Petitioner who was raised as an urban black male in a culture of violence, James Grant likewise possessed the same background and possessed a gun on the night in question, Derrick Frazier possessed a gun as part of his drug dealing activities (Tr. 1629) and Antwuan Gilliam possessed a gun (Tr. 1631) all of whom were raised in the same urban culture of violence. The Prosecutors opened the Gastil-door by calling Petitioner an "urban terrorist" (Tr. Trans. 2964). The connection between the guilt phase and the penalty phase are at least the guns—why were there so many guns, one of which accidentally discharged causing the death of Antwuan Gilliam—because that ladies and gentlemen of the jury is the culture in which all of the black males involved in this case were raised and how their parents were raised. Had counsel been effective, the guilt and penalty phases would have been seamlessly joined: Dr. Gastil's testimony that the black

---

[36] Most if not all of the witnesses testified to the use of weapons including a German Shepard a BB gun, razors, belts, fists, broomsticks and "anything" else to intimidate, punish, harm or injure members of the immediate and extended family.

urban subculture's increased violence is attributable in part to the migration of the

Southern culture of violence into Northern urban centers would have been presented by a

Harvard-trained anthropologist who had no prior "track record". (Testimony of Dr.

Raymond Gastil, Evid. Hrg. Tr. at 3-179).

The Magistrate cited to *State v. Murphy,* No. 00AP-233, 2000 WL 1877526 at *6

(Ohio App.10[th] Dist. Dec. 26, 2000)(unreported) for the proposition that there is a

"distaste for any argument that asks for a benefit or more severe punishment based on

conclusions about groups of people" (R & R p.79). However, that case is inapplicable to

the issues at hand.

In *Murphy,* trial counsel was criticized for failing to call a cultural expert to testify

that "cultural stereotypes are true and that because he suffered under a stereotype, that his

sentence should be more lenient". *State v. Murphy,* 2000 Ohio App. LEXIS 6129 at *16.

The Magistrate's Report and Recommendation herein ignores the Court's adoption in

*Murphy* of the Prosecutor's argument in that same case that "sentencing in a capital case

should be about the crime and the **<u>individual characteristics of the defendant</u>**":

individual characteristics of Petitioner is how he became an "urban terrorist". (Tr. Trans.

2964) (Emphasis added) (*Id.*).

One of the individual characteristics of Petitioner was that he was raised in a

violent urban setting caused in part because of the historical migration of the Southern

culture of violence to those northern urban settings including his paternal grandmother

who was described as an "aggressive woman from the South". (Apx. Vol. VI p. 336).

The explanation is not a stereotype, it is an explanation of the characteristics of this

Petitioner, who was  raised in an urban setting after migration from the South and the

characteristics of the generations that raised him. Petitioner objects to the Magistrate's recommendation that Petitioner not be granted habeas relief on this sub-claim. What the Magistrate's Report and Recommendation sanctions by denying relief on this sub-claim, is the use by the State of stereotypes (e.g. "urban terrorist" (Tr. Trans. 2964); "his family is welfare supported (Tr. Trans. 2970) and "they've never paid taxes"(Id.) but no ability to explain how those "stereotypes", if same they be, arose and to mitigate their effect. Again, again and again, the State is permitted to strike foul blows, and the Magistrate's recommendation that relief be denied, sanctions those blows: Petitioner objects.

The Magistrate Judge comments "…it is not at all clear that there is a "reasonable probability" that but for Fears' counsels' failure to present Dr. Gastil's testimony in mitigation, "the sentencer—including [the state] appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death" (R & R at p. 79). But the comment ignores the availability of Dr. Gastil to the sentencer or the reviewing state court. The arguments that preceded, demonstrate that the Magistrate's comments, and his conclusions based thereon, are erroneous—the availability of Dr. Gastil coupled with the expert testimony of Dr. Robert Smith (infra), clearly indicate the reasonable probability that the dysfunction presented in a hodge-podge fashion by ill-prepared trial counsel, could have been professionally presented to explain "who is Angelo Fears". Neither of the experts had warrants out for their arrest, had prior felony convictions, abused drugs and alcohol, neglected their children or brought other detractors to bear on their professional opinions. Dr. Robert L. Smith had bountiful evidence to work with: as trial counsel admitted there is "no down side" (Evid. Hrg. Tr. at 429) to consulting a

chemical dependency expert like Dr. Smith, when confronted with virtually every witness he presented having a prolonged, debilitating, substance abuse history.

Defense counsel had the temerity to testify that his request for experts "would try the patience of the trial judge" (Evid. Hrg. Tr. at 418) this from an attorney who did not know that intoxication could be used as a defense to a specific intent crime, from an attorney who spent only four hours interviewing mitigation witnesses all within days of their presentation and only after the witnesses were culled by the mitigation specialist, from an attorney who as part of a team, utilized only one expert witness. To whom does counsel owe a duty, to the impatient trial judge or the death eligible client?

Of course there is no down side to making the request: move for the appointment of the expert and support the motion with evidence from a dozen or more witnesses that substance abuse was rampant[37] and either receive the funds necessary to hire and consult with the expert, or preserve the denial as constitutional error for further review. Counsel was ineffective for their failures in this regard and Petitioner objects to the denial of habeas relief on this sub-claim.

How would the use of a chemical dependency expert have with "reasonable probability", affected the reasonable juror, sentencing judge or reviewing court? By casting doubt on and/or undercutting and/or eliminating the State's argument in mitigation closing, that Angelo's actions were by choice.

Admittedly, "[E]vidence of substance abuse and intoxication at the time of the offense is admissible for mitigation purposes" Ohio Rev. Code §2929.04(B)(3) and (7)".

---

[37] This of course could not have been done in the instant case because that would have necessitated the preparation of the mitigation witnesses far sooner in the litigation than was actually done so that counsel would know what themes of mitigation needed to be developed and moved accordingly for expert assistance to present it.

(R & R p. 79). Mitigation does not limit the substance abuse issue solely to the time of the offense, as substance abuse in this case shaped Angelo Fears for twenty of his twenty-four years—another thread to sew the guilt and penalty phases together.

There was evidence presented in mitigation that Petitioner at the age of six or seven was bribed with alcohol to keep quite about his father's dalliances with other women. (Tr. Trans. 2772-74). There was evidence presented that Petitioner was an alcoholic and "alcohol dependent". (R & R p. 80). The clinical psychologist testified that alcohol can play a significant role in compromising the individual's judgment when consumed in the quantities Petitioner regularly consumed. (Id.). The clinical psychologist testified that Petitioner consumed huge quantities of alcohol on the day of the crime. (Tr. Trans 2830). Marijuana use was documented by Petitioner's Evidentiary Hearing Exhibit 31. Substance abuse ("drinking, getting high) was conceded by the State (Tr. Trans. 2270). Seven lay witnesses testified that Fears abused alcohol. (R & R p. 80).

Introduced at post conviction, Petitioner's father's alcohol use was described as "fifths or a gallon frequently" when he could afford it, now "only pints". (Evid. Hrg. Ex. 15). In post-conviction, alcohol abuse was established not only by the immediate Fears' family, but by the extended family who "passed out" at the Fears home. (Apx. Vol. VI p. 152, 156).

The State argued as follows in its attempt to secure a sentence of death:

    1.    "Not being able to spell is a result of his **choice**, his decision through his juvenile life not to go to school" (Emphasis added) (Tr. Trans. 2957);

2.　　"He made the **choice** not to do it and that's why he can't spell" (Emphasis added) (Tr. Trans. 2958);

3.　　"The treatment was available to him. He was given probation. He would not conform to the rules. He **chose** not to conform". (Emphasis added) (Tr. Trans. 2959);

4.　　"There's no voice from the television telling him, 'Don't go and see your probation officer'. He **chose** not to do it" (Emphasis added) (Id);

5.　　"He made that **choice**. So what are our priorities? **Choices**, responsibilities" (Emphasis added) (Id);

6.　　"He **chose** not to stay with it" (Emphasis added) (Tr. Trans. 2960);

7.　　"He's told, 'Get a job, go to school'. He **chooses** not to do it." (Emphasis added) (Id.);

8.　　"He just blatantly doesn't do it because he just doesn't care" (Id.);

9.　　"Even though Dr. Smalldon wants to do an exhaustive investigation, he never gets the records and never looked at them until today. So he doesn't base any of his opinions on them." (Tr. Trans. 2961);

10.　　"…in his **deliberations** and in **choosing** what he's going to do and who to do it to, he left Lakesha alone and that four-year-old baby there" (Emphasis added) (Tr. Trans. 2964);

11.　　"Well, when **choosing** who to kill and what is right and what is wrong…" (Emphasis added) (Id.);

77

12. "I mean, I think after hearing what you heard in phase one, we all want to know what could cause a person to get to the point in his life where you could, in cold blood, just reach down, point the gun at somebody and rack the gun and pull the trigger. We all want to know what brought him to that point in his life and now we know it". (Tr. Trans. 2966);

13. "Each time he's been locked up, he's been given the insight and counseling and given orders to get drug and alcohol treatment and he **chooses** not to" (Emphasis added) (Id.);

14. "But I think the evidence before you when you look at the DYS and Hillcrest was that Angelo Fears, as he told you, knows how to manipulate" (Tr. Trans. 2968);

15. "And the last thing I want to talk about is shifting responsibility and **choices**…[T]he family members that you heard from in mitigation, the mom said, "It wasn't my fault. The dad was abusive and alcoholic. The daughter said, it wasn't my fault. It was my mom's fault…and the brother said it was dad's fault." (Emphasis added) (Tr. Trans 2969);

16. "He's old enough to father children and old enough and has the **mental capacity** to make the **choices** he has made in his life and make the **choices** he made the morning of Easter Sunday" (Emphasis added) (Tr. Trans. 2970).

What then would Dr. Smith have done to rebut the State's theme and as a result of

not being called, was unable to provide to the Petitioner in mitigation of his sentence?

1. "Mr. Fears presented as being limited intellectually. He presented as being in the borderline mental retardation range of intellectual functioning. He displayed marginal insight regarding his actions and the actions of others" (Apx. Vol. VI p. 214);

2. "With regard to his father, Mr. Fears viewed him as dangerous and manipulative.  He introduced Mr. Fears to alcohol at age of four and enjoyed encouraging him to become intoxicated. As Mr. Fears became older, his father used the alcohol as a tool to manipulate him to commit crimes for him. On numerous occasions, his father would use a BB gun to discipline him, shooting him in the legs and in the back. On other occasions, he would beat Mr. Fears with a belt, extension cord, or switch. Finally, he would throw Mr. Fears against the wall and punch him in the head and arms and chest. Overall, Mr. Fears came to hate his father, wishing that he would "move away or die". (Apx. Vol. VI p. 211);

3. "In considering Mr. Fears' background, he has an extensive family history of substance abuse. His father and mother both abused alcohol. In addition, Mr. Fears has three paternal uncles and a maternal aunt who have a history of substance abuse. Undoubtedly, this significant family history of substance abuse placed Mr. Fears at risk for developing an addiction to alcohol and other drugs". (Apx. Vol. VI p. 209);

4.  "In addition to the clinical interview, Mr. Fears was administered three objective measure to assess his use of substances…A total score is determined and compared to a criterion of five. Those individuals scoring above the criterion are identified as having abused alcohol and suffered significant problems. Mr. Fears score was 29***The DAST is a series of 28 items…it has a cut off score of five…Mr. Fears' score on the DAST was 17***The resultant clinical profile [test three] indicates that his use of alcohol and other drugs was abusive and indicative of chemical dependency" (Apx. Vol. VI p. 208);

5.  "At the age of 22, Mr. Fears disclosed that his use of alcohol was out of control…Throughout the year prior to the instant offense, Mr. Fears used alcohol on a daily basis. In general, he drank whiskey, gin, beer and wine. He would consume approximately a pint or more of whiskey plus a fifth of wine or several 40 ounces of beer". (Id.);

6.  "Mr. Fears indicated that his father was a chronic alcoholic, drinking until intoxication on a daily basis. His mother, also a heavy drinker, tended to drink with her husband or her significant others. In addition, Mr. Fears' brother, James has a history of abusing alcohol and marijuana. His half sister, Chevonne, also abuses alcohol and other drugs. In considering the extended family, Mr. Fears' maternal uncle, Kevin Johnson, and maternal aunt, Willa Johnson, both have a history of abusing alcohol and other drugs. Kevin Johnson frequently drank alcohol with Mr. Fears. On his paternal side, Mr. Fears' paternal

uncles, Charles, Ricky and Billy Fears, all have a history of abusing

alcohol, cocaine and other drugs". (Apx. Vol. VI. p. 207);

7. "In considering his own history, Mr. Fears disclosed that he 'hurt

himself' at the age of eight. He admitted that he is uncertain if it was a

true suicide attempt or just a cry for help". (Apx. Vol. VI. p. 206);

8. "The trauma he endured far exceeded the experiences of an average

child. His own ability to cope with the trauma and emotional aftermath

was severely limited due to his intellectual deficits. Finally, there were

no safe, supportive adults available to assist him in dealing with his

feelings of confusion, fear, guilt, shame, depression, anger, etc. As a

result, Mr. Fears carried the emotional scars from his abuse with him

into adulthood, leading him to be involved in dysfunctional

relationships and to rely upon drugs to numb his emotional pain. On

the night of the instant offense, the events that occurred were

overwhelming and confusing to Mr. Fears', reminding him of his

childhood abuse. It is my belief that the culmination of Mr. Fears'

substance abuse, limited intellectual functioning and past physical and

sexual abuse contributed to the commission of the instance offense"

(Apx. Vol. VI p. 215-216).

Dr. Smith would have reduced if not eliminated the State's argument that Angelo

Fears made deliberate choices. As Dr. Smith opined, "In light of each of these factors, it

was **_inevitable_** that Mr. Fears would **_eventually_** turn to alcohol and other drugs as a

means of escaping his emotional turmoil": there were no choices involved. (Apx. Vol. VI. p. 209).

Attorney Pandilidis testified at the evidentiary hearing that he could not remember whether he developed the intoxication evidence in the mitigation phase of Fears' trial, though it could be an effective strategy. (Evid. Hrg. Tr. at 454). The Magistrate Judge found, "…much of what Fears now says should have been included by defense counsel is cumulative of what was presented to the jury". (R & R p. 82). There were no objective tests used to corroborate the lay witnesses, other than the MMPI, and that test did not corroborate the generational history of substance abuse or chemical dependency.

Petitioner strongly objects to the Magistrate's finding that "[F]ears has not overcome the strong presumption that his trial counsel effectively represented him respecting their presentation of evidence of Fears' substance abuse in the mitigation phases of his trial. Fears' claim to the contrary should be denied" (R & R p. 82). For all the foregoing reasons, Petitioner objects. The court cannot accord a strong deference to counsel in light of the foregoing facts. Petitioner objects to the Magistrate Judge's finding that Petitioner "has not succeeded in eliminating the probability that the decision was strategic or tactical". (Id.).

> …strategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgments support the limitation on investigation. A decision not to investigate thus must be directly assessed for reasonableness in all the circumstances.

*Wiggins v. Smith,* 539 U.S. 510, 533 (2002) citing with approval, *Strickland Washington,* 466 U.S. at 690-691 (1984).

This court's analysis is not limited solely to the evidence presented at trial, but the "totality of the evidence—both that adduced at trial and the evidence adduced in the

habeas proceedings". *Wiggins v. Smith,* 539 U.S. 510, 536, (2003) quoting with approval, *Williams v. Taylor,* 529 U.S. at 397-398.

There is no evidence that **counsel** made a reasonable investigation (they defaulted to the scripted questions of Dr. Smalldon and the faxed notes of the mitigation specialist[38] received four days before the witnesses were presented), there is no evidence that **counsel** made a reasonable decision that made particular investigations unnecessary. (See ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 1989 at Guideline 11.4.1).

As to the thirty-one witnesses identified by the mitigation specialist, "[I]t's unlikely I [Attorney Rosenwald] knew what each one was going to say, but how many of them I had a general idea of, I don't know". (Evid. Hrg. Tr. 541).

Attorney Pandilidis formulated questions "on what evidence the mitigation expert has brought in"(Evid. Hrg. Tr. 433) demonstrating the abrogation of the duty of counsel to conduct the mitigation investigation and make reasonable decisions based on the investigation or to make reasonable decisions not to investigate a given area of mitigation. Defaulting to the mitigation specialist, who owes no constitutional duty to the Petitioner, is not reasonable.

Attorney Pandilidis who presented the bulk of the witnesses in the penalty phase and who was in charge of the penalty phase of Petitioner's trial (Evid. Hrg. Tr. 421; 553) recalled one meeting with the mitigation specialist, face-to-face in Cincinnati, when "she **was first hired**" (Emphasis added) (Evid. Hrg. Tr. 434), a meeting Attorney Pandilidis

---

[38] This is a mitigation specialist Attorney Rosenwald had never worked with prior to Petitioner's case. (Evid. Hrg. Tr. 549). It is not reasonable for counsel to have defaulted to a mitigation specialist with whom he had never worked.

recalled occurring "when she first came down to meet us, talk to the client and started working" (Evid. Hrg. Tr. 435).

Attorney Rosenwald obtained the thirty-one witness list from the mitigation specialist on October 3, 1997, and faxed it to Attorney Pandilidis on October 23, 1997, the day after the verdict was returned in the guilt phase of Petitioner's trial. (Evid. Hrg. Tr. 540). There is no evidence that any witness that appeared on the list was contacted by counsel in the twenty days that the list sat in Attorney Rosenwald's office. On the day before mitigation began, Attorney Pandilidis, who was in charge of mitigation, who presented the bulk of the mitigation witnesses, spent four hours interviewing the mitigation witnesses who would be presented to the jury twenty-four hours later. (Evid. Hrg. Tr. 438-439). The attorneys never interviewed any mitigation witness jointly or in each other's presence so as to judge the relative strengths or weaknesses of the potential witness, as the witnesses were independently prepared by each attorney. (Evid. Hrg. Tr. 552). Attorney Rosenwald heard the mitigation testimony for the first time just as it was presented to the jury. (Evid. Hrg. Tr. 553).

Attorney Rosenwald had no specific recollection of strategy sessions when asked about same at the evidentiary hearing. (Evid. Hrg. Tr. 559). One of the witnesses called at the mitigation phase of Petitioner's case was Petitioner's mother—a strategic or tactical decision made by counsel as found by the Magistrate in his report and recommendation— who was problematic: counsel did not even know if she was competent to testify at the time she was called. (Evid. Hrg. Tr. 560). One wonders what strategically or tactically was achieved by counsel calling a witness who had been found in a court document to have previously "exaggerated her responses and that she was faking bad responses".

(Evid. Hrg. Tr. 561). One wonders what strategically or tactically was achieved by calling a witness who had an outstanding warrant for his arrest at the time he appeared at Petitioner's trial. (Evid. Hrg. Tr. 572).

Petitioner objects to the Magistrate's conclusion that he has not eliminated the probability that the decision was strategic or tactical and urges the Magistrate to reconsider his prior recommendation in light of the above. There is nothing that indicates counsel made a reasonable investigation, or failed to make an investigation into mitigation based upon a reasonable decision and the testimony of mitigation specialist Jacoby (Evid. Hrg. Tr. 339-367) coupled with all of the above demonstrate the erroneous recommendation of the Magistrate Judge in this regard. Habeas relief should be recommended.

As it relates to the Petitioner's argument that his counsel failed to object to instances of prosecutorial misconduct in the mitigation phase, counsel calls the court's attention to the Evidentiary Hearing Transcript, with internal citations to the actual trial transcript, at pages 556, 560, 567, 571, 573, 574, 575.

The Magistrate Judge "is at a loss as to what other ground there could be upon which to object to the questioning" of Petitioner's mother on her burglary "conviction", an offense the Magistrate found she "had pled guilty to" and "was awaiting sentencing". (R & R p.86). Counsel refers the court to Ohio Rules of Criminal Procedure, Rule 32(C) which states:

> A judgment of conviction shall set forth the plea, the verdict and the sentence. If the defendant is found not guilty or for any other reason is entitled to be discharged, the court shall render judgment accordingly. The

judge shall sign the judgment and the clerk shall enter it on the journal. A judgment is effective only when entered on the journal by the clerk.[39]

Thus the pending burglary charge had not yet ripened into a conviction for impeachment purposes since sentence had not yet been imposed, and the clerk had not entered the judgment on the journal of the court. It therefore was unavailable for impeachment purposes and should have been objected to by trial counsel.

The Magistrate correctly noted that Petitioner "has not identified the witnesses by name nor directed the Court to the appropriate pages in the trial transcript" where the objectionable prior criminal history of the Petitioner can be found; again counsel apologizes to the court and rectifies the deficiency as follows:

| WITNESS | OBJECTIONABLE MATERIAL | PAGE |
|---|---|---|
| Venustien Fears | "You have a pending burglary **charge** in this room, don't you?"[admission that the charge had not yet ripened into a conviction] | 2547 |
| Venustien Fears | "Do you have any other crimes of theft or dishonesty other than the burglary charge"? | 2548 |
| Venustien Fears | "Did you know that **those doctors reported** that you exaggerated your responses; that you are faking bad responses?" (Emphasis added) | 2549 |
| Venustien Fears | "All domestic violence charges were dismissed against him. Did you know that"? | 2552 |
| Venustien Fears | "Were you into crack"? | 2562 |
| Latanya Clark | "He is in a gang, isn't he"? | 2591 |

---

[39] One does not have a right to appeal within the prescribed time (thirty days in State, ten days in Federal) after a guilty plea has been entered, but only within the prescribed time after sentence has been imposed and Petitioner's mother was awaiting sentence and thus had not been "convicted" for impeachment purposes.

| | | |
|---|---|---|
| Latanya Clark | "Your brother knows it's wrong to kill doesn't he"? | 2596 |
| Brian Anten | "And you were aware that he [Angelo Fears] had other contacts with the criminal justice system other than the DUI that you represented him on? | 2607 |
| Brian Anten | "But he did not discuss his criminal history?" | 2608 |
| Angelo Dean | "…he had two convictions in 19-- two adjudications, he was adjudicated a juvenile delinquent in 1986 on two separate occasions for breaking and entering"? | 2628 |
| Angelo Dean | "Well, just in layman's terms what would be a breaking and entering"? | 2628 |
| Angelo Dean | "Breaking and entering into somebody's **homes**; property that someone has entered without permission of that owner" [exactly what the jury had already concluded he did in this case.] | 2628 |
| Angelo Dean | "..had a VCO probation. What is a VCO? A failure to—it's a violation of court-ordered probation, meaning that he had failed to do whatever was required of him when he was on probation". | 2629 |
| Angelo Dean | Use of an intake summary that he did not author and for which no foundation was laid. | 2630 |
| Angelo Dean | "**And the writer feels** that Angelo's involvement **with stealing is even greater than his record reflects**"? | 2630 |
| Angelo Dean | "His violation of court order charges were from **curfew violations**" | 2631 |
| Angelo Dean | "Angelo is fairly candid in regards to those | 2632 |

|                | charges and **he showed no remorse**"                                                                                                                                                    |      |
| Angelo Dean    | "…he impresses one that for him **delinquency is a way of life**"                                                                                                                          | 2632 |
| Angelo Dean    | "Angelo does not impress me as being a typically hostile or aggressive young man, although if placed with his delinquent group on the street, I **would not trust him**."                   | 2634 |
| Angelo Dean    | "But when he went to DYS, when he violated court orders, he chose not to follow the rules? It was a free choice he made"? "I would think so. I don't know what he went to DYS, the Department of Youth Services, on. | 2637 |
| Angelo Dean    | "**So the probation officer at that point in 1988, did not perceive him as having a substance abuse problem, is that fair**?"[40]                                                           | 2639 |
| James Fears    | "What kind of **trouble** did you get in **juvenile**"[41]                                                                                                                                 | 2666 |

---

[40]    Note for the record that after all of the above had been testified to by incompetent witness, Angelo Dean, who did not author the report and was simply reading the report to answer the un-objected-to questions, Attorney Rosenwald finally stated:

> The remaining pages, Judge, are apparently his juvenile delinquency history, which we would object to also.

Why didn't counsel object sooner? Because counsel admitted, "I have no idea what you have got; I have no idea what he has been looking at. I didn't see this. I have no idea". (Tr. Trans. 2647). The Judge retorted when the State moved to admit the entire report, although no foundation had been laid for the admission of any portion of the exhibit except for that portion of the report that was actually authored by witness Angelo Dean, "Yes, but there might be stuff in here inadmissible. This is the first time I have seen this, let alone heard about it. What is it 12, 15-page report?" (Tr. Trans. 2650).

Finally, after all of the damage had been done, the State then attempted to lay a foundation for the admission of the exhibit, asking witness Angelo Dean "[I]s that the document to which you have been referring during your testimony"? (Tr. Trans. 2653): the only portion of that exhibit that witness Dean was competent to testify to was the "aftercare treatment plan and progress report" which he authored. (Tr. Trans 2654).

After abusing the rules of evidence, all without objection, the Prosecutor, flagrantly, blatantly and with prior calculation and design, asked witness Angelo Dean, "Mr Dean has every juvenile you have dealt with, and a record like this and a history like this, have they all gone on to be murderers": counsel finally objected and the court sustained the objection, but no curative instruction nor any more severe punishment was inflicted by the court on the intentional prosecutorial misconduct. The motion for a mistrial was overruled. (Tr. Trans. 2655).

[41] Counsel Rosenwald objected to the use of a misdemeanor conviction, "that's an improper way to cross-examine someone to bring out a criminal history [sic]" (Tr. Trans. 2670) demonstrating to the court that counsel knew the correct way to cross examine on prior convictions, but failed to do so on each of the

| James Fears | "Are you aware there is a warrant out for your arrest as we sit here today"? | 2674 |
| James Fears | "You had contacts, yourself, for assaults" not that I recall. Fights?" | 2676 |
| James Fears | "Your brother has been to DYS, hasn't he"? | 2677 |
| Mae Fears | "If I told you he got all As and Bs, except one D-plus in Health while he was in the juvenile institution, were you aware of that? | 2696 |
| Mae Fears | "Do you think the people at DYS inflated his grades?" | 2697 |
| Mae Fears | "When he was in Hillcrest that term, for grade seven, let's see, first quarter he got a C in Math; second quarter he got a D in Math; third quarter he got a C. Then for social studies, first quarter he got a B-minus; second quarter he got a B; third quarter got a D…" | 2698 |
| Mae Fears | "If I tell you while he was at DYS, **the people at DYS reported** that he spent… "[42] | 2700 |

Counsel apologizes to the court and certainly understands why this court was unwilling to "sift through the record to find support for Fears' claim" however counsel having done so, Petitioner argues to this court that yet again a pattern of prosecutorial misconduct, but now in the form of ineffective assistance of counsel, (prosecutors struck foul blows and defense counsel failed to function as an advocate for their client) has been amply demonstrated by counsel's citation to the record. There is little question that

---

occasions cited to this court in this section of Petitioner's objections. The State admitted that in fact it was a misdemeanor, apologized to the court AND THE COURT OVERRULED THE OBJECTION AND PERMITTED THE STATE TO USE THE MISDEMEANOR CONVICTION ANYWAY. (Tr. Trans. 2670-2672).

[42] Witness Mae Fears, a lay witness became frustrated with the State's questions, when the State kept repeating them, trying to edge her, same did not "edge" defense counsel. (Tr. Trans. 2701-2702).

Petitioner is entitled to relief on this sub-claim and Petitioner objects to the court's recommendation that relief be denied.

Counsel understands the court's analysis on his sub-claim that trial counsel were ineffective for failing to object to an instruction that the sentencing verdict must be unanimous, however to protect the record, Petitioner objects to the court's denial of relief on this sub-claim.

For the reasons stated in his Second Claim for Relief, the Ohio Supreme Court having found that merger did not happen, and that fact is presumed correct, Petitioner objects to the Magistrate Judge's recommendation that Petitioner be denied relief on his sub-claim that he was denied effective assistance of counsel for their failure to seek merger.

Finally, the cumulative effect of counsel's ineffectiveness warrants relief and Petitioner objects to the Magistrate's recommendation that relief be denied on this sub-claim. Ample evidence now exists, and Petitioner apologizes to the court yet again for his failures at the initial stages of this litigation, but because death is different, and because counsel have now performed the analysis sought by the court, the denial of relief is now unreasonable. Time and time again, counsel failed the basic functions of capital counsel. Why after setting up the abuse of Angelo at the hands of his father, would counsel call a maternal aunt, who was close to the family, with only two days notice, to testify that she saw no abuse by the father and no evidence of the abuse by the father—contradicting all previous witnesses called, if not for their lack of preparation in the mitigation stage of this litigation (See testimony of Gail Benton)? They did not know what the maternal aunt was going to say, they had only told her she was going to testify forty-eight hours before

she actually did, and then testified in direct contradiction to the remainder of the family members who had testified. Relief is required on Petitioner's claims herein and Petitioner objects to the Magistrate's recommendation to the contrary on the relief sought in his Fifth claim and its sub-claims.

**OBJECTION TO DENIAL OF RELIEF ON PETITIONER'S SIXTH GROUND FOR RELIEF: Petitioner Fears was deprived of the effective assistance of counsel on his direct appeal as of right in violation of the Sixth Amendment and due process clause of the Fourteenth Amendment.**

Once a capital defendant is convicted and sentenced to death, his direct appeal to the Ohio Supreme Court becomes critical.  Issues raised on direct appeal can make the difference between life and death. The Due Process Clause guarantees the effective assistance of counsel on direct appeal.  *Evitts v. Lucey*, 469 U.S. 387 (1985).  The failure of Petitioner's appellate attorneys to raise fundamental errors occurring at trial constitutes ineffective assistance of counsel.

Counsel must act as an advocate and support the cause of the client to the best of their ability.  *Anders v. California*, 386 U.S. 738 (1967); *Penson v. Ohio*, 488 U.S. 75 (1989). Their performance should be viewed under the circumstances that existed at the time of direct appeal.  *Id.*  Additionally, appellate counsel has certain essential duties such as reading the trial transcript and keeping abreast of developments in the law during the pendency of the appeal.  *McCoy v. Court of Appeals*, 486 U.S. 429 (1988).

Presenting a capital appeal has differences from other appeals because "death is different."  *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).  Even one sufficiently egregious and prejudicial error by an appellate lawyer can be enough to violate the right to effective assistance of counsel.  *Smith v. Murray*, 477 U.S. 527, 535 (1986).  Nowhere

is that more true than in a capital case, where the failure to raise a single claim can be the reason a client is executed rather than spared.

While there is no definitive standard that specifically addresses the performance of appellate counsel, the Sixth Circuit applies a modified "*Strickland* test" when evaluating appellate ineffectiveness claims. *Bowen v. Foltz*, 763 F.2d 191 (6th Cir. 1985). In the appellate context, the prejudice requirement is met by showing that there is a reasonable probability the result of the appeal would have been different. *Id*. at 194. Although ineffective assistance of appellate counsel was raised via an Ohio App.Rule 26(B) and/or timely filed *Murnahan* petition, filed in the Ohio Supreme Court, the Ohio Supreme Court dismissed same without comment.

Appellate counsel in the direct appeal to the Ohio Supreme Court failed to raise fundamental errors, including but not limited to the fact that Petitioner was convicted and sentenced to death based on specifications that he was never charged with. (See Ground for Relief No. 7).[43]

The Magistrate Judge, stated in his Report and Recommendation, "[E]ssential to the success of an application for reopening in Ohio, however, is that the proposed propositions of law must be the sort that are cognizable on direct appeal" (R & R p. 88-89) and then gives an example of an issue that arguably could not have been raised on

---

[43] Judge Painter writing for the First District Court of Appeals, in his decision for the court on Petitioner's appeal of the trial court's denial of post-conviction relief, stated: "[A]lthough we are concerned that the enumeration of the specifications referred to at trial are inconsistent with the enumeration contained in the indictment, we are constrained by the procedural posture of this case, including the fact that the Ohio Supreme Court has affirmed Fears's conviction on direct appeal, and must conclude that *res judicata* precludes the recognition of any error for the purposes of postconviction relief, because the irregularity could have been raised at trial or on direct appeal. This determination does not, however, foreclose the issue being raised by means of another procedure", citing to *State v. Gibbs* (Dec. 11, 1998), Ham. App.No. C-971087, unreported. (See Appendix 9 attached hereto). In a per curiam decision, the First District Court of Appeals for Hamilton County, wrote in *Gibbs*, "As a claim of ineffective assistance of appellate counsel cannot be raised in a petition for postconviction relief *State v. Murnahan* (1992), 63 Ohio St.3d 60, 584 N.E.2d 1204, paragraph one of the syllabus, Gibbs must raise this claim either in a motion for reconsideration, or in a motion to re-open the direct appeal, made pursuant to App.R. 26" *Gibbs* at 3.

direct appeal. The Magistrate continued, "[O]hio law, however, does not allow consideration of evidence outside the record on direct appeal, so even if Fears' appellate counsel had presented the claim on direct appeal, there is  no doubt that it would have been summarily rejected by the Ohio appellate court". (R & R p. 89). Finally, the Magistrate Judge listed several of the issues raised as evidence of ineffective appellate counsel, and concludes each "…would have been summarily rejected by the Ohio Supreme Court"; Petitioner disagrees.

Particularly, Petitioner states that alleging ineffective assistance of counsel for failure to raise the defense of voluntary intoxication would not have suffered the fate predicted by the Magistrate Judge.

Accepting the Magistrate's analysis that Ohio law requires evidence in the record in the trial court upon which the appellate issues must be based (i.e. "a reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter" *State v. Ishmail,* 54 Ohio St.2d 402, 377 N.E. 2d 500 (1978) (paragraph one of the syllabus)), ample evidence was in the trial record upon which appellate counsel could have and should have based their ineffective assistance of trial counsel claim on direct appeal, for failing to raise the defense of voluntary intoxication.

1) The testimony of Dr. Smalldon, after interviewing and testing the Petitioner wherein Dr. Smalldon concluded "Mr. Fears was doing what he apparently did every day, which is consume **huge** amounts of alcohol (Emphasis added) (Tr. Trans. 2830).

2)  "You met Lakesha's boyfriend Darius, who told us that day, earlier in the day, of this murder; that Angelo and James Grant had been together drinking, getting high…" (Tr. Trans. 2270)

3)  The Statement of Petitioner, "I wasn't really thinking at the time. I was drunk; I was on drugs. I would have never did—I would never have been up there if I wouldn't have been on drugs". (Tr. Trans. 2909);

4)  Evidence in the record from all mitigation witnesses that the defendant was an alcoholic and drug abuser from the age of twelve to fourteen (Court's " Opinion as to the Existence of Mitigating Factors and Sentence in a Capital Case" at Apx. Vol II p. 256).

Thus there was evidence in the record, upon which to base the ineffectiveness of counsel, for their failure to raise the defense of voluntary intoxication—it was a consistent link between the guilt phase and the mitigation phase. Appellate counsel was ineffective for their failure to raise trial counsel's ineffectiveness and the Magistrate is incorrect that this issue would have suffered the same fate as other claimed appellate ineffectiveness issues, and for that reason Petitioner objects.

The Magistrate Judge analyzes the sub-claim that Petitioner was convicted of specifications for which he was never charged, by stating that this sub-claim, "represents an excellent example of attorneys attempting to take advantage of understandable human error, specifically, the trial judge's misidentification of the enumeration of the specifications attached to each count of the indictment". (R & R p. 92).

Judge Painter, writing for the First District Court of Appeals in ruling on the trial court's dismissal of Petitioner's Post-conviction petition, stated that the court was

"concerned that the enumeration of the specifications referred to at trial are inconsistent with the enumeration contained in the indictment…" unfortunately, the court could not address the concern because of the procedural posture of the case. There was no hint in the court's opinion expressing its concern, that this was "understandable human error" nor did the court hint that it was "careless but harmless". (R & R. p. 92). In fact the First District Court of Appeals, provided guidance to counsel on how to purse their concern by stating, "[T]his determination does not, however, foreclose the issue being raised by means of another procedure" and cited to *State v. Gibbs,* (Dec. 11, 1998), Ham. App.No. C-971087, unreported. a 26(b)/*Murnahan* case.

The Magistrate Judge stated "[S]ince the jury instructions naturally came at the end of the guilt phase, nothing the trial court said could have influenced in the slightest Fears' understanding of the charges and the specifications he faced or his defense to them": agreed. However, even the Magistrate Judge has to agree the trial court committed error in instructing the jury on the wrong specifications that applied to Petitioner. The Magistrate Judge has to also agree the jury convicted Petitioner on specifications for which he had never been charged. The Magistrate Judge has to further agree that trial counsel never raised the issue on Petitioner's behalf in the trial court—they permitted their client to be convicted on specifications for which he had never been charged. This error is clearly in the trial court record—there would have been no need to resort to evidence outside the record to assign on direct appeal, the trial court's error and trial counsel's ineffectiveness in failing to correct the error. Appellate counsel were ineffective for failing to assign as error on direct appeal trial counsel's failure. Because the Magistrate Judge recommended that relief be denied on this claim, Petitioner objects.

Because Petitioner has demonstrated he is entitled to relief on either his third or fifth or both grounds for relief, it was error for appellate counsel not to have assigned as error the ineffectiveness of counsel on each of those bases and because the Magistrate Judge recommended denial of relief on this sub-claim of Petitioner's Sixth ground for relief, Petitioner objects. Petitioner has demonstrated the prejudice that flowed from the prosecutorial misconduct. The Ohio Supreme Court has stated "again and again and again" its frustration at prosecutorial misconduct. (See Objection to Denial of Relief on Petitioner's First Ground for Relief). As demonstrated herein, Petitioner has shown his entitlement to relief on the grounds of prosecutorial misconduct, and in arguing his objection, has analyzed the issue pursuant to state law. Having now pointed out the prosecutorial misconduct, and arguing how egregious and flagrant it was in his objections to denial of relief on his previous grounds for relief and citing the numerous cases in which the Ohio Supreme Court has issued caution to prosecutors to avoid the misconduct, Petitioner has in fact argued the merits of the claims and incorporates those arguments and the theory under which appellate counsel might have proceeded, in objecting to the denial of relief on this sub-claim.

Petitioner objects to denial of relief on this sub-claim and urges the Magistrate Judge to reconsider his Report and Recommendation in this regard.

**OBJECTION TO DENIAL OF RELIEF ON PETITIONER'S NINTH GROUND FOR RELIEF: A jury instruction on the defense of accident that was neither asserted by the defense nor supported in the record and which had the effect of shifting the burden of proof on the essential element of purpose to Petitioner, violated his fundamental rights to due process and a fair trial as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. [44]**

---

[44] Petitioner raised this Ninth Claim for Relief as his Twenty-third Assignment of Error in the Ohio Supreme Court.

Prior to closing argument in the trial phase of the proceedings, the state requested the court to give an instruction on accident as set forth in OJI 411.01.  The defense objected and discussed the definition of purpose that refers to accident and argued that an instruction on accident was inappropriate. (Tr. Trans. 2264). Defense counsel also noted that the very definition of accident, which requires the defense to show the defendant was engaged in a lawful act, was not present under the facts of the case. (Tr. 2264-2265).

The defense of accident was never raised by the defense except to create reasonable doubt as to the element of intent, which the State owed a duty to prove beyond a reasonable doubt. Even though the defense of accident was clearly inapplicable to the facts of the case, the court granted the state's request for an accident instruction and overruled the defense objection. (Tr. 2264).

In the jury instructions in the trial phase, the Court gave the following instruction on accident:

> Now, an accidental result is one that occurs unintentionally and without any design or purpose to bring it about. An accident is a mere physical happening or event out of the usual order of things and not reasonably anticipated or foreseen **as a natural or probable result of a lawful action**. (Emphasis added)(Tr. 2384).

It is clear that this instruction was improper as there was no "lawful action" supported by the facts, upon which to rest this instruction.

The court then instructed the jury on the essential element of purpose to cause the death of another, as follows:

> Purpose to cause the death is an essential element of the crime of aggravated murder. A person acts purposefully when it is his specific intention to cause a certain result.

It must be established in this case that at the time in question there was present in the mind of the defendant a specific intention to cause the death of another.

Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result or engaging in specific conduct. **To do an act purposefully is to do it intentionally and not accidentally. Purpose and intent mean the same thing.** The purpose with which a person does an act is known only to themselves unless he or she expresses it to others or indicates it by his conduct.

The purpose with which a person does an act is determined from the manner in which it is done, the weapon used and all the facts and circumstances in evidence.

If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life or inflict great bodily harm, the purpose to cause the death may be inferred from the use of the weapon. (Tr. Trans. 2388-2389).

The Magistrate Judge stated in his Report and Recommendation in response to Petitioner's argument that the prejudice suffered by him flowed from the false impression the instruction created with the jury that their decision between accident and finding purposefulness was an either/or situation, was "sheer conjecture on Fears' part" (R & R p. 96), same is not true.

Prosecutor Russell, in her portion of the closing argument stated as follows:

Judge is going to give you a definition of "purpose". A purposeful act is when one intends it and not accident. **So, "purpose" and "accident" is opposite in this—this analysis.** (Tr. Trans. 2293).

Petitioner argues to this court, if purpose and accident are "opposite", then by their nature, they create an either/or situation. "Sheer conjecture" is not what Petitioner relies on in objecting to the Magistrate Judge's Report and Recommendation but yet again statements made by the Prosecutors on behalf of the State of Ohio.

The State filed a hand-written "request for jury instructions" on the morning of its closing argument, which stated, "[N]ow comes the State, by and through the undersigned, who requests OJI instruction 411.01 'accident'". (Apx. Vol. II p. 180). The hand-written request did not limit the request to any sub-portion of the instruction but to the entirety of the instruction.

The court "after discussing this with the attorneys" (Tr. Trans. 2264), agreed to give the instruction over the defense objection: the court committed prejudicial error and the error was preserved by defense counsel in the record (Tr. Trans. 2264, 2378).

The State requested "OJI instruction 411.01" the court provided **only a portion** of 411.01 thereby confusing the jury, especially when the prosecutors argued the either/or scenario.

Ohio Jury Instruction 411.01 states:

1. The Defendant denies any purpose to (*describe*). He denies he committed an unlawful act and says that the result was accidental.

2. DEFINED. An accidental result is one that occurs unintentionally and without any design or purpose to bring it about. An accident is a mere physical happening or event, out of the usual order of things and not reasonably (anticipated)(foreseen) as a natural or probable result of a lawful act.

3. FORESEEABILITY 4 OJI 409.56.

4. CONCLUSION ON ACCIDENT. If after considering all of the evidence, including that on the subject of accident, you are not convinced beyond a reasonable doubt that the defendant had a purpose to (*describe*) you must return a verdict of any guilty.

In reviewing the entire instruction it becomes clear why defense counsel objected. The Defendant never denied any purpose to commit any act except by his general "not guilty" plea. He never denied he committed an unlawful act **and** claimed that the result was accidental (Emphasis added). The court failed to give that portion of the instruction

that dealt with foreseeability and never gave that portion of the instruction that dealt with

the conclusion. This court is reminded that OJI 411.01 is contained in the "defense"

section of the instructions—a defense that the Defendant never raised and could not raise.

The sole purpose in arguing anything that came close to "accident" was to negate the

prosecutor's element of intent.

As the "Comment" to OJI 411.01 states:

> An instruction on accident is not recommended unless required by the evidence, argument or request of counsel.
>
> The claim of accident is not an affirmative defense. The committee recommends that no statement be given to that effect because it is unnecessary and it is confusing unless there exists a second defense on which the defendant has the burden of proof.

*State v. Poole,* (1973) 33 Ohio St. 2d 18 is instructive. On June 10, 1970, a jury

found appellant, Arthur Poole, guilty of murder in the first degree. In the course of his

trial, appellant attempted to show that the killing was accidental. As the Ohio Supreme

Court stated:

> ***The intent or purpose, to kill, being an essential constituent of the offense, should be averred and proven. *Fouts v. The State,* 8 Ohio St. 98; *Kain v. The State,* ib. 306; *Hagan v. The State* 10 Ohio St. 459. This purpose, like every other material averment of the indictment is put in issue by the plea of not guilty and to authorize a conviction must be proven beyond a reasonable doubt. Where the state has shown that the death was the result of design, purpose, or intent—and these terms in this relation are synonymous—then the notion of accident is necessarily excluded. That which is designedly or purposely accomplished cannot, in the very nature of things, be accidental. Therefore, when the plaintiff in error introduced evidence tending to prove that the gun was accidentally discharged, he was merely controverting the truth of the averment in the indictment that it was purposely discharged.

*Id.* at 20.

Exactly like *Poole*, Petitioner's "sole theory at trial[45] was that the fatal shot occurred from an accidental discharge thereby casting doubt on the "intent" element. There were several witnesses whose statements on examination and cross-examination bore on that theory."[46] *Id.* at 21.

The *Poole* court reversed the first-degree murder conviction because of the erroneous jury instruction, this court should grant habeas relief for the same reason. To give the erroneous instruction and then only a portion of the instruction, is clearly prejudicial and the error was preserved by defense counsel at the trial level.

Even though the jury instruction at issue, did not go as far as the jury instruction in *Francis v. Franklin,* 471 U.S. 307 (1985), there are similarities between the cases that aid the Petitioner herein.

In *Francis* a state prisoner seized an officer's gun while receiving dental care, and forced a dental assistant to accompany him as a hostage. The prisoner and his hostage went to a nearby house and demanded the keys from the occupant, who slammed the door thereby causing the prisoner's gun to discharge. The bullet traveled through the wooden door and into the occupant's chest, killing him. The prisoner defended his malice murder charge on the grounds of a lack of the requisite intent. The trial court instructed the jury as follows:

> The acts of a person of sound mind and discretion are presumed to be the product of the person's will; but the presumption may be rebutted. A person will not be presumed to act with criminal intention but the trier of facts, that is; the jury; may find criminal intention upon a consideration of

---

[45] Although other defenses were considered in the preparation of the case, "we decoded to go with the accidental discharge" (Evid. Hrg. Tr. p.587).

[46] Those witnesses who bore on this issue on direct or cross-examination included, "Franklin" Evid. Hrg. Tr. p. 587; Schrand (Tr. Trans. 1927 ("malfunction"), 1928 ("hair trigger"), 1930, 1935 ("pull the hammer back to get ready to fire and my finger slipped off…") 1935, ("malfunctioned") 1928 ("…is it possible for me to take my hand and hit that and fire the gun"), 1940 ("…hammer resting against the back of the firing pin and accidentally hit or intentionally hit the hammer of the gun…") 1963, 1964).

> the words, conduct, demeanor, motive and all other circumstances
> connected with the act for which the accused is prosecuted.

*Francis v. Franklin,* 471 U.S. 307 (1985).

It was clear that the Petitioner's Prosecutor's sought the "accident"

instruction for one reason, to force the Defendant to demonstrate that the killing was in

fact an accident as evidenced by the following Prosecutorial comments thereby relieving

the state of a portion of their burden to show the killing was purposeful and with prior

calculation and design and to place some burden on the Petitioner to prove the defense of

accident, when in fact *Poole* prohibited same:

> 1) " He didn't say accident" when the State referred to the silence of the
>    Defendant that caused the defense to move for a mistrial on the grounds of
>    the improper comment by the State on the Defendant's silence (Tr. Trans.
>    2305);
> 2) "It's clear he is going to tell you that he never was going to kill him. Gun
>    wasn't loaded" (Tr. Trans. 2294);
> 3) "So, purpose and accident is opposite in this—this analysis" (Tr. Trans
>    2293).

As the United States Supreme Court has stated, "shifting of the burden of

persuasion with respect to a fact which the State deems so important that it must be either

proved or presumed is impermissible under the Due Process Clause" *Patterson v. New*

*York,* 432 U.S. 197 at 215 (1977).

The Ohio Supreme Court in analyzing this error stated:

> The concept of accident is tantamount to a denial that the act was
> intentional. Throughout the trial, defense counsel challenged the state's
> evidence of intent. The instruction on accident, in effect, underscores the
> position taken by defense counsel that appellant did not intentionally cause
> the death of the victim. The trial court made it clear that "purpose to cause
> the death" is an essential element of aggravated murder and that the state
> had to prove all elements of the offense beyond a reasonable doubt,
> including that appellant had the specific intent to cause the death of
> Antwuan Gilliam.

*State v. Fears,* (1999) 86 Ohio St. 3d 329; 340.

"The question however is not what the State Supreme Court declares the meaning of the charge to be, but rather what a reasonable juror could have understood the charge as meaning". *Francis v. Franklin,* 471 U.S. 307, 315-316 (1985) quoting with approval, *Sandstrom v. Montana,* 442 U.S. 510, 516-517 (1979). A reasonable jury could have interpreted the "accident" charge, only a portion of which was given by the trial court, to create a burden on the Defendant where none existed, especially when coupled with the impermissible comments of the State Prosecutors.

The State of Georgia argued unsuccessfully in *Francis* that because the jury was also charged that the defendant was presumed innocent and that the state was required to prove every element of the offense beyond a reasonable doubt that the instruction in question was harmless *Id.* at 319. The fact that Petitioner's jury was likewise charged does not save the State from the error committed by the trial court charging Petitioner's jury on the definition of accident at the request of the Prosecutors.

In Ohio, it is well established that the trial court will not instruct the jury where there is no evidence to support an issue. *Riley v. Cincinnati,* (1976) 46 Ohio St. 287. There is no basis in this case to support the issue of accident, as there is a complete absence of any lawful act. The confusion caused by the erroneous jury charge violates Petitioner's Fourteenth Amendment right to substantive due process.

For all the foregoing reasons, the Petitioner objects to the denial of relief on this claim. The Ohio Supreme Court's analysis in *Fears* tracks the Ohio Supreme Court's analysis in *Poole,* yet an opposite result. Petitioner has demonstrated the trial court's error and his entitlement to relief.

Petitioner having completed his objections to the Magistrate's Report and Recommendation, and demonstrating that in fact the Magistrate erred in denying relief on one or more of the Petitioner's claims, prays the court reject the Magistrate's Report and Recommendation and order relief on one or more of the grounds for relief pled and proven by Petitioner. Admittedly the pleadings in this case frustrated the Magistrate in reaching the correct conclusion, that being to grant habeas relief. Petitioner apologizes to the Court for contributing to the confusion, but now urges the court to grant the relief sought now that the arguments, citations and authority clearly support same.

It would be easy for the Magistrate Judge having expressed his initial opinion, to simply support that conclusion in his Supplemental Report and Recommendation, again emphasizing the correctness of his initial Report and Recommendation. However the procedural posture of this case is completely different than when first reviewed by this court and so too should the court's conclusions on denying relief. Death is different and so too should the conclusions of the Magistrate Judge in his Supplemental Report and Recommendation.

> Respectfully submitted:
> S/:Lawrence J. Greger
> Attorney at Law 0002592
> Suite 1100 Liberty Tower
> 120 W. Second Street
> Dayton, OH 45402
>
> David H. Bodiker
> State Public Defender
> By:  S/: Linda Prucha
> Assistant State Public Defender
> 8 East Long Street - 11th Floor
> Columbus, Ohio 43215
> (614) 466-5394
> TRIAL COUNSEL FOR
> PETITIONER

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true copy of the foregoing HABEAS CORPUS PETITION was forwarded by using the Court's CM/ECF filing system to Jim Petro, Ohio Attorney General, State Office Tower, 30 East Broad Street, Columbus, Ohio 43215-3428, on this 30th day of March, 2006 and to all other counsel listed on that same day.

<u>S:/Lawrence J. Greger</u>
Lawrence J. Greger