## STATEMENT OF APPLICABLE STANDARD OF REVIEW

### *Standard Of Review Mandated By Statute*

AEDPA applies to this case. The pertinent provision provides as follows:

28 U.S.C. 2254:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or,

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The characteristics of this standard of review have been fleshed out in decisions by the United State Supreme Court, commencing with *Terry Williams v. Taylor*, 529 U.S. 362 (2000), and continuing through to the recent case of *Holland v. Jackson*, 542 U.S. 649 (2004).

In reviewing a judgment of a State court, a federal habeas court must examine State court finding of facts and applications of United States Supreme Court holdings "through the lens of 28 U.S.C. Section 2254(d)". *Price v. Vincent*, 538 U.S. 634, 639 (2003). The focus of this lens is the reasonableness of the State court judgment, whether the judgment falls within a generous continuum of sensible and temperate interpretations of facts and law. As spelled out in the following decisions of the United States Supreme Court, the State court judgment stands unless it is "objectively unreasonable".

### Not A De Novo Independent Inquiry

- Relief cannot be granted under AEDPA by a federal court conducting its own independent inquiry into whether the state court was correct as a de novo matter. *Yarborough v. Alvarado*, 541 U.S. 652, at 665 (2004); *Terry Williams v. Taylor*, 529 U.S. 362, 411 (2000).

- It is not enough for the petitioner to show that, if his claim were being reviewed in the first instance, the federal court would conclude, in its independent judgment, that the state court applied the law incorrectly. *Price v. Vincent*, 538 U.S. 634, 641 (2003); *Bell v. Cone*, 535 U.S. 685, 699 (2002); *Terry Williams v. Taylor*, 529 U.S. 362, 411 (2000).

- It is not enough that a federal habeas court, in its 'independent review of the legal question' is left with a 'firm conviction' that the state court was 'erroneous'. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

- Even on a "question of law", review by the federal court is not de novo, but rather is through the lens of 28 U.S.C. 2254(d). *Price v. Vincent*, 538 U.S. 634, 639 (2003).

### Factual Findings Stand Unless "Objectively Unreasonable"

- Absent clear and convincing evidence to the contrary, factual determinations by the state court are presumed correct. A decision adjudicated in on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state

court proceeding. 28 U.S.C. Section 2254(d), 28 U.S.C. Section 2254(e)(1), *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

- If there is no dispute as to the underlying facts, then the habeas petitioner is entitled to relief only pursuant to the review of law factors under 28 U.S.C. Section 2254(d)(1). *Price v. Vincent*, 538 U.S. 634, 639-640 (2003).

- The federal habeas court may be of the view that the state court did not give certain facts and circumstances adequate weight (hence adequate discussion), but it would be an exaggeration to say that the state court did not consider them. *Early v. Packer*, 537 U.S. 3, 8-9 (2002).

- As an example, a state court can be reasonable in concluding as a factual matter that a suspect was not in "custody" during a police interrogation, even though other facts could support a valid conclusion that the suspect was in "custody". Even though fair minded jurists could disagree over whether the suspect was in custody, the factual finding by the state court would still be reasonable. *Yarborough v. Alvarado*, 451 U.S. 652, at 665-667(2004).

### *Applications of USSC Law Stand Unless "Objectively Unreasonable"*

- A state court decision would be "contrary to" U.S. Supreme Court precedent if :
  - The state court arrives at a conclusion opposite to that reached by the U.S. Supreme Court on a question of law, or

o The state court confronts facts that are materially indistinguishable from relevant U.S. Supreme Court precedent and arrives at a result opposite to that reached by the U.S. Supreme Court. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) *Early v. Packer*, 537 U.S. 3, 7-8 (2002); *Bell v. Cone*, 535 U.S. 685, 699 (2002); *Terry Williams v. Taylor*, 529 U.S. 362, 405 (2000).

o "Contrary" is commonly understood to mean 'diametrically different', 'opposite in character or nature', or 'mutually opposed'. Thus, the text of 28 U.S.C. Section 2254(d)(1) suggests that the state court decision must be substantially different from the relevant precedent of the U.S. Supreme Court. *Terry Williams v. Taylor*, 529 U.S. 362, 405 (2000).

o That the state court decision be 'contrary to' clearly established Supreme Court law is more demanding than a determination that the state court 'failed to apply' clearly established Supreme Court law. *Early v. Packer*, 537 U.S. 3, 10 (2002).

o "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent of this Court is, at best, ambiguous. As the Ohio Court of Appeals' decision does not conflict with the reasoning or the holdings of our precedent, it is not 'contrary to … clearly established

Federal                                                                          law.'"

*Mitchell v. Esparza*, 540 U.S. 12, at 17 (2003).

- o A "run-of –the-mill" state court decision applying the correct legal rule from U.S. Supreme Court cases to the facts of the prisoner's case would not fit comfortably within [28 U.S.C.] 2254(d)(1)'s 'contrary to' clause. For example,  assume a state court correctly identifies Strickland as the controlling legal authority for the prisoner's ineffective assistance claim, and applying the Strickland framework, rejects that claim. The state court decision would be in accord with Strickland, even assuming the federal court might reach a different result. Although the state court decision might be contrary to the federal court's conception of how Strickland ought to be applied in that particular case, the state court decision would not be 'mutually opposed' to Strickland itself. *Terry Williams v. Taylor*, 529 U.S. 362, 406 (2000).

- • A state court decision would be "an unreasonable application" of U.S. Supreme Court precedent if:

  - o The state court identifies the correct governing legal rule from U.S. Supreme Court cases, but unreasonably applies it to the facts of the particular state prisoner's case, or

  - o The state court either unreasonably extends a legal principle from U.S. Supreme Court precedent to a new context where it

should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Terry Williams v. Taylor*, 529 U.S. 362, 407 (2000).

o An unreasonable application of federal law is different from an incorrect or an erroneous application of federal law. *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002); *Bell v. Cone*, 535 U.S. 685, 698-699 (2002).*Terry Williams v. Taylor*, 529 U.S. 362, 410-411 (2000).

o The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable. *Yarborough v. Alvarado*, 541 U.S. 652, 665-666 (2004); *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

o "Objectively unreasonable" and "clear error" are not the same. The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

o Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway [state] courts have in reaching outcomes in case-by-case

determinations. *Yarborough v. Alvarado*, 451 U.S. 652, 664(2004).

- "Clearly established federal law as determined by the Supreme Court of the United States" refers to the holdings, as opposed to the dicta, of the Supreme Court decisions as of the time of the relevant state court decision. *Lockyer v. Andrade*, 538 U.S. 63,71 (2003); *Terry Williams v. Taylor*, 529 U.S. 362, 412 (2000).

  o A state court need not cite to U.S. Supreme Court cases, nor even be aware of them, so long as neither the reasoning not the result of the state court decision contradicts U.S. Supreme Court cases. *Early v. Packer*, 573 U.S. 3, 8 (2002).

### *The Habeas Petitioner, Not The Warden, Carries The Burden To Show A State Court Judgment To Be "Objectively Unreasonable"*

- The habeas petitioner has the burden to show that the state court applied U.S. Supreme Court law to the facts of his case in an objectively unreasonable manner. *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

### *State Court Decisions Should Be Given "The Benefit Of The Doubt"*

- The federal habeas court should make an effort to reconcile the application of the law by the state court in light of a presumption that state courts know and follow the law. A readiness to attribute error to the state court is incompatible with  a 'highly deferential standard for evaluating state court rulings' under 28 U.S.C. Section 2254(d). State

7

court decisions should be given the benefit of the doubt. *Holland v.*

*Jackson*, 542 U.S. 649, 655 (June 28, 2004); *Woodford v. Visciotti*,

537 U.S. 19, 24 (2002).

**Bell v. Cone,** 535 U.S. 685, 122 S. Ct. 1843, (May 28, 2002)

FACTS: Cone, who received a death sentence for a double murder in Tennessee, filed a post-AEDPA habeas petition claiming ineffective assistance of trial counsel for complete failure to subject the prosecutor's penalty phase case to meaningful adversary testing.

During the guilt phase, the state presented conclusive evidence that Cone burglarized and murdered an elderly couple as part of an ongoing effort to flee from a crime spree from the day before, which included armed robbery, carjacking and critically wounding a police officer who had attempted to apprehend him. The facts of the crime spree and murder showed that Cone acted in a callous and brutal manner.

Cone was represented by court-appointed attorneys, one of whom served as lead counsel. The defense was insanity.

Cone's background showed a normal childhood without any sort of deprivation, plus that he was a college graduate with honors. Cone enlisted in the Army and served as a supply clerk in Viet Nam. During that tour of duty, Cone was traumatized by the task of transporting dead bodies. Cone was also required to perform long hours of guard duty, where tacit approval was given to amphetamine use in order to stay awake and alert during guard duty. Cone became addicted to amphetamines. Upon his return from Viet Nam, Cone turned to crime to finance his addiction, and later spent 6 years in a state penitentiary for armed robbery. Following his release from prison, Cone wandered the United States where he supported himself and his drug habit with criminal activity.

During the guilt phase, Cone presented evidence of insanity from three sources. A clinical psychologist testified that Cone suffered from post-traumatic stress disorder as a result of his Viet Nam experience. A neuropharmacologist testified that Cone was a severe amphetamine abuser whose thought processes were disrupted by drug use. Finally, Cone's mother testified that his behavior following his return from Viet Nam was radically different when compared with his behavior before that experience. On guilt phase rebuttal, the state produced evidence that Cone's behavior contemporaneous with the crimes was lucid and calculating, as well as expert testimony countering the conclusions of Cone's experts. The jury convicted and the case proceeded to the mitigation phase on the day following the conclusion of the guilt phase.

The prosecution made a matter-of-fact opening statement about the four death specifications it intended to prove. Cone's lead counsel made a brief opening statement, referencing the mental impairment evidence from the guilt phase, and finished with a plea for mercy. Following testimony from a state's witness about the extent of Cone's prior record, Cone's counsel secured a concession on cross-examination that Cone had been awarded the Bonze Star for his service in Viet Nam. Also, Cone's counsel, during sidebar proceedings, successfully rebuffed the prosecutor's effort to introduce grisly post-mortem photos of the elderly victims. Cone did not put on any additional evidence during the mitigation phase.

The second-chair junior prosecutor gave what was described as a "low key" closing. Cone's counsel waived his closing argument, thereby preventing the lead prosecution counsel from making the reply final closing argument. The jury was instructed it may consider evidence from the guilt phase during its mitigation phase deliberations, and that even though insufficient to show insanity, evidence of a mental disease or defect could be considered during mitigation. The jury returned a death verdict.

During post-conviction proceedings, Cone claimed ineffective assistance of trial counsel for failure to present mitigating evidence and make a closing argument. At a state evidentiary proceeding, both of Cone's trial counsel testified. In general, counsel said their mitigation strategy was the same as the guilt phase strategy to emphasize post-traumatic stress disorder and amphetamine abuse as reducing Cone's culpability. They decided not to call the same witnesses again during mitigation, since that very testimony had already been presented just the a couple of days before. Various of Cone's family members, who had been interviewed by Cone's counsel, would have testified during mitigation about his normal and undeprived childhood. Counsel decided against such testimony, reasoning that evidence of a normal youth might seem to the jury to be more aggravating than mitigating. Counsel also decided against having Cone testify during mitigation, where Cone's admitted hostile attitude and demeanor could have been exhibited to the jury. Cone's lead counsel explained that he waived closing argument to prevent the lead prosecutor from making the final reply closing which would emphasize the calculating and brutal nature of the crimes. All agreed that the lead prosecutor was a highly effective advocate.

On other points, Cone's counsel gave explanations and reasons for taking or not taking certain action during the mitigation phase. Cone did not produce any evidence calling into question any proffered explanation or reason, or that his trial counsel was misrepresenting anything about their preparation or investigation of a mitigation strategy.

The state courts denied relief, entering a number of specific findings to reach the conclusion that counsel's performance was well within acceptable bounds. The state courts also found no prejudice, in that Cone's death sentence was justified by the facts and the law, rather than being a product of counsel's shortcomings.

Cone filed a post-AEDPA habeas petition which was denied by the District Court. The Sixth Circuit reversed concluding, purporting to use AEDPA analysis, that the state courts made "unreasonable application" of *Strickland* to the facts of the case. It held that the *Cronic* standard applied to the facts of the case, where in its view defense counsel 'entirely failed to subject the prosecution's [penalty phase] case to meaningful adversarial testing', in that evidence wasn't adduced during the mitigation phase and counsel waived closing argument. Since prejudice is presumed under the *Cronic* standard, reversal of the death sentence was warranted, according to the Sixth Circuit.

At the state's request, the United States Supreme Court granted certiorari and reversed the decision of the court of appeals.

EVALUATION BY THE COURT:

**Distinction between *Strickland* and *Cronic:***

(a) ***Strickland* standard:** In *Strickland*, which was decided the same day as *Cronic*, we announced a **two-part test** for evaluating claims that a defendant's counsel performed so incompetently in his or her representation of a defendant that the defendant's sentence or conviction should be reversed. We reasoned that there would be a sufficient indication that counsel's assistance was defective enough to undermine confidence in a proceeding's result if the defendant proved two things: **first**, that counsel's "representation fell below an objective standard of reasonableness," 466 U.S., at 688; and **second**, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.,* at 694. Without **proof of both** deficient performance and prejudice to the defense, we concluded, it could not be said that the sentence or conviction "resulted from a breakdown in the adversary process that rendered the result of the proceeding unreliable," *id.,* at 687, and the sentence or conviction should stand. (Emphasis added) p. 1850.

(b) ***Cronic* standard:** In *Cronic*, we considered whether the Court of Appeals was correct in reversing a defendant's conviction under the Sixth Amendment without inquiring into counsel's actual performance or requiring the defendant to show the effect it had on the trial. 466 U.S., at 650, 658. We determined that the court had erred and remanded to allow the claim to be considered under *Strickland*'s test. 466 U.S., at 666-667, and n. 41. In the course of deciding this question, **we identified three situations implicating the right to counsel that involved circumstances "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified**." (Emphasis added) *Id.,* at 658-659.

10

**First** and "most obvious" was the "complete denial of counsel." *Id.,* at 659. A trial would be presumptively unfair, we said, where the accused is denied the presence of counsel at "a critical stage," *id.,* at 659, 662, a phrase we used in *Hamilton* v. *Alabama,* 368 U.S. 52, 54, 7 L. Ed. 2d 114, 82 S. Ct. 157 (1961), and *White* v. *Maryland,* 373 U.S. 59, 60, 10 L. Ed. 2d 193, 83 S. Ct. 1050 (1963) *(per curiam),* to denote a step of a criminal proceeding, such as arraignment, that held significant consequences for the accused. n3 **Second**, we posited that a similar presumption was warranted if "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Cronic, supra,* at 659. **Finally**, we said that in cases like *Powell* v. *Alabama,* 287 U.S. 45, 77 L. Ed. 158, 53 S. Ct. 55 (1932), where counsel is called upon to render assistance under circumstances where competent counsel very likely could not, the defendant need not show that the proceedings were affected. [attorney first appointed on the day of trial in a death case] *Cronic*, *supra,* at 659-662. p. 1851.

(c) **Distinction between *Strickland* and *Cronic*:** When we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's **failure must be complete**. We said "if counsel ***entirely* fails** to subject the prosecution's case to meaningful adversarial testing." *Cronic*, *supra,* at 659 (emphasis added). Here, respondent's argument is not that his counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific points. For purposes of distinguishing between the rule of *Strickland* and that of *Cronic*, this difference is not of degree but of kind. n4 p. 1851.

**Meaning of "contrary to" in 28 USC 2254(d)(1):** (from syllabus) A federal habeas court may grant relief under the [contrary to] clause if the state court applies a rule different from the governing law set forth in this Court's cases, or if it decides a case differently than this Court has done on a set of materially indistinguishable facts. *Williams* v. *Taylor,* 529 U.S. 362, 405, 146 L. Ed. 2d 389, 120 S. Ct. 1495-406.

Cf. *Williams,* 529 U.S., at 405 ("The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature, ' or 'mutually opposed'" (quoting Webster's Third New International Dictionary 495 (1976))). p. 1852.

11

**Meaning of "unreasonable application" in 28 USC 2254 (d)(1):** (from syllabus) The federal court may grant relief under the [unreasonable application] clause if the state court correctly identifies the governing legal principle from this Court's decisions but unreasonably applies it in the particular case. *Id., at 407-410.* Such application must be objectively unreasonable, which is different from incorrect.

The focus of the [unreasonable application]  inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams* that an unreasonable application is different from an incorrect one. *Id., at 409-410.* See also *id., at 411* (a federal habeas court may not issue a writ under the unreasonable application clause "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly"). p. 1850.

The remaining issue, then, is whether respondent can obtain relief on the ground that the state court's adjudication of his claim involved an "unreasonable application" of *Strickland*. In *Strickland* we said that "judicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *466 U.S., at 689.* Thus, even when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a defendant must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Ibid.* (quoting *Michel v. Louisiana, 350 U.S. 91, 101, 100 L. Ed. 83, 76 S. Ct. 158 (1955)).* p. 1852.

For respondent to succeed, however, he must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough  to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. See *Williams, supra, at 411.* Rather, he must show that the Tennessee Court of Appeals applied *Strickland* to the facts of his case in an objectively unreasonable manner. This, we conclude, he cannot do. p. 1852.

**Purpose of AEDPA:** The Antiterrorism and Effective Death Penalty Act of 1996 modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas "retrials" and to ensure that state-court convictions are given effect to the extent possible under law. See *Williams v. Taylor, 529 U.S. 362, 403-404 (2000).* p. 1849.

(The *Bell* Court went on to conclude that the state court was correct in concluding that *Strickland* applied to the facts, since that claim was not a wholesale lack of adversarial challenge to the state's penalty phase case. Moreover, the *Bell*  Court concluded the application of *Strickland* was not unreasonable, noting with approval the state court findings and analysis on the two prong test.)

***Early v. Packer,*** 537 U.S. 3 (November 4, 2002)

FACTS: During jury deliberations on a non-capital murder charge, a single juror twice notified the judge that she wished to be dismissed for stress related reasons. Each time, the judge met alone with her and the juror agreed to press on with deliberations. At one point, a possible deadlock situation was addressed in open court, where the judge gave extemporaneous instructions that paraphrased written instructions and otherwise urged the jury to continue to deliberate.   After two more days of deliberations, the jury returned a guilty verdict.

On direct appeal, the petitioner claimed that the instructions, as well as the judge's private meetings with the juror,  were coercive and denied him due process rights to a fair and impartial jury.

The state intermediate appellate court rejected the claim. The pertinent facts from the trial record were spelled out in the decision. The court analyzed the claim and concluded that the events during deliberations and the instructions to the jury were not coercive. It applied California law which was consistent with U.S. Supreme Court precedent about a charge to a deadlocked jury (*Allen* charge). However,  the state intermediate appellate Court did not cite to U.S. Supreme Court cases, because California law "impose[d] even *greater* restrictions for the avoidance of potentially coercive jury instructions" than did U.S. Supreme Court precedent. The California Supreme Court declined further review.

Petitioner commenced a habeas action pursuant to 28 U.S.C. 2254(d) which was denied by the District Court. The 9th Circuit Court of Appeals reversed on the coercive jury instruction claim and instructed the District Court to grant the writ on the murder conviction.

In its decision, the 9th Circuit found fault with the state appellate decision in three areas: **(1)** "…The state court 'failed to cite … any federal law, much les the controlling Supreme Court precedents; **(2)** the 9th Circuit recited a number of  facts it found pertinent     and concluded the state court failed to properly consider the claim because those facts it found pertinent were not recited in the state court decision; and **(3)** the  9th  Circuit concluded that the state court "failed to apply" what it perceived (mistakenly so) as clearly established Supreme Court law.

EVALUATION BY THE COURT:

**Citation To Supreme Court Precedent Not Required:**  First, the Ninth Circuit observed that the state court "failed to cite . . . any federal law, much less the controlling Supreme Court precedents." *Packer*, 291 F.3d at 578. If this meant to suggest that such citation was required, it was in error. A state-court decision is "contrary to" our clearly established precedents if it "applies a rule that contradicts the governing law set forth in our cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent."

13

*Williams* v. *Taylor*, 529 U.S. 362, 405, 146 L. Ed. 2d 389, 120 S. Ct. 1495-406 (2000). ***Avoiding these pitfalls does not require citation of our cases -- indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.*** (Emphasis added).

**Failure To Recite Facts Does Not Mean The State Court Failed To Consider Those Facts:** Second, the Ninth Circuit charged that the Court of Appeal "failed to apply the totality of the circumstances test as required by *Lowenfield* [v. *Phelps*, 484 U.S. 231, 98 L. Ed. 2d 568, 108 S. Ct. 546 (1988)." That was so, the Ninth Circuit concluded, because it "simply mentioned three particular incidents in its analysis," "failed to consider" other "critical facts," and "failed to consider the cumulative impact" of all the significant facts, one of which it "[did] not even mention in its analysis." *Packer* v. *Hill*, at 578-579, and n. 10. With regard to the last point: The significant fact the Ninth Circuit said was not mentioned -- that the judge sent the jury back to its deliberations after learning that it was split 11 to 1 -- was in fact succinctly described. See 529 U.S. at 579, n. 10. The Court of Appeal focused its analysis upon "three particular incidents" for the entirely acceptable reason that (as the court said) those incidents constituted "the essence of Packer's complaints" regarding juror coercion. App. to Pet. for Cert. H-15. The opinion set forth many facts and circumstances beyond those three incidents, including the two "critical facts" that the Ninth Circuit said it "failed to consider," *Packer*, *supra*, 291 F.3d 569, 579, n. 10 -- the judge's knowledge that Radcliff was the sole dissenting juror prior to his instructing the jury to keep deliberating, App. to Pet. for Cert. H-14, and the fact that the foreman's note, which mentioned Radcliff by name, was read in court, *ibid*. The contention that the California court "failed to consider" facts and circumstances that it had taken the trouble to recite strains credulity. ***The Ninth Circuit may be of the view that the Court of Appeal did not give certain facts and circumstances adequate weight (and hence adequate discussion); but to say that it did not consider them is an exaggeration.*** There is, moreover, nothing to support the Ninth Circuit's claim that the Court of Appeal did not consider the "cumulative impact" of all the recorded events. Compliance with *Lowenfield* ***does not demand a formulary statement*** that the trial court's actions and inactions were noncoercive "individually and cumulatively." It suffices that that was the ***fair import*** of the Court of Appeal's opinion. (Emphasis added).

**Even If Erroneous, State Court Decision Stands If Reasonable:** Having determined that the Court of Appeals ***"failed to apply"*** clearly established Supreme Court law\*, *Packer* v. *Hill*, *supra*, at 579 (***a phrase which the opinion repeatedly and erroneously substitutes for the more demanding requirement of § 2254(d)(1): that the decision be "contrary to" clearly established Supreme Court law***), the Ninth Circuit then proceeded to address the question "whether [the Court of Appeal's] decision constituted error and if so whether the error had a substantial or injurious effect on the verdict." 291 F.3d at 579. But that inquiry would **[\*13]** have been proper only if the Ninth Circuit had first found (pursuant to the correct standard) that the California court's decision was "contrary to" clearly established Supreme Court law -- which it did not and could not. ***By mistakenly making the "contrary to" determination and then proceeding***

14

*to a simple "error" inquiry,* the Ninth Circuit evaded 2254(d)'s requirement that decisions which are not "contrary to" clearly established Supreme Court law can be subjected to habeas relief only if they are not merely erroneous, but "an *unreasonable* application" of clearly established federal law, or based on "an *unreasonable* determination of the facts" (emphasis added). Even if we agreed with the Ninth Circuit majority (Judge Silverman dissented) that there was jury coercion here, it is at least reasonable to conclude that there was not, which means that the state court's determination to that effect must stand.

(* Note that the Supreme Court earlier concluded that the 9th Circuit was wrong in its reading of federal constitutional law.)

**Mitchell v. Esparza,** 124 S. Ct. 7, 2003 U.S. LEXIS 8191 (November 3, 2003)

**FACTS:** After robbing a store and killing the clerk, Esparza was indicted for capital murder. His indictment recited a charge of aggravated murder during the course of and aggravated robbery, but did not allege that he was the "principal offender" as stated in the capital murder statute.

On state post-conviction review, Esparza for the first time claimed his death sentence was invalid because his indictment did not state a capital offense, due to the omission of the "principal offender" language. The state appeals court rejected this claim, holding that the "principal offender" language would need to be recited only when two or more defendants are named in the indictment. On a second state post-conviction petition, Esparza claimed that the sentencing phase jury instructions were defective for failure to instruct on the "principal offender" factor. The state appellate court summarily rejected that claim, with a simple citation to their decision on the first post-conviction case.

During federal habeas proceedings, Esparza for the first time alleged that there was another person involved in the crime.

Applying an AEDPA standard of review, the Sixth Circuit granted the writ as to the death sentence, on a theory that the state court decisions were "contrary to" *Sullivan v. Louisiana,* 508 U.S. 275 (1993). According to the Sixth Circuit, the state's failure to charge in the indictment that Esparza was the "principal offender" was the functional equivalent of completely dispensing with the reasonable doubt requirement. Consequently, the error was considered "structural", and thus invalidated the sentence regardless of the facts of the case or how a perceived error impacted upon the sentence. Although, according to the Sixth Circuit, United States Supreme Court precedent in non-capital cases would suggest harmless error analysis was appropriate, there was no precedent holding that these cases would apply in a death penalty context.

*Sullivan* had had invalidated a conviction secured without the jury having been instructed to apply a reasonable doubt standard to the state's case. This type of error was not amendable to a "harmless error" analysis, as would be instructional error cases

involving individual elements of the offense. This was so since the failure to instruct on reasonable doubt corrupted the entire charge, not just a single element of a charge.

In a *Per Curium* decision, the United States Supreme Court granted the state's petition for certiorari and reversed.

**EVALUATION BY THE COURT:** In relying on the absence of precedent to distinguish our noncapital cases, and to hold that harmless-error review is not available for this type of Eighth Amendment claim, the Sixth Circuit exceeded its authority under § 2254(d)(1). A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from this Court is, at best, ambiguous. As the Ohio Court of Appeals' decision does not conflict with the reasoning or the holdings of our precedent, it is not "contrary to . . . clearly established Federal law." p. 9

We may not grant respondent's habeas petition, however, if the state court simply erred in concluding that the State's errors were harmless; rather, habeas relief is appropriate only if the Ohio Court of Appeals applied harmless-error review in an "objectively unreasonable" manner. p. 10.

The Court of Appeals noted evidence brought to light for the first time in the habeas proceeding in the District Court that suggested there might have been another participant in the crime, Joe Jasso. The jury, however, was not presented with this evidence at trial, and thus it has no bearing on the correctness of the Ohio Court of Appeals' decision that the State need not charge a defendant as a principal offender if the failure to so charge is harmless error. p. 12.

*Terry Williams v. Taylor,* 529 U.S. 362 (April 18, 2000)

FACTS: Following a full confession, Williams was charged with capital murder. Guilt phase evidence was conclusive. During the penalty phase, the state showed that Williams had a longstanding record of many crimes of violence, including several arsons and a brutal assault on an elderly woman who was left in a coma.

The defense mitigation strategy was limited to emphasis on the voluntary confession as a mitigating factor. Defense counsel had Williams' mother and two neighbors present brief and general testimony that when Williams was a child he was a nice boy not prone to violence. The jury returned a death verdict, which the trial judge approved.

Following an unsuccessful direct appeal, Williams commenced a state post-conviction action, which was presented to the same judge who presided over the trial. . The primary claim was ineffective assistance of trial counsel during the mitigation phase, for inadequate investigation and inadequate presentation of evidence. A hearing was granted and new evidence was adduced which established five (5) areas of mitigation which were not investigated by trial counsel, and hence not a component of mitigation strategy: 1) Williams was taken from his home at age 11 due to significant

16

mistreatment, neglect and abuse by his caretakers; 2) Williams was borderline mentally retarded; 3) Williams had repeatedly suffered significant head injuries; 4) Williams had indicators of organic brain defects; and 5) the state's psychiatric  experts who testified at trial that Williams had a high probability of future dangerousness also would have testified, if asked, that Williams would not pose a danger if he was in a "structured environment".

The trial judge granted post-conviction relief by way of a new sentencing proceeding after application of the *Strickland* test to conclude mitigation investigation and presentation fell below professional standards and that the outcome of the sentencing would likely have been different if the omitted evidence had been presented.

The grant of relief by the original trial court was reversed by the state supreme court. It concluded that the *Strickland* standard of prejudice was changed by the case of *Lockhart v. Fretwell,* 506 U.S. 364 (1993), meaning that relief was not justified simply because the outcome of the trial would have been different. This legal proposition was the product of independent legal analysis of the state supreme court, and not founded upon  any pronouncement of the United States Supreme Court.  The state court  went on to factually mischaracterize the post-conviction evidence. It concluded that while the performance prong may have been met,  Williams had shown insufficient prejudice under what they perceived to be the new *Strickland/Fretwell* test.   The death sentence was reinstated.

Williams filed a post-AEDPA habeas petition. The writ was granted by the District Court for the same reasons and under the same analysis as that given by the trial judge. On federal appeal, the Circuit Court of Appeals reversed the District Court and denied the writ. It construed the "contrary to/unreasonable application of clearly established federal law" standard under 28 USC 2254(d)(1) to mean that a state decision applying U.S. Supreme Court precedent  will be upheld unless "[all] reasonable jurists would agree [the state court legal analysis] is unreasonable".

The United States Supreme Court reversed the denial of the writ, concluding that the state court  misconstrued and misapplied the *Strickland* standard of prejudice,  in an instance of admittedly deficient performance.

**EVALUATION BY THE COURT** (as to the meaning of 28 USC 2254(d), AEDPA version; Part II of decision, authored by O'Connor, joined by Rehnquist, Kennedy, Thomas, Scalia)

In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied -- the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of

17

the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. p. 412-413.

   **Meaning of "clearly established federal law as determined by the Supreme Court of the United States"**   That statutory phrase refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision. In this respect, the "clearly established Federal law" phrase bears only a slight connection to our *Teague* jurisprudence. With one caveat, whatever would qualify as an old rule under our *Teague* jurisprudence will constitute "clearly established Federal law, as determined by the Supreme Court of the United States" under § 2254(d)(1). See, *e.g.*, *Stringer* v. *Black,* 503 U.S. 222, 228, 117 L. Ed. 2d 367, 112 S. Ct. 1130 (1992) (using term "old rule"). The one caveat, as the statutory language makes clear, is that § 2254(d)(1) restricts the source of clearly established law to this Court's jurisprudence. p. 412.

   **Independent meaning given to "contrary to" and "unreasonable application" clauses** JUSTICE STEVENS arrives at his erroneous interpretation by means of one critical misstep. He fails to give independent meaning to both the "contrary to" and "unreasonable application" clauses of the statute. p. 404.

   Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court. Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "*contrary to* . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "*involved an unreasonable application of* . . . clearly established Federal law, as determined by the Supreme Court of the United States." (Emphases supplied.)     The Court of Appeals for the Fourth Circuit properly accorded both the "contrary to" and "unreasonable application" clauses independent meaning. p. 404-405.

   JUSTICE STEVENS would instead construe § 2254(d)(1)'s "contrary to" clause to encompass such a routine state-court decision [applying the correct case in an unreasonable manner]. That construction, however, saps the "unreasonable application" clause of any meaning. If a federal habeas court can, under the "contrary to" clause, issue the writ whenever it concludes that the state court's *application* of clearly established federal law was incorrect, the "unreasonable application" clause becomes a nullity. We must, however, if possible, give meaning to every clause of the statute. JUSTICE STEVENS not only makes no attempt to do so, but also construes the "contrary to" clause in a manner that ensures that the "unreasonable application" clause will have no independent meaning. See *ante*, at 21, 24-25. We reject that expansive interpretation of the statute. p. 407.

**Meaning of "contrary to" clearly established federal law as determined by the Supreme Court of the United States** With respect to the first of the two statutory clauses, the Fourth Circuit held in *Green* that a state-court decision can be "contrary to" this Court's clearly established precedent in two ways. First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours. See <u>143 F.3d at 869-870.</u> p. 405.

The word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed." Webster's Third New International Dictionary 495 (1976). The text of § 2254(d)(1) therefore suggests that the state court's decision must be substantially different from the relevant precedent of this Court. The Fourth Circuit's interpretation of the "contrary to" clause accurately reflects this textual meaning. A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. p. 405.

**Example of a case falling within the "contrary to" clause** Take, for example, our decision in *Strickland* v. *Washington,* <u>466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984).</u> If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be "diametrically different," "opposite in character or nature," and "mutually opposed" to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a "reasonable probability that . . . the result of the proceeding would have been different." *Id.* <u>at 694.</u> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent. Accordingly, in either of these two scenarios, a federal court will be unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's "contrary to" clause. p. 405-406.

**Example of a case not falling within the "contrary to" clause** On the other hand, a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s "contrary to" clause. Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe such a run-of-the-mill state-court decision as "diametrically different" from, "opposite in character or nature" from, or "mutually opposed" to *Strickland*, our clearly established precedent. Although

19

the state-court decision may be contrary to the federal court's conception of how *Strickland* ought to be applied in that particular case, the decision is not "mutually opposed" to *Strickland* itself. p. 406.

**Meaning of "unreasonable application" of clearly established federal law as determined by the Supreme Court of the United States** The Fourth Circuit's interpretation of the "unreasonable application" clause of § 2254(d)(1) is generally correct. That court held in *Green* that a state-court decision can involve an "unreasonable application" of this Court's clearly established precedent in two ways. First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. See 143 F.3d at 869-870.     A state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would qualify as a decision "involving an unreasonable application of . . . clearly established Federal law." p. 407-408.

Stated simply, a federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. The federal habeas court should not transform the inquiry into a subjective one by resting its determination instead on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case. The "all reasonable jurists" standard would tend to mislead federal habeas courts by focusing their attention on a subjective inquiry rather than on an objective one. p. 409-410.

For purposes of today's opinion, the most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law. (Emphasis supplied) p. 410.

In § 2254(d)(1), Congress specifically used the word "unreasonable, " and not a term like "erroneous" or "incorrect." Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable. p. 411.

**Standard of review pre-AEDPA** Before 1996, this Court held that a federal court entertaining a state prisoner's application for habeas relief must exercise its independent judgment when deciding both questions of constitutional law and mixed constitutional questions (*i.e.*, application of constitutional law to fact). See, *e.g.*, *Miller* v. *Fenton,* 474 U.S. 104, 112, 88 L. Ed. 2d 405, 106 S. Ct. 445 (1985). In other words, a

20

federal habeas court owed no deference to a state court's resolution of such questions of law or mixed questions. p. 400.

Under the federal habeas statute as it stood in 1992, then, our precedents dictated that a federal court should grant a state prisoner's petition for habeas relief if that court were to conclude in its independent judgment that the relevant state court had erred on a question of constitutional law or on a mixed constitutional question. p. 402.

**Congressional intent to change habeas corpus law**  That JUSTICE STEVENS would find the new § 2254(d)(1) to have no effect on the prior law of habeas corpus is remarkable given his apparent acknowledgment that Congress wished to bring change to the field. See *ante*, at 22 ("Congress wished to curb delays, to prevent 'retrials' on federal habeas, and to give effect to state convictions to the extent possible under law"). That acknowledgment is correct and significant to this case. It cannot be disputed that Congress viewed § 2254(d)(1) as an important means by which its goals for habeas reform would be achieved. p. 404.

**Woodford v. Visciotti,** 537 U.S. 19 (November 4, 2002)

FACTS:  Petitioner's death sentence was upheld on state court direct appeal. Petitioner then filed a state post-conviction proceeding, claiming ineffective assistance of trial counsel for inadequate investigation and presentation of mitigation evidence. The state court conducted an evidentiary hearing "and after briefing on the merits, it denied the petition in a lengthy opinion." On appeal of this decision, "The California Supreme Court assumed that [petitioner's] trial counsel provided constitutionally inadequate representation during the penalty phase, but concluded that this did not prejudice the jury's sentencing decision."

Petitioner filed a federal habeas corpus petition on the ineffective assistance claim. After the District Court granted the writ, the State appealed to the 9th Circuit. In upholding the granting of the writ, the 9th Circuit "correctly observed that a federal habeas application can only be granted if it meets the requirements of 28 U.S.C. 2254(d)…."

In the state court decision, *Strickland* was cited and its burden for the defendant to prove prejudice was "painstakingly" recited (the defendant must establish a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different). However, in four places in the state court opinion the term 'probable' was used without the modifier "reasonably". Because of this, the 9th Circuit concluded that the state court held the petitioner/defendant to a higher standard of proof than what was called for under *Strickland* and thus was "contrary to …clearly established federal law as determined by the Supreme Court of the United States".

The 9th Circuit also concluded that the state court's application of *Strickland* was "objectively unreasonable" because it purportedly failed to "take into account facts which the 9th Circuit found pertinent. Also, according to the 9th Circuit, the "aggravating factors were not overwhelming" based upon its assessment of the meaning and import of the two questions posed by the jury during mitigation phase deliberations.

EVALUATION BY THE COURT: **"Contrary To" Clause; State Gets The Benefit Of The Doubt:** The Court of Appeals made no effort to reconcile the state court's use of the term "probable" with its use, elsewhere, of *Strickland*'s term "reasonably probable," nor did it even acknowledge, much less discuss, the California Supreme Court's proper framing of the question as whether the evidence "undermines confidence" in the outcome of the sentencing proceeding. This readiness to attribute error is inconsistent with the presumption that state courts know and follow the law. See, *e.g.*, *Parker* v. *Dugger*, 498 U.S. 308, 314, 112 L. Ed. 2d 812, 111 S. Ct. 731-316 (1991); *Walton* v. *Arizona*, 497 U.S. 639, 653, 111 L. Ed. 2d 511, 110 S. Ct. 3047 (1990), *overruled on other grounds*, Ring v. Arizona, 536 U.S. ___ , 153 L. Ed. 2d 556, 122 S. Ct. 2428,(2002); *LaVallee* v. *Delle Rose*, 410 U.S. 690, 694, 35 L. Ed. 2d 637, 93 S. Ct. 1203-695 (1973) (per curiam). It is also incompatible with § 2254(d)'s "highly deferential standard for evaluating state-court rulings," *Lindh* v. *Murphy*, 521 U.S. 320, 333, 138 L. Ed. 2d 481, 117 S. Ct. 2059, n. 7 (1997), which demands that state court decisions be given the benefit of the doubt.

**"Unreasonable Application" Clause:** Under § 2254(d)'s "unreasonable application" clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied *Strickland* incorrectly. See *Bell* v. *Cone*, 535 U.S. ___, ___ (2002) (slip op., at 12), 152 L. Ed. 2d 914, 122 S. Ct. 1843; Williams, 529 U.S. at 411. Rather, it is the habeas applicant's burden to show that the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner. An "*unreasonable* application of federal law is different from an *incorrect* application of federal law." Williams, 529 U.S. at 410; see Bell, at ___ (slip op., at 7), 152 L. Ed. 2d 914, 122 S. Ct. 1843. The Ninth Circuit did not observe this distinction, but ultimately substituted its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d).

\*\*\*

The Court of Appeals disagreed with this assessment, suggesting that the fact that the jury deliberated for a full day and requested additional guidance on the meaning of "moral justification" and "extreme duress," meant that the "aggravating factors were not overwhelming." 288 F.3d at 1118. Perhaps so. However, "under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly." *Bell*, 535 U.S., at ___ (slip op., at 12), 152 L. Ed. 2d 914, 122 S. Ct. 1843 . The federal habeas scheme leaves primary responsibility with the state courts for these judgments, and authorizes federal-court intervention only when a state-court decision is objectively unreasonable. It is not that here. Whether or not we would reach the same conclusion as the California Supreme Court, "we think at the

very least that the state court's contrary assessment was not 'unreasonable.'" *Id.*, at ___ (slip op., at 14), 152 L. Ed. 2d 914, 122 S. Ct. 1843. Habeas relief is therefore not permissible under § 2254(d).