*Barclay v. Florida*, 463 U.S. 939 (July 6, 1983)

**FACTS:** Defendant convicted by jury of murder with death specification. After full opportunity for the presentation of mitigating evidence, the jury issued an advisory opinion for life imprisonment. As is authorized under Florida law, the trial judge rejected this advisory opinion and imposed a death sentence, pursuant to written opinion as required under Florida law.

The trial judge properly found three statutory aggravating circumstances and properly found that that there were no mitigating circumstances. However, the trial judge found the defendant's prior criminal record to be an aggravating circumstance, where the Florida statute did not list a prior criminal record as an aggravating circumstance. Under Florida law, the sentencer must balance [weigh] statutory aggravating circumstances against all mitigating circumstances. It is improper under Florida law to permit non-statutory aggravating circumstances to enter into the weighing process. Florida case law holds that a death case will be remanded for resentencing if a non-statutory aggravating circumstance was considered if mitigation was found. However, if no mitigation was found, the Florida Supreme Court would apply a harmless error analysis, as long as the trial judge properly found one or more statutory aggravating circumstances.

The Florida Supreme Court upheld the death sentence, concluding that consideration of the non-statutory aggravating circumstance of the defendant's criminal record was harmless error.

**QUESTION PRESENTED** The question before the *Barclay* Court is whether Florida may constitutionally imposed the death penalty where one of the 'aggravating circumstances' relied upon by the trial judge to support the sentence was not among those established by the Florida death penalty statute. p. 941 In other words, the question before the Court is whether the trial judge's consideration of this improper aggravating circumstance so infects the balancing [weighing] process created by the Florida statute that it is constitutionally impermissible for the Florida Supreme Court to let the sentence stand.

**EVALUATION BY THE COURT:** The United States Constitution does not forbid a state from making a defendant's criminal record to be an aggravating circumstance. p. 951 Thus, the trial judge did not consider any constitutionally protected behavior to be an aggravating circumstance. p. 956. There is no constitutional defect in a death sentence based on both statutory and non-statutory aggravating circumstances. p. 957. There is no reason why the Florida Supreme Court cannot examine the balance struck by the trial judge and decide that the elimination of improperly considered aggravating circumstances could not possibly affect the balance [weighing process] . 'What is important … is an *individualized* determination on the basis of the character and the circumstances of the crime.' p. 958 *Zant v. Stephens*, 462 U.S. 862, 879 (1983)

STEVENS (Concurring) A death sentence may not rest *solely* on a non-statutory aggravating factor, see *Zant v. Stephens,* 462 U.S. at 876-878, the Constitution does not prohibit consideration at the sentencing phase of information not directly related to either statutory aggravating or statutory mitigating factors, as long as that information is relevant to the character of the defendant and the circumstances of the crime. p. 967 *Zant,* at 878-879, *Gregg v. Georgia,* 428 U.S. at 164, 196-197, 206, *Proffitt v. Florida*, 428 U.S. at 242, 248, 256-257, n.14.

Under Florida law, if there are no statutory mitigating circumstances, n13 one valid statutory aggravating circumstance will generally suffice to uphold a death sentence on appeal  even if other aggravating circumstances are not valid. N14 The Federal Constitution requires no more, at least as long as none of the invalid aggravating circumstances is supported by erroneous or misleading information. p. 967-968.

As long as the Federal Constitution did not bar introduction of the evidence underlying those improperly considered non-statutory aggravating circumstances, it does not require that the death sentence be set aside. p. 968 n13, *Zant v. Stephens,* 262 U.S. at 888-889.

In any event, nothing in the Federal Constitution  bars the introduction of  a defendant's prior criminal record, which is highly relevant to his individual background and character. p. 970 See *Zant,* 262 U.S., at 887-888; *Proffitt,* 428 U.S., at 252, n. 9. n17

### *Berger v. United States,* 295 U.S. 78 (April 15, 1935)

**FACTS:** Berger, along with Katz and Rice, were  charged with conspiracy to utter counterfeit federal reserve notes, plus eight different substantive offenses. Katz pled guilty to conspiracy and testified for the government in exchange for dismissal of all substantive counts against him.  Rice was convicted of conspiracy plus substantive offenses. Berger was convicted of conspiracy only, and acquitted of the substantive offenses.  The "case against Berger was not strong …[and] may properly be characterized as weak – depending, as it did, upon the testimony of Katz, an accomplice with a long criminal record." p. 88-89.

The prosecutor "was guilty of misstating the facts in his cross-examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; of bullying and arguing with witnesses; and in general, of conducting himself in a thoroughly indecorous and improper manner." p. 84. Also, the prosecutor accused defense counsel of participating in the counterfeiting conspiracy. "The prosecuting attorney's argument to the jury was undignified and intemperate, containing improper insinuations and assertions calculated to mislead the jury." p. 85.

**EVALUATION BY THE COURT**: The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor -- indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none. The court below said that the case against Berger was not strong; and from a careful examination of the record we agree. Indeed, the case against Berger, who was convicted only of conspiracy and not of any substantive offense as were the other defendants, we think may properly be characterized as weak -- depending, as it did, upon the testimony of Katz, an accomplice with a long criminal record.

In these circumstances prejudice to the cause of the accused is so highly probable that we are not justified in assuming its non-existence. ***If the case against Berger had been strong, or, as some courts have said, the evidence of his guilt "overwhelming," a different conclusion might be reached.*** [Citations omitted]. Moreover, we have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential. A new trial must be awarded. Compare *N.Y. Central R. Co.* v. *Johnson*, 279 U.S. 310, 316-318. p. 88-89.

*Brown v. Ohio* 432 U.S. 161 (1977)

**FACTS:** Brown stole a car form a parking lot in East Cleveland, and nine days later was caught driving the same car in the nearby suburban jurisdiction of Wycliffe. Charged by Wycliffe police with misdemeanor joyriding ("No person shall purposely take, operate, or keep any motor vehicle without consent of its owner."), Brown pled guilty.

Later, Brown was indicted by the grand jury for felony theft of the same car. ("No person shall steal any motor vehicle.") Brown interposed a double jeopardy defense. The Ohio Courts overruled that defense and Brown was convicted of auto theft.

**QUESTION PRESENTED:** The principal question in this case is whether auto theft and joyriding, a greater and lesser included offense under Ohio law, constitute the "same offence" under the Double Jeopardy Clause. p. 164

**EVALUATION BY THE COURT:** Because it was designed originally to embody the protection of the common-law pleas of former jeopardy, see *United States v. Wilson, 420 U.S. 332, 339-340 (1975)*, the Fifth Amendment double jeopardy guarantee serves principally as a restraint on courts and prosecutors. The legislature remains free under the Double Jeopardy Clause to define crimes and fix punishments; but once the legislature has acted courts may not impose more than one punishment for the same offense and prosecutors ordinarily may not attempt to secure that punishment in more than one trial. p. 165

After correctly holding that joyriding and auto theft are the same offense under the Double Jeopardy Clause, the Ohio Court of Appeals nevertheless concluded that Nathaniel Brown could be convicted of both crimes because the charges against him focused on different parts of his 9-day joyride. App. 23. We hold a different view. The Double Jeopardy Clause is not such a fragile guarantee that prosecutors can avoid its limitations by the simple expedient of dividing a single crime into a series of temporal or spatial units. Cf. *Braverman v. United States, 317 U.S. 49, 52 (1942).*The applicable Ohio statutes, as written and as construed in this case, make the theft and operation of a single car a single offense. Although the Wickliffe and East Cleveland authorities may have had different perspectives on Brown's offense, it was still only one offense under Ohio law. n8 Accordingly, the specification of different dates in the two charges on which Brown was convicted cannot alter the fact that he was placed twice in jeopardy for the same offense in violation of the Fifth and Fourteenth Amendments.

> n8 We would have a different case if the Ohio Legislature had provided that joyriding is a separate offense for each day in which a motor vehicle is operated without the owner's consent. Cf. *Blockburger v. United States, 284 U.S. 7 at 302.* We also would have a different case if in sustaining Brown's second conviction the Ohio courts had construed the joyriding statute to have that effect. We then would have to decide whether the state courts' construction, applied retroactively in this case, was such "an unforeseeable judicial enlargement of a criminal statute" as to violate due process. See *Bouie v. City of Columbia, 378 U.S. 347, 353 (1964)*; cf. *In re Snow, 120 U.S. 274, 283-286 (1887); Crepps v. Durden, 2 Cowper 640 (K.B. 1777).*

> ***Brown v. Sanders,*** 126 S. Ct. 884, 2006 US LEXIS 760 (January 11, 2006)

**FACTS:** During a home invasion burglary, Sanders robbed and killed one victim and attempted to kill the other victim. Following a trial by jury, Sanders was sentenced to death.

The jury found four "eligibility factors": (a) murder in the course of a robbery; (b) murder in the course of a burglary; (c) killing a witness to prevent testimony; and

(d) murder that was especially 'heinous, atrocious, or cruel.' In accordance with California law, in the penalty phase the jury was then to take into consideration a separate list of "sentencing factors", one of which was the "circumstances of the crime." The jury was also entitled to consider as a sentencing factor any of the eligibility factors it found to be true.

On direct appeal, the California Supreme Court held the robbery and burglary eligibility factors should have been merged by the trial court such that the jury should have gone on to consider only the robbery/murder factor. In addition, the California Supreme Court invalidated the 'heinous, atrocious, cruel" factor on vagueness grounds. It nevertheless upheld Sander's death sentence, reasoning that the other two proper eligibility factors (robbery/murder and witness killing) rendered Sanders death eligible. "Moreover, the jury's consideration of the invalid eligibility factors in the weighing process did not produce constitutional error because all of the facts and circumstances admissible to establish the "heinous, atrocious, or cruel" and burglary-murder eligibility factors were also properly adduced as aggravating facts bearing upon the "circumstances of the crime" sentencing factor. They were properly considered whether or not they bore upon the invalidated eligibility factors." p. 894.

**QUESTION PRESENTED:** We consider the circumstances in which an invalidated sentencing factor will render a death sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the jury's weighing process. p. 888.

The issue in the line of cases we confront here is what happens when the sentencer imposes the death penalty after at least one valid eligibility factor has been found, but under a scheme in which an eligibility factor or a specified aggravating factor is later held to be invalid. p. 889.

**EVALUATION BY THE COURT:** We think it will clarify the analysis, and simplify the sentence-invalidating factors we have hitherto applied to non-weighing States, see *supra*, at 5-6, if we are henceforth guided by the following rule: An invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process n6 *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances.

n6 There may be other distortions caused by the invalidated factor beyond the mere addition of an improper aggravating element. For example, what the jury was instructed to consider as an aggravating factor might have "actually . . . militated in favor of a lesser penalty," *Zant, supra, at 885, 103 S. Ct. 2733, 77 L. Ed. 2d 235*. See *supra*, at 5-6.

If the presence of the invalid sentencing factor allowed the sentencer to consider evidence that would not otherwise have been before it, due process would mandate

reversal without regard to the rule we apply here. See *supra*, at 6; see also n. 6, this page. n7 The issue we confront is the skewing that could result from the jury's considering *as aggravation* properly admitted evidence that should not have weighed in favor of the death penalty. See, *e.g.*, *Stringer, 503 U.S., at 232, 112 S. Ct. 1130, 117 L. Ed. 2d 367* ("When the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale."). As we have explained, such skewing will occur, and give rise to constitutional error, only where the jury could not have given aggravating weight to the same facts and circumstances under the rubric of some other, valid sentencing factor.

### *Clemons v. Mississippi,* 494 U.S. 738 (March 28, 1990)

**FACTS:** Clemons convicted of capital murder by a jury and a sentencing hearing was held. At the sentencing hearing the state presented evidence on two statutory aggravating factors, one of which was constitutionally valid (murder during the course of a robbery) and one of which was constitutionally invalid due to vagueness ( a killing that was 'especially heinous, atrocious or cruel'). Jury returned a death sentence, finding that the aggravating circumstances outweighed the mitigating circumstances.

The Mississippi Supreme Court acknowledged that the jury was instructed on an unconstitutionally vague aggravating circumstance but upheld the death sentence, stating that "We likewise are of the opinion beyond a reasonable doubt that the jury's verdict would have been the same with or without the 'especially heinous, atrocious or cruel' aggravating circumstance'.

**EVALUATION BY THE COURT** We hold that the Federal Constitution does not prevent a state appellate court from upholding a death sentence that is based in part on an invalid or improperly defined aggravating circumstance either by reweighing of the aggravating and mitigating evidence or by harmless error review…. p. 741   Nothing in this opinion is intended to convey the impression that state appellate courts are required or necessarily should engage in reweighing or harmless error analysis when errors have occurred in a capital sentencing proceeding. Our holding is only that such procedures are constitutionally permissible. p. 754  A state appellate court's decision to conduct harmless error analysis  or to reweigh aggravating and mitigating factors rather than remand to the sentencing jury violates the Constitution only if the decision is made arbitrarily. p. 755

We accordingly see nothing in appellate weighing or reweighing of the aggravating and mitigating circumstances that is at odds with contemporary standards of fairness or that is inherently unreliable and likely to result in the arbitrary imposition of the death sentence. p. 750

Appellate courts need to apply the same "beyond a reasonable doubt' standard on independent reweighing as that applied by a jury during the sentencing phase. p. 753.

***Darden v. Wainwright,*** 477 U.S. 168 (June 23, 1986)

**FACTS:** After a jury trial in a Florida court, petitioner was found guilty of murder, robbery, and assault with intent to kill. Pursuant to Florida's capital sentencing statute, the same jury heard further testimony and argument, and made a nonbinding recommendation that the death penalty be imposed. The trial judge followed that recommendation, and the Florida Supreme Court affirmed the conviction and the sentence, rejecting petitioner's contention that the prosecution's closing argument during the guilt phase of the trial rendered the trial fundamentally unfair and deprived the sentencing determination of the reliability required by the Eighth Amendment.

During guilt phase closing argument, defense counsel blamed investigators for bungling the collection of evidence, and offered his personal opinion that the state's evidence was weak. Defense counsel also alluded to the death penalty,  and characterized the real perpetrator of the crime, being someone other than the defendant, as an 'animal'.

The prosecutor then made his guilt phase closing argument.  In five (5) separate portions of his argument, the prosecutor made numerous improper comments.

'As far as I am concerned, there should be another Defendant in this courtroom, one more, and that is the division of corrections, the prisons. . . . Can we expect him to stay in a prison when they go there? Can't we expect them to stay locked up once they go there? Do we know that they're going to be out on the public with guns, drinking?. Yes, there is another Defendant, but I regret that I know of no charges to place upon him, except the public condemnation of them, condemn them.'

'I will ask you to advise the Court to give him death. That's the only way that I know that he is not going to get out on the public. It's the only way I know. It's the only way I can be sure of it. It's the only way that anybody can be sure of it now, because the people that turned him loose --.'

'As far as I am concerned, and as Mr. Maloney said as he identified this man, this person as an animal, this animal was on the public for one reason.'

'He shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash. ....I wish [the surviving victim]  had had a shotgun in his hand when he walked in the back door and blown his [Darden's] face off. I wish that I could see him [Darden] sitting here with no face, blown away by a shotgun…. I wish someone had walked in the back door and blown his head off at that point…. He fired in the boy's back, number five, saving one. Didn't get a chance to use it. I wish he had used it on himself…. I wish he had been killed in the accident, but he wasn't. Again, we are unlucky that time…. [D]on't forget what he has done according to those witnesses, to make every attempt to change his appearance from September the 8th, 1973. The hair, the goatee, even the moustache and the weight. The only thing he hasn't done that I know of is cut his throat"…. p. 181.

After this, the last in a series of such comments, defense counsel objected for the first time.

**EVALUATION BY THE COURT:** The record also supports the rejection of petitioner's contention as to the prosecution's closing argument. The prosecution's argument included improper remarks that indicated that petitioner was on weekend furlough from an earlier prison sentence when the crime involved here occurred; implied that the death penalty would be the only guarantee against a future similar act; referred to petitioner as an "animal"; and reflected an emotional reaction to the case. **However, the relevant question is whether the comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.** Viewed under this standard, the prosecution's comments did not deprive petitioner of a fair trial. The comments did not manipulate or misstate the evidence, or implicate other specific rights of the accused, and much of their objectionable content was responsive to the opening summation of the defense (available under a state procedural rule). Moreover, defense counsel were able to use their final rebuttal argument to turn much of the prosecution's argument to turn much of the prosecution's closing argument against it.(Emphasis added)  p. 178-183.

But as both the District Court and the  original panel of the Court of Appeals (whose opinion on this issue still stands) recognized it "is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden* v. *Wainwright,* 699 F. 2d, at 1036. The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly* v. *DeChristoforo,* 416 U.S. 637 (1974). **Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power."**(Emphasis added)  *Id.,* at 642.

Under this standard of review, we agree with the reasoning of every court to consider these comments that they did not deprive petitioner of a fair trial. n13 The prosecutors' argument    did not manipulate    or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent. See *Darden* v. *Wainwright,* 513 F. Supp., at 958. Much of the objectionable content was invited by or was responsive to the opening summation of the defense. As we explained in *United States* v. *Young,* 470 U.S. 1 (1985), the idea of "invited response" is used not to excuse improper comments, but to determine their effect on the trial as a whole. *Id.,* at 13. The trial court instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence. The weight of the evidence against petitioner was heavy; the "overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges," 329 So. 2d, at 291, reduced the likelihood that the jury's decision was influenced by argument. Finally, defense counsel made the tactical decision not to present any witness other than petitioner. This decision not only permitted them to give their summation prior to the prosecution's closing argument, but also gave them the opportunity to make a final rebuttal argument. Defense counsel were able to use the opportunity for rebuttal very effectively, turning much of the prosecutors' closing argument against them by placing many of the prosecutors' comments and actions in a

light that was more likely to engender strong disapproval than result in inflamed passions against petitioner. n14  For these reasons, we agree with the District Court below that "Darden's trial was not perfect -- few are -- but neither was it fundamentally unfair." 513 F. Supp., at 958. n15

n15 JUSTICE BLACKMUN's dissenting opinion mistakenly argues that the Court today finds, in essence, that any error was harmless, and then criticizes the Court for not applying the harmless-error standard. *Post,* at 196-197. We do not decide the claim of prosecutorial misconduct on the ground that it was harmless error. In our view of the case, that issue is not presented. Rather, we agree with the holding of every court that has addressed the issue, that the prosecutorial argument, in the context of the facts and circumstances of this case, did not render petitioner's trial unfair -- *i.e.,* that it was not constitutional error. *** In this case, the comments were made at the guilt-innocence stage of trial, greatly reducing the chance that they had any effect at all on sentencing. The trial judge did not approve of the comments, and several times instructed the jurors that the arguments were not evidence and that their decision was to be based only on the evidence. ***

### *Donnelly v. DeChristoforo*, 416 U.S. 637 (May 13, 1974)

FACTS   During a joint murder trial, the co-defendant pled guilty to a lesser charge. At that point, the trial judge announced to the jury that the other defendant had pled guilty an that the trial would proceed against defendant DeChristoforo.

During his reply closing argument, the prosecutor said 'They [DeChristoforo and his counsel] said they hope that you find him not guilty. I quite frankly think that they hope that you find him guilty of something a little less than first-degree murder.'

Defendant's counsel immediate objection to this remark was sustained. During general jury instructions, the court repeated the prosecutor's statement  and instructed the jury:  'Closing arguments are not evidence for your consideration…. There is no evidence of that whatsoever, of course, and you are instructed to disregard that statement made by the District Attorney. Consider the case as though no such statement was made.'

QUESTION PRESENTED: Whether such remarks, in context of the entire trial, were sufficiently prejudicial to violate respondent's due process rights.

EVALUATION BY COURT In the circumstances of this case, , where the prosecutor's ambiguous remark in the course of an extended trial was followed by the trial court's specific disapproving instructions, no prejudice amounting to a denial of constitutional due process was shown. (Syllabus)

The review to be exercised is the narrow one of due process, and not the broad exercise of supervisory power that an appellate court would possess in regards to its own trial court . We regard this observation as important for not every trial error or infirmity

which might call for application of supervisory powers correspondingly constitutes a failure to observe that fundamental fairness essential to the very concept of justice. p. 642

This is not a case in which the State has denied a defendant the benefit of a specific provision of the Bill of Rights, such as the right to counsel, *Argersinger v. Hamlin,* 407 U.S. 25 (1972), or in which the prosecutor's remarks so prejudiced a specific right, such as the privilege against compulsory self-incrimination, so as to amount to a denial of that right. *Griffin v. California*, 380 U.S. 609 (1965) n15 When specific guarantees of the Bill of Rights are involved, this Court has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them. But here the claim is only that a prosecutor's remark about respondent's expectations at trial by itself so infected the trial with unfairness as to make the resulting conviction a denial of due process. We do not believe that examination of the entire proceedings in this case supports that contention. p. 643.

The right to confrontation might be implicated where the prosecutor introduced statements made by persons unavailable for questioning at trial. *Pointer v. Texas,*  380 U.S. 400 (1965) p. 643 n15.

Although some occurrences at trial may be too clearly prejudicial for such a curative instruction to mitigate their effect, the comment in this case is hardly of such character. p. 644.

The prosecutor's remark here, admittedly an ambiguous one, was but one moment in an extended trial and was followed by specific disapproving instructions. Although the process of constitutional line drawing in this regard is necessarily imprecise, we simply do not believe that this incident made respondent's trial so fundamentally unfair as to deny him due process. p. 645.

*Miller v. Pate*, 386 U.S. 1 (1967), stands for the proposition that the 14th Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence. (prosecutor argued under shorts of defendant were stained with blood, when in fact he knew they were stained with paint) p. 646

Isolated passages of a prosecutor's argument, billed in advance to the jury as a matter of opinion not of evidence, do not reach the same proportions [of knowing use of false evidence]. Such arguments, like all closing arguments of counsel, seldom carefully constructed *in toto* before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury , sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations. p. 646-647.

The Court of Appeals' reliance on *Brady* v. *Maryland*, 373 U.S. 83 (1963), is likewise misplaced. In *Brady*, the prosecutor had withheld evidence, a statement by the

petitioner's codefendant, which was directly relevant to the extent of the petitioner's involvement in the crime. Since the petitioner had testified that his codefendant had done the actual shooting and since the petitioner's counsel was not contesting guilt but merely seeking to avoid the death penalty, evidence of the degree of the petitioner's participation was highly significant to the primary jury issue. As in *Miller*, manipulation of the evidence by the prosecution was likely to have an important effect on the jury's determination. But here there was neither the introduction of specific misleading evidence important to the prosecution's case in chief nor the nondisclosure of specific evidence valuable to the accused's defense. There were instead a few brief sentences in the prosecutor's long and expectably hortatory closing argument which might or might not suggest to a jury that the respondent had unsuccessfully sought to bargain for a lesser charge. We find nothing in *Brady* to suggest that due process is so easily denied.

The result reached by the Court of Appeals in this case leaves virtually meaningless the distinction between ordinary trial error of a prosecutor and that sort of egregious misconduct held in *Miller* and *Brady, supra*, to  amount to a denial of constitutional due process. n23   Since we believe that distinction should continue to be observed, we reverse the judgment of the Court of Appeals.


### *Doyle v. Ohio*, 426 U.S. 610 (June 17, 1976)

**FACTS:** Defendants charged with selling ten pounds of marihuana to a local narcotics informant. Both were convicted in separate trials. Police set up a transaction between the CI and the two defendants and secretly observed the transaction. The defendants were apprehended in possession of the buy money. The defendants were arrested and given *Miranda* warnings. Each refused to answer questions. At trial, each defendant testified,  saying that the CI framed them by planting buy money on them and then pretending the marihuana belonged to them when it actually belonged to the CI. The prosecutor cross-examined each defendant, and exacted concessions that the defendants did not tell the frame-up story after their arrest, but rather stayed silent and said nothing to the police. The prosecutor argued to the jury that the in-court story was not believable because the defendants remained silent after their arrest.

**QUESTION PRESENTED:** Whether a state prosecutor may seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told his story after receiving *Miranda* warnings at the time of his arrest?

**EVALUATION BY THE COURT:** In view of the implicit assurance in the *Miranda* warning that post-arrest silence will carry no penalty, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. p. 618 We hold that the use for impeachment purposes of petitioner's silence, at the time of the arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment. The State has not claimed that such use in the circumstances of this case

might have been harmless error. Accordingly, petitioner's convictions are reversed and their causes remanded to the state courts for further proceedings not inconsistent with this opinion.

### *Espinosa v. Florida,* 505 U.S. 1079 (June 29, 1992)

**FACTS:** During the penalty phase of a capital case, a Florida jury recommended a death sentence after weighing mitigation against four aggravating circumstances, one of which was that the murder was "especially wicked, evil, atrocious or cruel." The trial court went on to impose a death sentence, although not expressly relying on the "especially wicked, evil, atrocious or cruel" factor to support the decision to impose a death sentence.

On direct appeal to the Florida Supreme Court, Espinosa claimed that the "especially wicked, evil, atrocious or cruel" factor was unconstitutionally vague and thus left the jury with insufficient guidance when to find the existence of that aggravating factor. The Florida Supreme Court rejected that claim.

During the same period as the pendency of Espinosa's appeal to the Florida courts, the United States Supreme Court issued a series of cases that established "[I]n a State where the sentencer weighs aggravating and mitigating circumstances, the weighing of an invalid aggravating circumstance violates the Eighth Amendment. See *Sochor v. Florida, 504 U.S. 527, 532, 119 L. Ed. 2d 326, 112 S. Ct. 2114 (1992); Stringer v. Black, 503 U.S. 222, 232, 117 L. Ed. 2d 367, 112 S. Ct. 1130 (1992); Parker v. Dugger, 498 U.S. 308, 319-321, 112 L. Ed. 2d 812, 111 S. Ct. 731 (1991); Clemons v. Mississippi, 494 U.S. 738, 752, 108 L. Ed. 2d 725, 110 S. Ct. 1441 (1990).*"

In response to Espinosa's petition for certiorari, the State conceded that the aggravating circumstance was unconstitutionally vague, but the death sentence was not thereby tainted because it was only considered by the jury, which could only recommend a sentence to the judge. The State argued that the trial court, which had an obligation to consider but not follow the jury's recommendation, imposed a death sentence without express reliance on the invalid factor. Therefore, according to the State, Espinosa's sentence was not based upon consideration by the sentencer of an unconstitutionally vague aggravating circumstance.

**EVALUATION BY THE COURT:** (Per Curium) We merely hold that, if a weighing State decides to place capital sentencing authority in two actors rather than one, neither actor [jury & judge] must be permitted to weigh invalid aggravating circumstances.

### *Estelle V. McGuire,* 502 U.S. 62 (December 4, 1991)

**FACTS:** McGuire charged with intentional murder in the death of his six month old child. Medical evidence showed significant blunt force trauma on the child that caused the death, along with two significant healed injuries, one six weeks old and

one seven weeks old. Medical experts testified that all injuries to the child were not inflicted by accidental means such as a fall.

McGuire made statements to police that the child was injured by falling off the couch and then later said perpetrators unknown to him might have beaten the child. Other evidence showed that McGuire and the mother were the sole caretakers of the child, that there were specific prior incidents where McGuire gave the child rough treatment, and that the mother was skeptical of McGuire's explanations for the child's injuries.

The jury was given an instruction a 'prior bad acts' instruction about the limited purpose for which evidence of the child's prior injuries was introduced. The jury returned a guilty verdict, which was upheld on direct appeal.

McGuire commenced habeas corpus proceedings that were denied by the District Court. The federal appellate court reversed and granted the writ, concluding that admission of the "battered child syndrome" evidence violated Due Process under the federal constitution, and rested its reasoning in large part on the assumption that this evidence was admitted in violation of state law. The federal appellate court also concluded that the prior bad acts instruction could be interpreted as a "propensity instruction" (the defendant did it before, *therefore* the defendant did it this time), and once again rested its reasoning in large part on the assumption that parts of the instruction violated state law.

**EVALUATION BY THE COURT:** We therefore hold that neither the introduction of the challenged evidence, nor the jury instruction as to its use, "so infused the trial with unfairness as to deny due process of law." *Lisenba* v. *California*, 314 U.S. 219, 228, 86 L. Ed. 166, 62 S. Ct. 280 (1941); see also *Donnelly* v. *DeChristoforo*, 416 U.S. at 643. p. 75.

We hold that in so doing [setting aside the conviction] the Court of Appeals exceeded the limited scope of federal habeas review of state convictions. p. 64.

We first consider whether the admission of the prior injury evidence justified habeas relief. In ruling that McGuire's due process rights were violated by the admission of the evidence, the Court of Appeals relied in part on its conclusion that the evidence was "incorrectly admitted . . . pursuant to California law." *Id.*, at 754. Such an inquiry, however, is no part of a federal court's habeas review of a state conviction. We have stated many times that "federal habeas corpus relief does not lie for errors of state law." *Lewis* v. *Jeffers*, 497 U.S. 764, 780, 111 L. Ed. 2d 606, 110 S. Ct. 3092 (1990); see also *Pulley* v. *Harris*, 465 U.S. 37, 41, 79 L. Ed. 2d 29, 104 S. Ct. 871 (1984). Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. 28 U. S. C. § 2241; *Rose v. Hodges*, 423 U.S. 19, 21, 46 L. Ed. 2d 162, 96 S. Ct. 175 (1975) *(per curiam)*. n2 p. 67-68.

In arguing his point, McGuire makes much of the fact that, in giving its instruction, the trial court deviated in part from standard jury instruction 2.50, 1 California Jury Instructions, Criminal (4th ed. 1979) (CALJIC). n3 As we have stated above, however, the fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief. See *Marshall v. Lonberger, 459 U.S. 422, 438, n. 6, 74 L. Ed. 2d 646, 103 S. Ct. 843 (1983)* ("The Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules"). Federal habeas courts therefore do not grant relief, as might a state appellate court, simply because the instruction may have been deficient in comparison to the CALJIC model. Nor do our habeas powers allow us to reverse McGuire's conviction based on a belief that the trial judge incorrectly interpreted the California Evidence Code in ruling that the prior injury evidence was admissible as bad acts evidence in this case. See Cal. Evid. Code Ann. § 1101(b) (West 1988). The only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten, 414 U.S. 141, 147, 38 L. Ed. 2d 368, 94 S. Ct. 396 (1973);* see also *Henderson v. Kibbe, 431 U.S. 145, 154, 52 L. Ed. 2d 203, 97 S. Ct. 1730 (1977);* *Donnelly v. DeChristoforo, 416 U.S. 637, 643, 40 L. Ed. 2d 431, 94 S. Ct. 1868 (1974).* ("'It must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some [constitutional] right'"). It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. *Cupp v. Naughten, supra, at 147.* In addition, in reviewing an ambiguous instruction such as the one at issue here, we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution. *Boyde v. California, 494 U.S. 370, 380, 108 L. Ed. 2d 316, 110 S. Ct. 1190 (1990).* n4 And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States, 493 U.S. 342, 352, 107 L. Ed. 2d 708, 110 S. Ct. 668 (1990).* "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Ibid.* p. 72-73.


n4 We acknowledge that language in the later cases of *Cage v. Louisiana, 498 U.S. 39, 112 L. Ed. 2d 339, 111 S. Ct. 328 (1990),* and *Yates v. Evatt, 500 U.S. 391, 114 L. Ed. 2d 432, 111 S. Ct. 1884 (1991),* might be read as endorsing a different standard of review for jury instructions. See *Cage, supra, at 41* ("In construing the instruction, we consider how reasonable jurors could have understood the charge as a whole"); *Yates, supra, at 401* ("We think a reasonable juror would have understood the [instruction] to mean . . ."). In *Boyde*, however, we made it a point to settle on a single standard of review for jury instructions -- the "reasonable likelihood" standard -- after considering the many different phrasings that had previously been used by this Court. 494 U.S. at 379-380 (considering and rejecting standards that required examination of either what a reasonable juror "could" have done or "would" have done). So that we may once again speak with one voice on this issue, we now disapprove the standard of review language in *Cage* and *Yates*, and reaffirm the standard set out in *Boyde*. p. 73

While the instruction was not as clear as it might have been, we find that there is not a "reasonable likelihood" that the jury would have concluded that this instruction, read in the context of other instructions, authorized the use of propensity evidence pure and simple. *Boyde* v. *California, supra*, at 380. p. 74-75.

***Francis v. Franklin,*** 471 U.S. 307 (April 25, 1985)

**FACTS:** During the course of a kidnapping, Franklin attempted a home invasion to take the homeowner's car to facilitate an escape with a hostage. The homeowner slammed the door and Franklin's gun went off, sending the bullet through the door and killing the homeowner. A second shot had an upward trajectory and ended in the porch ceiling. Franklin entered the home, demanding car keys from the surviving residents, but did not attempt to harm them as they fled. Also, Franklin did not attempt to harm his hostage as she fled.

Later that same day, Franklin was captured and admitted to his crimes, except he insisted that his gun went off accidentally in reaction to the resident slamming the door.

During his capital murder trial, Franklin sole defense was lack of intent to kill, relying on a hypothesis of accident.

**QUESTION PRESENTED:** This case requires that we decide whether certain jury instructions in a criminal prosecution in which intent is an element of the crime charged and the only contested issue at trial satisfy the principles of *Sandstrom v. Montana, 442 U.S. 510 (1979)*. Specifically, we must evaluate jury instructions stating that: (1) "[the] acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted" and (2) "[a] person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts but the presumption may be rebutted." App. 8a-9a. The question is whether these instructions, when read in the context of the jury charge as a whole, violate the Fourteenth Amendment's requirement that the State prove every element of a criminal offense beyond a reasonable doubt. See *Sandstrom, supra; In re Winship, 397 U.S. 358, 364 (1970)*. p. 309

The question before the Court in this case is almost identical to that before the Court in *Sandstrom*: "whether the challenged jury instruction had the effect of relieving the State of the burden of proof enunciated in *Winship* on the critical question of . . . state of mind," *442 U.S., at 521*, by creating a mandatory presumption of intent upon proof by the State of other elements of the offense. p. 313

**EVALUATION BY THE COURT:** Because a reasonable juror could have understood the challenged portions of the jury instruction in this case as creating a mandatory presumption that shifted to the defendant the burden of persuasion on the crucial element of intent, and because the charge read as a whole does not explain or cure the error, we hold that the jury charge does not comport with the requirements of the Due Process Clause. p. 325

*Griffin v. California,* 380 U.S. 609 (April 28, 1965)

**FACTS:** Evidence showed defendant with murder victim in the hours before the homicide, at the scene where the body was eventually found. The defendant did not testify.

At that time, the California constitution provided that the judge and the prosecutor could comment on the defendant's failure to testify.

During closing argument, the prosecutor made the following comments:

"*The defendant certainly knows* whether Essie Mae had this beat up    appearance at the time he left her apartment and went down the alley with her.

"What kind of a man is it that would want to have sex with a woman that beat up if she was beat up at the time he left?

"*He would know that. He would know* how she got down the alley. *He would know* how the blood got on the bottom of the concrete steps. *He would know* how long he was with her in that box. *He would know* how her wig got off. *He would know* whether he beat her or mistreated her. *He would know* whether he walked away from that place cool as a cucumber when he saw Mr. Villasenor because he was conscious of his own guilt and wanted to get away from that damaged or injured woman.

"*These things he has not seen fit to take the stand and deny or explain.*

"*And in the whole world, if anybody would know, this defendant would know.*

"*Essie Mae is dead, she can't tell you her side of the story. The defendant won't.*" p. 610-611 (Emphasis added) p. 610-611

**EVALUATION BY THE COURT**: Comment to the jury by a prosecutor in a state criminal trial upon a defendant's failure to testify as to matters which he can reasonably be expected to deny or explain because of facts within his knowledge or by the court that the defendant's silence under those circumstances evidences guilt violates the Self-Incrimination Clause of the Fifth Amendment of the Federal Constitution as made applicable to the States by the Fourteenth, *Malloy* v. *Hogan*, 378 U.S. 1. Pp. 610-615.

(\* though *Griffen* is most often cited as a "prosecutorial misconduct" case, it actually stands for the proposition that the "no comment" rule of  federal Fifth Amendment constitutional jurisprudence applied to the states through the 14th Amendment; See concurring opinion, Harlan, J. p. 615-617)

**Jones v. United States,** 527 U.S. 373 (June 21, 1999)

**FACTS:** Jones kidnapped, sexually assaulted and murdered the victim. Jones was charged federally and was subsequently sentenced to death following a jury recommendation.

The trial court declined Jones's request to instruct the jury that if it failed to reach a verdict, a life sentence would be imposed by the court. After the jury recommended a death sentence, Jones claimed for the first time that portions of the instructions caused confusion of the jury. Finally, Jones claimed that the government's choice of non-statutory aggravating factors (slight physical stature of the victim and laudable personality traits of the victim) were vague and duplicative.

**QUESTION PRESENTED:** We are presented with three questions: whether petitioner was entitled to an instruction as to the effect of jury deadlock; whether there is a reasonable likelihood that the jury was led to believe that petitioner would receive a court-imposed sentence less than life imprisonment in the event that they could not reach a unanimous sentence recommendation; and whether the submission to the jury of two allegedly duplicative, vague, and overbroad nonstatutory aggravating factors was harmless error. We answer "no" to the first two questions. As for the third, we are of the view that there was no error in allowing the jury to consider the challenged factors. Assuming error, *arguendo*, we think it clear that such error was harmless. p. 375-376

**EVALUATION BY THE COURT:** [T]he Eighth Amendment does not require that the jury be instructed as to the consequences of their failure to agree. p. 381

We have never suggested, for example, that the Eighth Amendment requires a jury be instructed as to the consequences of a breakdown in the deliberative process. On the contrary, we have long been of the view that "the very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves." *Allen v. United States, 164 U.S. 492, 501, 41 L. Ed. 528, 17 S. Ct. 154 (1896).* n5 We further have recognized that in a capital sentencing proceeding, the Government has "a strong interest in having the jury express the conscience of the community on the ultimate question of life or death." *Lowenfield v. Phelps, 484 U.S. 231, 238, 98 L. Ed. 2d 568, 108 S. Ct. 546 (1988)* (citation omitted). We are of the view that a charge to the jury of the sort proposed by petitioner might well have the effect of undermining this strong governmental interest. n6

n5 We have thus approved of the use of a supplemental charge to encourage a jury reporting itself as deadlocked to engage in further deliberations, see *Allen v. United States, 164 U.S. at 501,* even capital sentencing juries, see *Lowenfield v. Phelps, 484 U.S. 231, 237-241, 98 L. Ed. 2d 568, 108 S. Ct. 546 (1988).*

n6 It is not insignificant that the Courts of Appeals to have addressed this question, as far as we are aware, are uniform in rejecting the argument that the

Constitution requires an instruction as to the consequences of a jury's inability to agree. See, *e.g.*, *Coe v. Bell, 161 F.3d 320, 339-340 (CA6 1998); Green v. French, 143 F.3d 865, 890 (CA4 1998); United States v. Chandler, 996 F.2d 1073, 1088-1089 (CA11 1993); Evans v. Thompson, 881 F.2d 117, 123-124 (CA4 1989).* Indeed, the Fifth Circuit, in the alternative, reached the same conclusion in this very case. See *132 F.3d 232, 245 (1998).* p. 382

Petitioner's argument [regarding confusing jury instructions] -- which depends on the premise that the instructions and decision forms led the jury to believe that it did not have to recommend unanimously a lesser sentence -- falls short of satisfying even the first requirement of the plain-error doctrine, for we cannot see that any error occurred. We have considered similar claims that allegedly ambiguous instructions caused jury confusion. See, *e.g., Victor v. Nebraska, 511 U.S. 1, 127 L. Ed. 2d 583, 114 S. Ct. 1239 (1994); Estelle v. McGuire, 502 U.S. 62, 116 L. Ed. 2d 385, 112 S. Ct. 475 (1991); Boyde v. California, 494 U.S. 370, 108 L. Ed. 2d 316, 110 S. Ct. 1190 (1990).* The proper standard for reviewing such claims is "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle, 502 U.S. at 72* (quoting *Boyde, supra, at 380); see also Victor, supra, at 6* (applying reasonable likelihood standard to direct review of state criminal conviction). n9

n9 Petitioner concedes that the *Boyde* standard applies to the extent that he is advancing a constitutional claim, but relying on our prior decision in *Andres v. United States, 333 U.S. 740, 752, 92 L. Ed. 1055, 68 S. Ct. 880 (1948),* he contends that a more lenient standard applies to the extent that he seeks relief under the statute directly. Our decisions in *Boyde* and *Estelle,* however, foreclose that reading of *Andres.* In *Boyde* we noted that our prior decisions, including *Andres,* had been "less than clear" in articulating a single workable standard for evaluating claims that an instruction prevented the jury's consideration of constitutionally relevant evidence. *494 U.S. at 378.* In order to supply "a single formulation for this Court and other courts to employ in deciding this kind of federal question," we announced the "reasonable likelihood" standard. *494 U.S. at 379.* We made this same point later in *Estelle,* noting that "in *Boyde* . . . we made it a point to settle on a single standard of review for jury instructions -- the 'reasonable likelihood' standard -- after considering the many different phrasings that had previously been used by this Court." *502 U.S. at 72, n. 4.*

There is no reasonable likelihood that the jury applied the instructions incorrectly. p. 390

Petitioner parses these passages too finely. Our decisions repeatedly have cautioned that instructions must be evaluated not in isolation but in the context of the entire charge. See, *e.g., Bryan v. United States, 524 U.S. 184, 199, 141 L. Ed. 2d 197, 118 S. Ct. 1939 (1998); United States v. Park, 421 U.S. 658, 674, 44 L. Ed. 2d 489, 95 S. Ct. 1903 (1975); Cupp v. Naughten, 414 U.S. 141, 147, 38 L. Ed. 2d 368, 94 S. Ct. 396 (1973); Boyd v. United States, 271 U.S. 104, 107, 70 L. Ed. 857, 46 S. Ct. 442 (1926).* We

agree with the Fifth Circuit that when these passages are viewed in the context of the entire instructions, they lack ambiguity and cannot be given the reading that petitioner advances. See *132 F.3d at 244*. We previously have held that instructions that might be ambiguous in the abstract can be cured when read in conjunction with other instructions. *Bryan, supra, at 199; Victor, 511 U.S. at 14-15; Estelle, 502 U.S. at 74-75.* p. 391-392

The error in this case [regarding the non-statutory aggravating factors claim], if any, rests in loose drafting of the nonstatutory aggravating factors; as we have made clear, victim vulnerability and victim impact evidence are appropriate subjects for the capital sentencer's consideration. Assuming that use of these loosely drafted factors was indeed error, we conclude that the error was harmless. p. 402

**McKoy v. North Carolina,** 494 U.S. 433 (March 5, 1990)

**FACTS:** McKoy sentenced to death upon a unanimous jury finding of two aggravating circumstances and that mitigation did not outweigh aggravation.

The death sentence was challenged as being in violation of the rule in *Mills v. Maryland*, because the jury was instructed it must unanimously agree on the existence of the same mitigating factor, through the requirement to answer the question as follows: Issue Two asked: "Do you **unanimously find** from the evidence the existence of one or more of **the following mitigating circumstances**?" *Id.*, at 8, 24. The judge submitted to the jury eight possible mitigating circumstances. With respect to each circumstance, the judge orally instructed the jury as follows: "If you do not **unanimously find this mitigating circumstance** by a preponderance of the evidence, so indicate by having your foreman write, 'No,' in that space" on the verdict form. *Id.*, at 10-13. The verdict form reiterated the unanimity requirement: "In the space after each mitigating circumstance, write 'Yes,' if you **unanimously find that mitigating circumstance** by a preponderance of the evidence. Write, 'No,' if you do not **unanimously find that mitigating circumstance** by a preponderance of the evidence." *Id.*, at 24. (Emphasis added) p. 436.

The McKoy jury was instructed on 8 different mitigating factors and it unanimously found the existence of 2 out of the eight. In general, McKoy's mitigation theme was that he had been severely mentally ill all of his life, that he was borderline retarded, and that he blacked out during the crime.

**EVALUATION BY THE COURT:** In this case we address the constitutionality of the unanimity requirement in North Carolina's capital sentencing scheme. That requirement prevents the jury from considering, in deciding whether to impose the death penalty, any mitigating factor that the jury does not unanimously find. We hold that under our decision in *Mills* v. *Maryland, 486 U.S. 367 (1988),* North Carolina's unanimity requirement violates the Constitution by preventing the sentencer from considering all mitigating evidence. We therefore vacate petitioner's death sentence and remand for resentencing. p. 435.

Despite the state court's inventive attempts to distinguish *Mills*, our decision there clearly governs this case. First, North Carolina's Issue Four does not ameliorate the constitutional

infirmity created by the unanimity requirement. Issue Four, like Issue Three, allows the jury to consider only mitigating factors that it unanimously finds under Issue Two. Although the jury may opt for life imprisonment even where it fails unanimously to find any mitigating circumstances, the fact remains that the jury is required to make its decision based only on those circumstances it unanimously finds. The unanimity requirement thus allows one holdout juror to prevent the others from giving effect to evidence that they believe calls for a "'sentence less than death.'" *Eddings* v. *Oklahoma*, 455 U.S. 104, 110 (1982), quoting *Lockett, supra*, at 604 (plurality opinion). Moreover, even if all 12 jurors agree that there are *some* mitigating circumstances, North Carolina's scheme prevents them from giving effect to evidence supporting any of those circumstances  in their deliberations under Issues Three and Four unless they unanimously find the existence of the ***same*** circumstance. This is the precise defect that compelled us to strike down the Maryland scheme in *Mills*. See 486 U.S., at 374. Our decision in *Mills* was not limited to cases in which the jury is ***required***   to impose the death penalty if it finds that  aggravating circumstances outweigh mitigating circumstances or that no mitigating circumstances exist at all. Rather, we held that it would be the "height of arbitrariness to allow ***or*** require the imposition of the death penalty" where 1 juror was able to prevent the other 11 from giving effect to mitigating evidence. *Ibid.* (emphasis supplied). p. 439-440.

The Constitution ***requires*** States to allow consideration of mitigating evidence in capital cases. Any barrier to such consideration must therefore fall. (emphasis supplied). p. 442.

As the Court stated in *Penry* v. *Lynaugh*, 492 U.S. 302 (1989):"'In contrast to the carefully defined standards that must narrow a sentencer's discretion to *impose* the death sentence, the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence.' *McCleskey* v. *Kemp*, 481 U.S. 279, 304 (1987) (emphasis in original). Indeed, it is precisely because the punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense." *Id.*, at 327-328. p. 443.

### *Mills v. Maryland,* 486 U.S. 367 (June 6, 1988)

**FACTS:** Mills charged with capital murder under the specification that the murder was committed while Mills was confined to a correctional institution. During mitigation, Mills presented evidence in reliance on four different statutory mitigating circumstances.

The standard verdict form called for the jury to determine the sentence in a three step process, where aggravation, mitigation and weighing were separate steps. In Section I of the verdict form, the jury was instructed to unanimously determine whether the state had proven beyond a reasonable doubt a particular aggravating circumstance, and then check "yes" or "no" as appropriate.

Section II of the verdict form was about mitigating factors. Each particular mitigating factor presented by the defense was listed separately, with a check beneath each particular mitigating factor for "yes" or "no" as appropriate. The instruction written in Section II read: "Based upon the evidence we *unanimously* find that *each* of the following *mitigating circumstances* which is marked "yes" has been proven to exist by a preponderance of the evidence and *each mitigating circumstance* marked "no" has not been proven by a preponderance of the evidence." (Emphasis added)

The verdict form also contained written instructions that if all of the mitigating factors in Section II were marked "no", then the jury was not to complete Section III, which was about weighing mitigating factors against aggravating circumstances.

The judge also gave more general instructions to the jury that they must unanimously decide each question before them.

The jury returned a death sentence, where "no" was checked off for each separate mitigating factor and Section III was not completed.

On direct appeal, Mills' claim was that jurors were in effect precluded from considering his mitigating evidence, in violation of *Lockett v. Ohio* and progeny. He reasoned that by instructing the jury it must unanimously find each particular mitigating factor, the lack of unanimity on a particular factor meant the jury could not further consider that factor. In other words, "even if some or all of the jurors were to believe *some* mitigating circumstance or circumstances were present, unless they could unanimously agree on the existence of the *same* mitigating factor, the sentence would necessarily be death." (Emphasis supplied) p. 371.

As an illustration of this argument, Mills wrote: "If *eleven jurors agree* that there are six mitigating circumstances, *the result is that no mitigating circumstance is found*. Consequently, there is nothing to weigh against any aggravating circumstance found and *the judgment is death even though eleven jurors think death is wholly inappropriate.*" (Emphasis added) p. 373-374.

On direct appeal, the Maryland Supreme Court rejected this argument, generally concluding that a unanimity requirement for mitigating factors was proper. Moreover, the Maryland Supreme Court reasoned that a lone juror could hold out for a life sentence and thereby cause a hung jury, which under Maryland law would then mandate a life sentence.

**QUESTION PRESENTED:** The critical question, then, is whether petitioner's interpretation of the sentencing process is one a reasonable jury could have drawn *from the instructions given by the trial judge and from the verdict form employed in this case*. (Emphasis added) p. 375-376.

**EVALUATION BY THE COURT:** We conclude that there is a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance. Under our cases, the sentencer must be permitted to consider all mitigating evidence. The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk. p. 384.

Although jury discretion must be guided appropriately by objective standards, see *Godfrey* v. *Georgia,* 446 U.S. 420, 428, 64 L. Ed. 2d 398, 100 S. Ct. 1759 (1980) (plurality opinion), it would certainly be the height of arbitrariness to allow or require the imposition of the death penalty under the circumstances so postulated by petitioner or the dissent. n6 It is beyond dispute that in a capital case "'the sentencer [may] not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" *Eddings* v. *Oklahoma,* 455 U.S. 104, 110, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982), quoting *Lockett* v. *Ohio,* 438 U.S. 586, 604, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978) (plurality opinion) (emphasis in original). See *Skipper* v. *South Carolina,* 476 U.S. 1, 4, 90 L. Ed. 2d 1, 106 S. Ct. 1669 (1986). The corollary that "the sentencer may not refuse to consider *or be precluded from considering* 'any relevant mitigating evidence'" is equally "well established." *Ibid.* (emphasis added), quoting *Eddings,* 455 U.S. at 114. n7 p. 374-375.

*** The following is an abstract of the problematic verdict form in *Mills.* The text is a verbatim quote from the words used in the verdict form. Note the express language which required unanimity on *each mitigating factor* and the structure of deliberation which precluded weighing unless unanimity was reached on at least one mitigating factor***

### *Section I*

Based upon the evidence we unanimously find that each of the following aggravating circumstances which is marked "yes" has been proven beyond a reasonable doubt and each aggravating circumstance which is marked "no" has not been proven beyond a reasonable doubt:

Agg. No. 1 ****

_____        _____
yes            no

Agg. No. 2 *****

_____        _____
yes            no

Agg. No. 3 ****

_____          _____
yes                no

(If one or more of the above are marked "yes", complete Section II. If all of the above are marked "no", do not complete Sections II and III.)

**_Section II_**

Based upon the evidence we unanimously find that each of the following mitigating circumstances which is marked "yes" has been proven to exist by a preponderance of the evidence and each mitigating circumstance marked "no" has not been proven by a preponderance of the evidence:

Mit. No. 1 ****

_____          _____
yes                no

Mit. No. 2 *****

_____          _____
yes                no

Mit. No. 3 *****

_____          _____
yes                no

(If one or more of the above in Section II have been marked "yes", complete Section III. If all of the above in Section II are marked "no", you do not complete Section III.

**_Section III_**

Based on the evidence we unanimously find that it has been proven by a preponderance of the evidence that the mitigating circumstances marked "yes" in Section II outweigh the aggravating circumstances marked yes in Section I.

_____          _____
yes                no

**_Determination of sentence_**

Enter the determination of sentence  either "Life Imprisonment" or "Death" according to the following instructions:

1. If all of the answers in Section I are marked "no", enter "Life Imprisonment".
2. If Section III was completed and was marked "yes" enter "life Imprisonment".
3. If Section II was completed and all of the answers were marked "no", then enter "Death".
4. If Section III was completed and was marked "no", enter "Death".

*** The following is an abstract of the rules enunciated in *Mills*, followed by the pertinent inquiry under AEDPA 28 USC 2254(d):

Rule No. 1:

The sentencer may not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence less than death. *Eddings, Lockett, Skipper.*

Rule No. 2:

A jury shall not be instructed that they must unanimously agree on the existence of any single mitigating circumstance, because a jury so instructed would be precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular mitigating circumstance. *Mills*

Rule No. 3:

A death sentence shall be vacated and remanded for further proceedings if there is a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance. *Mills,* p. 384.

28 USC 2254 (d) inquiry:

A.  Was the OSC decision upholding the jury instructions "contrary to" *Mills*?

____          ___
yes            no

B.  Did the OSC decision upholding the jury instructions "involve an unreasonable application" of *Mills?*

____          ____
yes            no

***Patterson v. New York,*** 432 U.S. 197 (June 17, 1977)

**FACTS:** "After a brief and unstable marriage, the appellant, Gordon Patterson, Jr., became estranged from his wife, Roberta.  Roberta resumed an association with John Northrup, a neighbor to whom she had been engaged prior to her marriage to [Patterson]. On December 27, 1970, Patterson borrowed a rifle from an acquaintance and went to the residence of his father-in-law.  There, he observed his wife through a window in a state of semiundress in the presence of John Northrup.  He entered the house and killed Northrup by shooting him twice in the head. p. 198

Patterson was charged with second-degree  murder. In New York there are two elements of this crime: (1) "intent to cause the death of another person"; and (2) "[caus]ing the death of such person or of a third person." *N.Y. Penal Law §  125.25* (McKinney 1975).n1 Malice aforethought is not an element of the crime.  In addition, the State permits a person accused of murder to raise an affirmative defense that he 'acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse.' " p. 198

Patterson raised the defense of extreme emotional disturbance, hoping to  gain a manslaughter verdict (causing the death of another while under extreme emotional disturbance).

The trial court instructed the jury clearly and repeatedly that the prosecution had the burden to prove the elements of the crime beyond a reasonable doubt, and that a defendant is never obliged to prove his innocence. The trial court also instructed the jury that a defendant who raises an affirmative defense has the burden to prove that defense by a preponderance of evidence.

The jury returned a verdict of guilty to the main charge of second degree murder.

**QUESTION PRESENTED:** The question here is the constitutionality under the Fourteenth Amendment's Due Process Clause of burdening the defendant in a New York State murder trial with proving the affirmative defense of extreme emotional disturbance as defined by New York law. p. 198

**EVALUATION BY THE COURT:** We thus decline to adopt as a constitutional imperative, operative countrywide, that a State must disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to the culpability of an accused.  Traditionally, due process has required that only the most basic procedural safeguards be observed; more subtle balancing of society's interests against those of the accused have been left to the legislative branch.  We therefore will not disturb the balance struck in previous cases holding that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged.  Proof of the non-existence of all affirmative defenses has never been constitutionally required; and we perceive no reason to fashion such a rule in this case and apply it to the statutory defense at issue here. p. 210

As we have explained, nothing was presumed or implied against Patterson; and his conviction is not invalid under any of our prior cases. p. 216

***Sandstrom v. Montana,*** 442 U.S. 510 (June 18, 1979)

**FACTS:** Sandstrom was charged with murder, where one of the elements was that he "purposely or knowingly" caused the victim's death. Sandstrom admitted the killing, but his defense theory was that due to a personality disorder, aggravated by alcohol consumption, he was unable at that time to form an intent to kill. Sandstrom did not put on a defense case, but argued the support for the defense came from the testimony of two court-appointed mental health experts, each of whom described for the jury the defendant's mental state at the time of the killing.

**QUESTION PRESENTED:** The question presented is whether, in a case in which intent is an element of the crime charged; the jury instruction, "the law presumes that a person intends the ordinary consequences of his voluntary acts," violates the Fourteenth Amendment's requirement that the State prove every element of a criminal offense beyond a reasonable doubt. p. 512.

**EVALUATION BY THE COURT:** (from Syllabus) *Held*: Because the jury may have interpreted the challenged presumption as conclusive, like the presumptions in *Morissette* v. *United States*, 342 U.S. 246, and *United States* v. *United States Gypsum Co.*, 438 U.S. 422, or as shifting the burden of persuasion, like that in *Mullaney* v. *Wilbur*, 421 U.S. 684, and because either interpretation would have violated the Fourteenth Amendment's requirement that the State prove every element of a criminal offense beyond a reasonable doubt, the instruction is unconstitutional. Pp. 514-527.

(a) The effect of a presumption in a jury instruction is determined by the way in which a reasonable juror could have interpreted it, not by a state court's interpretation of its legal import. Pp. 514, 517.

(b) Conclusive presumptions "conflict with the overriding presumption of innocence with which the law endows the accused and which extends to every element of the crime," *Morissette, supra*, at 275, and they "[invade the] factfinding function," *United States Gypsum Co., supra*, at 446, which in a criminal case the law assigns to the jury. The presumption announced to petitioner's jury may well have had exactly these consequences, since upon finding proof of one element of the crime (causing death), and of facts insufficient to establish the second (the voluntariness and "ordinary consequences" of petitioner's action), the jury could have reasonably concluded that it was directed to find against petitioner on the element of intent. The State was thus not forced to prove "beyond a reasonable doubt . . . every fact necessary to constitute the crime . . . charged," *In re Winship*, 397 U.S. 358, 364, and petitioner was deprived of his constitutional rights. Pp. 521-523.

(c) A presumption which, although not conclusive, had the effect of shifting the burden of persuasion to petitioner, would have suffered from similar infirmities. If the jury interpreted the presumption in this manner, it could have concluded that upon proof by the State of the slaying, and of additional facts not themselves establishing the element of intent, the burden was then shifted to petitioner to prove that he lacked the requisite mental state. Such a presumption was found constitutionally deficient in *Mullaney, supra*. P. 524.

The threshold inquiry in ascertaining the constitutional analysis applicable to this kind of jury instruction is to determine the nature of the presumption it describes. See *Ulster County Court* v. *Allen, ante*, at 157-163. That determination requires careful attention to the words actually spoken to the jury, see *ante*, at 157-159, n. 16, for whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction. p. 514.

The Supreme Court of Montana is, of course, the final authority on the legal weight to be given a presumption under Montana law, but it is not the final authority on the interpretation  which a jury could have given the instruction. If Montana intended its presumption to have only the effect described by its Supreme Court, then we are convinced that a reasonable juror could well have been misled by the instruction given, and could have believed that the presumption was not limited to requiring the defendant to satisfy only a burden of production. Petitioner's jury was told that "[*the*] *law presumes* that a person intends the ordinary consequences of his voluntary acts." They were not told that the presumption could be rebutted, as the Montana Supreme Court held, by the defendant's simple presentation of "some" evidence; nor even that it could be rebutted at all. Given the common definition of "presume" as "to suppose to be true without proof," Webster's New Collegiate Dictionary 911 (1974), and given the lack of qualifying instructions as to the legal effect of the presumption, we cannot discount the possibility that the jury may have interpreted  the instruction in either of two more stringent ways. p. 516-571.

n7 The potential for these interpretations of the presumption was not removed by the other instructions given at the trial. It is true that the jury was instructed generally that the accused was presumed innocent until proved guilty, and that the State had the burden of proving beyond a reasonable doubt that the defendant caused the death of the deceased purposely or knowingly. App. 34-35; Brief for Respondent 21. But this is not rhetorically inconsistent with a conclusive or burden-shifting presumption. The jury could have interpreted the two sets of instructions as indicating that the presumption was a means by which proof beyond a reasonable doubt as to intent could be satisfied. For example, if the presumption were viewed as conclusive, the jury could have believed that, although intent must be proved beyond a reasonable doubt, proof of the voluntary slaying and its ordinary consequences constituted proof of intent beyond a reasonable doubt. Cf. *Mullaney* v. *Wilbur, 421 U.S. 684, 703 n. 31 (1975)* ("These procedural devices require (in the case of a presumption) . . . the trier of fact to conclude that the prosecution has met its burden of proof with respect to the presumed . . . fact by having satisfactorily established other facts"). p. 518.

We do not reject the possibility that some jurors may have interpreted the challenged instruction as permissive, or, if mandatory, as requiring only that the defendant come forward with "some" evidence in rebuttal. However, the fact that a reasonable juror could have given the presumption conclusive or persuasion-shifting effect means that we cannot discount the possibility that Sandstrom's jurors actually did proceed upon one or the other of these latter interpretations. And that means that unless these kinds of presumptions are constitutional, the instruction cannot be adjudged valid. p. 519.

### *Smith v. Phillips,* 455 U.S. 209 (January 25, 1982)

FACTS: A person who had a job application in with the prosecutor's office as a major felony investigator was seated as a juror in a murder trial. One week before the end of the murder trial, various officials in the prosecutor's office, along with the two trial prosecutors, learned that the seated juror had a job application pending with the office. In view of the jurors statements during voir dire about his background in law enforcement and that he was seeking a job with a drug enforcement agency, the trial prosecutors decided there was no need to then inform the court or defense counsel about the juror's job application. When the jury retired to deliberate, three alternate jurors were available to substitute for the juror in question, but neither the trial court nor defense counsel knew of the job application.

Three weeks after the verdict, the District Attorney informed the trial court and defense counsel of the juror's job application and that the trial prosecutors knew of this before the end of the trial. Defendant moved to set aside the verdict and the trial judge held a hearing where the jurors and various prosecutors testified. The juror explained that he had seen noting improper in the job application matter. The prosecutors explained they decided not to inform the court or defense counsel because the juror was questioned at length by defense counsel during voir dire, and did not misrepresent about his background and interest in law enforcement. After this, the trial judge denied defendant's motion to set aside the verdict, finding that the job application matter did not cause the juror to be biased and that there was no evidence of sinister or dishonest motives by the prosecutors.

Defendant's petition for habeas relief was granted, with the lower federal court concluding that the failure of the prosecutors to disclose their knowledge was a denial of due process.

QUESTION PRESENTED: Whether misconduct by the prosecutor in failing to promptly disclose knowledge about possible juror bias, without more, constitutes a violation of due process of law?

EVALUATION BY THE COURT: Past decisions of this Court demonstrate that the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. In *Brady v. Maryland, 373 U.S. 83 (1963),* for example, the prosecutor failed to disclose an admission by a participant in the murder which corroborated the defendant's version of the crime. The Court held that a prosecutor's suppression of requested evidence "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of

the prosecution." *Id., at 87.* Applying this standard, the Court found the undisclosed admission to be relevant to punishment and thus ordered that the defendant be resentenced. Since the admission was not material to guilt, however, the Court concluded that the trial itself complied with the requirements of due process despite the prosecutor's wrongful suppression. n9 The Court thus recognized that the aim of due process "is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." *Ibid.*

n9 As we said of *Brady* in *United States v. Agurs,* 427 U.S., at 106: "[The] confession could not have affected the outcome on the issue of guilt but could have affected Brady's punishment. It was material on the latter issue but not on the former. And since it was not material on the issue of guilt, the entire trial was not lacking in due process."

This principle was reaffirmed in *United States v. Agurs,* 427 U.S. 97 (1976). There, we held that a prosecutor must disclose unrequested evidence which would create a reasonable doubt of guilt that did not otherwise exist. Consistent with *Brady*, we focused not upon the prosecutor's failure to disclose, but upon the effect of nondisclosure on the trial:

"Nor do we believe the constitutional obligation [to disclose unrequested information] is measured by the moral culpability, or willfulness, of the prosecutor. If evidence highly probative of innocence is in his file, he should be presumed to recognize its significance even if he has actually overlooked it. Conversely, if evidence actually has no probative significance at all, no purpose would be served by requiring a new trial simply because an inept prosecutor incorrectly believed he was suppressing a fact that would be vital to the defense. If the suppression of the evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." 427 U.S., at 110 (footnote and citation omitted). n10

n10 Even in cases of egregious prosecutorial misconduct, such as the knowing use of perjured testimony, we have required a new trial only when the tainted evidence was material to the case. See *Giglio v. United States,* 405 U.S. 150, 154 (1972); *Napue v. Illinois,* 360 U.S. 264, 272 (1959). This materiality requirement implicitly recognizes that the misconduct's effect on the trial, not the blameworthiness of the prosecutor, is the crucial inquiry for due process purposes.

We note, of course, that nothing in this case suggests that the prosecutors' conduct was undertaken in bad faith. As the trial court found, "there is no evidence which to any degree points to a conclusion that any member of the District Attorney's staff, . . . or any court officer, had a sinister or dishonest motive with respect to Mr. Smith's letter of application, or sought to gain thereby an unfair advantage over the defendant." 87 Misc. 2d, at 618-619, 384 N. Y. S. 2d, at 910.

 In light of this principle, it is evident that the Court of Appeals erred when it concluded that prosecutorial misconduct alone requires a new trial. We do not condone the conduct

of the prosecutors in this case. Nonetheless, as demonstrated in Part II of this opinion, Smith's conduct did not impair his ability to render an impartial verdict. The trial judge expressly so found. 87 Misc. 2d, at 627, 384 N. Y. S. 2d, at 915.

Therefore, the prosecutors' failure to disclose Smith's job application, although requiring a post-trial hearing on juror bias, did not deprive respondent of the fair trial guaranteed by the Due Process Clause. p. 219-221

*Strickland v. Washington,* 466 U.S. 668 (May 14, 1984)

**FACTS**: Washington went on a crime spree where in three groups of events, he committed kidnapping for ransom, severe assaults, torture of victims, attempted murders, and in separate incidents, stabbed three victims to death. He was captured and confessed at length to the third of the criminal episodes. Indicted capitally for the third episode, the court appointed an experienced defense lawyer to represent Washington. p. 671-672

The trial court ordered that Washington undergo a psychiatric examination. The report stated that Washington did not have a major mental illness at the time of the crime. p. 676 Defense counsel's conversations with Washington gave no indication that Washington had psychological problems. p. 673

"Counsel actively pursued pretrial motions and discovery. He cut his efforts short, however, and he experienced a sense of hopelessness about the case, when he learned that, against his specific advice, [Washington] had also confessed to the first two murders. By the date set for trial, [Washington] was subject to indictment for three counts of first-degree murder and multiple counts of robbery, kidnapping for ransom, breaking and entering and assault, attempted murder, and conspiracy to commit robbery. [Washington] waived his right to a jury trial, again acting against counsel's advice, and pleaded guilty to all charges, including the three capital murder charges." p. 672

During the guilty plea colloquy, Washington told the judge that, apart from a sting of burglaries, he had no significant prior record. Washington also told the judge he was under "extreme stress" at the time of the crime spree. Otherwise, Washington accepted responsibility for the crimes. "The trial judge told [Washington] that he had 'a great deal of respect for people who are willing to step forward and admit their responsibility' but that he was making no statement at all about his likely sentencing decision." p. 672

"Counsel advised [Washington] to invoke his right under Florida law to an advisory jury at his capital sentencing hearing. [Washington] rejected the advice and waived the right. He chose instead to be sentenced by the trial judge without a jury recommendation." p. 672

In preparing for the sentencing hearing, counsel spoke with Washington about his background. Counsel spoke by phone with Washington's wife and Washington's mother. Counsel did not otherwise seek out character witnesses for Washington. "Nor did he

30

request a psychiatric examination, since his conversations with his client gave no indication that [Washington] had psychological problems." p. 673

"Counsel decided not to present and hence not to look further for evidence concerning [Washington's] character and emotional state. That decision reflected trial counsel's sense of hopelessness about overcoming the evidentiary effect of [Washington's] confessions to the gruesome crimes. It also reflected the judgment that it was advisable to rely on the plea colloquy for evidence about [Washington's] background and about his claim of emotional stress: the plea colloquy communicated sufficient information about these subjects, and by forgoing the opportunity to present new evidence on these subjects, counsel prevented the State from cross-examining [Washington] on his claim and from putting on psychiatric evidence of its own." p. 673

"Counsel also excluded from the sentencing hearing other evidence he thought was potentially damaging. He successfully moved to exclude [Washington's] "rap sheet." Because he judged that a presentence report might prove more detrimental than helpful, as it would have included [Washington's] criminal history and thereby would have undermined the claim of no significant history of criminal activity, he did not request that one be prepared." p. 673

"At the sentencing hearing, counsel's strategy was based primarily on the trial judge's remarks at the plea colloquy as well as on his reputation as a sentencing judge who thought it important for a convicted defendant to own up to his crime. Counsel argued that [Washington's] remorse and acceptance of responsibility justified sparing him from the death penalty. Counsel also argued that [Washington] had no history of criminal activity and that respondent committed the crimes under extreme mental or emotional disturbance, thus coming within the statutory list of mitigating circumstances. He further argued that [Washington] should be spared death because he had surrendered, confessed, and offered to testify against a codefendant and because [Washington] was fundamentally a good person who had briefly gone badly wrong in extremely stressful circumstances. The State put on evidence and witnesses largely for the purpose of describing the details of the crimes. Counsel did not cross-examine the medical experts who testified about the manner of death of respondent's victims." p. 673-674

In sentencing Washington to death, the trial court found several aggravating circumstances to be present. "With respect to mitigating circumstances, the trial judge made the same findings for all three capital murders. First, although there was no admitted evidence of prior convictions, [Washington] had stated that he had engaged in a course of stealing. In any case, even if [Washington] had no significant history of criminal activity, the aggravating circumstances 'would still clearly far outweigh' that mitigating factor. Second, the judge found that, during all three crimes, [Washington] was not suffering from extreme mental or emotional disturbance and could appreciate the criminality of his acts. Third, none of the victims was a participant in, or consented to, [Washington's] conduct. Fourth, [Washington's] participation in the crimes was neither minor nor the result of duress or domination by an accomplice. Finally, [Washington's] age (26) could not be considered a factor in mitigation, especially when viewed in light of

[Washington's] planning of the crimes and disposition of the proceeds of the various accompanying thefts." p. 674-675

"In short, the trial judge found numerous aggravating circumstances and no (or a single comparatively insignificant) mitigating circumstance." p. 675

During state post-conviction proceedings, Washington claimed ineffective assistance of counsel, alleging deficiencies as follows: (a) failure to request a continuance; (b) insufficient preparation for the sentencing hearing; (c) failure to request a psychiatric report; (d) failure to investigate and present character witnesses; (e) failure to seek a pre-sentence investigation report; (f) failure to present meaningful arguments to the sentencing judge; and (g) failure to investigate the medical examiner's reports or cross-examine the state's medical experts. In support of the claim, Washington submitted 14 affidavits from friends and family members. Washington also submitted one psychiatric and one psychological report, each concluding that Washington was "frustrated and depressed", although not under extreme mental or emotional disturbance at the time of the crime. p. 675-676

"The trial court denied relief without an evidentiary hearing, finding that the record evidence conclusively showed that the ineffectiveness claim was meritless.  Four of the assertedly prejudicial errors required little discussion.  First, there were no grounds to request a continuance, so there was no error in not requesting one when [Washington] pleaded guilty.   Second, failure to request a presentence investigation was not a serious error because the trial judge had discretion not to grant such a request and because any presentence investigation would have resulted in admission of [Washington's] "rap sheet" and thus would have undermined his assertion of no significant history of criminal activity. Third, the argument and memorandum given to the sentencing judge were 'admirable' in light of the overwhelming aggravating circumstances and absence of mitigating circumstances. Fourth, there was no error in failure to examine the medical examiner's reports or to cross-examine the medical witnesses testifying on the manner of death of respondent's victims, since [Washington] admitted that the victims died in the ways shown by the unchallenged medical evidence." p. 676

"The trial court dealt at greater length with the two other bases for the ineffectiveness claim.   The court pointed out that a psychiatric examination of [Washington] was conducted by state order soon after [Washington's]   initial arraignment.  That report states that there was no indication of major mental illness at the time of the crimes.  Moreover, both the reports submitted in the collateral proceeding state that, although [Washington] was "chronically frustrated and depressed because of his economic dilemma," he was not under the influence of extreme mental or emotional disturbance.  All three  reports thus directly undermine the contention made at the sentencing hearing that [Washington] was suffering from extreme mental or emotional disturbance during his crime spree.  Accordingly, counsel could reasonably decide not to seek psychiatric reports; indeed, by relying solely on the plea colloquy to support the emotional disturbance contention, counsel denied the State an opportunity to rebut his claim with psychiatric testimony.  In any event, the aggravating circumstances were so overwhelming that no substantial prejudice resulted from the absence at sentencing of the psychiatric evidence offered in the collateral attack." p. 676-677

"The [trial] court rejected the challenge to counsel's failure to develop and to present character evidence for much the same reasons. The affidavits submitted in the collateral proceeding showed nothing more than that certain persons would have testified that [Washington] was basically a good person who was worried about his family's financial problems. [Washington] himself had already testified along those lines at the plea colloquy. Moreover, [Washington's] admission of a course of stealing rebutted many of the factual allegations in the affidavits. For those reasons, and because the sentencing judge had stated that the death sentence would be appropriate even if [Washington] had no significant prior criminal history, no substantial prejudice resulted from the absence at sentencing of the character evidence offered in the collateral attack." p. 677

In denying post-conviction relief to Washington, the trial court concluded that "'[As] a matter of law, the record affirmatively demonstrates beyond any doubt that even if [counsel] had done each of the . . . things [that [Washington] alleged counsel had failed to do] at the time of sentencing, there is not even the remotest chance that the outcome would have been any different. The plain fact is that the aggravating circumstances proved in this case were completely *overwhelming*. . . .'" (emphasis supplied) p. 677-678 This outcome was upheld by the Florida Supreme Court.

On federal habeas proceedings, the District Court denied Washington's petition. The Circuit Court of Appeals reversed, and the United States Supreme Court granted certiorari.

**QUESTION PRESENTED:** This case requires us to consider the proper standards for judging a criminal defendant's contention that the Constitution requires a conviction or death sentence to be set aside because counsel's assistance at the trial or sentencing was ineffective. p. 671

For these reasons, we granted certiorari to consider the standards by which to judge a contention that the Constitution requires that a criminal judgment be overturned because of the actual ineffective assistance of counsel. p. 684

**EVALUATION BY THE COURT:** A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable. p. 687

The Court has not elaborated on the meaning of the constitutional requirement of effective assistance in the latter class of cases -- that is, those presenting claims of "actual

ineffectiveness." In giving meaning to the requirement, however, we must take its purpose -- to ensure a fair trial -- as the guide. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. p. 686

A number of practical considerations are important for the application of the standards we have outlined. Most important, in adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles we have stated do not establish mechanical rules. Although those principles should guide the process of decision, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results. p. 696

Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result. p. 697

### I  Performance Prong:

**(a) Defendant's Obligation:** When a convicted defendant   complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness. p. 687-688

A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. p. 690

Conflict of interest claims aside, actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice. p. 693

**(b) Obligations Of Trial Counsel:** The proper measure of attorney performance remains simply reasonableness under prevailing professional norms. Representation of a criminal defendant entails certain basic duties. Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest. [citation omitted] From counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution. Counsel also has a duty to

bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.  p. 688

These basic duties neither exhaustively define the obligations of counsel nor form a checklist for judicial evaluation of attorney performance.  In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.  Prevailing norms of practice as reflected in American Bar Association standards and the like, *e. g.*, ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable, but they are only guides.  No particular set of detailed rules for counsel's conduct can satisfactorily take  account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.  Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.  [citation omitted]  Indeed, the existence of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant's cause.  Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system.  The purpose is simply to ensure that criminal defendants receive a fair trial. p. 688-689

**(c) Deference Afforded to Counsel's Conduct:** Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [citation omitted] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."[citation omitted] There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.  [citation omitted] p. 689

Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. p. 690

**(d) Rules For Judicial Review Of Claims Of Ineffective Assistance:** A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.  The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.  In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.  At the same time, the court should recognize that counsel is

strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. p. 690

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. p. 690-691

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions. [citation omitted] p. 691

Although these factors [idiosyncrasies of the decision maker] may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry, they are irrelevant to the prejudice inquiry. p. 695

## II   Prejudice Prong

(a) **Defendant's Obligation:** Conflict of interest claims aside, actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice. p. 693

Even if a defendant shows that particular errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense. It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, cf. *United States v. Valenzuela-Bernal, 458 U.S. 858, 866-867 (1982),* and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding. p. 693

The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. p. 694

Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. p. 696

**(b) General Standards** An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.   [citation omitted] The purpose of the Sixth Amendment guarantee of counsel is to ensure    that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding.  Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution. p. 691-692

Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial.  They cannot be classified according to likelihood of causing prejudice.  Nor can they be defined with sufficient precision to inform defense attorneys correctly just what conduct to avoid.  Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.  Even if a defendant shows that particular errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense. p. 693

Even if a defendant shows that particular errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense. It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.  Virtually every act or omission of counsel would meet that test, cf.  *United States v. Valenzuela-Bernal, 458 U.S. 858, 866-867 (1982),* and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding.  p. 693

Accordingly, the appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution, *United States v. Agurs, 427 U.S., at 104, 112-113,* and in the test for materiality of testimony made unavailable to the defense by Government deportation of a witness, *United States v. Valenzuela-Bernal, supra, at 872-874.* The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome. p. 694

In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law.  **[*695]**  An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, "nullification," and the like.  A defendant has no entitlement to the luck of a lawless decision maker, even if a lawless decision cannot be reviewed.  The assessment of prejudice should proceed on the assumption that the decision maker is reasonably, conscientiously, and impartially applying the standards that govern the decision.  It should not depend on the idiosyncrasies of the particular decision maker, such as unusual propensities toward harshness or leniency.  Although these factors may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry, they are irrelevant to the prejudice inquiry.  Thus, evidence about the actual process of decision, if not part of the record of the proceeding under review, and evidence about, for example, a particular

judge's sentencing practices, should not be considered in the prejudice determination. p. 694-695

The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors. When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer -- including an appellate court, to the extent it independently reweighs the evidence -- would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. p. 695

In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. p. 695-696

**(c) Special Rule For Conflict Of Interest** One type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice. In *Cuyler v. Sullivan, 446 U.S., at 345-350,* the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, see, *e. g.*, *Fed. Rule Crim. Proc. 44(c)*, it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, the rule is not quite the *per se* rule of prejudice that exists for the Sixth Amendment claims mentioned above. Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." [citation omitted] p. 692

**III Application Of Performance Prong Test In Washington's Case:** With respect to the performance component, the record shows that [Washington's] counsel made a strategic choice to argue for the extreme emotional distress mitigating circumstance and to rely as fully as possible on respondent's acceptance of responsibility for his crimes. Although counsel understandably felt hopeless about respondent's prospects, [citation omitted], nothing in the record indicates, as one possible reading of the District Court's opinion suggests, [citation omitted], that counsel's sense of hopelessness distorted his

38

professional judgment.   Counsel's strategy choice was well within the range of professionally reasonable judgments, and the decision not to seek more character or psychological evidence than was already in hand was likewise reasonable. p. 699

The trial judge's views on the importance of owning up to one's crimes were well known to counsel.   The aggravating circumstances were utterly overwhelming.   Trial counsel could reasonably surmise from his conversations with [Washington]  that character and psychological evidence would be of little help. [Washington]  had already been able to mention at the plea colloquy the substance of what there was to know about his financial and emotional troubles.   Restricting testimony on [Washington's] character to what had come in at the plea colloquy ensured that contrary character and psychological evidence and respondent's criminal history, which counsel had successfully moved to exclude, would not come in.   On these facts, there can be little question, even without application of the presumption of adequate performance, that trial counsel's defense, though unsuccessful, was the result of reasonable professional judgment. p. 699

**IV Application Of The Prejudice Prong In Washington's Case:** With respect to the prejudice component, the lack of merit of [Washington's]  claim is even more stark. The evidence that [Washington] says his trial counsel should have offered at the sentencing hearing would barely have altered the sentencing profile presented to the sentencing judge.   As the state courts and District Court found, at most this evidence shows that numerous people who knew [Washington] t thought he was generally a good person and that a psychiatrist and a psychologist believed he was under considerable emotional stress that did not rise to the level of extreme disturbance.   Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed.   Indeed, admission of the evidence respondent now offers might even have been harmful to his case: his "rap sheet" would probably have been admitted into evidence, and the psychological reports would have directly contradicted respondent's claim that the mitigating circumstance of extreme emotional disturbance applied to his case. p. 699-700

*Stringer v. Black,* 503 U.S. 222 (March 9, 1992)

**FACTS:** After finding petitioner Stringer guilty of capital murder, a Mississippi jury, in the sentencing phase of the case, found that there were three statutory aggravating factors. These included the factor the murder was "especially heinous, atrocious or cruel," which had not been otherwise defined in the trial court's instructions.  The other two aggravating factors were unquestionably valid and constitutionally proper. Stringer was sentenced to death, the sentence was affirmed by the State Supreme Court on direct review, and postconviction relief was denied in the state courts.

As presumably evident at the time, the heinous/atrocious/cruel aggravating circumstance was unconstitutionally vague, under reasoning that since all murders could

be so considered, this factor thereby did not perform a constitutionally required narrowing function.

In affirming, the Mississippi Supreme Court **did not** find that the heinous/atrocious/cruel factor was unconstitutionally vague, and presumably relied upon this factor in its independent assessment that the death sentence was appropriate.

Mississippi is a weighing state, meaning that the sentencer weighs specific aggravating circumstances against specific mitigating factors to determine an appropriate sentence.

In a non-weighing state, the aggravating circumstances serve the sole function of determining whether the defendant is "death eligible"; i.e. whether the death penalty is included as a sentencing option. Then, in a non-weighing state, the jury determines the appropriate sentence by consideration of all evidence in the case, whether presented by the prosecution or the defense. In a non-weighing state, then, the jury is not making a specialized comparison of dissimilar items (weighing aggravating circumstances against mitigating factors) but rather is considering all evidence to reach a decision. In a non-weighing state, the jury must find the existence of at least one aggravating factor before imposing the death penalty (the determination of "death eligibility, the  "narrowing function" ), but aggravating factors as such have no specific function in the jury's decision whether a defendant who has been found to be eligible for the death penalty should receive it under all the circumstances of the case. p. 230.

**EVALUATION BY THE COURT:**

Use of a vague or imprecise aggravating factor in the weighing process invalidates the sentence and at the very least requires constitutional harmless-error analysis or reweighing in the state judicial system. p. 237.

Although we later held in *Clemons* v. *Mississippi* that under such circumstances a state appellate court could reweigh the aggravating and mitigating circumstances or undertake harmless-error analysis, we have not suggested that the Eighth Amendment permits the state appellate court in a weighing State to affirm a death sentence without a thorough analysis of the role an invalid aggravating factor played in the sentencing process. We require close appellate scrutiny of the import and effect of invalid aggravating factors to implement the well-established Eighth Amendment requirement of individualized sentencing determinations in death penalty cases. See *Zant, supra*, at 879; *Eddings* v. *Oklahoma*, 455 U.S. 104, 110-112, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982); *Lockett* v. *Ohio*, 438 U.S. 586, 601-605, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978) (plurality opinion); *Roberts* v. *Louisiana*, 431 U.S. 633, 636-637, 52 L. Ed. 2d 637, 97 S. Ct. 1993 (1977); *Gregg* v. *Georgia*, 428 U.S. 153, 197, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.); *Woodson* v. *North Carolina*, 428 U.S. 280, 303-304, 49 L. Ed. 2d 944, 96 S. Ct. 2978 (1976) (plurality opinion). In order for a state appellate court to affirm a death sentence after the sentencer was instructed   to consider an invalid factor, the court must determine what the

sentencer would have done absent the factor. Otherwise, the defendant is deprived of the precision that individualized consideration demands under the *Godfrey* and *Maynard* line of cases. p. 230-231.

The fact that both principal opinions in *Barclay* focused on the weight the sentencer gave to an invalid aggravating factor demonstrates that a reviewing court in a weighing State may not make the automatic assumption that such a factor has not infected the weighing process. In view of the well-established general requirement of individualized sentencing and the more specific requirement that a sentence based on an improper factor be reassessed with care to assure that proper consideration was given, there was no arguable basis to support the view of the Court of Appeals that at the time petitioner's sentence became final the Mississippi Supreme Court was permitted to apply a rule of automatic affirmance to any death sentence supported by multiple aggravating factors, when one is invalid.  p. 231

In a nonweighing State, so long as the sentencing body finds at least one valid aggravating factor, the fact that it also finds an invalid aggravating factor does not infect the formal process of deciding whether death is an appropriate penalty. Assuming a determination by the state appellate court that the invalid factor would not have made a difference to the jury's determination, there is no constitutional violation resulting from the introduction of the invalid factor in an earlier stage of the proceedings. But when the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale. When the weighing process itself has been skewed, only constitutional harmless-error analysis or reweighing at the trial or appellate level suffices to guarantee that the defendant received an individualized sentence. This clear principle emerges not from any single case, as the dissent  would require, *post*, at 243-247, but from our long line of authority setting forth the dual constitutional criteria of precise and individualized sentencing. Thus, the principal difference between the sentencing systems of Mississippi and Georgia, the different role played by aggravating factors in the two States, underscores the applicability of *Godfrey* and *Maynard* to the Mississippi system. p. 232

…and Florida, of course, [a weighing state]  is subject to the rule forbidding automatic affirmance by the state appellate court if an invalid aggravating factor is relied upon. P. 234

If a State uses aggravating factors in deciding who shall be eligible for the death penalty or who shall receive the death penalty, it cannot use factors which as a practical matter fail to guide the sentencer's discretion. p. 235

Although our precedents do not require the use of aggravating factors, they have not permitted a State in which aggravating factors are decisive to use factors of vague or imprecise content. A vague aggravating factor employed for the purpose of determining whether a defendant is eligible for the death penalty fails to channel the sentencer's discretion. A vague aggravating factor used in the weighing process is in a sense worse,

for it creates the risk that the jury will treat the defendant as more deserving of the death penalty than he might otherwise be by relying upon the existence of an illusory circumstance. Because the use of a vague aggravating factor in the weighing process creates the possibility not only of randomness but also of bias in favor of the death penalty, we cautioned in *Zant* that there might be a requirement that when the weighing process has been infected with a vague factor the death sentence must be invalidated. p. 235-236.

### *United States v. Young,* 407 U.S. 1 (February 20, 1985)

**FACTS:**  Young was charged federally for defrauding an oil refinery, by selling to it a cheap fuel oil mixture he falsely certified was more expensive crude oil. Young's defense was that he mistakenly believed the fuel oil mix could legally be sold as crude oil.

During closing argument, defense counsel maligned the prosecution, stating to the jury that the prosecution intended to "poison your minds", that the prosecution deliberately withheld exculpatory evidence, and that the prosecution otherwise engaged in "reprehensible" conduct. Defense counsel pointed to the prosecution table and told the jury that "there's not a person in this courtroom including those sitting at this table who think that Billy Young intended to defraud [the oil refinery]", and that defendant Young had been "the only one in this whole affair that has acted with honor and integrity."

The prosecution did not object to these comments, nor did the District judge intervene.

During rebuttal argument, the prosecutor responded by expressing his personal opinion that Young was guilty, citing to various point of evidence. The prosecutor also admonished the jury that if Young was acquitted,  they would have a skewed view of "honesty and integrity", and stating that if they acquitted Young  "I don't think you're doing your job as jurors…."

The defense did not object to these comments, nor did the trial judge intervene. Also, neither side asked for curative instructions, nor were any given by the District judge.

On appeal, the Circuit Court of Appeals reversed the conviction, holding that the prosecutor's comments constituted misconduct that amounted to plain error.

In a 5 to 4 vote, the United States Supreme Court reversed the Court of Appeals and reinstated the conviction.

**EVALUATION BY THE COURT:** The principal issue to be resolved is not whether the prosecutor's response to defense counsel's misconduct was appropriate, but

whether it was "plain error" that a reviewing court could act on absent a timely objection. *Young,* at p. 6

***

Nevertheless, a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial. To help resolve this problem, courts have invoked what is sometimes called the "invited response" or "invited reply" rule, which the Court treated in *Lawn v. United States, 355 U.S. 339, 2 L. Ed. 2d 321, 78 S. Ct. 311 (1958).*** This Court's holding in *Lawn* was no more than an application of settled law. ***Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding.*** Instead, as *Lawn* teaches, the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly. In this context, defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant. *** As *Lawn* itself indicates, the issue is not the prosecutor's license to make otherwise improper arguments, but whether the prosecutor's "invited response," taken in context, unfairly prejudiced the defendant. (Emphasis added) *Young,* at p. 11-12.

***

Here the Court of Appeals was not unaware of our holdings and those of other Circuits, but seemingly did not undertake to weigh the prosecutor's comments in context. The court acknowledged defense counsel's obvious misconduct, but it does not appear that this was given appropriate weight in evaluating the situation. We share the Court of Appeals' desire to minimize "invited responses"; and we agree that the prosecutor's response constituted error. In addition to departing from the Tenth Circuit's "rule" prohibiting such remarks, n11 the prosecutor's comments crossed the line of permissible conduct established by the ethical rules of the legal profession, as did defense counsel's argument, see *supra,* at 6-10, and went beyond what was necessary to "right the scale" in the wake of defense counsel's misconduct. As we suggested earlier, the dispositive issue under the holdings of this Court is not whether the prosecutor's remarks amounted to error, but whether they rose to the level of "plain error" when he responded to defense counsel. In this setting and on this record the prosecutor's response -- although error -- was not "plain error" warranting the court to overlook the absence of any objection by the defense. *Young,* at p. 14.

***

The plain-error doctrine of *Federal Rule of Criminal Procedure 52(b)* n12 tempers the blow of a rigid application of the contemporaneous-objection requirement. The Rule authorizes the Courts of Appeals to correct only "particularly egregious errors," *United States v. Frady, 456 U.S. 152, 163, 71 L. Ed. 2d 816, 102 S. Ct. 1584 (1982),* those errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings," *United States v. Atkinson, 297 U.S. at 160.* In other words, the plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v.*

*Frady, 456 U.S. at 163, n. 14.* Any unwarranted extension of this exacting definition of plain error would skew the Rule's "careful balancing of our need to encourage all trial participants to seek a fair and accurate trial the first time around against our insistence that obvious injustice be promptly redressed." *Id., at 163* (footnote omitted). Reviewing courts are not to use the plain-error doctrine to consider trial court errors not meriting appellate review absent timely objection n13 -- a practice which we have criticized as "extravagant protection." *Henderson v. Kibbe, 431 U.S. 145, 154, n. 12, 52 L. Ed. 2d 203, 97 S. Ct. 1730 (1977); Namet v. United States, 373 U.S. 179, 190, 10 L. Ed. 2d 278, 83 S. Ct. 1151 (1963). Young,* at p. 15-16.

***

Especially when addressing plain error, a reviewing court cannot properly evaluate a case except by viewing such a claim against the entire record. We have been reminded:

> ***"In reviewing criminal cases, it is particularly important for appellate courts to relive the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal trial into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution."*** *Johnson v. United States, 318 U.S. 189, 202, 87 L. Ed. 704, 63 S. Ct. 549 (1943)* (Frankfurter, J., concurring). (Emphasis added).

It is simply not possible for an appellate court to assess the seriousness of the claimed error by any other means. As the Court stated in *United States v. Socony-Vacuum Oil Co., 310 U.S. at 240,* "each case necessarily turns on its own facts."

When reviewed with these principles in mind, the prosecutor's remarks cannot be said to rise to the level of plain error. Viewed in context, the prosecutor's statements, although inappropriate and amounting to error, were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice. See *United States v. Frady, supra, at 163; United States v. Atkinson, supra, at 160.* n14 *Young,* at p. 16.

### *Zant v. Stephens*, 462 U. S. 862 (June 22, 1983)

**FACTS** (from Syllabus) In a bifurcated trial in a Georgia state court, a jury found respondent guilty of murder and imposed the death penalty. At the sentencing phase of the trial, the judge instructed the jury that it was authorized to consider all of the evidence received during the guilt phase of the trial as well as all facts and circumstances presented in mitigation or aggravation during the sentencing proceeding, and that it must find and designate in writing the existence of one or more specified statutory aggravating circumstances in order to impose the death penalty. The jury stated in writing [ express findings made separately; NOT a general verdict] that it found the statutory aggravating circumstances that respondent had a prior conviction of a capital felony, that he had "a substantial history of serious assaultive criminal convictions," and that the murder was

44

committed by an escapee. While respondent's appeal was pending, the Georgia Supreme Court held in another case that one of the aggravating circumstances -- "substantial history of serious assaultive criminal convictions" -- was unconstitutionally vague. In respondent's case, the Georgia Supreme Court held that the two other aggravating circumstances adequately supported the sentence.

**MORE FACTS**  In Georgia, the finding of an aggravating circumstance does not play any role in guiding the sentencing body in the exercise of its discretion, apart from its function of narrowing the class of persons convicted of murder who are eligible for the death penalty. p.874    Under Georgia law the finding of a statutory aggravating circumstance serves a limited purpose -- it identifies those members of the class of persons convicted of murder who are eligible for the death penalty, without furnishing any further guidance to the jury in the exercise of its discretion in determining whether the death penalty should be imposed. [ This conclusion reached by the GEORGIA SUPREME COURT in response to an earlier question certified to it by the US Supreme Court : "What are the premises of state law that support the conclusion that the death sentence in this case is not impaired by the invalidity of one of the statutory aggravating circumstances found by the jury?"]

**MORE FACTS** Under the Georgia capital statute,  at the sentencing phase, the prosecution is authorized to admit  the defendant's  "record of any prior criminal convictions and pleas of guilty  or pleas of nolo contendere of the defendant, or the absence of any prior convictions or pleas…." p. 886

 (This means, in the *Zant v. Stephens* case, the jury would have received information about the defendant's prior record even if the subsequently declared vague aggravating circumstance [ "history of serious assaultive convictions"] was not relied upon by the prosecution.)

**MORE FACTS** Under the Georgia  capital statute, the jury is NOT instructed to "balance aggravating against mitigating circumstances pursuant to any special standard". p. 874  The jury is NOT specifically instructed to "weigh statutory aggravating and mitigating circumstances in exercising its discretion whether to impose the death penalty." p. 890    Rather, the Georgia jury  is instructed that:

…Unless at least one of the ten statutory aggravating circumstances exists, the death penalty may not be imposed in any event. If there exists at least one statutory aggravating circumstance, the death penalty may be imposed but the factfinder has a discretion to decline to do so without giving any reason. . . . In making the decision as to the penalty, the factfinder takes into consideration all circumstances before it from both the guilt-innocence and the sentence phases of the trial." 250 Ga., at 100, 297 S. E. 2d, at 3-4. This is precisely what the trial court told the jury: "Now in arriving at your determinations in this regard you are authorized to consider all of the evidence received in court throughout the trial before you. You are further authorized to consider all facts and circumstances presented in extenuation *[sic]*, mitigation and aggravation of punishment as well as such arguments as have been presented for the State and for the

Defense. . . . Unless one or more of these statutory aggravating circumstances are proven beyond a reasonable doubt you will not be authorized to fix punishment at death. . . . If you fix punishment at death by electrocution you would recite in the exact words which I have given you the one or more circumstances you found to be proven beyond a reasonable doubt. . . . [If you recommend life imprisonment] it would not be necessary for you to recite any mitigating or aggravating circumstances as you may find, and you would simply state in your verdict, We fix punishment at life in prison." p.889  [This instruction does NOT tell the jury to weigh aggravators against mitigators]

**QUESTION PRESENTED**: Whether respondent's death penalty must be vacated because one of three statutory aggravating circumstances found by the jury was subsequently held to be invalid by the Supreme Court of Georgia, although the other two aggravating circumstances were specifically upheld. The answer depends (a) on the function of the jury's finding of an aggravating circumstance under Georgia's capital sentencing statute, and (b) the reasons that the aggravating circumstance at issue in this particular case was found to be invalid. p. 864

**EVALUATION BY THE COURT** --- holding(from the syllabus) : *Held*:

1. The limited function served by the jury's finding of a statutory aggravating circumstance does not render Georgia's statutory scheme invalid under the holding in *Furman* v. *Georgia*, 408 U.S. 238. Under Georgia's scheme, the jury is required to find and identify in writing at least one valid statutory aggravating circumstance, an individualized determination must be made on the basis of the defendant's character and the circumstances of the crime, and the State Supreme Court reviews the record of every death penalty proceeding to determine whether the sentence was arbitrary or disproportionate. The narrowing function of statutory aggravating circumstances was properly achieved in this case by the two valid aggravating circumstances upheld by the Georgia Supreme Court, because these two findings adequately differentiate this case in an objective, evenhanded, and substantively rational way from the many Georgia murder cases in which the death penalty may not be imposed. Moreover, the Georgia Supreme Court reviewed respondent's death sentence to determine whether it was arbitrary, excessive, or disproportionate. Thus the Georgia capital sentencing statute is not invalid as applied here. Pp. 873-880.

Mandate of *Furman* is NOT violated by a state statutory scheme that permits the jury to exercise unbridled discretion in determining whether the death penalty should be imposed AFTER it has found that the defendant is a member of the class made eligible for that penalty by statute. p. 875

Specific standards for balancing aggravating against mitigating circumstances are NOT constitutionally required. p. 875 *Jurek v. Texas*, 428 U.S. 262 (1976)

Our cases indicate, then, that statutory aggravating circumstances play a constitutionally  necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. But the Constitution does

not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death. n17  What is important at the selection  stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime. See *Eddings* v. *Oklahoma*, 455 U.S. 104, 110-112 (1982); *Lockett* v. *Ohio*, 438 U.S. 586, 601-605 (1978) (plurality opinion); *Roberts (Harry)* v. *Louisiana*, 431 U.S. 633, 636-637 (1977); *Gregg*, 428 U.S., at 197 (opinion of Stewart, POWELL, and STEVENS, JJ.); *Proffitt* v. *Florida*, 428 U.S., at 251-252 (opinion of Stewart, POWELL, and STEVENS, JJ.); *Woodson* v. *North Carolina*, 428 U.S. 280, 303-304 (1976) (plurality opinion). p. 878-879

A State is, of course, free to decide as a matter of state law to limit the evidence of aggravating factors that the prosecution may offer at the sentencing hearing. A number of States do not permit the sentencer to consider aggravating circumstances other than those enumerated in the statute. See Gillers, Deciding Who Dies, 129 U. Pa. L. Rev. 1, 101-119 (1980); see, *e. g.*, Ark. Stat. Ann. § 41-1301(4) (1977); 42 Pa. Cons. Stat. § 9711(a)(2) (1980). p. 879

In analyzing this contention [death verdict invalid because jury instructed on unconstitutionally vague aggravating circumstance]   it is essential to keep in mind the sense in which that aggravating circumstance is "invalid." It is not invalid because it authorizes a jury to draw adverse inferences from conduct that is constitutionally protected. Georgia has not, for example, sought to characterize the display of a red flag, cf. *Stromberg* v. *California*, the expression of unpopular political views, cf. *Terminiello* v. *Chicago*, 337 U.S. 1 (1949), or the request for trial by jury, cf. *United States* v. *Jackson*, 390 U.S. 570 (1968), as an aggravating circumstance. Nor has Georgia attached the "aggravating" label to factors that are constitutionally impermissible or totally irrelevant to the sentencing process, such as for example the race, religion, or political affiliation of the defendant, cf. *Herndon* v. *Lowry*, 301 U.S. 242 (1937), or to conduct that actually should militate in favor of a lesser penalty, such as perhaps the defendant's mental illness. Cf. *Miller* v. *Florida*, 373 So. 2d 882, 885-886 (Fla. 1979). If the aggravating circumstance at issue in this case had been invalid for reasons such as these, due process of law would require that the jury's decision to impose death be set aside. p. 885.

Assuming trial court's erroneous instruction [that "substantial history of serious assaultive criminal convictions {this is uncon. vague}is a statutory aggravating circumstance] caused jury to unduly focus on prior criminal record, constitutional rights NOT  implicated because the instructions required the jury to focus on all the evidence, not on the "statutory aggravating circumstances." p. 888-889.