UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Angelo Fears,                          :    Case No. 1:01-cv-183
                                       :
        Petitioner,                    :
                                       :
vs.                                    :
                                       :
Margaret Bagley, Warden,               :
                                       :
        Respondent.                    :

**ORDER**

Before the Court are Petitioner's Objections to the
Magistrate Judge's Report and Recommendation. (Doc. 117)  In his
Report (Doc. 114), the Magistrate Judge recommends that the Court
deny all claims raised by Petitioner in his habeas corpus
petition.  After the Warden responded to Petitioner's objections
(Doc. 119) and Petitioner replied (Doc. 123), the Magistrate
Judge filed a supplemental report addressing several of
Petitioner's objections and again recommending denial of the
petition.  (Doc. 124)  Petitioner has filed objections to the
supplemental report. (Doc. 128)

**FACTUAL BACKGROUND**

Angelo Fears was convicted by a jury in Hamilton County,
Ohio of four counts of aggravated murder for the death of Antwuan
Gilliam.  Fears was sentenced to death by the same jury, a
sentence adopted by the trial judge.  His direct appeal to the
Ohio Supreme Court and his post-conviction proceedings were all

-1-

unsuccessful.  The Ohio Supreme Court described the facts giving rise to Fears' conviction in its opinion denying Fears' direct appeal.

> The afternoon prior to the shooting, ... Fears warned his friend, Darius Harris, to stay off the streets that night after 11:00 p.m. because he and James Grant were planning to rob people.  At around 1:00 a.m., Gilliam was on the street outside his apartment talking to his girlfriend, Keyona Haynes.  Gilliam's friend, Steven Franklin, approached him and asked where Derrick Frazier was because he wanted to purchase two ounces of crack cocaine.  Although Gilliam also dealt drugs, Frazier had recently purchased over twenty-eight ounces of crack cocaine worth $ 21,000.  Gilliam went into an alley and yelled to Frazier, who was inside his girlfriend's nearby apartment, to come outside.

> Frazier came outside and then took Franklin to another apartment, where he kept the crack cocaine while staying with his friend, Lakesha Bryant.  Bryant opened the door, let the men in, and went back to bed.  Her young child was asleep in another bedroom.  Frazier retrieved two ounces of crack cocaine from the safe, and put the drugs on the kitchen table.  In the meantime, James Grant and [Fears] pulled up in a van and were seen talking to Gilliam outside the apartment building.  Gilliam knocked on the door when Frazier and Franklin were discussing the price of the drug transaction.  Frazier let Gilliam in, but as Gilliam was closing the door, James Grant stepped inside the apartment.  At first, Grant asked to buy a small amount of crack cocaine, but then pulled out a gun and aimed it at Franklin, who was holding $ 2,000 in his hands, and told him to "lay it down."  At this point, [Fears] entered the apartment with a gun in his hand.  Franklin dropped the money and James told [Fears] to pick it up. [Fears] took the money as well as Franklin's bracelets and rings.

> Franklin and Gilliam dropped to the floor.  According to Franklin, Grant then told [Fears], who by that time was armed with a gun in each hand, to "shoot one of them niggas." [Fears] pointed the gun at Gilliam, but Grant said, "no, shoot him" referring to one of the other men. [Fears] said, "No, I'm going to shoot him

[Gilliam]." [Fears] pointed his gun at Gilliam's buttocks and said "I should shoot you right here in your bootie."  Gilliam pleaded with him not to kill him, but [Fears] told Gilliam, "I don't give a fuck about killing you." [Fears] then fired a single shot into Gilliam's left temple, killing him.

In the meantime, Grant had gone into a back bedroom. When he returned, he shoved his gun in Frazier's face, asked where the rest of the drugs were, and said, "Nigger, I should kill you."  Grant forced Frazier at gunpoint to the back bedroom.  Frazier opened the safe and Grant took the bulk of the remaining crack cocaine. While Grant and Frazier were in the back, Franklin escaped by jumping out a window to the alley below. Both Grant and [Fears] then fled the apartment. Gilliam's girlfriend saw [Fears] running from the apartment building and saw [Fears] and Grant drive off in a van.

Bryant called 911 at 1:29 a.m.  The police arrived at the scene shortly thereafter.  The police interviewed witnesses and several people identified [Fears] in a photo array as the person who fired the gun and fatally shot Gilliam.  Gilliam's body was taken to the morgue. The coroner determined that Gilliam's cause of death was a gunshot wound to the head, with perforation of the skull and brain.

Grant was arrested around 9:00 a.m. the day of the shooting.  In the process of arresting Grant, police learned that the gun used to kill Gilliam had been given to a Solomon Grant.  The police retrieved the gun, and ballistic tests revealed that the projectile found in Gilliam's body was fired from that gun.

State v. Fears, 86 Ohio St.3d 329 (Ohio 1999).

Fears was arrested about two weeks later, after a grand jury indicted him for aggravated murder, kidnaping, robbery, and burglary, with capital specifications.

Jury selection began on October 6, 1997, and a jury was empaneled on October 14.  Witnesses for the state included Darius

Harris, Keyona Haynes, Steven Franklin, and Derrick Frazier, along with several police officers involved in the investigation of Gilliam's killing. The jury returned guilty verdicts on October 22 after one day of deliberations. Testimony in the penalty phase of the trial began on October 28. Several of Fears' family members (his sister, brother, mother and stepmother) testified, as well as Dr. Jeffrey Smalldon, a psychologist who met with and evaluated Fears. The jury imposed the death penalty, and the trial court later adopted that recommendation. (Appx. Vol. II, pp. 255-260)

Fears raised twenty-eight propositions of law in his direct appeal to the Ohio Supreme Court. (Appendix Vol. III, pp. 59-182) After reviewing his claims and conducting its own statutorily-required proportionality review, the Supreme Court affirmed his conviction and sentence. State v. Fears, 86 Ohio St.3d 329, 715 N.E.2d 136 (Ohio 1999). Two justices dissented, concluding that Fears was entitled to a new sentencing hearing due to prosecutorial misconduct during the penalty phase of his trial. (Id. at 350)

Fears pursued post-conviction relief, raising seventeen claims, all of which were denied by the trial court (Appx. Vol. VII, pp. 239-244) and subsequently affirmed by the Ohio Court of Appeals. See State v. Fears, 1999 Ohio App. LEXIS 5365 (Ohio 1st Dist. App., November 12, 1999; Appx. Vol. VIII at 418). The Ohio

-4-

Supreme Court dismissed his appeal from that order, finding no substantial constitutional question.  (Appx. Vol. IX, p. 109)

Fears also sought to reopen his direct appeal to the Ohio Supreme Court, to argue ineffective assistance of appellate counsel based on the failure to raise a number of trial errors. (Appx. Vol. IV at p. 2)  The Ohio Supreme Court summarily denied this application.

On March 26, 2001, Fears filed his habeas corpus petition in this court.  (Doc. 8)  His amended petition (Doc. 69) was filed at the request of the Magistrate Judge, to correct several deficiencies in his original pleading.  His amended petition raised a tenth claim of mental retardation, but Fears subsequently withdrew that claim.  (See Doc. 109)  The nine grounds for relief raised in his original petition as restated in the amended petition are addressed below.

## ANALYSIS

Standard of Review.

Fears' petition is governed by the requirements of the Antiterrorism and Effective Death Penalty Act.  Under the AEDPA, a federal court may not grant a writ of habeas corpus unless it concludes that the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on
an unreasonable determination of the facts in
light of the evidence presented in the State
court proceeding.

28 U.S.C. §2254(d). "A state court renders an adjudication
'contrary to' clearly established federal law when it 'arrives at
a conclusion opposite to that reached by [the Supreme] Court on a
question of law' or 'decides a case differently than [the
Supreme] Court has on a set of materially indistinguishable
facts.'" Carter v. Mitchell, 443 F.3d 517, 524 (6th Cir. 2007),
citing Williams v. Taylor, 529 U.S. 362, 412-13 (2000). A state
court unreasonably applies clearly established federal law when
it "identifies the correct governing legal principle from [the
Supreme] Court's decisions but unreasonably applies that
principle to the facts of the prisoner's case." Id.

In defining the term "objectively unreasonable," the Supreme
Court has stated that "a federal habeas court may not issue the
writ simply because that court concludes in its independent
judgment that the relevant state-court decision applied clearly
established federal law erroneously or incorrectly. Rather, that
application must also be unreasonable." Williams v. Taylor, 529
U.S. at 411.

The doctrine of procedural default bars a habeas petitioner
from raising claims that were not considered by the state court.
If a state court previously dismissed a state prisoner's federal
claim on the grounds that the prisoner failed to comply with a

-6-

state procedural rule, then a federal court ordinarily cannot consider the merits of that federal claim.  See <u>Coleman v. Thompson</u>, 501 U.S. 722, 729-731 (1991).  This doctrine bars habeas review of such claims only if the following requirements are satisfied: (1) Petitioner actually violated the applicable state procedural rule; (2) that violation is an adequate and independent state ground upon which to deny the federal claim; and (3) the state court clearly and unambiguously enforced the procedural violation to reject the claim.

A petitioner can excuse a procedural default by showing (1) cause for the default and actual prejudice caused by the alleged constitutional error, or (b) that his case involves a fundamental miscarriage of justice that requires habeas relief.  <u>Maupin v. Smith</u>, 785 F.2d 135, 138 (6th Cir. 1986).  The cause and prejudice prong requires petitioner to establish a substantial reason for his default that is "external" to the petitioner.  And he must demonstrate prejudice by showing that the alleged errors infected his trial with constitutional error.  A fundamental miscarriage of justice is a relatively rare situation, and requires petitioner to demonstrate that the constitutional error probably resulted in his conviction despite actual innocence.  That is, he must show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt, or would have sentenced him to death rather than imposing

another available sentence.

> **First Claim for Relief**: Intentional prosecutorial misconduct in petitioner's state court trial denied petitioner his right to due process of law and his right to a fair trial protected by the Sixth Amendment. The resultant sentence of death violates petitioner's Eighth Amendment right to be free from cruel and unusual punishment.

Fears argues in his first claim that multiple instances of prosecutorial misconduct occurred in both the guilt phase and the penalty phase of his trial. He also argues that the cumulative effect of the prosecutors' misconduct violated his right to a fair trial, and that the resulting death sentence violates the Eighth Amendment.

<u>Guilt Phase</u>: (1) During voir dire, the prosecutor suggested that the "purpose" element of aggravated murder might not be present in (for example) a self defense killing, or an "accidental" killing. The prosecutor was about to suggest a "major issue" the jury would have to decide, but defense counsel's objection was sustained following a sidebar, and the "major issue" was not identified. (TR 360-362)

Fears argued on direct appeal, and argues here, that these statements diluted the state's burden of proof by suggesting in voir dire that Fears was going to argue that the shooting was an "accident." The Ohio Supreme Court held that, "[s]ince the trial court sustained defense counsel's objection and the prosecutor never completed her thought as to what one of the main issues

was, we do not believe that appellant was prejudiced by these remarks." State v. Fears, 86 Ohio St.3d at 335.

The Magistrate Judge concluded that "It is difficult to see how the result in the Ohio Supreme Court might be contrary to or an unreasonable application of clearly established federal law...". (Doc. 114 at 22) This Court agrees. Use of the word "accidental" during voir dire is highly unlikely to confuse the prospective jurors, as it is a common word with a generally understood meaning. Moreover, the prosecutor was entitled to discuss the difference between purposeful and non-purposeful acts, the latter of which may include "accidental," because purpose is an element of the crime of aggravated murder. See Ohio Rev. Code §2903.01. Fears has not established that the Ohio Supreme Court's decision was unreasonable.

(2) Fears argues that the prosecutor improperly told the jury in her closing argument that Fears was relying on an accidental shooting defense. The trial transcript reflects that the prosecutor was again discussing the "purpose" element of aggravated murder, arguing that several facts before the jury were sufficient for them to infer purpose. One was that the witnesses all testified that Fears brought a loaded semi-automatic weapon with him into a "home-invasion" sort of robbery. She suggested that if Fears only wanted "to scare somebody, why did he have it loaded? Bring it in and pointed it. **It's clear**

**he is going to tell you that he never was going to kill him**.  Gun wasn't loaded." (TR 2294, emphasis added)  Defense counsel objected, the trial court sustained the objection but asked the prosecutor, "Want to rephrase."  She resumed by asking the jury to consider why Fears brought the loaded gun with him, suggesting that if he only wanted to threaten people, he would have brought it unloaded.  "Wouldn't that serve the same reason if the purpose was to scare someone to make them think:  Give it over or else?" (TR 2295)

The Magistrate Judge's Report concludes that these remarks were not improper and did not amount to misconduct.  He notes that the prosecutors did not argue to the jury that Petitioner failed to prove the shooting was an "accident."  The prosecutors reminded the jurors many times that the state was required to prove the "purpose" element of the charges beyond a reasonable doubt.  This Court concludes that the prosecutor's suggestion (that an unloaded gun would sufficiently "scare" the residents for purposes of robbery) is not a statement suggesting that Fears was relying on an "accidental shooting" defense, and does not amount to misconduct.

(3) Fears argues that a comment made during voir dire, combined with the "It's clear he is going to tell you that he never was going to kill him" statement highlighted in paragraph (2) above, improperly infringed on his Fifth Amendment right not

to testify.  During voir dire, the prosecutor asked if it was
possible for a potential juror to determine someone's intent
"without having them help us figure that out?"  (TR 959)  Then in
her closing, the prosecutor made the statement quoted just above.
The prosecutor finished her closing shortly thereafter, and the
trial court then sua sponte instructed the jury:

> I am going to instruct you to disregard Mrs.
> Russell's comment that Mr. Rosenwald will
> tell you something because, as I will tell
> you – instruct you that the law that you will
> apply in this case is that the defendant has
> a constitutional right not to testify; that
> the fact he did not testify cannot be
> considered by you for any reason.

(TR 2304)

     The Ohio Supreme Court addressed this sub-claim, noting
well-established law that severely restricts a prosecutor from
commenting about a defendant's failure to testify.  Any such
comment may violate defendant's Fifth Amendment rights if "the
language used was manifestly intended or was of such character
that the jury would naturally and necessarily take it to be a
comment on the failure of the accused to testify."  State v.
Fears, 86 Ohio St.3d at 336 (citing state and federal cases to
that effect).  The Supreme Court concluded that Prosecutor
Russell's comment suggested an impermissible reference to Fears'
failure to testify, but that the comment could also be understood
to refer to Fears' claim that he did not intentionally kill
Gilliam.  The Court concluded, "While we in no way condone the

choice of words used, we do not believe that the jury would necessarily take them to be comments on appellant's failure to testify." Id.

The Ohio Supreme Court correctly identified the governing principle, as articulated in Griffin v. California, 380 U.S. 609, 615 (1965). There, the Supreme Court held that the Fifth Amendment (applicable to the states through the 14th Amendment) "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." Id. at 615. The Magistrate Judge concluded that the Ohio Supreme Court's application of that established principle to the facts at issue was not objectively unreasonable.

The Court agrees with that conclusion. The prosecutor's comment during voir dire was suggestive, but it was made almost in passing and is not, in the Court's view, reflective of an intent to bring to the jury's immediate attention the prosecutor's assumption that Fears would not testify. The closing argument statement more directly referred to Fears, but the comment could be reasonably construed by the jury as a comment on what defense counsel would argue in his own closing argument. The trial court's curative instruction clearly brought home to the jury the absolute right of a defendant not to take the stand, and that his choice not to testify is not a fact for the jury's consideration. Fears suggests that the delay between

-12-

the prosecutor's comments and the curative instruction was highly prejudicial, but the Court cannot agree.  The instruction was given after the prosecutor had finished and sat down, and for that reason may have had an even greater impact on the jury than one given in the middle of argument.  In any event, the trial court's instruction was quite explicit, and Fears offers nothing to suggest that the jury did not follow that instruction.

(4) Fears claims constitutional error based on the prosecutor's statement during voir dire that Fears and Grant were going to rob people the night of Gilliam's killing, and that "if they had to kill someone they would."  (TR 517)  Defendant's objection was sustained by the trial court.  Fears argued on direct appeal that the trial court should also have given a curative instruction, and its failure to do so amounted to prejudicial error.  The Ohio Supreme Court rejected this argument, noting that no instruction had been requested, and in any event the remark was not unconstitutionally prejudicial.  State v. Fears, 86 Ohio St.3d at 335.  The Magistrate Judge found that the Supreme Court's conclusion was not contrary to or an unreasonable application of federal law.

The Court agrees.  The statement is suggestive to be sure, and better words could have been used to convey the point.  However, it was an isolated phrase in a lengthy voir dire.  The lack of a curative instruction, especially in view of the lack of

a request for one, does not give rise to constitutional error.

(5) Fears' final guilt phase challenge is an argument that the prosecutor improperly denigrated defense counsel, calling him a "magician" and labeling Fears' defense as a "slight [sic] of hand technique" and a "trick." (TR 2339-2340) Defense counsel did not object to these remarks, and the Ohio Supreme Court did not explicitly address them. The Magistrate Judge, noting that Respondent did not raise procedural default, considered this particular claim on the merits and rejected it.

The context of the challenged remarks is important to assessing any potential prejudicial impact. Defense counsel discussed the "proof beyond a reasonable doubt" standard in his closing. He used an example of someone who is told by one doctor that he has a disease and needs a specific treatment. Counsel suggested that a reasonable patient would see a specialist, even two or three, and then with all of the available information, make a reasoned decision. He suggested that this is the type of information upon which the jury should be willing to "rely and act upon in the most important of your own affairs" (alluding to the jury instruction on reasonable doubt). (TR 2329)

In her rebuttal closing, the prosecutor told the jury they could not find Fears guilty if the evidence was lacking, nor could they base their verdict on bias, sympathy or prejudice. She then stated:

-14-

I'm going to tell you right up front I don't mean any disrespect to Mr. Rosenwald. I think he is a fine attorney. Obviously, he is an excellent attorney.

But when you look at this case and when you look at some explanations for some things, it reminded me of the first time I ever saw a magician take a quarter out of his pocket and show it to an audience. And he put it up in his hand and it was gone.

And I don't do it as well as most magicians do, but when you first see that for the first time, you look. That's pretty impressive.

And what does everyone that is not a magician, what do they ask if they don't know the trick? How did you do that? How did that happen?

And what does the magician say how it happened? Does he tell you the truth? He says, 'It's magic.'

Some people say it would be magic. But is that the truth? No. The truth is it's a slight [sic] of hand technique, a trick.

. . . The magic thing sounds good, but that's not the truth.

And you know what, the Defendant's position in this case is that our witnesses aren't credible enough to prove the obvious, to prove what happened, to prove the unrebutted, to prove that in the early morning hours of March 30 he intentionally and with prior calculation and design racked a gun, racked a gun that he knew wasn't [sic] loaded before he racked it. That's why he did it. Put it to Antwuan [Gilliam]. Put it at his head, pointed it at his head and fired it with the intent to kill him.

(TR 2339-2340)

Respondent argues that, in context, and given the

overwhelming evidence of guilt, no prejudice flowed from the "magic" remarks. The Court must agree. Counsel has significant latitude, especially in a closing argument, to use colorful adjectives, even biting analogies, to describe a defendant's case or the defense attorney's presentation of that case. The question is whether such comments go beyond the pale and affect the fundamental fairness of the trial. The Magistrate Judge notes cases holding that comments likening a defendant's case to a smoke screen, to game-playing, or to the proverbial red herring, do not exceed permissible boundaries.[1] Given these authorities, and reviewing the entire context of the prosecutor's remarks, the Court cannot find the comments were prejudicial to the extent that Fears' right to a fair trial was affected.

    <u>Penalty Phase</u>: Fears raises several instances of prosecutorial misconduct during the penalty phase of his trial. The relevant inquiry in the context of a death penalty sentencing hearing was recently addressed by the Sixth Circuit:

> Rather than determining whether a constitutional error would have pushed a jury from a 'not guilty' verdict to a 'guilty' verdict, we must attempt to discover whether the constitutional error influenced the jury's decision between life and death.

---

[1] See, <u>United States v. Bernard</u>, 299 F.3d 467 (5th Cir. 2002) ["attempting to create a red herring" is allowable comment on defense strategy]; <u>United States v. Rivera</u>, 971 F.2d 876, 882 (2d Cir. 1992) ["smoke screens, game-playing, distractions, and distortions" are legitimate appeals to jury to disregard defendant's contention that he was framed].

Bates v. Bell, 402 F.3d 635, 641 (6th Cir. 2005).

(1) Fears contends that the prosecutor argued non-statutory aggravating circumstances during closing argument. The challenged remarks, in the order they appear in the transcript, were:

> [D]oes that abuse [Fears' childhood abuse], is that justification or is that a mitigation factor sufficient to outweigh the brutal death of Antwuan Gilliam ...
>
> I submit to you there is nothing mitigating in the manner in which Angelo Fears purposely killed Antwuan Gilliam. There's no mitigation in that. ...
>
> Well, I guess there's some mitigation there because, you know ... he left [Lakesha] alone and that four-year-old baby there. He didn't touch that child. There's mitigation for you. There's mitigation for you.
>
> The murder. You have to look at the nature and circumstances of the murder. ...
>
> What kind of terror did [Fears] put into Derrick Frazier's head? He told us he peed in his pants. How is that for aggravating circumstances?

(TR 2927, 2952, 2964-65)

Defense counsel objected to the last statement concerning Derrick Frazier, but did not object to the rest. The Ohio Supreme Court applied plain error review to all of these statements, apparently including the Frazier comment. See State v. Fears, 86 Ohio St.3d at 332-333. It held that the Frazier comment, and the comment suggesting the jury should weigh

Petitioner's childhood abuse against the circumstances of the offense, were improper but did not rise to the level of plain error.

The Magistrate Judge concluded that all but the Frazier comment were procedurally defaulted, because Ohio's contemporaneous objection rule is an adequate and independent state ground, citing <u>Mason v. Mitchell</u>, 320 F.3d 604, 635 (6th Cir. 2003). (See Doc. 114 at p. 31)   Since the Ohio Supreme Court apparently incorrectly relied on this procedural rule with respect to the Frazier comment, however, this specific sub-claim is not defaulted and may be considered on the merits.

Ohio statutes strictly control the basis upon which a sentence of death may be imposed.  Aggravating circumstances are limited to those identified in Ohio Rev. Code §2929.04(A). Mitigating circumstances are contained in Section 2929.04(B) which includes a catch-all provision, permitting the jury to consider "any other factors" that may be relevant to sentencing. The nature and circumstance of the offense cannot be considered as an aggravating factor, but may be considered for mitigation. There is no doubt that the prosecutor's comment about Frazier, followed by her remark "How's that for aggravating circumstances?" clearly violated well established Ohio law.

If a statement is improper, the Court must then consider if it was "flagrant" by considering (1) the likelihood it would

mislead the jury or cause prejudice to the defendant, (2) whether the statement was isolated or extensive, (3) whether it was deliberate or accidental, and (4) the total strength of evidence against the defendant.  See Bates v. Bell, 402 F.3d 635, 641 (6th Cir. 2005) and cases cited therein.  Claims of prosecutorial misconduct must also be reviewed with deference under AEDPA.  See Millender v. Adams, 376 F.3d 520, 528 (6th Cir. 2004).

The Magistrate Judge noted several factors offsetting the improper Frazier remark, and concluded it was not flagrant.  The prosecutors specifically told the jury that they must consider the aggravating circumstances the jury found in their guilt phase verdicts.  They also told the jury that the nature and circumstances of the offense are only relevant for the jury's consideration of mitigation, and that the murder itself cannot be considered an aggravating factor.  (TR 2921, 2952)  The Frazier comment in this context was an isolated remark.  The trial court properly instructed the jury as to the permissible aggravating circumstances it could consider, which were those the found in the guilt phase verdicts.  The Magistrate Judge noted that while the trial court "inexplicably" overruled a defense objection to the improper comment about Derrick Frazier, this single utterance was not flagrant.

Fears objects, arguing that the Frazier comment must be viewed as part of the overall pattern of the prosecutors'

misconduct, which he alleges began with objectionable suggestions in voir dire and continued through the penalty phase rebuttal argument. Fears suggests that Prosecutor Russell in particular set out to "indoctrinate and confuse the jury . . . in an effort to skew the weighing process in favor of death, in direct violation of the law." (Doc. 117 p. 15)[2]

Fears' cumulative impact objection will be discussed below, after consideration of the other misconduct of which Fears complains. But on this sub-claim, the Court agrees with the Magistrate Judge's conclusion. The likelihood that the jury was misled or confused is very small. The trial court instructed the jury that counsel's arguments are not evidence. It is also the case that "consideration of a non-statutory aggravating circumstance, even if contrary to state law, does not violate the Constitution." Nields v. Bradshaw, 482 F.3d 442, 451 (6th Cir. 2007), quoting Smith v. Mitchell, 348 F.3d 177, 210 (6th Cir. 2003). Assuming the prosecutor's statement was deliberate, that is insufficient to outweigh the strength of the evidence, or to establish that Fears was actually prejudiced.

(2) Fears contends the prosecutors improperly argued in

---

[2] Fears suggests that Prosecutor Russell was "notorious for her misconduct", citing State v. Cotton, 113 Ohio App.3d 125 (Ohio App. 1996). There, the Court of Appeals reversed a guilty verdict largely based on erroneous admission of "other acts" evidence. A concurring opinion accused the prosecutor (apparently Russell) of "rampant and egregious" misconduct.

closing that he lacked remorse for his conduct.  Prosecutor Prem told the jury that Dr. Smalldon said that Fears "doesn't care. He is callous.  He doesn't have any remorse.  He doesn't regret the consequences of what he does."  (TR 2935)  Later, Prosecutor Russell stated in her rebuttal argument: "[Fears] shot them with no remorse.  He shot them in front of two other people and he pistol whipped Derrick Frazier."  (TR 2963)  The Court notes that Frazier testified that it was Grant who pistol-whipped him, not Fears.  The assertion about Frazier clearly misstated the evidence.  But the arguments about Fears' lack of remorse are not improper.  While remorse or lack thereof is not an aggravating circumstance, the state may rebut a defendant's evidence of remorse, and may fairly comment upon any such evidence.  As the Ohio Supreme Court noted, Fears expressed remorse in his unsworn statement to the jury, and the prosecutors' responding comments were not improper.

(3) Fears raises a series of objections to the prosecutors' treatment of Dr. Smalldon, Fears' expert psychologist.

(a) Fears contends the prosecutors denigrated Smalldon by calling him a "mouthpiece."  This insinuated that defense counsel paid Smalldon to say what Fears wanted him to say, denigrating the doctor and (as interpreted by the Ohio Supreme Court) defense counsel.  A defense objection to that remark was sustained, and the trial court instructed the jury to disregard

it.

(b) The prosecutors improperly emphasized that Smalldon
was paid with public, taxpayer funds.  During Smalldon's cross-
examination, the prosecutor elicited the fact that public funds
were being used to pay for his services.  In her closing,
Prosecutor Russell argued that Smalldon's bias - which he
admitted in his testimony - was anti-death penalty.  She then
stated:

> He told us he has a wife and two children,
> and while he considers himself a clinical
> psychologist and he interviews people on a
> one-to-one case, **it's clear that he testifies**
> **all over the State of Ohio and elsewhere in**
> **this type of work at six thousands dollars a**
> **pop.  That's your money paying for him**.
>
> Well, I'm glad he's there because we can't
> have a fair trial in this case unless you
> hear what he has to say.
>
> But he's against the death penalty in any
> circumstance.  He presents statewide to
> lawyers and defense lawyers on how to prepare
> and put together a death penalty case.

(TR 2954-2955; emphasis added)

(c)  Fears objects to a series of questions, statements
and comments concerning Smalldon's interview notes and his
failure to prepare a written report.  The trial judge had ruled
that the state was not entitled to discovery of Smalldon's
personal notes of his interview with Fears.  During Smalldon's
testimony, the state objected to Smalldon's failure to produce
all records that had been ordered by the court, which included

all materials upon which he relied in forming his opinion.  After a conference outside the hearing of the jury, the trial court ruled that Smalldon and defense counsel substantially complied with the court's prior order.  The trial court also stated "it's clear to me that interview notes that he has made, himself, are work product and not subject to discovery."  (TR 2821)

Despite these rulings, the prosecutor repeatedly questioned Smalldon about the notes and what they may have contained.  In at least one exchange in the presence of the jury, it was made quite clear that the state did not have those notes.  (TR 2847-2848) Prosecutor Russell then requested that Smalldon's entire file be marked as an exhibit, and the court sustained defendant's objection to including Smalldon's notes, because they were not admissible.  (TR 2848) Prosecutor Russell immediately returned to interrogating Smalldon about his failure to provide his interview notes, and asking Smalldon to testify about everything Fears told him over the course of his interview with Fears.  When Smalldon stated that he wasn't sure he could recall "all of the details" of his interview, the prosecutor suggested he review his notes, to which defendant objected.  However, the trial court overruled that objection.  (TR 2849-2850) Defense counsel again objected, stating that Prosecutor Russell had been cross-examining Smalldon for half an hour in an attempt to get his notes.  Again, the trial court overruled the objection, permitted Smalldon to review

-23-

his notes, and then permitting him to testify about what Fears told him about the events leading up to the offense.  (TR 2852-2856)

The prosecutor also persisted in asking questions about Smalldon's non-existent written report, insinuating that he was trying to hide something.  At one point, she told Smalldon that he needed "to make the report to the jury so that they know where [the] inconsistencies are."  (TR 2883)  The trial court sustained an objection to that comment, and told Smalldon not to respond. Several other similar statements were not objected to, however. (See TR 2931, 2955, 2957)

The Magistrate Judge observes that, despite the trial court's rulings on these issues, the prosecutors "blatantly revisited both issues in their closing argument."  (Doc. 114 at p. 36)  Prosecutor Prem stated that "we didn't get a report from him.  We didn't know until he testified what his diagnosis was going to be.  We heard it as you heard it."  (TR 2931)  Prem also stated that Smalldon "was fairly coy about how he presented things. ... And he glossed over things ...  Didn't want to tell you what [Fears] told him happened on the night of the murder." (TR 2932)

In her rebuttal, Prosecutor Russell told the jury that Smalldon "was reluctant to give up what was in his file.  He was reluctant to tell us what the defendant had told him.  He was

unwilling to give us his notes and unwilling to write a report."
(TR 2956)  Defense counsel's objection was sustained only as to
the notes, and the jury was instructed to disregard that comment.

The Ohio Supreme Court addressed Fears' claims concerning
the prosecutors' treatment of and comments about Smalldon.  It
found the "mouthpiece" comment "obviously intended to denigrate
defense counsel.  However, the trial court sustained an objection
to this remark and instructed the jury to disregard it.  The jury
is presumed to have followed the court's instructions."  State v.
Fears, 86 Ohio St.3d at 334.  Regarding the comments about public
funds used to pay Smalldon, the Supreme Court concluded they
constituted an "impermissible reference to taxpayer's
contributions, by which the prosecutor obviously hoped to gain an
unfair advantage."  Id.  However, the improper remarks did not
constitute prejudice such that a new sentencing hearing was
required.  With regard to Smalldon's notes and non-existent
report, the Court found:

> Since the trial court had initially overruled
> the state's request for Smalldon's notes, the
> prosecutor should not have made these
> comments, which cast an improper light on
> Smalldon and accused him of wrongdoing and
> withholding of pertinent information.
> However, even in combination with the above
> errors, we do not believe that [Fears] was
> denied a fair trial by any of these remarks.

State v. Fears, 86 Ohio St.3d at 335.[3]

The Magistrate Judge concluded that, despite the "obvious impropriety of the prosecutors' conduct," in light of the aggravating circumstance evidence, the Ohio Supreme Court's rejection of this claim was not unreasonable.  (Doc. 114, pp. 39-40)

The jury was instructed to disregard the prosecutor's "mouthpiece" comment, and some of the comments concerning Smalldon's notes.  However, most of the other comments were not addressed by the trial court and were improper.  There is a likelihood, as the Magistrate Judge recognized, that this treatment prejudiced the jury against Smalldon and thus against Fears.  The prosecutors intentionally attacked Smalldon, rather than presenting a rebuttal psychologist who could have taken the same data and information and articulated an opposing view to the jury.  There is little doubt in this Court's mind that the prosecutors' conduct, both in questioning Smalldon and in their comments to the jury about him, was deliberate.  However, in order to find this conduct "flagrant" such that a reasonable likelihood of a different result can be shown, the total strength of the evidence against Fears must be considered.  And it is here

_____

[3] The Ohio Supreme Court did not explicitly distinguish between the statements that had been objected to and those that had not, in addressing and rejecting Fears' arguments concerning Smalldon.  The Magistrate Judge concluded, and this Court agrees, that they may be reviewed on the merits.

that the Ohio Supreme Court's decision does not unreasonably apply established federal law.  Even if the misconduct was improper or "universally condemned," relief must be provided only if the Court concludes that the misconduct was so flagrant as to render the entire trial fundamentally unfair.  <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986), as applied in <u>Bowling v. Parker</u>, 344 F.3d 487, 512-513 (6th Cir. 2003).  This Court cannot conclude that Fears' entire penalty phase trial was rendered fundamentally unfair by the prosecutor's improper treatment of Dr. Smalldon, such that a different result would have been obtained absent this misconduct.

(4) Fears contends that the prosecutor improperly cross-examined his mother about a burglary charge for which she had not yet been sentenced.  No objection was lodged at trial.  The Ohio Supreme Court reviewed for plain error and found none.  This sub-claim is procedurally defaulted, and Fears does not articulate cause and prejudice to excuse the default.[4]

(5) Fears contends the prosecutors improperly questioned mitigation witnesses about whether he belonged to a gang, about his criminal history, and whether he knew right from wrong.  The Magistrate Judge recommended these claims be denied because Fears did not identify the improper questions or which witnesses were

---

[4] Fears raises this claim and other defaulted prosecutorial misconduct claims, as ineffective assistance of counsel discussed in the Sixth Ground for Relief, *infra*.

asked these questions.  Fears belatedly provides some transcript references in his Objections (see Doc. 117 at pp. 50-52).

The Ohio Supreme Court briefly addressed this claim and rejected it.  The Court noted that questions about "right from wrong" had been introduced through defense questions of the same witnesses, and that his sister and brother denied Fears' gang membership or his participation in a previous assault.  Therefore the Supreme Court found no prejudice resulted from the remarks. State v. Fears, 86 Ohio St.3d at 334.  These conclusions are entitled to deference and do not detract from the fact that the aggravating circumstances evidence against Fears is very strong. Taken in isolation, these comments did not prejudice Fears or deprive him of a fair trial.

Cumulative Impact: While any single instance of misconduct may be insufficient to warrant relief, the Court must consider the cumulative impact of the challenged instances to determine if the essential fairness of Fears' trial was compromised.  Several Sixth Circuit opinions on this subject are instructive.

In Johnson v. Bell, 525 F.3d 466 (6th Cir. 2008), petitioner alleged multiple instances of misconduct, including improper interference with his alibi witness who changed his story just before trial after meeting with the prosecutor; improper vouching for that witness' credibility; deliberately inflaming the passions of the jury in closing; and a cumulative misconduct

charge.  The bulk of Petitioner's specific misconduct claims were procedurally defaulted, and the Sixth Circuit found that four of the five individual instances addressed on the merits were not improper.  Only the prosecutor's closing arguments appealing to the passions of the jury were found improper, but were not "flagrant."  As a result, the Court did not address cumulative impact and denied the petition.  Id. at 486.  (A spirited dissent focused on petitioner's claim that critical Brady material had been withheld, an issue not raised by Fears.)

In another recent case, Cristini v. McKee, 526 F.3d 888 (6th Cir. 2008), the Sixth Circuit unanimously reversed a district court's grant of habeas relief based on several claims of prosecutorial misconduct.  The incidents included use of petitioner's prior assaults to argue propensity and identification.  Some of the challenged statements clearly exceeded the trial court's pre-trial ruling permitting use of three specific prior incidents.  But the court concluded this was harmless error in view of other admissible evidence establishing petitioner's guilt.

Petitioner also argued that the prosecutor called his alibi witnesses liars, and accused them of committing perjury.  A prosecutor cannot offer his or her personal opinions on witness credibility.  See, e.g., Hodge v. Hurley, 426 F.3d 368 (6th Cir. 2005), granting habeas relief based upon the prosecutor's

conclusory attacks on witness credibility.  But in <u>Cristini</u>, the Sixth Circuit distinguished <u>Hodge</u> by noting that the challenged comments were supported by prosecutor's detailed analysis of the facts, which he argued demonstrated that the witnesses were "liars."  Moreover, the evidence against Cristini was strong, and supported by three disinterested witnesses.  Therefore, the Sixth Circuit held that the district court erred in granting a writ.

In <u>Broom v. Mitchell</u>, 441 F.3d 392 (6th Cir. 2006), a habeas petition based on prosecutorial misconduct, the challenged comments included a closing argument remark that the defendant "kills in the community, and it's going to go on and on and on," suggesting he was a "serial killer."  (<u>Id.</u> at 412, n.31)  The prosecutor misrepresented the physical evidence concerning the victim's rape (two different men were responsible for sperm found in her body, not solely the defendant).  And in his penalty phase closing, the prosecutor said that the defendant's pleas for a life sentence amounted to asking the jury to "Send [him] back [to prison] for 20 years, so [he] can come back and do it again."  The prosecutor also denigrated petitioner's mitigation evidence, stating "These ridiculous mitigating circumstances that were put on before you which insult your intelligence, actually insult your intelligence. . .".  (<u>Id</u>. at 412, n.33)  Broom also claimed the prosecutor improperly commented on Broom's failure to testify.  The Ohio Supreme Court found the prosecutor's remarks

to be improper but did not affect the verdict or infringe on Broom's due process rights.  The Sixth Circuit found the comments were not sufficiently flagrant to justify reversing that decision.

In contrast, the Sixth Circuit granted a partial writ in Bates v. Bell, 402 F.3d 635 (6th Cir. 2005).  Bates pled guilty to a horrible murder, and a jury sentenced him to death.  He claimed that prosecutorial misconduct prevented the jury from fully considering his mitigation evidence by inciting the jury's passion and prejudice, injecting personal beliefs and opinions into the trial, and repeatedly criticizing defense counsel for objecting to their highly improper arguments.  The Sixth Circuit had little difficulty finding the conduct improper, in particular the prosecutor's argument that if the jury "chose not to execute the defendant, you have passively issued a warrant of execution for someone else.  We don't know who it is.  We don't know when it will take place; but ... [t]his man is going to kill again if he is not stopped first, ...  Where is fundamental fairness in that, to let this man live and, in essence, to sentence someone else to die?"  Id. at 642.  The prosecutors repeatedly referred to these all-but-certain murders Bates would commit if given a life sentence, even suggesting that prison overcrowding might be reduced if he was sentenced to life rather than death.  The prosecutor compared Bates to a "rabid dog," calling him "abnormal

because he is mean." <u>Id</u>. at 643.  The prosecutor directly
confronted defense counsel to berate him when he objected that
the prosecutors were appealing to the fears of the jury.

The prosecutor also repeatedly expressed personal opinions
on the credibility of petitioner's two mitigation witnesses, his
mother and a psychiatrist.  The Tennessee Supreme Court found the
statements raised in Bates' direct appeal to be "indefensible."
<u>Id</u>. at 645.  But many others were not raised in state court,
including statements that the prosecutor did not believe that
anything would inhibit Bates "from killing again if he escapes."
When defense counsel did object, the prosecutor responded with
either personal attacks on defense counsel, or by suggesting to
the jury that the valid objections were a subterfuge or a
diversionary tactic.  The trial court sustained some objections,
but the Sixth Circuit noted that the trial court was "generally
permissive of improper argument," thus compounding defense
counsel's dilemma.  (<u>Id</u>. at 646)

The Tennessee Supreme Court condemned the conduct, but found
that it did not prejudice Bates' defense.  The Sixth Circuit
disagreed, finding almost certain prejudice resulted from the
persistent and deliberate misconduct.  Bates' undisputed guilt
did not "immunize the sentencing phase evaluation of aggravating
and mitigating factors." <u>Id</u>. at 649.  Finding "grave doubt" as
to the harmless nature of the misconduct, the Sixth Circuit

granted the writ for resentencing because Bates' due process rights had been violated.

This Court has reviewed the transcript and the incidents of misconduct of which Fears complains.  The Court shares some of the concerns expressed by Chief Justice Moyer in the dissenting opinion in Fears' direct appeal to the Ohio Supreme Court.  The dissent observed that prosecutorial misconduct claims all too often focus on the question of sufficient evidence of guilt, rather than on the fairness of the trial:

> Refusing to address the fundamental unfairness of a trial riddled with prosecutorial misconduct because a majority of this court deems the evidence of guilt to be overwhelming creates the perception that we protect the right to a fair trial only when we believe that the defendant is not guilty.  However, our constitutional duty is to ensure that all defendants, regardless of guilt or innocence, receive a fair trial, and to ensure that a person accused is presumed innocent until the state, within the bounds of due process, satisfies its burden of proving beyond a reasonable doubt all of the elements of the charged offense, and the appropriateness of the imposed sentence. ... These protections become even more important when the same jury that determines a defendant's guilt is also responsible for recommending whether that defendant will live or die once convicted.  Due process requires that the sentencing phase of a capital trial not be unduly influenced by passion, prejudice, or any other arbitrary factor. ... Even though I agree that the prosecutorial misconduct in this case may not have affected the overall fairness of the guilt phase, it is impossible to say that impropriety in both the guilt and penalty phases did not in any way affect the jury's deliberations regarding

the penalty to be imposed.

State v. Fears, 86 Ohio St.3d at 353-354.  The dissent also noted its concern that the majority opinion focused on measuring prejudice of each discrete instance of misconduct, and "ignoring or summarily dismissing errors to which there was no objection, as well as the potential for cumulative error."  Id. at 354.

While the Court shares these concerns, this Court is not free to grant relief simply because the Court may have joined the dissenters in Fears' direct appeal.  Habeas relief cannot be granted because this Court believes that the Ohio Supreme Court was wrong in its resolution of Fears' prosecutorial misconduct claims.  Williams v. Taylor, 529 U.S. 362, 411 (2000).  The Court must be convinced that the state court's decision was objectively unreasonable in applying established federal law, and must have "grave doubt" that the outcome would have been different absent the misconduct.  Bates v. Mitchell, 402 F.3d at 649 (quoting O'Neal v. McAninch, 513 U.S. 432, 436 (1995)).

This case presents very similar facts to those addressed by the Sixth Circuit in Broom v. Mitchell.  Here, as there, the alleged misconduct included at least one misstatement of fact in evidence; a suggestion that Fears was an "urban terrorist" (similar to the "serial killer" comment in Broom); comments alluding to defendant's failure to testify; and harsh criticism of the defendant's mitigation evidence and witnesses.  The

-34-

conduct of the prosecutors in this case does not approach the level of intentional misconduct discussed in <u>Bates v. Bell</u>, misconduct clearly intended to completely prejudice the jury. The Ohio Supreme Court concluded that, "Although we are greatly disturbed by Prosecutors Russell and Prem's lack of restraint and their willingness to utter such inflammatory remarks, we cannot say that these comments constitute reversible error.  The evidence of guilt in this case is so overwhelming that none of the prosecutors' comments, even if error, amounted to reversible error.  Upon review of the entire record, we find that none of the alleged instances of misconduct that occurred affected the fairness of the trial."  <u>State v. Fears</u>, 86 Ohio St.3d at 336. This Court cannot conclude that this decision is an unreasonable application of established law, and therefore denies the First Ground for Relief.

> **Second Ground for Relief**: Petitioner's death sentence resulted from an arbitrary and capricious process that deprived him of fundamental constitutional protections in violation of his rights as guaranteed by the Fifth, Sixth, Eighth, Fourteenth Amendments to the United States Constitution.

Fears argues here that the trial court's sentencing decision was premised on improper aggravating circumstances by "use" of the fact of the murder.  He contends the trial court improperly weighed the evidence, and excluded relevant mitigation evidence. He also argues that the penalty phase jury instructions were erroneous by (i) defining "aggravating circumstances" to include

the fact of Gilliam's murder, (ii) implicitly requiring the jury to "consider death first," and (iii) suggesting that a life sentence should be considered only in the absence of a unanimous rejection of death.  He also contends that the trial court failed to merge the capital specifications prior to submitting the case to the jury.  For the same reasons, he contends that the Ohio Supreme Court's independent weighing of the aggravating and mitigating factors violated his Eighth Amendment rights. Finally, Fears argues that the state failed to establish beyond a reasonable doubt that the aggravating factors outweighed mitigating factors, making his death sentence unconstitutional.

Respondent contends, and the Magistrate Judge concluded, that this claim is procedurally defaulted with respect to "use" of the murder, and the jury instructions.  The contention that the trial court "used" the murder as an aggravating circumstance was not presented to the state court.  Moreover, even if it had been, the Magistrate Judge found no support in the record for this contention, and recommended denial of the claim.  (Doc. 114 p. 43)  The Court agrees.  The trial transcript, and the court's sentencing entry, simply do not support Fears' contention that the trial court improperly "used" Gilliam's murder as an aggravating circumstance.

The objection to the jury instruction was raised in Fears' direct appeal.  But due to the lack of a contemporaneous trial

objection, the Ohio Supreme Court reviewed for plain error and found none.  State v. Fears, 86 Ohio St.3d at 340-341.  Thus this sub-claim is procedurally defaulted.  Even if the objection were preserved for review, however, it lacks merit.  Fears relies on Davis v. Mitchell, 318 F.3d 682 (6th Cir. 2003), which held in part that an "acquittal first" jury instruction is unconstitutional, by requiring the jury to unanimously reject the death penalty before it can consider a life sentence.

The penalty phase instruction at issue here was:

> You shall find in favor of the sentence of
> death if you unanimously, that is, all
> twelve, find by proof beyond a reasonable
> doubt that the aggravating circumstances
> outweigh the mitigating factors.
>
> If you do not unanimously so find, you shall
> unanimously, again all twelve, find in favor
> of either a sentence of life imprisonment
> without parole eligibility, life imprisonment
> with parole eligibility after serving 25
> years of imprisonment or life imprisonment
> with parole eligibility after serving 30 full
> years of imprisonment.

(TR 2983)  The instructions continued with the trial court describing the verdict forms (four forms on each of the four aggravated murder counts, to provide for each of the available sentences on each count).

The instruction actually given comports with the Sixth Circuit's decision in Hartman v. Bagley, 492 F.3d 347, 362-365 (6th Cir. 2007).  There, the challenged jury instruction stated:

> If all 12 members of the jury find by proof

beyond a reasonable doubt that the
aggravating circumstances ... are sufficient
to outweigh the mitigating factors, then you
must return such finding to the court. ...

I instruct you, as a matter of law, that if
you make such a finding, then you have no
choice and must make a recommendation to the
court that the sentence of death be imposed
on the Defendant ... .

...

On the other hand, if after considering all
of the evidence ... you cannot unanimously
agree that the State of Ohio proved beyond a
reasonable doubt that the aggravating
circumstances, as I have defined them,
outweigh the mitigating factors, then you'll
return your recommendation reflecting your
decision.

In this event, you will then proceed to
determine which of the three possible life
imprisonment sentences to impose.

Id. at 362.  The Sixth Circuit distinguished this instruction

(which it found constitutionally acceptable) from that given in

Davis v. Mitchell upon which Fears relies.  The Davis instruction

told the jury they must unanimously find that aggravating

circumstances outweigh mitigating factors in order to impose a

death sentence.  But then they were told:  "[T]hat is, you must

find that the State has failed to prove beyond a reasonable doubt

that the aggravating circumstances which the defendant was found

guilty of committing outweigh the mitigating factors."  This

sentence impermissibly suggested that the jury must be unanimous

in **rejecting** a death sentence.  Other instructions suggested that

-38-

the jury had to be unanimous on <u>any</u> decision, including a specific mitigating factor.

And in <u>Mapes v. Coyle</u>, 171 F.3d 408 (6th Cir. 1999), the trial court went a step further than had the <u>Davis</u> trial court, telling the jury:  "[Y]ou must unanimously find that the State has failed to prove beyond a reasonable doubt that the aggravating circumstances of which the defendant was found guilty of committing outweigh the mitigating factors" (as quoted in <u>Hartman</u>, 492 F.3d at 364).

Here, in contrast, the instruction told the jury it must unanimously agree on a death sentence, but if they could not reach unanimity on a death sentence they must consider the life sentence options.  The jury was also instructed that any life sentence verdict must be unanimous.  This is not an erroneous statement of the law, and does not violate Fears' constitutional rights, as discussed in <u>Hartman</u>.

To the extent that Fears argues the instruction fails to state that mitigation unanimity is not required, that argument would also fail.  There is no requirement in this Circuit that an instruction expressly or explicitly tell the jury that they need not be unanimous on any one specific mitigation factor.  See <u>Coe v. Bell</u>, 161 F.3d 320, 337-38 (6th Cir. 1998).  And the Court cannot conclude that the instructions actually given here imply or suggest such a requirement.

-39-

Merger: Fears argues the trial court failed to merge the
capital specifications prior to submitting the penalty phase case
to the jury.  This issue was raised in Fears' direct appeal.  The
Ohio Supreme Court held that the "kidnaping specification merges
with the aggravated robbery specification.  Although merger
should have taken place, under *Jenkins*,[5] resentencing is not
automatically required.  Since we do not believe that the outcome
of the penalty hearing was affected by the jury's consideration
of duplicative aggravating circumstances, and because we find, in
our independent review, that the remaining aggravating
circumstances outweigh the mitigating circumstances, we conclude
that appellant need not be resentenced."  State v. Fears, 86 Ohio
St.3d at 344.

The Magistrate Judge observed that it is unclear from the
record that the trial court did **not** merge the duplicative
aggravating circumstances.  Prior to the penalty phase trial, the
trial court discussed merger with counsel.  All agreed it was
proper to instruct the jury on merger, and the court stated that
its inclination was "to merge all four counts into one count with
four verdicts on the aggravating circumstances," but reserved a
final ruling.  (TR 2522-2523)  Later, just prior to closing
argument, defense counsel reiterated its position that only one

---

[5] State v. Jenkins, 15 Ohio St.3d 164, 473 N.E.2d 264,
syllabus ¶5 (1984).

-40-

verdict form be given to the jury, as there was only one murder.
However, the trial court granted the state's request that
separate verdicts be submitted on the four counts of aggravated
murder, but again stated that the "aggravating circumstances"
would merge.  The penalty phase instructions included the three
aggravating circumstances that had been found by the jury in the
guilt phase verdicts. (TR 2977-2978)  The trial court then
instructed the jury:

> Now, when a person is convicted of more than
> one count of aggravated murder, the penalty
> for each individual count must be assessed
> separately.  The aggravating circumstances
> that are related to a particular count of
> aggravated murder will merge with each other
> when you consider assessing the penalty for
> that count.

(TR 2978)  Unfortunately, after that instruction, the trial court
made repeated reference to the aggravating "circumstances" rather
than a single, merged "circumstance."  (See TR 2979, 2983, 2984,
2985)  This included reading the actual verdict forms
incorrectly, because the forms used the singular "circumstance."
(Appx. Vol. II at 263-266)  The trial court's post-verdict
sentencing entry states that all four counts, together with all
aggravating circumstances, were merged for sentencing.  (Appx.
Vol. II, pp. 259-260)

     If proper merger did not in fact take place prior to
submission to the jury, this error does not rise to the
constitutional level.  This is especially true in view of the

-41-

verdict forms actually given to the jury, which correctly referred to a single (merged) circumstance.  Perhaps it might have been preferable to further explain to the jury the application of the concept of "merger."  However, the Ohio Supreme Court's resolution of this issue - even assuming that their finding that merger should have and did not take place is correct - is not objectively unreasonable.

Aggravating vs. Mitigating Factors.  Fears finally contends that the trial court erred in concluding that aggravating factors outweighed mitigating factors, and that the Ohio Supreme Court's re-weighing of those factors on direct appeal suffered from the same errors committed during his trial.  While Fears argues the conclusion is wrong, he does not articulate a reasoned basis upon which the state court's decision should be vacated.  He again suggests that the trial court failed to merge duplicative aggravating factors, causing it to give undue weight to those factors.  But for the reasons discussed above, the Court does not agree.

The Second Ground for Relief is therefore denied.

**Third Ground for Relief:** Petitioner was denied his right to the effective assistance of counsel during the trial phase of this capital case as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

Fears contends that his trial counsel (Messrs. Rosenwald and Pandilitis) were ineffective in (A) failing to obtain a firearms

expert to rebut the State's testimony; (B) failing to present evidence that the gun had been recalled by its manufacturer due to a danger of accidental discharge; (C) failing to obtain an expert toxicologist to testify about the effects of Fears' alcohol and drug abuse, and his intoxication the night of the murder; and (D) failing to object to numerous instances of prosecutorial misconduct.

The standard of review applicable to ineffective assistance claims is set forth in Strickland v. Washington, 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Id. at 687.  In addition, the Court cautioned that:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's

-43-

> perspective at the time.  Because of the
> difficulties inherent in making the
> evaluation, a court must indulge a strong
> presumption that counsel's conduct falls
> within the wide range of reasonable
> professional assistance; that is, the
> defendant must overcome the presumption that,
> under the circumstances, the challenged
> action might be considered sound trial
> strategy.

Id. at 694 (internal quotations and citations omitted).  To

demonstrate prejudice under the second Strickland prong, Fears

must demonstrate a reasonable probability that the result would

have been different.  "A reasonable probability is a probability

sufficient to undermine confidence in the outcome." Id. at 694.

Evidence Concerning the Gun:  Fears raised his two sub-

claims concerning the gun (failing to retain an expert and to

present evidence of the manufacturer's recall) during post-

conviction proceedings.  The trial and appellate courts found

these sub-claims barred by Ohio's res judicata doctrine.  (Appx.

Vol. VII at pp. 238-239; State v. Fears, Ohio App. 1st Dist.,

November 12, 1999; 1999 Ohio App. LEXIS 5365).  The Ohio Court of

Appeals held that Fears' post-conviction affidavits did not rise

above "speculation and a desire for further discovery," and thus

was not substantive evidence dehors the record that is required

to avoid the res judicata bar.  State v. Fears, at *5. Ohio's res

judicata doctrine is an independent and adequate state procedural

ground.  Buell v. Mitchell, 274 F.3d 337, 349 (6th Cir. 2001).

As discussed in the Magistrate Judge's Report (Doc. 114 at pp.

55-60), these sub-claims are defaulted because the Ohio courts actually applied this independent and adequate state procedural ground to deny relief.

Moreover, the Magistrate Judge concluded that these sub-claims would fail even if considered on the merits.  Fears essentially contends that a firearms expert would have raised reasonable doubt as to Fears' intent to kill Gilliam, by establishing a factual premise for an accidental discharge of the gun.

A police officer testified at trial that a spent shell casing was found in the apartment after Gilliam's murder that matched the firearm in question.  The state's expert William Schrand testified at Fears' trial that an accidental discharge of the firearm "would have" prevented rejection of the bullet casing from the chamber.  Fears presented an affidavit from a firearms expert, Cleon Maurer, who admitted that the firearm used to kill Gilliam was in "mechanical operating condition with the safety features functioning properly." (Appx. Vol. VI, pp. 179-181 at ¶6)  Maurer disagreed with Schrand's trial testimony, as Maurer averred that an accidental discharge "may have" prevented ejection of the casing.  The Magistrate Judge concludes that Maurer's equivocal statement is insufficient to establish a "reasonable probability" that the result at trial would have been different.

Fears objects, noting that his trial counsel admitted that he had started to develop an accidental discharge defense based on what Fears told him (that the gun went off when Fears cocked it to see if a bullet was chambered; see Evid. Hrg. Exh. 31). Steve Franklin testified at Fears' trial that Fears had "just cocked the other gun. He had both guns in his hand. He just cocked the other gun. As soon as he cocked it, it went off" (TR 2016), testimony that lends some support to Fears' claim. Fears also notes that trial counsel admitted that he didn't research the history of the gun model, did not have the gun independently tested or go to the state's lab to have Schrand test the gun in his presence, and admitted he has limited knowledge about guns.

In addition to Maurer's affidavit, Fears submitted evidence that the gun's manufacturer (Colt) issued a recall of this gun, due to the potential for accidental discharge. Colt's recall letter states that Colt would replace "the direct firing pin with an inertial-style firing pin system which will substantially reduce the risk of accidental discharge if you have a round in the chamber and the pistol is dropped or otherwise mishandled." (See Evid. Hrg. Ex. 5) This evidence would likely have provided interesting cross-examination material for Schrand. But the Court can find no evidence in the record to support a claim that the gun was dropped, and no evidence to explain what "mishandling" might cause the gun to accidentally discharge.

Schrand testified at Fears' evidentiary hearing that, in his opinion, a blow to the gun would have to hit directly on the gun's hammer, and break portions of its safety features, in order to cause an accidental discharge. Fears did not present Maurer as a witness at the evidentiary hearing, and his affidavit standing alone is not sufficient to raise a reasonable dispute about Schrand's testimony.

Assuming that counsel was deficient in not fully investigating the firearm or engaging an independent expert to counter Schrand's testimony, Fears has not established a reasonable probability that the result would have been different if his trial counsel had done so. The arguments Fears presents – Maurer's equivocal affidavit and the unexplained nature of the accidental discharge mentioned in the recall letter – amount to speculation that the jury might have accepted Fears' contention. The Court agrees with the Magistrate Judge's recommendation that these sub-claims be denied.

Failure to Obtain Toxicologist: Fears argues that an expert toxicologist should have testified about the effects of his long-standing alcohol and substance abuse, which would have helped establish that he lacked the requisite intent to kill Gilliam. This claim is not defaulted, as it was raised and addressed on the merits in Fears' post-conviction proceedings. The trial court concluded that this argument amounts to an alternate theory

-47-

of mitigation, insufficient to warrant post-conviction relief. (Appx. Vol. VII at p. 241)  The Court of Appeals rejected this argument because the decision not to employ a toxicologist is a strategic one.  The Court also noted that an intoxication defense does not necessarily negate the "purpose" element of aggravated murder.  <u>State v. Fears</u>, 1999 Ohio App. LEXIS 5365 at *18, citing <u>State v. Combs</u>, 100 Ohio App.3d 90, 100, 652 N.E.2d 205, 212 (Ohio App. 1995).  That is, intoxication must be so severe that it renders an individual incapable of forming an intent.

Ohio law provides that voluntary intoxication may negate intent if the evidence establishes that defendant is "mentally unable to intend anything."  <u>State v. Otte</u>, 74 Ohio St.3d 555, 564, 660 N.E.2d 711, 720 (1996).  The Magistrate Judge recites the trial evidence that contradicts that degree of intoxication: Fears got out of a van he was in with Grant, walked up the stairs to the apartment, assisted in confiscating weapons, talked with Grant about which one of the victims (Franklin or Gilliam) was going to be killed, and then fled the scene by running back to the van, and managing to elude apprehension that night.  The Ohio Court of Appeals concluded the evidence in the trial record "clearly shows that Fears terrorized Gilliam and specifically chose to kill him."  While there was also testimony that Fears had been consuming alcohol and drugs the day of the shooting, and in the days (and years) before that, the Magistrate Judge aptly

notes that "impairment does not equal incapacity." (Doc. 114 at p. 61)

At the evidentiary hearing, defense counsel Rosenwald testified on this subject:

> Q: Did you attempt to develop any other theories of defense besides accidental discharge?
>
> A: I don't believe that we did, no.
>
> Q: I will ask you Mr. Rosenwald, whether or not Mr. Fears ever told you that he was intoxicated or drunk or high on the night in question?
>
> A: The notes that I have, which I looked at this morning again before I came up here, do not reflect that specific language.

(Doc. 83, Evid. Hrg. Trans. p. 491) Counsel also testified he relied on what he learned during the case, and said he "did not know" that he had an intoxication defense based on the available information. (Id. at 505) The Magistrate Judge concluded that even if trial counsel's decision not to pursue this defense was a mistake, rather than a deliberate strategic choice, Fears has not demonstrated a reasonable probability that the guilt phase outcome would have been different.

Fears objects to the Magistrate Judge's statement that Rosenwald relied on information given to him "by" Fears. He argues there is a difference between what Rosenwald actually testified (he relied on information he got "in" Fears), and the conclusion that Rosenwald relied on things that Fears told him directly. The evidence available "in Fears" is presumably

-49-

everything counsel may have learned in working up Fears' defense. Counsel's notes state that Fears told him that he and Grant "rode to store to get beer on Auburn" and "rode around to clubs and drinking"; that he "did some MJ [marijuana joints]"; that Grant got "more beer" from Fast Fredy's on Walnut; and that Fears was "sitting and drinking and watching ppl" in the van.  (Evid. Hrg. Ex. 31)  Darius Harris testified at trial that he had seen Fears and Grant drinking and getting high earlier in the day.  (TR 2270)  This evidence collectively suggests that Fears was intoxicated.  But taken together, the evidence does not rise to the level that would overcome the presumption that counsel's decision not to pursue this defense amounts to constitutionally ineffective assistance.

Pandilidis testified at the evidentiary hearing that he believed voluntary intoxication was not a defense to the aggravated murder charges, and could only be used as mitigation evidence.  (Doc. 85, Evid. Hrg. TR 428, 430)  This is incorrect under Ohio law.  However, this mistake does not overcome the fact that the evidence available to counsel, as well as that presented by Fears post-conviction, fails to establish a reasonable probability that the result at trial could have been different.

Fears' post-conviction affidavit from Dr. Robert Smith states that Fears was under the influence of alcohol and marijuana the night of Gilliam's murder.  Smith opined that Fears

was "impaired, had decreased problem solving skills, impaired memory and significant mood swings among other cognitive deficits." State v. Fears, 1999 Ohio App. LEXIS 5365 at *18. This testimony, even if it had been presented during the guilt phase trial, would not establish that Fears was "unable to intend anything" the night of Gilliam's murder, as the Court of Appeals concluded. The Court agrees with the Magistrate Judge's recommendation that this sub-claim be denied.

Failure to Object to Prosecutorial Misconduct: Fears also claims ineffective assistance of counsel by the failure to object to numerous instances of prosecutorial misconduct. Fears raised this sub-claim in his 26th proposition of law on direct appeal (which combined his guilt and penalty phase arguments). The Supreme Court noted Fears' assertion that his trial counsel

> ... should have objected to various
> unspecified errors. However, the failure to
> object to error, alone, is not enough to
> sustain a claim of ineffective assistance of
> counsel. Since [Fears] does not show that
> any particular failure to object
> substantially violated any essential duty or
> was prejudicial, we reject this claim of
> ineffective assistance of counsel.

State v. Fears, 86 Ohio St.3d at 347 (internal quotation and citations omitted).

The Magistrate Judge notes that Fears does not identify all of the unobjected-to misconduct in his petition. Therefore, the Magistrate Judge addressed the instances that were raised in the

-51-

First Ground for Relief concerning Fears' prosecutorial misconduct claims.  Those were: (1) the prosecutor's closing argument statement about whether the killing was accidental, (2) the statements alluding to Fears' failure to testify, and (3) the "magician" and "trick" comments in closing argument.  For the reasons discussed above, the Magistrate Judge concluded that these statements are not misconduct, and therefore trial counsel was not ineffective in failing to object.

Fears objects and belatedly cites a list of 18 instances of alleged misconduct to which his trial counsel did not object. (See Doc. 117, pp. 50-52)  These include 16 incidents during cross-examination of Fears' mitigation witnesses, and two statements of Prosecutor Russell in closing argument.  However, Fears does not show that these sub-claims were presented to the state courts, nor show that any court has previously addressed them.

Moreover, generously assuming these sub-claims are not defaulted, Fears does not explain why each incident was misconduct that caused prejudice.  The Court notes that several of the incidents involved passing comments that were not repeated, and do not indicate an overt intent to prejudice the jury.  The bulk of the cited incidents occurred during the cross-examination of Fears' mitigation witness Angelo Dean, a social worker who had contact with Fears during his time in the juvenile

justice system at Hillcrest School.[6]  Prosecutor Russell's cross-examination spans fifteen transcript pages (TR 2625-2640), and largely consists of her reading sections of a probation officer's intake report on Fears.  Angelo Dean did not write that report, and he generally responded that Prosecutor Russell was correctly reading from the report.  No objections were lodged to any of these questions.

Fears insists that at least one of his lawyers "had never seen the document" before trial.  (Doc. 117, p. 51 n.28)  This suggestion is not supported by the record.  The sidebar conference Fears cites reflects the fact that the Hillcrest record was included in the materials reviewed by Dr. Smalldon, and that the prosecutors received it from Smalldon in response to the Court's order for Smalldon to produce materials he relied upon.  The comment by counsel that "I don't even know what this document is" refers to an apparent dispute about two versions of the Hillcrest record, one with highlighting on it and to which defense counsel was objecting.  (TR 2647-2653)  Counsel clearly stated that he had the report prior to Dean's testimony.  (TR 2649)

Even if Prosecutor Russell's questions were improper by

---

[6] Dean testified on direct that "Hillcrest School is a treatment center that is operated by Hamilton County Juvenile Court.  All the kids that are placed there are placed there by Juvenile Court."  (TR 2616)

violating some unidentified evidentiary rules, the fact of Fears'
early involvement with the juvenile justice system, and being
removed from his home, were put into evidence by Fears.  He does
not explain why the relatively short cross examination of Dean
may have caused him **undue** prejudice such that he received
ineffective assistance of counsel.

In sum, the Court concludes that trial counsel's performance
during the guilt phase was not ineffective.  This Court cannot
say that the errors deprived Fears of a fair trial.  The Third
Ground for Relief is therefore denied.

> **Fourth Ground for Relief**: Petitioner was denied his
> right to the effective assistance of counsel during the
> jury selection phase of this capital case as guaranteed
> by the Sixth and Fourteenth Amendments to the United
> States Constitution.

Fears contends that trial counsel's failure to challenge the
venire of fifty people, only one of whom was African-American,
amounted to constitutionally ineffective assistance of counsel.

The venire was brought into the courtroom the afternoon of
October 6, 1997.  (TR 103)  Voir dire began, two jurors were
excused for cause, and the venire was dismissed until the
following morning.  Defense counsel then stated that "I would
like to put on the record, if - if that's what I am supposed to
do about this, of the 50 people that are brought up, Judge, there
is only one black individual, that was a female."  Counsel noted
that fifty percent of the City of Cincinnati's population, and

between 20 and 30 percent of Hamilton County's, was African-American.  He told the court that he "assume[d] that probably things were done correctly" (TR 159) and did not move for an evidentiary hearing.  He also stated: "I don't know that you get a fair trial if you don't have a representative panel from the community; that's our position.  We don't have that kind of fair representative panel and that is why we are asking to have the panel discharged." (TR 161)

The following morning, the trial court denied the motion to dismiss the venire, stating there was no evidence that the members had been chosen in any manner other than randomly.  The court also relied on Ohio Crim. Rule 24(E), requiring challenges to the venire to be made before voir dire begins.

Fears raised this claim in his direct appeal, and the Ohio Supreme Court rejected his challenge.  The Court recognized Fears' established right to a jury "drawn from a source fairly representative of the community", citing <u>Taylor v. Louisiana</u>, 419 U.S. 522, 538 (1975).  The Court noted that defense counsel should have objected prior to the start of voir dire, but held that Fears had not shown a "reasonable probability" that absent counsel's error, the trial result would have been different. <u>State v. Fears</u>, 86 Ohio St. 3d at 347.

Counsel's failure to timely object to the composition of the venire, or to request a hearing or evidence of the manner of

selection, satisfies the first <u>Strickland</u> prong.  However, Fears
presents **no** evidence suggesting that the venire was chosen in any
improper or discriminatory manner.  If there was no impropriety
which might have been uncovered, Fears cannot establish that he
was prejudiced by trial counsel's failure to pursue an
evidentiary hearing.  This claim does not rise above conjecture,
which is insufficient to warrant habeas relief.

>    <u>Fifth Ground for Relief</u>: Petitioner was denied his
>    right to the effective assistance of counsel at the
>    penalty phase of this capital case as guaranteed by the
>    Sixth, Eighth and Fourteenth Amendments to the United
>    States Constitution.

Fears alleges six sub-claims that his trial counsel was
constitutionally ineffective during the penalty phase trial.  He
argues that counsel (1) failed to adequately prepare for and
present his defense; (2) failed to present available mitigating
evidence; (3) failed to obtain expert socio-cultural and
toxicological testimony; (4) failed to object to numerous
instances of prosecutorial misconduct; (5) failed to object to
erroneous jury instructions; and (6) failed to move for the
merger of the death penalty specifications prior to submission to
the jury.  Each sub-claim is discussed in turn.

(1) Fears claims that his trial counsel did not adequately
prepare for the penalty phase, and that their presentation of
available mitigation evidence was constitutionally deficient.  He
especially focuses on the alleged lack of communication with a

mitigation specialist, Martha Jacoby, and with Dr. Smalldon.

Jacoby testified at the evidentiary hearing in this case.
(Doc. 85, Evid. Hrg. Trans. at pp. 339-409)  She first met with
defense counsel in early August 1997 for about an hour.  (Jacoby
was the second mitigation specialist retained, as the first one
apparently withdrew from the case.)  Jacoby lived in Cleveland,
Ohio, about 250 miles from Cincinnati.  Despite the distance,
Jacoby traveled to Cincinnati at least twice before the trial,
but she did not meet with the attorneys on those trips.  She met
with counsel again on October 1, 1997, shortly before the start
of Fears' trial.  Jacoby identified 31 potential mitigation
witnesses, but testified that she did not have time to discuss
each witness with counsel at their short October meeting.  Jacoby
believes that significant mitigation evidence was not presented,
or was superficially presented, at Fears trial.  This evidence
includes Fears' mother's psychiatric history; the extent of
Fears' substance abuse; the poverty, abuse and neglect Fears
suffered growing up; and the failure of child protection and
public educational services to help Fears.

However, testimony and evidence on these topics and more was
presented by Fears' mitigation witnesses.  Gail Benton, Mrs.
Fears' sister and Fears' aunt, told the jury about Mrs. Fears
depression, use of medication, and repeated hospitalizations.
(TR 2717-18)  Dr. Smalldon confirmed these facts, noting her long

history of serious depression.  Fears' history of substance abuse
was undisputed, and almost every witness in the case talked about
Fears' long-standing use of alcohol and marijuana.  His mother
and his sister told the jury about his prodigious alcohol
consumption, his brother said he was a heavy drinker, and his
stepmother described him as a drinker "like his father" who is an
alcoholic.  (TR 2690)  Ms. Benton said that every time she
visited, Fears was drunk, or getting alcohol in order to get
drunk.  Smalldon described Fears' early use of alcohol,
encouraged by his father from the time he was a child.  Smalldon
suspected Fears was drinking heavily by the time he was 12 years
old, and that Fears minimized his drinking when asked about it.
Smalldon testified that the amount of alcohol Fears regularly
consumed can compromise judgment.  (TR 2831)

Testimony about Fears' truly deplorable upbringing, and the
Over-the-Rhine area where he was raised, was also presented to
the jury.  His sister LaTanya, his mother, and Dr. Smalldon all
testified about the horrible conditions Fears faced on the
streets of his impoverished neighborhood, and the unconscionable
abuse and neglect he suffered at the hands of his father and his
mother.  (As one example, when Fears was very young, he
accompanied his father on visits to the father's various
paramours.  The father gave Fears copious quantities of alcohol
to persuade Fears not to tell his mother about his father's

dalliances.)

Some testimony regarding Fears' education and contacts with child protective services was presented.  The bulk of it came from Angelo Dean, the Hillcrest social worker, albeit in the context of Fears' early juvenile criminal contacts.  His brother James testified that no one had tried to help Fears by offering counseling, and that no one helped him in school.  Smalldon alluded to some early educational services, but could not obtain records to verify what services were provided.  Most of the family member witnesses testified in detail about the abuse, neglect, and substance abuse that was prevalent in his family.  His mother said she had been physically and sexually abused by her own stepfather, and that Fears' father was a chronic alcoholic who was abusive to her and to the children.

Attorney Rosenwald testified at the evidentiary hearing that he could not specifically remember why he decided to present the witnesses who testified, but also stated that presenting all 31 individuals initially identified by Jacoby would have been repetitive.  (Doc. 86, pp. 542-543)  Rosenwald also thought that the mitigation phase of the trial went well.  (Doc. 85 at p. 526)

In view of this record, the Magistrate Judge concluded that Fears has not established constitutionally ineffective assistance of counsel.  (Doc. 114, pp. 70-71)  Fears objects, citing Jacoby's critique of his trial counsel.  Jacoby states that

-59-

"During the mitigation phase of the trial, the jury was given a sample of the turmoil that Petitioner experienced; however, those family problems were not detailed to the point where it may have impacted the jury." (Evid. Hrg. Exhibit 30) Fears takes issue with counsels' failure to hold more team meetings; failure to discuss with Jacoby each of the 31 potential witnesses; failure to investigate the criminal histories of each witness, in order to avoid prejudicial cross-examination; failure to present more witnesses who (in Jacoby's words) "can get across what we wanted to get across in this case" (Doc. 85 at p. 367); failure to visit the neighborhoods and Fears' home, to get a "whole sense of what needs to be asked and what the true picture is" (Id. at 403); failure to spend more than four hours interviewing potential witnesses; and generally being unprepared to present what Fears and Jacoby assert would have been a more complete picture of Fears' background.

Fears also criticizes his lawyers for their failure to prepare for Smalldon's testimony. Rosenwald testified at the evidentiary hearing that he did not need much preparation, because Smalldon had provided a "script" for counsel to follow. (Doc. 83, Evid. Hrg. Trans. p. 530) At trial, Smalldon admitted that he was personally opposed to the death penalty, and that he made it a practice to offer that fact during his direct examination. However, on cross, the prosecutors alluded to

several other cases in which Smalldon had not volunteered that information.  The prosecutors also suggested that Smalldon's diagnosis of Fears (unspecified mixed borderline personality with antisocial traits) was one that Smalldon routinely arrived at in other cases where he testified for the defense.  The prosecutor started to question Smalldon about his failure to pass a board certification examination; however, the trial court sustained an objection to the question, he did not answer, and the prosecutor did not return to that subject.  None of these instances reflect a failure to prepare such that Fears received ineffective assistance with regard to Smalldon's testimony.

Fears also cites several comments Smalldon made during his testimony that Fears characterizes as prejudicial (comments about Fears' law-breaking behavior, of Fears being at "loggerheads" with authority figures, or that Fears grew up without a core set of values).  In the Court's view, these comments accurately reflect the testimony and evidence of the other mitigation witnesses Fears presented, and did not prejudice his defense.

Fears cites a letter Smalldon wrote to Jacoby, stating that Smalldon did not receive a phone call from trial counsel after the jury verdict.  His letter states "It's frustrating when communication with the attorneys isn't any better than it was in this instance - ...".  (Evid. Hrg. Exhibit 20)  It is unclear what communication Smalldon may be referring to.  Smalldon did

not testify at the evidentiary hearing, and the court gives little weight to this ambiguous comment.

The Court finds that this sub-claim does not merit habeas relief. In the Court's view, Fears is essentially arguing that his lawyers should have done "a better job." This is far below the <u>Strickland</u> threshold of deficient performance that causes actual prejudice.

(2) In this sub-claim, Fears argues that his trial counsel failed to present crucial mitigating evidence which may have resulted in a life sentence. He cites the post-conviction affidavits of his father, James Fears, Sr.; his girlfriend, Keisha Grant; a mitigation specialist, John Lee; his paternal aunt, Gloria Criswell; his uncle, Charles Fears; Alvin Grant (the brother of James Grant, his co-defendant); James Grant; and Dr. Robert Smith (the toxicologist). With the exception of his father, the Magistrate Judge concluded that all of these witnesses would have provided testimony merely cumulative to that actually presented at the trial.[7] These areas include confirmation of Fears' father's heavy drinking and abusive conduct, and Fears' own early and chronic alcohol abuse.

Fears objects. He states that Keisha Grant would have testified how well Fears treated her children, taking them to the

---

[7] Lee's affidavit (Appx. Vol. VI at pp. 169-170) consists of what Fears' cousin told Lee, and is hearsay. The Magistrate Judge properly disregarded this affidavit.

zoo and buying them clothes.  His uncle, Charles Fears, would
have amplified facts about Fears' upbringing, including the ready
and constant access to weapons in his home, substance abuse,
domestic violence, and a belief that Fears and his brothers
resorted to selling drugs because their parents would not support
them.  Charles Fears states that he no longer drinks, is active
in his church, and owns his own construction business.  His
affidavit states he was told by Fears' mother to stay away from
the trial, because "the attorneys instructed her to say this
because of concerns regarding how the Fears family might act
publicly." (Appx. Vol. VI, pp. 337-338)  Charles Fears is not on
Jacoby's list of 31 potential mitigation witnesses.  There was no
testimony at the evidentiary hearing concerning Charles Fears,
and whether or not anyone on the defense team was even aware of
his existence at the time of trial.  Fears suggests that his
testimony, unlike all the others, would have demonstrated that
Fears could be rehabilitated, because Charles grew up in the same
violent family surroundings but made good choices about his life.
This speculative suggestion about one aspect of Charles Fears'
affidavit does not support Fears' ineffective assistance claim.
The Ohio Court of Appeals described all of the proffered
affidavits as "merely cumulative, a repackaging of evidence
already presented, or failed to materially advance his claims."
State v. Fears, 1999 Ohio App. LEXIS 5365 at *29.  This Court

views the affidavits in the same way. The Court of Appeals decision is not objectively unreasonable.

With regard to the father's affidavit, the Magistrate Judge observes that his testimony would have been qualitatively different from that of the other witnesses. His testimony, as stated in his affidavit, would have directly and personally corroborated the endemic violence in the home, use of weapons, and his threats against Fears and the other family members. The father admits his sexual promiscuity, and that he forced his sons to fight with older, larger cousins. He admits that when Fears was a teenager they would drink all night together. (Appx. Vol. VI, pp. 150-154) It cannot be said that the lack of this testimony did not prejudice Fears.

However, the Magistrate Judge cites Jacoby's notes of her interview with Fears' father (James) and Fears' stepmother, which she provided to attorney Pandilitis about four days before the penalty phase trial. Her notes do not contain many of the statements made in James' post-conviction affidavit. While the notes mention his alcoholism and frequent fights with Fears' mother, James also told Jacoby that he left his children with their mother in 1980, "but stayed in touch with the kids. Says he took them fishing and tried to get them out of downtown as it was a bad environment. He was not aware of Angelo's out-of-home placements." He claimed that he did not raise Angelo "like that,

-64-

I didn't let him get away with things." He said Angelo "never wanted to go to school. He tried to tell him to go back and finish." He admitted to having a bad temper, and that his children were probably scared of him, but he also minimized his own alcoholism and played down his own parents' alcoholism. (Evid. Hrg. Exhibit 15)

Neither Rosenwald nor Pandilitis were asked why they did not call James Fears as a trial witness. Based upon Jacoby's notes, it seems likely they may have concluded that James could do more harm than good as a mitigation witness. Even Jacoby noted a concern that James Fears would try to minimize his own responsibility for Angelo's problems, and would deny that the conditions described by Angelo's sister and brother were as bad as they remembered. Jacoby also admitted that she had reservations about James Fears, because he was an alcoholic and "you never really knew what kind of a person you were going to find . . . you didn't know what state of mind he was going to be in." (Doc. 85, Evid. Hrg. Trans. at p. 404) Jacoby's testimony supports the conclusion that not calling James Fears as a witness was not an instance of defective performance by counsel, but rather was a strategic decision to avoid the clear prejudice that would result if he denied that conditions in the household were as bad as the other family members testified they were.

(3) Fears argues that his trial counsel were ineffective

because they did not present testimony from a "cultural expert" and from Dr. Smith, the psychologist/toxicologist.

<u>Cultural Expert</u>:  Fears proffered an affidavit and report by Dr. Raymond Gastil in his post-conviction proceedings.  (Appx. Vol VI, pp. 185-200)  Dr. Gastil is a social scientist, who reviewed Fears' background and addressed socio-cultural issues surrounding the case.  Very briefly summarized, Dr. Gastil believes that Fears was raised in a "subculture of violence" that has its roots in the violent clashes between the African-American and Caucasian populations of the southern United States in the 19th century.  In published papers, Gastil has attempted to correlate regional homicide rates with an "Index of Southernness."  He suggests that the "southern culture factor" accounted for the major difference in homicide rates between states, larger than other biosocial factors such as the size of urban or non-white population, median income, or age.  (<u>Id.</u> at p. 193, ¶19)  Gastil opines that evidence of this violent subculture can be found in the behavior and attitude of people of "Southern background," particularly African-Americans who migrated from the rural South to northern cities during the 20th century.  (<u>Id.</u> at ¶30)  He believes the resultant "urban black underclass" is responsible for the majority of urban violence and crime.

Gastil opines that Angelo Fears had become a career criminal before he was 18 years old.  "No one or no circumstance compelled

him to become a criminal, but the culture that had come down to him, the culture that surrounded him, and what he was taught in his own home by example and precept, pushed him much of the way toward this outcome." Id., p. 198 at ¶57. Gastil testified at the evidentiary hearing, providing an expanded explanation of these opinions. Doc. 82, Evid. Hrg. Trans., pp. 3-181.

The Ohio Court of Appeals rejected this sub-claim, summarily concluding that Gastil's proffered testimony was nothing more than an alternate mitigation theory. State v. Fears, 1999 Ohio App. LEXIS 5365 at *22. The Magistrate Judge found that decision is not contrary to or an unreasonable application of federal law. He found this especially true because Gastil's opinion - that Fears' upbringing and cultural surroundings victimized him into committing this violent crime - contradicts Fears' primary argument that he did not intend to shoot Gilliam.

The Court does not necessarily agree that the two theories are in direct contradiction. Gastil's theory could provide a cultural context for Fears' overall behavior, including his juvenile criminal behavior, his drug dealing, his possession and use of a gun, and his participation in an armed robbery.

At the evidentiary hearing, neither Rosenwald nor Pandilitis were asked about their reasons for not pursuing a "cultural expert" to testify. However, at Rosenwald's deposition, he was asked about Gastill's theories, using a hypothetical murder case

with similar facts.  He responded: "I don't know how the southern culture of violence would play into my geographic area. ... I don't want to believe that simply because there is an urban ghetto subculture of violence that makes blacks more prone to commit homicides, I don't agree with that... ."  (Rosenwald Deposition at pp. 45-46.)

Toxicologist:  Dr. Robert Smith's affidavit detailed Fears' background, history of abuse, addiction, and the effects of his alcohol and drug abuse on his reasoning, cognition and mood. Smith opines that Fears substance abuse "played a significant role in his commission of the instant offense." (Appx. Vol. VI, p. 214 at ¶75)

As discussed above, Fears' trial counsel testified they did not consult with a toxicology expert to develop an intoxication defense.  In the penalty phase trial, however, most of the facts and background Smith recites in his post-conviction affidavit was presented by Smalldon and through the testimony of Fears' family. While Smith's affidavit may more skillfully weave together the tragic threads of Fears' upbringing than did Smalldon's testimony, the facts he recites were before Fears' jury.

In Brooks v. Bagley, 513 F.3d 618, 627 (6th Cir. 2008), the Sixth Circuit rejected a similar argument, that a "properly prepared expert" could have more effectively made the case for a life sentence.  That did not establish prejudice under

Strickland: "[T]he new evidence that a habeas petitioner presents must differ in a substantial way--in strength and subject matter--from the evidence actually presented at sentencing." Brooks, 513 F.3d at 627 (citing Hill v. Mitchell, 400 F.3d 308, 318 (6th Cir. 2005)).  Information presented in post-conviction affidavits cannot simply "echo" the points already presented to and weighed by the sentencer.  Id.

In his objections, Fears argues that the state repeatedly alluded to negative stereotypes about Fears and his family to prejudice the jury against Fears.  For example, the prosecutor called Fears an "urban terrorist" (TR 2964), and told the jury that "his family is welfare supported" and "never paid taxes" (TR 2970).  He notes the prosecutor's repeated statements that all of Fears' problems – from his inability to spell, to his failure at juvenile probation, to his decision on which person to kill the night of the murder – reflected his "choice" of behaviors.  Fears argues that Gastil and Smith would have cogently contradicted these arguments.  Without their testimony, his mitigation defense was "presented in a hodge-podge fashion by ill-prepared trial counsel." (Doc. 117 at p. 74)  He particularly takes issue with counsel's admissions at the evidentiary hearing that he did not know intoxication was a defense to a specific intent crime, and that he spent only four hours preparing the critical mitigation witnesses.  Fears notes that his counsel did not even request the

-69-

appointment of a toxicology expert which, if it had been denied, would have preserved this issue for full review on direct appeal.

Assuming (generously) without deciding that Gastil's opinions would pass muster under Daubert, the failure to present the testimony of both of these experts is, in the Court's view, insufficient to establish actual prejudice. Fears' arguments with respect to Smith are quite similar to those presented and rejected in Hill v. Mitchell, 400 F.3d 308 (6th Cir. 2005). There, the petitioner argued that his post-conviction affidavits from two experts "demonstrate[d] how a properly prepared expert could have (and should have) testified." Id. at 316. The Sixth Circuit noted that the affidavits provided more information than had been presented at trial about petitioner's background. But the petitioner "failed to explain why this additional information would have been likely to persuade a jury to give him a life rather than a capital sentence." This was especially true because the majority of the factual information was actually presented to the jury in a different form.

The Court also notes that Fears complains of the use of negative stereotypes, but that Gastil's theory of a violent urban subclass appear to reinforce such negative stereotypes. The Court finds that it is speculative, at best, whether Gastil's testimony would have resulted in a life, rather than a death, sentence. And since Smith's affidavit does not materially differ

from Smalldon's testimony, this sub-claim is denied.

(4) In this sub-claim, Fears argues that his trial counsel were ineffective in failing to object to prejudicial and improper statements by the prosecutors.  While these sub-claims are procedurally defaulted for purposes of prosecutorial misconduct analysis, as discussed in the First Ground for Relief, Fears contends that counsel's failure to object to so many improper or inflammatory statements amounted to ineffective assistance.  As noted above, the Ohio Supreme Court rejected Fears' 26th claim for relief on direct appeal, because Fears did not specifically identify the objectionable statements.  State v. Fears, 86 Ohio St. 3d at 347.

The Magistrate Judge concluded that many of the statements discussed in Fears' First Ground for Relief were not improper, or were isolated and unintentional, and that none caused prejudice. These include (i) the closing argument comments about lack of mitigation (quoted above at pp. 16-17); (ii) the several objections concerning Dr. Smalldon; (iii) use of Fears' mother's burglary conviction; (iv) reference to Mrs. Fears' psychological evaluation relating to the burglary charge; (v) Mrs. Fears' conviction for falsification, apparently for welfare fraud; (vi) a jury instruction requiring a unanimous sentencing verdict; and (vi) failure to seek merger of aggravating circumstances.  For the reasons discussed above, the Court concludes that these

incidents, individually or collectively, do not amount to
ineffective assistance of counsel.

With respect to his mother's burglary charge, Fears contends
that reference to it was improper because, under Ohio Criminal
Rule 32(C), a criminal "conviction" requires both judgment and
imposition of a sentence.  Since she had pled guilty but had not
been sentenced, she had no "conviction."  The Magistrate Judge
notes this is a technically correct statement of Ohio law, but
that the evidence of the charge and her plea would nonetheless be
admissible under Rule 608(B) as prior conduct relevant to her
character for truthfulness.  (Doc. 124, Suppl. Report &
Recommendation, at p. 20)  The Court agrees that the prosecutor's
question was not improper, and counsel's failure to object was
not ineffective assistance.

With regard to the claims that the prosecutor improperly
used his criminal history and gang membership, Fears again
belatedly provides citations.  (See Doc. 114, pp. 86-88, and pp.
50-52)  The Magistrate Judge did not consider these citations in
his Supplemental Report, because Fears simply listed the
incidents without explaining why each statement was improper, or
why each failure to object caused him prejudice.  (Doc. 124 at p.
21)

Trial counsel was asked about some of these instances at the
evidentiary hearing.  He did not know why no objection was made

-72-

to Mrs. Fears' cross-examination (Doc. 86, Evid. Hrg. Trans., p. 556), although he agreed that at least one question was objectionable.  (_Id_. at 560)  He did not know why no objection was made to cross-examination of Fears' sister concerning a child endangerment charge, used to suggest her children had been taken away from her. (_Id_. at 566-567)  He did not know why no objection was made to a question to Fears' brother about a misdemeanor assault charge, or to several statements in the prosecutor's closing argument.  (_Id_. at 570-571, 573-575)

The bulk of the instances Fears belatedly cites occurred during Angelo Dean's cross-examination.  As discussed above, Prosecutor Russell cross-examined Dean with an intake report written by another social worker describing Fears' juvenile record and his family circumstances.  None of her questions were objected to.  (TR 2628-2634 and 2639-2640)  As discussed in the Third Ground for Relief, assuming the questions were improper and assuming counsel was deficient in failing to object, the Court finds that Fears has not demonstrated a likelihood that the outcome would have been different if objections had been made.

(5) Fears contends his counsel failed to object to a jury instruction stating a verdict on a sentence must be unanimous. Respondent contends this claim is procedurally defaulted; whether it is or not, the claim is meritless as is fully discussed above. The jury charge was not erroneous, and Fears' counsel was not

ineffective for failing to object to an instruction that correctly stated the law.

(6) Fears contends his counsel was ineffective in failing to seek merger of the aggravating circumstances prior to submission of the case to the jury. As is fully discussed above, the record is unclear that merger did not take place. In any event, the Court finds that Fears was not prejudiced, and that he has not established that the outcome would have been different.

Cumulative Effect: Finally, Fears argues that the cumulative effect of his trial counsels' errors and omissions deprived him of a fundamentally fair trial.

In Morales v. Mitchell, 507 F.3d 916 (6th Cir. 2007), the Sixth Circuit affirmed the trial court's partial writ, based upon ineffective assistance of counsel at Morales' penalty trial. Morales was convicted of the brutal beating death of a teenager, and pled not guilty by reason of insanity. He contended he did not and could not appreciate the consequences of his actions due to severe alcohol abuse, and his background and upbringing. Several witnesses testified that Morales had consumed a large quantity of alcohol before the crime, and about the especially pernicious effect of alcohol abuse on Native Americans. A forensic psychologist described Morales' troubled upbringing and extensive substance abuse. She testified that Morales was unable to control his actions, and was mentally ill. The jury convicted

him and his sentencing phase began one day after those verdicts
were returned.  The only evidence presented was Morales' unsworn
statement.  The jury returned a death sentence, affirmed by the
Ohio Supreme Court.  On post-conviction review, the Ohio Court of
Appeals rejected his ineffective assistance claim, noting his
trial counsel strategically chose to present significant
mitigation evidence during the guilt phase.  In Morales' habeas
proceeding, the district court disagreed with that finding,
concluding the state court unreasonably applied federal law.

The Sixth Circuit affirmed, concluding that trial counsel
did not adequately investigate Morales' background, or the extent
of his alcohol and drug abuse.  Counsel failed to interview
witnesses before their testimony.  He failed to retain a
mitigation specialist or an investigator, and did not speak with
any family members except for Morales' father (and that was for
only ten minutes).  The father asserted that he had scheduled two
meetings for trial counsel to talk with proposed witnesses, but
counsel cancelled both at the last minute without explanation.
Applying Terry Williams v. Taylor, 529 U.S. 362 (2000), and
Wiggins v. Smith, 539 U.S. 510 (2003), the Sixth Circuit found
counsel's performance was deficient in failing to uncover and
present a volume of evidence that was not simply duplicative of
the trial testimony.  This was especially damaging in view of the
fact that counsel presented **no** evidence during the penalty phase.

-75-

Given the volume of uncovered evidence and witnesses, the court affirmed the district court's conclusion that Morales established a reasonable probability that "at least one juror hearing that evidence would have been persuaded to impose a life, rather than a death, sentence." Morales, 507 F.3d at 936.

Similarly, in Williams v. Anderson, 460 F.3d 789 (6th Cir. 2006), defense counsel did no investigation at all, waived opening statement in penalty phase, presented only the defendant's unsworn statement, and made a closing argument described as "incomprehensible." Id. at 797-798. The Sixth Circuit found that relief based upon ineffective assistance of counsel was warranted.

Habeas relief was also granted in Haliym v. Mitchell, 492 F.3d 680 (6th Cir. 2007) based upon ineffective assistance during the penalty phase. The Sixth Circuit noted that counsel failed to investigate information about petitioner's history of physical abuse, and instead introduced mistaken evidence that there was no such history. Counsel ignored evidence of petitioner's serious head injury, sustained when he tried to commit suicide with a self-inflicted gunshot to his temple, and failed to have petitioner assessed for functional brain impairment. Petitioner's sworn statement, read to the jury, indicated that his parents were "beautiful people." This statement was simply false - his father died of a heroin overdose, and brutally abused

-76-

petitioner and his siblings throughout his life.  Yet counsel
permitted petitioner to read the statement to the three-judge
panel who sentenced him.  Id. at 710-712.  These deficiencies,
among several others, demonstrated prejudice under Strickland,
entitling petitioner to relief.

     In contrast, in Fautenberry v. Mitchell, 515 F.3d 614 (6th
Cir. 2008), petitioner argued that his trial counsel was
ineffective, because counsel hired an expert who did not uncover
some clinical evidence suggesting that petitioner suffered from
an organic brain disorder.  In rejecting the argument that the
expert was not qualified (and thus counsel was deficient in
retaining that expert), the Sixth Circuit noted that petitioner
offered no evidence to support a suggestion that counsel had
"good reason" to suspect his expert's qualifications.  Id. at
626.  The dissent disagreed, finding the expert in question was
plainly unqualified because the clinical tests she used could not
determine organic brain disorder.  The dissent opined that
counsel has an obligation, at a minimum, to ensure the retained
expert "knows of what she speaks" before testifying.  Id. at 643.

     Here, when compared to the facts at issue in Morales,
Haliym, and Williams, the Court must conclude that counsels'
performance was not deficient under Strickland.  Unlike the
situation presented in Morales, trial counsel here investigated
the circumstances of the crime and Fears' background; hired a

mitigation specialist; spoke with witnesses and family members; cross-examined the state's witnesses; and presented the facts and arguments on Fears' behalf.  Fears complaints about his counsels' performance, in most instances, are the sort of hindsight critiques that <u>Strickland</u> specifically cautions the courts not to countenance.  No doubt, some things could have been done by counsel that were not, and more time could have been spent on other tasks.  But this reality is insufficient to establish a reasonable probability that the complained-of errors "were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  <u>Strickland</u>, 466 U.S. at 687.

The Court will grant a certificate of appealability as to the Fifth Ground for Relief, recognizing that reasonable jurists could reach a different conclusion on this constitutional question.

> **Sixth Ground for Relief**: Petitioner was deprived of the effective assistance of counsel on his direct appeal as of right in violation of the Sixth Amendment and due process clause of the Fourteenth Amendment.

Fears contends that his appellate counsel was ineffective in failing to raise several issues during his direct appeal to the Ohio Supreme Court.  He cites appellate counsel's failure to appeal (1) his conviction on specifications he was not charged with (the same issue discussed below in the Seventh Ground for Relief); (2) trial counsel's failure to object to the defectively numbered indictment, and/or the jury instructions that misstated

the numbered specifications (also discussed below); (3) the erroneous instruction on unanimity of a sentencing verdict; and (4) nine specific instances of ineffective assistance of trial counsel that were not directly appealed to the Ohio Supreme Court. (Doc. 69, Amended Petition at pp. 55-56)  The ninth item on this list is counsel's failure to object to "continuous" prosecutorial misconduct.

To succeed on this Ground for Relief, Fears must establish prejudice by demonstrating a reasonable probability that his direct appeal would have been successful if not for the claimed errors.  See, e.g., Bowen v. Foltz, 763 F.2d 191, 194 (6th Cir. 1985).

Under Ohio law, ineffective assistance of appellate counsel provided in a direct appeal must be raised in an application to reopen a defendant's direct appeal, not in post-conviction proceedings.  State v. Murnahan, 63 Ohio St.3d 60, 65-66, 584 N.E.2d 1204 (1992).  Reopening under Murnahan may succeed only if the claims could have been raised on direct appeal, and are not premised on evidence outside the trial record.  Any other claim may only be raised in post-conviction proceedings.

(1) Fears first and second sub-claims concern the "misnumbering" of the capital specifications as charged in the Indictment.  This issue was raised for the first time by the Ohio Court of Appeals in Fears' post-conviction proceedings.  That

-79-

court noted that "The numerical designation of the specifications in the verdict forms and the trial court's sentencing entry was not consistent with the designation in the indictment." State v. Fears, 1999 Ohio App. LEXIS 5365 at *4.

The indictment against Fears and Grant charged them each with twelve identical counts, and with identical specifications for each count.  For example, Count One charged them both with aggravated murder, followed by three identical capital specifications and two firearms specifications.  Grant's specifications were numbered one through five, and Fears' specifications were numbered six through ten.  That format continued through Counts Two, Three and Four of the Indictment.  (Appx. Vol. I, pp. 13-25)  However, the guilt phase verdict forms numbered Fears' specifications as the "First" through "Fifth," rather than "sixth" through "tenth" as numbered in the indictment.  (Appx. Vol. II, pp. 183-198 and 221-236)  The trial court's sentencing entry also refers to Fears' specifications as numbered "one through five," not "six through ten."  (Appx. Vol. II, p. 261)

The Ohio Court of Appeals noted this "misnumbering" but observed that each of the specifications against Grant and Fears were identical.  Because Fears' conviction had been affirmed on direct appeal, the Court of Appeals applied the doctrine of res judicata to preclude any merits consideration of this issue.

<u>State v. Fears</u>, 1999 Ohio App. LEXIS 5365, at *4-6.[8]

The Magistrate Judge concluded that, because this mistake came at the very end of the guilt phase of Fears' trial, "nothing the trial court said could have influenced in the slightest Fears' understanding of the charges and specifications he faced or his defense to them, including the judge's misnumbering of the specifications. Any casual observer would recognize the mistake as careless, but harmless." (Doc. 114, p. 92)

Fears objects, arguing that there is no dispute that the trial court erred in instructing the jury on the "wrong" specifications. Even if no one disputes what happened, however, Fears fails to explain how this numbering error caused him any prejudice. Since the specifications that he and Grant were charged with were in fact identical, actual prejudice to Fears is not evident. He does not explain why the result of his direct appeal would have been different, especially in view of the undeniable fact that he knew and appreciated the substance of the charges and specifications he was facing. Sub-claims (1) and (2), premised on this numbering error, do not establish ineffective assistance of appellate counsel.

(3) In this sub-claim, Fears contends his appellate counsel

---

[8] Accepting the Court of Appeals' suggestion, however, Fears filed a petition to reopen his direct appeal to pursue this claim in the Ohio Supreme Court. That Court summarily denied the petition. (Appx. Vol IV, p. 178)

was ineffective in failing to challenge the penalty phase jury instruction on unanimity of verdicts. As discussed above concerning the Second Ground for Relief, the instruction was not erroneous. His trial counsel was not ineffective in failing to object, and his appellate counsel's failure to appeal a correct instruction is not ineffective assistance.

(4) This sub-claim presents nine errors of trial counsel that Fears contends should have been, and were not, appealed. Several of these issues would have required evidence *dehors* the record, and could not have been raised on direct appeal. These include the failure to present a firearm expert; failure to use Derrick Frazier's testimony given in James Grant's trial (which was given before the start of Fears' trial); failure to present an expert to establish an intoxication defense; and the failure to adequately investigate Dr. Smalldon's background and history. All of these sub-claims would require evidence not presented at trial, and could only be presented post-conviction.

Fears objects with respect to the intoxication defense, arguing that the trial evidence clearly supported this missing defense. The Court disagrees. As discussed above, the evidence in the trial record certainly suggested intoxication, but not the degree necessary to establish intoxication that negates intent. Additional evidence would have been required to evaluate this argument. These four sub-claims are denied on that basis.

-82-

The Magistrate Judge concluded that three of the nine sub-claims are too vague to merit discussion. These include a claim that the jury instructions were "improper," that the instructions precluded the jury from considering Fears' mitigating evidence, and counsel's failure to correct unidentified "sentencing errors." (See Doc. 69, p. 55, ¶191(d), (e) and (f).) Fears does not object to this conclusion, and the Court agrees with the Magistrate Judge's recommendation.

Another sub-claim is the failure to appeal trial counsel's failure to object to the penalty phase unanimity jury instruction. Doc. 69, p. 55 at ¶191(g). As discussed above with respect to sub-claim 2, the jury instruction was not erroneous. Appellate counsel was not ineffective for this alleged failure to appeal.

Finally, Fears contends that numerous instances of prosecutorial misconduct to which trial counsel failed to object were not raised on his direct appeal. The Magistrate Judge concluded this claim should be denied. The prosecutorial misconduct, and ineffective assistance of trial counsel claims premised on that misconduct, have been analyzed at length above. The Court has found that these claims lack merit. Fears does not demonstrate that the result of his appeal would have been different if these additional instances had been presented to the Ohio Supreme Court. That Court considered the cumulative effect

of all the alleged trial errors, and concluded that Fears received a fair trial and a fair sentencing determination.  <u>State v. Fears</u>, 86 Ohio St.3d at 348.  The Supreme Court independently weighed the evidence, and found that Fears' actions merited the penalty he received.  <u>Id</u>. at 350.  It would be speculating to conclude that these additional instances of misconduct would have persuaded the Supreme Court to reach a different conclusion.

For all these reasons, the Court agrees with the Magistrate Judge's conclusions with respect to the Sixth Ground for Relief, and denies that claim.

> **Seventh Ground for Relief**: The most basic notions of due process are violated when a capital defendant is convicted of specifications for which he had not been indicted.

Fears contends that the misnumbering of the capital specifications, discussed immediately above in his Sixth Ground for Relief, deprived him of his due process rights, entitling him to habeas relief.  Respondent contends this issue is procedurally defaulted, as it was first raised in his application to reopen.  That application preserved his ineffective assistance of appellate counsel claim, but not the substantive claim concerning the numbering of the specifications.  The Court agrees with this analysis.

Moreover, even if the claim were not defaulted, the Court finds the due process claim lacks merit.  In <u>Joseph v. Coyle</u>, 469 F.3d 441 (6th Cir. 2006), the Sixth Circuit affirmed the grant of

habeas relief based on a defective indictment.  The defendant was charged with aggravated murder with a capital kidnapping specification.  The statute required that the defendant be the "principal offender in the commission of the aggravated murder." But the indictment alleged he was the principal offender "in the commission **of the kidnapping**."  Id. at 451 (emphasis in original).  No one noticed this substantive error, and the arguments, the instructions, and the verdict forms all repeated this error.  The Sixth Circuit found that Joseph established cause and prejudice to excuse his failure to object at trial, holding that his trial counsel was clearly ineffective in failing to raise this substantive legal error, which had the practical effect of lowering the state's burden of proof on the aggravated murder charge.

Here, in sharp contrast, Fears does not suggest, and there is nothing in the record to support a suggestion, that he did not understand the counts and the specifications charged against him in the indictment.  The substance of the specifications was correctly stated throughout the trial.  The misnumbering error did not cause prejudice that deprived Fears of his constitutionally guaranteed due process rights.

> **Eighth Ground for Relief**:  The trial court committed
> constitutional error when it improperly instructed the
> jurors that they must unanimously recommend a life
> sentence in violation of Petitioner's Fourteenth
> Amendment right to be free from deprivation of life
> without due process of law.

This claim is premised upon the same arguments presented in Fears' Second Ground for Relief concerning the jury instruction on unanimity of verdicts. Fears cites Ohio Rev. Code §2929.03(D)(2), which states in pertinent part: "If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. Absent such a finding, the jury shall recommend that the offender be sentenced to one of the following: . . ." (The alternative options are life without parole, life with parole after 25 years, and life with parole after 30 years.) Fears argues that the challenged instruction told the jury it must arrive at a unanimous sentencing recommendation, in violation of his Fourteenth Amendment due process rights.

For the reasons discussed above with respect to the Second Ground for Relief, this claim lacks merit. The trial court's instruction was not contrary to Ohio or federal law. A verdict must be unanimous; if the jury is unable to reach a unanimous verdict imposing a death sentence, then the trial court must impose a life sentence rather than the death penalty. But any jury **verdict** on a sentence, whether death or life, must be unanimous. The instructions correctly stated the law, and did not violate Fears' due process rights.

**Ninth Ground for Relief**:  A jury instruction on the
defense of accident that was neither asserted by the
defense nor supported in the record and which had the
effect of shifting the burden of proof on the essential
element of purpose to Petitioner, violated his
fundamental rights to due process and a fair trial as
guaranteed by the Fifth, Sixth and Fourteenth
Amendments to the United states Constitution.

Just prior to closing argument during the guilt phase, the
state filed a hand-written request for an instruction on
"accident" from Ohio Jury Instruction 411.01.  (Appx. Vol. II, p.
180)  Fears objected, arguing the instruction was improper and
did not apply to the facts adduced at trial.  The trial court
overruled his objection, and instructed the jury:

> [A]n accidental result is one that occurs
> unintentionally and without any design or
> purpose to bring it about.  An accident is a
> mere physical happening or event out of the
> usual order of things and not reasonably
> anticipated or foreseen as a natural or
> probable result of a lawful action.

(TR 2384)

Later, the trial court instructed the jury on "purpose," an
essential element of aggravated murder which the state must prove
beyond a reasonable doubt:

> A person acts purposefully when it is his
> specific intention to cause a certain result.
> ...  Purpose is a decision of the mind to do
> an act with a conscious objective of
> producing a specific result or engaging in
> specific conduct.  To do an act purposefully
> is to do it intentionally and not
> accidentally.  Purpose and intent mean the
> same thing.

(TR 2388)

Fears contends that he did not raise a specific **defense** of accident.  He argues that the state cannot interject this defense into the trial, and that it was error for the trial court to instruct that an "accident" can only result from an otherwise "lawful action."

The Ohio Supreme Court addressed this claim in Fears' direct appeal.  It rejected Fears' argument that the instruction confused the jury, or improperly suggested that Fears was asserting something other than a lack of purpose:

> The concept of accident is tantamount to a denial that the act was intentional.  Through the trial, defense counsel challenged the state's evidence of intent.  The instruction on accident, in effect, underscores the position taken by defense counsel that [Fears] did not intentionally cause the death of the victim.

State v. Fears, 86 Ohio St.3d at 340.  Reviewing the jury charges as a whole, the Supreme Court found no error in the challenged instruction.  The Magistrate Judge concluded that Fears has not shown that the Ohio Supreme Court's resolution is contrary to or an unreasonable application of clearly established federal law, and that his argument was premised on sheer speculation.  (Doc. 114, p. 96)

Fears objects, contending that the instruction combined with the prosecutor's closing argument, set up a false "either/or" dichotomy for the jury: either Fears purposefully and intentionally shot Gilliam, or the shooting was an "accident" as

-88-

defined in the challenged instruction.  He cites Prosecutor
Russell's statement in closing argument, that "A purposeful act
is when one intends it and not accident.  So, 'purpose' and
'accident' is opposite in this - this analysis [sic]."  (TR 2293)
This Court does not view the challenged comment as setting up an
improper dichotomy; rather, as the Ohio Supreme Court noted, the
instruction and the prosecutor's argument underscored the defense
contention that Fears did not purposefully intend to shoot
Gilliam.

Fears also complains that the trial court only gave a
portion of OJI 411.01, the section defining an "accidental
result," and did not give the conclusion section.  But he does
not explain why the failure to give the entire instruction
resulted in any prejudice to him.  He notes that the Comment to
OJI 411.01 recommends that the instruction not be given at all
unless it is required by evidence or argument in the case.  But
regardless of the comment, the text of the instruction defines an
"accident" as an unintentional act done without purpose to cause
the result.  While the statement about a "lawful act" does not
apply to the facts at issue here, the prosecutor did not argue or
suggest that Fears needed to prove he was acting "lawfully" in
order to prove an accidental shooting.  The prosecutor also did
not argue that Fears had any duty or burden to prove that the
shooting was an "accident," and the instructions did not so

inform the jury.  The Court fails to see any prejudice that resulted from giving only the definitional portion of the instruction.

Fears cites <u>State v. Poole</u>, 33 Ohio St.2d 18 (1973), where the Ohio Supreme Court reversed a murder conviction due to error in jury instructions.  But there, the trial court explicitly instructed the jury that the defendant (charged with first degree murder) had to prove by a preponderance of the evidence that the shooting was an accident.  The Supreme Court held that a defense that the gun accidentally discharged is not an affirmative defense, and the jury charge that defendant had the burden of proving accidental discharge by a preponderance of the evidence is erroneous.  The instruction given in this case does not come close to imposing any burden upon Fears to prove an accidental discharge defense.

Fears also cites <u>Francis v. Franklin</u>, 471 U.S. 307 (1985). There, defendant (a prison inmate) was charged with "malice murder," similar to Ohio's aggravated murder charge.  His defense was that the gun he was carrying, which he had stolen from a prison guard who had accompanied him while he was being treated in a local dentist's office, accidentally discharged and killed a third person.  The shooting took place after he had stolen the gun, taken a hostage, and was trying to get car keys from the resident of a nearby house.  When the resident slammed the door

in defendant's face, the gun discharged killing the resident.  A
second bullet fired and lodged in the ceiling of the house.  The
trial court's challenged instruction stated:

> A person shall not be found guilty of any
> crime committed by misfortune or accident
> where it satisfactorily appears there was no
> criminal scheme or undertaking or intention
> or criminal negligence.  **The acts of a person
> of sound mind and discretion are presumed to
> be the product of the person's will, but the
> presumption may be rebutted.  A person of
> sound mind and discretion is presumed to
> intend the natural and probable consequences
> of his acts but the presumption may be
> rebutted.**  A person will not be presumed to
> act with criminal intention but the trier of
> facts, that is, the Jury, may find criminal
> intention upon a consideration of the words,
> conduct, demeanor, motive and all other
> circumstances connected with the act for
> which the accused is prosecuted.

Id. at 311-312 (emphasis added).

The Supreme Court began its analysis with the "bedrock"
principle that the Fourteenth Amendment's due process clause
"prohibits the State from using evidentiary presumptions in a
jury charge that have the effect of relieving the State of its
burden of persuasion beyond a reasonable doubt of every essential
element of a crime."  Id. at 313.  The Court found that
instructing the jury that the presumptions "may be rebutted"
could lead them to believe they were required to infer intent to
kill as the natural and probable consequence of the act of firing
the gun, **unless** the **defendant** persuaded them that such an

-91-

inference was unwarranted.  The phrase "may be rebutted" could have suggested that the defendant bore an affirmative burden of persuasion once the State proved the underlying act.  The Court held the instruction improperly shifted the burden to the defendant.  The Court also rejected the state's argument that the instructions taken as a whole, particularly those concerning the state's burden of proof and the presumption of innocence, defeated any suggestion of a burden-shifting presumption.

Here, Fears admits that the trial court's instruction did not "go as far" as the instruction at issue in <u>Francis</u>, but he suggests that "similarities" between his case and <u>Francis</u> are enough.  (Doc. 117, p. 101)  The Court cannot agree.  The only question for resolution under 28 U.S.C. §2254(d) is whether the Ohio Supreme Court's disposition of the issue is objectively **unreasonable**.  The word "accident" has a common meaning, and it is highly unlikely that the jury was misled or confused.  The challenged instruction does not, in the Court's view, shift any burden of proof or create any unconstitutional presumptions concerning the State's burden of proof on all elements of an aggravated murder charge.

The Ninth Ground for Relief is therefore denied.

## CONCLUSION

For all of the foregoing reasons, the Court denies the petition for a writ of habeas corpus.  The Court will grant a

certificate of appealability on the First, Third, and Fifth Grounds for Relief; the Sixth Ground for Relief with respect to the failure to appeal trial counsel's failure to object to prosecutorial misconduct; and on the Ninth Ground for Relief, all pursuant to 28 U.S.C. §2253, in view of the ultimate penalty Fears is facing, and because reasonable jurists may reach different conclusions on the constitutional issues raised in these claims.

     SO ORDERED.

DATED: July 15, 2008     <u>s/Sandra S. Beckwith</u>
     Sandra S. Beckwith, Chief Judge
     United States District Court